

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

United States of America ex rel.                )
                                                )
THOMAS O'FARRELL – K54340                        )
(Full name and prison number)                    )
(Include name under which convicted)             )
                                                )
PETITIONER                                       )
                                                )
                                                )
   vs.                                           )
                                                )
EDDIE JONES, WARDEN                              )
(Warden, Superintendent, or authorized          )
person having custody of petitioner)             )
                                                )
RESPONDENT, and                                  )
                                                )
**(Fill in the following blank <u>only</u> if judgment** )
**attacked imposes a sentence to commence**      )
**in the future)**                               )
                                                )
ATTORNEY GENERAL OF THE STATE OF                 )
                                                )
                                                )
_____                   )
(State where judgment entered)                   )

**08CV2403**
**JUDGE SHADUR**
**MAG. JUDGE KEYS**

(Supplied by Clerk of this Court)

**RECEIVED**

APR 28 2008
Apr 28 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Case Number of State Court Conviction:

_____

## PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1.  Name and location of court where conviction entered: Circuit Court of Cook County, Illinois, 2650 S. California Ave., Chicago, Illinois 60608

2.  Date of judgment of conviction: January 21, 1997

3.  Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known) Count #1, 720 ILCS 5/9-1(a)(1)/Count #2, 720 ILCS 5/9-1(a)(2), both first degree murder with Count #2 to merge into Count #1 – Indictment #95 CR 3046301

4.  Sentence(s) imposed: 50 years

5.  What was your plea? (Check one)     (A) Not guilty     ( X )
                                        (B) Guilty         (   )
                                        (C) Nolo contendere ( )

   If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

Does not apply

Revised: 7/20/05

## PART I – TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):    Jury ( )    Judge only (X)

2. Did you testify at trial?    YES ( )    NO    (X)

3. Did you appeal from the conviction or the sentence imposed? YES (X) NO ( )

   (A) If you appealed, give the

        (1) Name of court: Appellate Court of Illinois, First Judicial District

        (2) Result: Affirmed conviction/modified sentence

        (3) Date of ruling: March 24, 1999 App.Ct.#1-97-0911- Il.S.Ct. Rule 23

        (4) Issues raised: Excessive sentence, violation of single subject act & sentence to reflect only one count of first degree murder.

   (B) If you did not appeal, explain briefly why not:

   Does not apply

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES (X)    NO ( )

   (A) If yes, give the

        (1) Result: Denied - Il.S.Ct.#88481 - 724 N.E.2d 1273

        (2) Date of ruling: February 2, 2000

        (3) Issues raised: Excessive sentence

   (B) If no, why not: Does not apply

5. Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes ( )  No (X)

   If yes, give (A) date of petition: _____  (B) date *certiorari* was denied: _____

Revised: 7/20/05

## PART II – COLLATERAL PROCEEDINGS

1.  With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

    YES ( x )   NO ( )

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

    A. Name of court: Circuit Court of Cook County, Illinois

    B. Date of filing: January 26, 2000

    C. Issues raised: Within Petitioner's pro-se petition: 15 counts of ineffective assistance of trial counsel; within counsel's amended petition: 8 counts of ineffective assistance of trial counsel & 7 counts of ineffective assistance of direct appeal counsel; and within counsel's amendment to the amended petition: excessive sentence

    D. Did you receive an evidentiary hearing on your petition?     YES ( )   NO (X)

    E. What was the court's ruling?  Dismissed upon respondent's motion to dismiss

    F. Date of court's ruling: October 4, 2001

    G. Did you appeal from the ruling on your petition?     YES ( x )   NO ( )

    H. (a)   If yes, (1) what was the result?  Denied - App.Ct.#1-04-2481 - Il.S.Ct. Rule 23

    (2) date of decision:  August 30, 2005 & May 21, 2007

    (b)   If no, explain briefly why not: Does not apply

    I.  Did you appeal, or seek leave to appeal this decision to the highest state court?

    YES (X)   NO ( )

    (a)   If yes, (1) what was the result? Denied with supervisory order - Il.S.Ct.#101468.
    840 N.E.2d 1233 Denied - Il.S.Ct.#105256  879 N.E.2d 936
    (2) date of decision:  January 25, 2006 & November 29, 2007

    (b)   If no, explain briefly why not: Does not apply

Revised: 7/20/05

PART II CONTINUED

1. Yes

A. Circuit Court of Cook County, Illinois

B. May 14, 2003

C. Ineffective assistance of trial counsel & 2 counts of inadequate post-conviction counsel in violation of Il.S.Ct. Rule 651(c)

D. No

E. Dismissed as frivolous and patently without merit

F. July 24, 2003

G. Yes

H. (a)(1) Dismissed appeal as moot as Appellate Court allowed Petitioner to file an appeal on his first post-conviction proceedings - App.Ct.#1-03-3404 & #1-03-2619

     (2) March 29, 2004

   (b) Does not apply

I. No

   (a) Does not apply

   (b) Appellate Court allowed Petitioner to file a late notice of appeal on his first post-conviction proceedings

PART II CONTINUED

1. Yes

A. Circuit Court of Cook County, Illinois

B. October 28, 2004

C. Violation of due process & Equal Protect of Law (Actual Innocence), Ineffective assistance of trial & direct appeal counsel's and denial of reasonable level of assistance of post-conviction counsel.

D. No

E. Dismissed as frivolous and patently without merit

F. January 2, 2004

G. Yes

H. (a)(1) Denied pro-se appeal/granted Finley brief - App.Ct.#1-04-1094 - Il. S.Ct. Rule 23

     (2) June 15, 2005 & October 31, 2005

   (b) Does not apply

I. Yes

   (a)(1) Denied - Il.S.Ct.#101736    844 N.E.2d 970

     (2) January 25, 2006

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?    YES (**X**)        NO ( )

   A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

   1.  Nature of proceeding             Motion for Writ of Habeas Corpus

   2.  Date petition filed              October 25, 1999

   3.  Ruling on the petition           Denied

   4.  Date of ruling                   November 2, 1999

   5.  If you appealed, what was
       the ruling on appeal?            Does not apply

   6.  Date of ruling on appeal         Does not apply

   7.  If there was a further appeal,
       what was the ruling ?            Does not apply

   8.  Date of ruling on appeal         Does not apply

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?    YES ( )   NO (**X**)

   A. If yes, give name of court, case title and case number: Does not apply

   B. Did the court rule on your petition?  If so, state

   (1) Ruling:  Does not apply

   (2)  Date:   Does not apply

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?    YES ( )        NO ( X )

   If yes, explain:  Does not apply

Revised: 7/20/05

PART III - PETITIONER'S CLAIMS

(A) <u>Ground One</u> - PETITIONER'S CONSTITUTIONAL RIGHTS TO THE DUE PROCESS
OF THE LAW WHICH IS SECURED BY THE FIFTH AND/OR
FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION
WERE SUBSTANTIALLY VIOLATED BY THE PROSECUTORAL
MISCONDUCT WHICH OCCURED WHEN THE <u>PROSECUTION KNOWINGLY
USED PERJURED TESTIMONY</u> DURING PETITIONER'S SENTENCING
HEARING.

<u>Supporting Facts</u> - Petitioner's proof of perjury is demonstrated

within the deposition of the State's witness, Mr. Thomas Dye, dated October 18,

2004. (see appendix A, exhibit 1 attached and incorporated herein by and with

this reference)

Within Mr. Dye's deposition he recounts a conversation that he had ($7\frac{1}{2}$)

seven and a half years earlier with Mr. Patrick J. Quinn, an Assistant State's

Attorney and Supervisor of the Organized Crime Unit (hereafter ASA Quinn).

In the deposition, Mr. Dye admitts that ASA Quinn pressured him to lie in

Petitioner's case at bar. (see appendix A, exhibit 1, page 5, lines 16-20) and

that ASA Quinn provided Mr. Dye with the following evidentiary facts regarding

Petitioner's case at bar and which Mr. Dye testified to on February 24, 1997:

1) the motive in which Petitioner killed his wife, Lesley for financial gain

where Petitioner would collect insurance money (see appendix A, exhibit 1, page

3, lines 15-19 and appendix B, exhibit 1, Tr. K-13); and 2) that Petitioner

placed a derringer into a pillow and shot his wife, Lesley in the head (see

appendix A, exhibit 1, page 7, lines 4-7 and appendix B, exhibit 1, Tr. K-17).

Mr. Dye further testified within his deposition that ASA Quinn needed Mr. Dye

to testify to these facts above because the facts were not within Petitioner's

confession to the police (see appendix A, exhibit 1, page 7, lines 10-13 and

exhibit 19, pages 6-7 attached and incorporated herein by and with this

reference).

Petitioner firmly believes that upon a close examination of the direct

6

evidence provided within Mr. Dye's deposition and the relevant transcripts

of Petitioner's sentencing hearing, this Honorable Court will conclude that

ASA Quinn engaged in gross misconduct by providing Mr. Dye with the evidentiary

facts/direct evidence and by allowing the perjured testimony of Thomas Dye to

be presented at Petitioner's sentencing hearing which is fundamentally unfair

and violates due process.

This deliberate deception of the court by the prosecution when they

allowed Mr. Dye's known perjured testimony, and the State's failure to afford

corrective judicial process to remedy this unconstitutional and illegal

wrongdoing constitutes fundamental unfairness and a clear deprivation of the

liberty of Petitioner without due process, whereas, ASA Quinn knew Mr. Dye was

not telling the truth as to how he became aware of the evidentiary facts to

which he testified to during Petitioner's sentencing hearing.

Although the perjured testimony of Thomas Dye was not injected until the

Petitioner's sentencing hearing and not the trial itself, Petitioner believes

the same premise applies at sentencing as at trial, whereas Petitioner's due

process rights were still substantially violated by the perjured testimony to

warrant a new sentencing hearing without the tainted testimony of the State's

witness, Thomas Dye.

(B) Ground Two – TRIAL COUNSEL'S ACTIONS AND/OR INACTIONS ALONG WITH THE OMISSION OF CRITICAL WITNESSES AND DIRECT EVIDENCE SUBSTANTIALLY VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, EQUAL PROTECTION OF THE LAW AND THE RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT WHICH ARE SECURED UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

Supporting Facts – (I) – Within Petitioner's confession to the police,

Petitioner stated that he believed that his wife, Lesley, the victim in this

case at bar was terminally ill, that his wife had previously attempted suicide

and that Petitioner assisted his wives suicide upon her request (see appendix

7

A, exhibit 19, pages 6-7 and appendix B, exhibit 7, Tr. I-153-156 & I-182-187 attached and incorporated herein by and with this reference).

Prior to any court proceedings in this case at bar, Petitioner and several witnesses informed appointed counsel, Joseph Kennelly of the following direct evidence to support Petitioner's version of events surrounding the death of his wife, Lesley and the confession: 1) that the victim, Petitioner's wife _ previously attempted suicide several times by either overdosing on her insulin, overdosing on her prescription medications, and even by trying to cut her wrist with a razor blade (see appendix A, exhibits 2 ¶8-11, 3 ¶6-9, 4 ¶6 & 9 ¶'s 14-15, 17-21 attached and incorporated herein by and with reference); 2)    ___ Petitioner's wife, Lesley continuously plead with Petitioner to help her end her life because she no longer wished to live with the pain that she was experiencing (see appendix A, exhibit 9 ¶24); and 3) that only (5) five days prior to her death, Petitioner's wife, Lesley told her family members that "I would rather die that to go through the rest of my life looking and feeling the way I do" (see appendix A, exhibits 2 ¶12, 3 ¶10 & 4 ¶7).

Now in 1993, the Illinois General Assembly directed their attention to the growing concerns regarding assisted suicides.    This was solely due to the media coverage of "Doctor Death", Doctor Jack Kevorkian who was either providing individuals with the physical means (i.e. lethal doses of drugs) so that the individuals may commit suicide themselves or intentionally participating in the physical act (i.e. personally injecting the lethal drugs into the individual) upon their request, thus assisting their suicide and ultimately causing the individuals death (see appendix B, exhibits 8-9 attached and incorporated herein by and with this reference).

The General Assembly in a preemptive strike against Dr. Kevorkian and those

who wish to emulate the doctors actions **(such as Petitioner)**, by discussing, drafting and enacting a law criminalizing assisted suicides. The General Assembly made it a crime to either coerce another into committing suicide, providing another with the physical means so that the another may commit suicide, and in the extreme act where one intentionally participates in anothers suicide (i.e. causes the death) upon anothers request (see appendix A, exhibit 8 attached and incorporated herein by and with this reference).

Despite trial counsel's knowledge of the direct evidence, critical witnesses above and the fact that counsel **must** stay apprised of current laws such as the one above, trial counsel failed to investigate, develop and pursue the viable strategies and/or defenses on Petitioner's behalf based upon the omitted direct evidence and critical witnesses herein this claim which demonstrates that Petitioner was either guilty of the offense of inducement to commit suicide based on the statutory provision 720 ILCS 5/12-31(a)(2)(ii), whereas Petitioner intentionally participated in the physical act by which his wife, Lesley committed suicide when he shot his wife upon her request causing her death or the offense of second degree murder based on the statutory provision 720 ILCS 5/9-2(a)(1)(b), whereas at the time of Petitioner's wife, Lesley's death, Petitioner was acting under a sudden and intense passion resulting from serious provocation. Both offenses and/or defenses were available at the time of Petitioner's proceedings as to demonstrate Petitioner was in fact innocent of the first degree murder charges and only guilty of inducement to commit suicide or second degree murder. (see appendix A, exhibits 36-37 attached and incorporated herein by and with this reference).

Trial counsel's performance was not only ineffective, counsel abandoned the required duty of loyalty to Petitioner; counsel did not simply make poor

9

strategic or tactical choices; when he acted with reckless disregard for Petitioners best intrest, by failing to subject the prosecution's case to a meaningful advesery testing process and failing to raised **any defense** of behalf of Petitioner (see appendix B, exhibit 10 attached and incorporated herein by and with this reference).

The omission of these viable strategies and/or defenses, direct evidence and critical witnesses above to support Petitioner's version of the events surrounding the death of his wife, Lesley, resulted in the Petitioner's conviction and sentence for the offense charged, first degree murder 9720 ILCS 5/9-1(A)(1), an offense which Petitioner is actually and/or factually innocent of.

Furthermore, a fundamental miscarriage of justice occured as Petitioner's actual offense is either inducement to commit suicide pursuant to statutory provision 720 ILCS 5/12-31(a)(2)(ii) or second degree murder pursuant to statutory provison 720 ILCS 5/9-2(a)(1)(b) and Petitioner is actually and/or factually innocent of the charged offense of first degree murder.

Finally, Petitioner, due to trial counsel's ineffectiveness was and still is subjected to cruel and unusual punishment as Petitioner's actual offense is either inducement to commit suicide (720 ILCS 5/12-31(a)(2)(ii)), a Class 4 felony, punishable by (1-3) one to three years incarceration (see appendix A, exhibits 36 & 38 attached and incorporated herein by and with this reference) or second degree murder (720 ILCS 5/9-2(a)(1)(b)), a Class 1 felony, punishable by (4-15) four to fifteen years incarceration (see appendix A, exhibits 37 & 38) and Petitioner in actuality recieved a (50) fifty year sentence, a sentence which clearly goes beyond the statutory maximum penalty for Petitioner's actual offense demonstrating cruel and unusual punishment.

Petitioner was denied his Constitutional Right to effective assistance, due process, equal protection of the law and was and still is subjected to cruel and unusual punishment to warrant new trial proceedings as no trier of fact would have convicted Petitioner in light of the previously omitted direct evidence and critical witnesses herein this claim.

Supporting Facts - (II) - Prior to any court proceedings in this case at bar, Petitioner informed appointed counsel, joseph Kennelly that Area Five Detective, Schak coerced a confession from Petitioner, when the detective used the threat that if Petitioner did not cooperate with the police and give an incriminating statement, that Detective Schak would take Petitioner's son, LeRoi (Lee) and give him to the Department of Children and Family Services. (see appendix B, exhibit 11 attached and incorporated herein by and with this reference).    Petitioner further informed trial counsel that the same Area Five Detectives attempted to coerce an incriminating statement from Petitioner by withholding food from him for (24) twenty four hours in a previous arrest and that the attorney who represented Petitioner during the previous arrest could in fact support these allegations herein (see appendix A, exhibit 18 attached and incorporated herein by and with this reference).

Members of Petitioner's family who were present at Area Five on the morning of Petitioner's arrest in this case at bar also informed trial counsel that Petitioner's son, Lee was present at Area Five when Petitioner confessed and that Petitioner ceased to cooperate with the Detective Schak and the Assistant State's Attorney after Petitioner was informed by family members that his son, Lee was removed from Area Five by other family members and was safe from Detective Schak's threats to be taken away (see appendix A, exhibits 2 ¶14,18,20-21, 3 ¶17, 4 ¶ 8-9, 9 ¶ 39-41 & 13 ¶7 and appendix B, exhibit 12, Tr. E-45-47 attached and incorporated herein by and with thie reference).

Despite trial counsel's knowledge of the direct evidence and critical witnesses herein which would have proven Petitioner's version of the events surrounding his confession, trial counsel opted to omit the evidence and witnesses herein, thus failing to subject the prosecution's case to a meaningful adversary testing process.    Trial counsel's performance was not only ineffective, but counsel abandoned the required duty of loyalty to Petitioner; counsel did not simply make poor strategic or tactical choices; he acted with reckless disregard to Petitioner's best intrest, and apparently with the intention to weaken Petitioner's case given the heavy weight typically accorded confessions by the trier of fact.

Therefore once again, Petitioner was denied his Constitutional Rights to effective assistance of counsel, due process and equal protection of the law to warrant new proceeding as without Petitioner's confession, no trier of fact would have convicted Petitioner.

Supporting Facts - (III) - On, or about, September 23, 1996, prior to Petitioner's bench trial, Judge Michael P. Toomin received and read ex parte communication in the form of a letter from one Kathy Morris, who was a friend of the victim, Lesley Chapman-O'Farrell, Petitioner's wife (see appendix A, exhibit 28 and appendix B, exhibit 13 attached and incorporated herein by and with this reference.  Also Tr. September 27, 1996 (missing)).

Ms. Morris' letter went into great detail describing disputed evidentiary facts surrounding this case at bar, many of which were never brought to light during Petitioner's proceedings.   The letter further notified the trial judge about Petitioner's past criminal histroy with the same area five detectives, who falsely arrested Petitioner several years earlier for the offense of first degree murder (see appendix A, exhibit 28).

The Sixth Amendment of the United States Constitution guarantees the Right to a trial before a fair and impartial trier of fact.   Furthermore, in accordance with Supreme Court Rule 63, Canon 3(C)(1)(a) (see appendix A, exhibit 39 attached and incorporated herein by and with this reference), the trial judge had a duty to preserve Petitioner's due process rights and recuse hiself from any further proceedings in this case at bar upon recieving and reading the ex parte communication (letter).   The trial court's failure to recuse himself resulted in a undue prejudice upon Petitioner.

Despite trial counsel's knowledge that the trial judge recieved and read ex parte communications which contained disputed evidentiary facts concerning this case at bar and the notification of Petitioner's past criminal history, trial counsel failed to object and/or file a motion for recusal of the judge which would have preserved further review, the trial counsel allowed Petitioner to proceed to a bench trial before a judge who knew disputed evidentiary facts concerning this case at bar and that Petitioner had a past criminal history for the offense of first degree murder, via the Morris letter (see appendix A, exhibit 28).

Trial counsel's performance was again not only ineffective, but counsel abandoned the required duty of loyalty to Petitioner; counsel acted with the blantant disregard for Petitioner's best intrest, and did so with the intention secure a guilty verdict.

Therefore, once again, Petitioner was denied the Right to effective assistance of counsel, due process and equal protection of the law which is guaranteed by the Constitution to warrant a new trial before a fair and impartial trier of fact.

Supporting Facts - (IV) - From the beginning of trial counsel's representation of Petitioner, trial counsel expressed a defeatest attitdue

13

regarding Petitioner's case at bar by telling Petitioner and his family members that "we wll not be able to win at this level.  Our best shot will be in the Appellate Court"  (see appendix A, exhibits 2 ¶25, 3 ¶19 & 9 ¶48).

On January 20, 1997, the evening prior to Petitioner's trial, trial counsel once again told Petitioner that "I can not win".   Trial counsel then proceeded to use coercive tactics to force Petitioner into waiving his Constitutional Right to a trial by jury and proceed to a bench trial by telling Petitioner that "If you (Petitioner) proceed with a jury trial, Judge Toomin will give you all (60) sixty years, but if you (Petitioner) put it in Judge Toomin's hands and take a bench trial, Judge Toomin will be more lenient and only give you (Petitioner) (30) thirty years, I guarantee it" (see appendix A, exhibits 9 ¶52 & 4 ¶11).

As this Honorable Court is aware, it is well established that a criminal attorney can not make promises or guarantees concerning the outcome of Judicial proceedings.

As a direct result of trial counsel's threat that Judge Toomin would give him (60) sixty years if Petitioner proceeded to trial with a jury and the promise of (30) thirty years if he took a bench trial, Petitioner reluctantly waived his Constitutional Right to a trial before a fair and impartial jury.

Trial counsel's performance and/or coercive tactics were not only ineffective, counsel further abandoned the required duty of loyality to Petitioner and acted with reckless disregard for Petitioner's best intrest.

Therefore; again, Petitioner was denied his Constitutional Rights to effective assistance of counsel, due process and equal protection of the law to warrant a new trial before a fair and impartial trial.

Supporting Facts - (V) - Trial counsel failed to present direct

14

evidence and critical witnesses which are herein Ground Two, (I) as mitigation at Petitioner's sentencing hearing to support Petitioner's confession and version of events surrounding the death of Petitioner's wife, Lesley, the victim in this case at bar, as to seek a lighter sentence based upon the fact, Petitioner's actions were one of mercy and not done out of malice.

Here again, trial counsel failed to put the prosecutions case to an adversary testing process.

To furthermore demonstrate trial counsel abandoned the required duty of loyalty to Petitioner and acted with blantant disregard to Petitioner's best intrest, Petitioner directs this Honorable Courts attention to Petitioner's death penalty hearing where trial counsel clearly sabotaged Petitioner's only line of defense when counsel offered into evidence, a letter that was previously ruled illegally obatined (see appendix B, exhibit 14, Tr. A-114, G-31 & J-20 attached and incorporated herein by and with this reference). The admission of this evidence was extremely damning for Petitioner and clearly swayed the trial court's judgment (see appendix B, exhibit 15 attached and incorporated herein by and with this reference), thus, demonstrating trial counsel was acting as an agent of the State and not in the best intrest of Petitioner.

Therefore, Petitioner was once again denied effective assistance of counsel, due process and equal protection of the law as well as subjecting Petitioner to cruel and unusual punishment as trial counsel apparently with the intention weaken Petitioner's only line of defense assisted the State in securing a higher sentence, thus, to warrant a new hearing without the illegally obtained evidence.

Supporting Facts - (VI) - The cumulative unprofessional errors,

failures and omissions of direct evidence and critical witnesses during the

proceedings which would have proven Petitioner's confession and version of the

events surrounding the death of his wife, Lesley, the victim in this case at

bar must be considered in light of the totalty of the circumstances to prove

Petitioner's Constitutional Rights were substantially violated.

     (C) <u>Ground Three</u> – DIRECT APPEAL COUNSEL'S ACTIONS AND/OR INACTIONS ALONG
WITH THE OMISSION OF DIRECT EVIDENCE AND CRITICAL
WITNESSES TO SUPPORT MANY CLAIMS OF INEFFECTIVE
ASSISTANCE OF COUNSEL SUBSTANTIALLY VIOLATED
PETITIONER'S CONSTITUTIONAL RIGHTS TO EFFECTIVE
ASSISTANCE OF COUNSEL, DUE PROCESS AND EQUAL PROTECTION
OF THE LAW WHICH IS SECURED UNDER THE FIFTH, SIXTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

     <u>Supporting Facts</u> – On January 9, 1998, Petitioner wrote appointed

appellate counsel, James Chadd, to inform counsel that Petitioner wished to

raise many claims of ineffective assistance of trial counsel within his direct

appeal brief (see appendix A, exhibit 23 attached and incorporated herein by

and with this reference).

     Later during a telephone conversation with appellate counsel, Petitioner

outlined the ineffective claims against trial counsel to he wished to raise,

however, appellate counsel told Petitioner that the record does not support the

ineffective assistance claims against trial counsel and then gave Petitioner

the legal advise to raise the claims against trial counsel in a post-conviction

petition (see appendix A, exhibit 24 attached and incorporated herein by and

with this reference).

     Following the legal advise of appellate counsel, Chadd, Petitioner raised

the many claims of ineffective assistance of trial counsel within (3) three

seperate post-conviction petitions which were subsequently dismissed at the

Circuit Court level.

     Petitioner then appealed said denials of his post-conviction petitions to

the Appellate Court of Illinois, First Judicial District.   Here, both the

16

the Appellate Court of Illinois, First Judicial District.    Here, both the
State and Appellate Court stated that direct appeal counsel could have raised
Petitioner's claims of ineffective assistance of trial counsel within the
direct appeal brief (see appendix B, exhibit 2 attached and incorporated herein
by and with this reference), which thus confirms this claim herein.    However,
as direct appeal counsel failed to raise said claims within Petitioner's brief,
Petitioner waived his right to have the claims heard by the Appellate Court of
any further review, which is clearly prejudicial to Petitioner.

Therefore, Petitioner was denied his Constitutional Right to effective
assistance of direct appeal counsel, due process and equal protection of law
as to warrant review of said claims of ineffective assistance of trial counsel.

(D)    <u>Gound Four</u> - POST-CONVICTION COUNSEL'S ACTIONS AND/OR INACTIONS ALONG
WITH THE OMISSION OF CRITICAL WITNESSES, DIRECT EVIDENCE
AND THE REMOVAL OF PETITIONER'S PRO-SE POST-CONVICTION
PETITION WHICH MADE IT PAST THE FRIVOLITY STAGE AND WAS
DOCKETED FOR FURTHER REVIEW IN THE SECOND STAGE OF POST-
CONVICTION PROCEEDINGS DENIED PETITIONER'S RIGHTS TO
DUE PROCESS AND EQUAL PROTECTION OF THE LAW WHICH IS
SECURED BY THE FIFTH AND FOURTEENTH AMENDMENTS OF THE
UNITED STATES CONSTITUTION.

<u>Supporting Facts</u> - On January 26, 2000, Petitioner's original pro-se
post-conviction petition which contained Petitioner's ineffective assistance of
trial counsel claims herein was filed with the Clerk of the Cook County,
Illinois (see appendix B, exhibit 16 attached and incorporated herein by and
with this reference).    Petitioner's pro-se petition survived the frivolity
issue of the first stage of post-conviction proceedings and the presiding judge
docketed the pro-se petition for further determination in the second stage and
pro-bono counsel was appointed. (see appendix A, exhibit 15 attached and
incorporated herein by and with this reference).

Petitioner made his contentions regarding his original pro-se petition and

17

the claims therein very clear to post-conviction counsel in person during an attorney visit, in writing and in telephone conversation, that post-conviction counsel was not given Petitioner's authority to remove his pro-se petition and/ or any issue contained therein said petition and that the amended and amendement to the amended petitions that counsel wished to file were to be in addition to Petitioner's pro-se petition already filed and docketed for further determination in the second stage of the post-convition proceedings (see appendix A, exhibits 29-34 attached and incorporated herein by and with this reference).

In accordance with Illinois Supreme Court Rule 651(c), post-conviction counsel is only permitted to make any amendments to the petition filed pro-se that are necessary for an adequate presentation of petitioner's contentions and that compliance with the duties set forth in this Rule in mandatory.

Despite the expressed contentions of Petitioner wishes, post-conviction counsel blatantly disregarded Petitioner's contentions and went behind his back, without Petitioner's knowledge before Judge William S. Wood on April 12, 2001 and filed a motion to withdraw appeal (Petitioner's original pro-se petition) either in writing or a verbal motion (the record is unclear to which)(see appendix A, exhibit 35 attached and incorporated herein by and with this reference), thus, resulting in the original pro-se petition and all of its meritoriuos claims being removed and waived for further review.

The removal of Petitioner's pro-se petition which survived the frivolity issue of the first stage and was docketed for further determination by the court in the second stage of the post-conviction proceedings by post-conviction counsel and counsel's failure to refer to or adopt Petitioner's pro-se petition

18

and its claims within counsel's amended petition or her amendment to the
amended petition violated the Supreme Court Rule as counsel clearly and
blatantly ignored Petitioner's expressed contentions and wishes, both verbal
and written (see appendix A, exhibits 29-34).   As Petitioner's original pro-se
post-conviction petition adequately raised many Constitutional violation of
ineffective assistance of trial counsel, with the required affidavits and direct
evidence to support said claims, post-conviction counsel's **only duty per Rule
651(c) was to attach the appropriate case law to further support Petitioner's
claims, not remove the pro-se petition and its claims therein** (see appendix B,
exhibit 16).

Here, both the State and Appellate Court stated that "where an amended
pleading is complete in itself and does not refer to or adopt the prior
pleading, the earlier pleading ceases to be part of the record for the most
purpose and is effectively abandoned and withdrawn" (see appendix B, exhibit 2,).
page 13), "defendant has waived his claims of ineffective assistance of counsel
* * * because these issues were capable of being raised on direct appeal and
because they were not contained in defendant's amended post-conviction petition"
(see appendix B, exhibit 2, page 13), which thus confirms this claim herein.

Whereas, Petitioner was denied his right to have the Appellate Court rule
upon his meritorious claims of ineffective assistance of trial and direct appeal
counsel or any further review by a higher court due to the inadequate level of
assistance of post-conviction counsel who removed Petitioner's pro-se petition
and its claims therein, which is highly prejudicial to Petitioner, Petitioner
believes that this Honorable Court may review the ineffective assistance of
trial and direct appeal counsel herein as the claims were contained within his
pro-se post-conviction petition which survived the 90 day frivolity stage and

the failure to raise said claims were not due to Petitioner's culpable

negligence as Petitioner continuously pursued the claims of ineffective

assistance of trial and direct appeal counsel within (3) post-conviction

petitions to the Circuit Court and appealed the denial of said petitions to

both the Appellate and Illinois Supreme Courts.

Therefore, Petitioner was denied his Constitutional Rights to due process

and equal protection of the law as to warrant review of this petition for

habeas corpus relief.

(E) Ground Five - THE CUMULATIVE ERRORS, FAILURES AND OMISSIONS BY
TRIAL, DIRECT APPEAL AND POST-CONVICTION COUNSEL'S
DENIED PETITIONER HIS CONSTITUTIONAL RIGHTS TO
EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND ON
DIRECT APPEAL, AS WELL AS THE CONSTITUTIONAL RIGHTS TO
DUE PROCESS AND EQUAL PROTECTION OF THE LAW THROUGHOUT
PETITIONER'S ENTIRE LEGAL PROCEEDINGS WHICH IS SECURED
BY THE UNITED STATES CONSTITUTION UNDER THE FIFTH,
SIXTH AND FOURTEENTH AMENDMENTS.

Supporting Facts - Petitioner would ask this Honorable Court to

review the direct evidence within gounds one through four herein this petition

as the facts of this claims as well.

The cumulitive errors, failures and omittions of direct evidence and

critical witnesses must be considered in light of the totality of the

circumstances as Petitioner's Constitutional Rights to effective assistance of

trial and direct appeal counsel, due process and equal protection of the law

were substantially violated by trial, direct appeal and post-conviction

counsel's.to warrant review of the claims herein this petition or new

proceedings.

Whereas, counsel's errors are so obvious and prejudicial which infected

Petitioner's trial proceedings, Petitioner believes that this Honorable Court

may address the claims although there was no proper objection made on

Petitioner's behalf by his appointed counsel's.

20

(C) Ground three ____ SEE PAGES 16 & 17 HEREIN THIS PETITION ____
Supporting facts:

_____

_____

_____

_____

_____

_____

_____

_____

(D) Ground four ____ SEE PAGES 17 – 20 HEREIN THIS PETITION ____
Supporting facts:

_____

_____

_____

_____

_____

_____

_____

2.  Have all grounds raised in this petition been presented to the highest court having jurisdiction?

YES (X)   NO ( )

3.  If you answered **"NO"** to question (2), state <u>briefly</u> what grounds were not so presented and why not:
____ Does not apply _____

_____

Revised: 7/20/05

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing Unknown – Cook County Public Defender 2650 S. California Ave., Chicago, Illinois 60608

(B) At arraignment and plea Unknown – Same as above

(C) At trial Joseph Kennelly, Cook County Public Defender Same as above

(D) At sentencing Joseph Kennelly – Same as above

(E) On appeal James Chadd, State Appellate Defender 100 W. Randolph St.–Suite 5-500 Chicago, Illinois 60601

(F) In any post-conviction proceeding Deborah J. Gubin, Pro-bono, 605 W. Madison-Suite 331 Chicago, Illinois 60661

(G) Other (state): Kari Firebaugh, State Appellate Defender 203 N. LaSalle St. 24th Floor Chicago, Illinois 60601

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )   NO ( X )

Name and location of the court which imposed the sentence: Does not apply

Date and length of sentence to be served in the future Does not apply

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: April 4, 2008
(Date)

_____
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

_____
(Signature of petitioner)

K54340
(I.D. Number)

P.O. Box 99, Pontiac, IL 61764
(Address)

Revised: 7/20/05

FOR EXHIBITS SEE ENCLOSED APPENDIX A & B

FOR SUPPORTING CASE LAW SEE ENCLOSED MEMORANDUM OF LAW IN
SUPPORT OF HABEAS CORPUS PETITION

ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

United States of America ex rel.,    )
Thomas O'Farrell - K54340,        )
                    PETITIONER,)
                             )
          vs.               )    CASE NO._____
                             )
Eddie Jones, Warden,        )
                    RESPONDENT,)

## MEMORANDUM OF LAW IN SUPPORT OF HABEAS CORPUS PETITION

## GROUND ONE

**PETITIONER'S CONSTITUTIONAL RIGHTS TO THE DUE PROCESS OF THE LAW WHICH IS SECURED BY THE FIFTH AND/OR FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION WERE SUBSTANTIALLY VIOLATED BY THE PROSECUTORAL MISCONDUCT WHICH OCCURED WHEN THE PROSECUTION KNOWINGLY USED PERJURED TESTIMONY DURING PETITIONER'S SENTENCING HEARING.**

Perjury is committed when a witness "gives false testimony concerning a matter with the willful intent to provide false testimony rather than as a result of confusion, mistake, or faulty memory".

U.S. V. Duggigan, 113 S.Ct. 1111 (1993)

U.S. ex. rel. Washington V. Page, 981 F.Supp. 1097 (N.D.Ill.)(1997)

State's knowing use of perjured testimony to obtain criminal conviction violates defendant's right to due process of law.

Napue V. Illinois, 79 S.Ct. 1173 (1959)

Schaff V. Snyder, 190 F.3d 513 (7th Cir.)(1999)

Deliberate deception of the court and jurors by the presentation of known false evidence will not be tolerated since it involves an affront to the rudimentary demands of justice.

Mooney V. Holohan, 55 S.Ct. 340 (1935)

Pyle V. Kansas, 63 S.Ct. 177 (1942)

Giglio V. United States, 92 S.Ct. 763 (1972)

U.S. V. Marrero, 516 F.2d 12 (C.A.Ill.)(1975)

Prosecutor actually trying case need not have known that relevant testimony of prosecution witness was false in order to establish due process violation, but, rather, knowledge on part of any representative or agent of prosecution is sufficient for due process violation.

U.S. V. Boyd, 833 F.Supp. 1277 (N.D.Ill.)(1993)

The Supreme Court has "consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside".

U.S. V. Agurs, 96 S.Ct. 2392 (1076)

Mooney V. Holohan, 55 S.Ct. 340 (1935)

The Governments knowing use of perjured testimony warranted a new trial.

Napue V. Illinois, 79 S.Ct. 1173 (1959)

U.S. V. Williams, 81 F.3d 1434 (C.A.(Ill))(1996)

U.S. V. Saadeh, 61 F.3d 510 (C.A.(Ill))(1995)

U.S. V. Adcox, 19 F.3d 290 (C.A.(Ind))(1994)

U.S. V. McLaughlin, 89 F.Supp.2d 617 (E.D.Penn)(2000)

U.S. V. Boyd, 833 F.Supp 1277 (N.D.Ill)(1993)

"Indeed, if it is established that the government knowingly permitted the introduction of false testimony, reversal is 'virtually automatic'".

Napue V. Illinois, 79 S.Ct. 1173 (1959)

U.S. V. Boyd, 833 F.Supp. 1277 (N.D.Ill)(1993)

U.S. V. Wallach, 935 F.2d 445 (2d Cir)(1991)

U.S. V. Stofsky, 527 F.2d 237 (2d Cir)(1975)

### GROUND TWO

TRIAL COUNSEL'S ACTIONS AND/OR INACTIONS ALONG WITH THE OMISSION OF CRITICAL WITNESSES AND DIRECT EVIDENCE SUBSTANTIALLY VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, EQUAL PROTECTION OF THE LAW AND THE RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT WHICH ARE SECURED UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

The Supreme Court has required a petitioner to support his allegations of constitutional error with reliable evidence whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial.

Sweger V. Chesney, 294 F.3d 506 (3rd Cir)(2002)

Schlup V. Delo, 115 S.Ct. 851 (1995)

In order to support an ineffective assistance of counsel claim for failing to call witnesses, evidence of putative witness must be presented in form of actual testimony or in an affidavit.

U.S. V. Ashimi, 932 F.2d 643 (7th Cir)(1991)

In prosecution for homicide where suicide of deceased is relied upon as a defense, the deceased's conduct, declarations, and threats indicating a dispostion are generally admitted into evidence for the purpose of showing the deceased's state of mind or intentions.

40A Am.Jur.2d, Homicide §287 (Suicide)

The initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem preceived, that accommodate competing concerns both public and private, and the account for limitations on the Equal Protection Clauses to most forms to state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public

2

purpose.

Plyler V. Doe, 102 S.Ct. 2382 (1982)

When the intentions of the legislature is clearly expressed, the plain meaning of the statute must be given effect.

Sweger V. Chesney, 294 F.3d 506 (3rd Cir)(2002)

Defense counsel must be familiar with the laws and facts of the case in order to provide effective assistance of counsel.

U.S. V. Burton, 575 F.Supp. 1320 (E.D.Texas)(1983)

Trial counsel's failure to understand defendant's factual or legal claims fails to provide performance within the competency expected from criminal defense counsel.

Young V. Zant, 677 F.2d 792 (11th Cir)(1982)

An accused has the right to present a defense, present witnesses to establish a defense and present his version of the facts to a jury.

Washington V. Texas, 87 S.Ct. 1920 (19  )

Hamling V. U.S., 94 S.Ct. 2887 (19  )

Criminal defendants have the right to present relevant, competent evidence and witnesses in their defense.

Taylor V. Illinois, 108 S.Ct. 646 (19  )

Trial counsel's failure to investigate alternative lines of defense may constitute ineffective assistance of counsel.

Miller V. Wainwright, 798 F.2d 426 (11th Cir)(1986)

"An attorney does not provide effective assistance if he fails to investigate sources of evidence which may be helpful to the defense".

Goodwin V. Balkcom, 684 F.2d 794 (11th Cir)(1982)

Trial counsel's lack of pretrial investigation, which deprived defendant of potential defense, constituted ineffective assistance.

Goodwin V. Balkcom, 684 F.2d 794 (11th Cir)(1982)

Trial counsel's inexperience and failure to present a good faith defense constituted ineffective assistance.

U.S. V. Cronic, 839 F.2d 1401 (10th Cir)(1988)

Trial counsel's failure to prepare law and evidence for trial can constitute ineffective assistance of counsel.

Pilchak V. Camper, 741 F.Supp. 782 (W.D.Mo.)(1990)

Trial counsel's failure to prepare for trial, to interview a single witness, did not call several witnesses who were in the Courtroom, failed to

3

prepare a defense and failed to proffer a written charge of voluntary manslaughter, constitutes ineffective assistance.

Kemp V. Leggett, 635 F.2d 453 (5th Cir)(1981)

Trial counsel's failure to argue that defendant was only guilty of manslaughter, was ineffective assistance of counsel.

Waters V. Zant, 979 F.2d 1473 (11th Cir)(1992)

Failure to call known exculpatory witness amounted ineffective assistance of counsel.

Berry V. Gramely, 74 F.Supp.2d 808 (N.D.Ill)(1999)

Failure to investigate and call defense witnesses constituted ineffective assistance of counsel.

Berryman V. Morton, 100 F.3d 1089 (3rd Cir)(1996)

An effective attorney "must play the role of an active advocate, rather than a mere friend of the court".

Evitts V. Lucey, 105 S.Ct. 830 (1985)

U.S. V. Cronic, 839 F.2d 1401 (10th Cir)(1988)

Anders V. California, 87 S.Ct. 1396 (1967)

Osborn V. Shillinger, 861 F.2d 612 (10th Cir)(1988)

Defense counsel's performance was not only ineffective, but counsel abandoned the required duty of loyalty to his client; counsel did not simply make poor strategic or tactical choices; he acted with reckless disregard for his client's best interest, and apparently did so with the intention to weaken his client's case.

Osborn V. Shillinger, 861 F.2d 612 (10th Cir0(1988)

Trial counsel's failure to have any defense theory compounded with other errors constitutes ineffective assistance.

Groseclose V. Bell, 130 F.3d 1161 (6th Cir)(1997)

Trial counsel's failure to subject the prosecution's case to a meaningful adversary testing process may constitute a denial of due process and establish a per se violation of defendant's right to effective assistance of counsel.

U.S. V. Cronic, 104 S.Ct. 2039 (1984)

Constitutionally, ineffective assistance of counsel is "cause".

People V. Flores, 606 N.E.2d 1078 (19  )

The Seventh Circuit found under the circumstances where counsel failed to subject the prosecution's case to a meaningful adversarial testing, applied the Cronic standard, prejudice is presumed.

4

Patrasso V. Nelson, 121 F.3d 297 (7th Cir)(1997)

Trial counsel's failure, in murder prosecution during bench trial, to offer evidence, to make closing arguments on defendant's behalf, amounted to failure to hold government to burden of proof and deprived defendant of the right to effective assistance of counsel.

U.S. ex. rel. Potts V. Chrans, 700 F.Supp. 1505 (N.D.Ill)(1988)

Defense counsel's failure to interview or call corroborating witness who would have supported petitioner's version of the events to all counts constitutes ineffective assistance of counsel.

Fuller V. Atty. Gen. of State of Alabama, 36 F.Supp.2d 1323 (N.D.Ala)(1999)

A fundamental miscarriage of justice occurs when "a Constitutional violation has probably resulted in a conviction of one who is actually innocent".

Murray V. Carrier, 106 S.Ct. 2639 (1986)

Schlup V. Delo, 115 S.Ct. 851 (1995)

Dugger V. Adams, 109 S.Ct. 1211 (1989)

Maciel V. Carter, 22 F. Supp.2d 843 (N.D.Ill)(1998)

U.S. V. Gilmore, 986 F.Supp. 491 (N.D.Ill)(1997)

Johnson V. Alabama, 256 F.3d 1156 (11th Cir)(2001)

Although a prototypical example of "autual innocence" is the case where the State has convicted the wrong person of the crime, one is also actually innocent if the State has the "right person", but he is not guilty of the crime with which he is charged.

McLaughlin V. Moore, 152 F.Supp.2d 123 (D.N.H.)(2001)

"Moreover. 'actual innocence' means factual innocence".

Maciel V. Carter, 22 F.Supp.2d 843 (N.D.Ill)(1998)

Cherrix V. Braxton, 131 F.Supp.2d 756 (E.D.Va)(2001)

U.S. V. Barrett, 178 F.3d 34 (1st Cir)(1999)

Bousley V. U.S., 118 S.Ct. 1604 (1998)

We conclude that the "ends of justice" requires Federal Courts to entertain such petitions only where the prisoners Constitutional claim is one of a colorable showing of factual innocence.

Kuhlmann V. Wilson, 106 S.Ct. 2616 (1986)

A four-justice plurality of the Supreme Court suggested that the ends of justice will demand consideration of the merits of claims only where there is

5

"a colorable showing of factual innocence".

Kuhlmann V. Wilson, 106 S.Ct. 2616 (1986)

Counsel's failure to investigate evidence, which demonstrated his client's factual innocence, undermines the confidence in the verdict and constitutes ineffective assistance of counsel.

Lord V. Wood, 184 F.3d 1083 (9th Cir)(1999)

Justice O'Connor wrote in Carrier that "in an extraordinary case, where a Constitutional violation has probably resulted in the conviction of one who is actually innocent, a Federal Habeas Court may grant the writ even in the absence of a showing of cause for procedural default".

Schulp V. Delo, 115 S.Ct. 851 (1995)

Murray V. Carrier, 106 S.Ct. 2639 (1986)

Dugger V. Adams, 109 S.Ct. 1211 (1989)

U.S. V. Gilmore, 986 F.Supp. 491 (N.D.Ill)(1997)

Steward V. Gilmore, 80 F.3d 1205 (7th. Cir)(1996)

Milone V. Camp, 22 F.3d 693 (7th Cir)(1994)

Britz V. Cowan, 192 F.3d 1101 (7th Cir)(1999)

Keithley V. Hopkins, 43 F.3d 1216 (8th Cir)(1995)

Narcisse V. Dahm, 9 F.3d 38 (8th Cir)(9193)

Johnson V. Alabama, 256 F.3d 1156 (11th Cir)(2001)

Gonzalez V. Abbott, 967 F.2d 1499 (11th Cir)(1992)

To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial.

Johnson V. Alabama, 256 F.3d 1156 (11th Cir)(2001)

Hughes V. Lund, 152 F.Supp.2d 1178 (N.D.Iowa)(2001)

The District Court is not bound by the rules of admissibility that would govern at trial.  Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial.

Murray V. Carrier, 106 S.Ct. 2639 (1986)

Schlup V. Delo, 115 S.Ct. 851 (1995)

The new facts need only raise suffcient doubt about petitioner's guilt to undermine confidence in the result of the trial and to extablish a threshold showing of innocence to justify a review of the merits of petitioner's Constitutional claims.

Cherrix V. Braxton, 131 F.Supp.2d 756 (E.D.Va)(2001)

6

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted.

U.S. Const., Amend. 8 (1791)

The Seventh Circuit has never expressly held that to be true, and decisions in other circuits suggest that "actual innocence" exception is available in non-capitol cases. Indeed, this is the only reading that makes sense. How can it be unconstitutional to execute someone who is innocent, but constitutional to jail him?

McLaughlin V. Moore, 152 F.Supp.2d 123 (D.NH)(2001)

Miscarriage of justice applies where petitioner is "actually innocent" of the crime of which he was convicted or penalty which was imposed.

Sawyer V. Whitley, 112 S.Ct. 2514 (1992)

If one is "actually innocent" of the sentence imposed, a Federal Habeas Court can excuse the procedure default to correct a fundamentally unjust incarceration.

Dugger V. Adams, 109 S.Ct. 1211 (1989)

In all criminal prosecutions, the accused shall enjoy * * * the assistance of counsel for his defense.

U.S. Const., Amend. 6 (1791)

No person shall be held to answer for a capitol, or otherwise infamous crime * * * nor be deprived of life, liberty, or property, without due process of law.

U.S. Const., Amend. 5 (1791)

No State shall deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const., Amend. 14 (1868)

The Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike".

F.S. Royster Guano Co. V. Virginia, 40 S.Ct. 560 (1920)

Plyler V. Doe, 102 S.Ct. 2382 (1982)

To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.

Murray V. Carrier, 106 S.Ct. 2639 (1986)

Schulp V. Delo, 115 S.Ct. 851 (1995)

Johnson V. Alabama, 256 F.3d 1156 (11th Cir)(2001)

Cherrix V. Braxton, 131 F.Supp.2d 756 (E.D.Va)(2001)

McLaughlin V. Moore, 152 F.Supp.2d 123 (D.NH)(2001)

Some courts, however, have suggested - apparently on due process grounds - that newly discovered evidence tending to show innocence is ground for the issurance of the writ if the evidence is so strong that it would probably lead to an acquittal upon retrial.

Milone V. Camp, 22 F.3d 693 (7th Cir)(1994)

The admission of an involuntart confession in unlikely to be harmless given the heavy weight typically accorded confessions by the trier of fact.

Colorado V. Connelly, 107 S.Ct. 515 (19  )

Trial counsel waived a jury trial and allowed defendant to be tried before a judge that was fully aware of defendant's long criminal history, compounded with numerous other errors, constituted ineffective assistance of counsel.

Jemison V. Foltz, 672 F.Supp. 1002 (E.D. Mich)(1987)

In all criminal prosecutions, the accused shall enjoy * * * public trial by an impartial jury of the state and district wherein the crime shall have been committed.

U.S. Const., Amend. 6 (1791)

Trial counsel's ineffectiveness at trial by failing to preserve error, denied defendant just result on appeal, amounted to ineffective assistance of counsel.

Government of the Virgin Island V. Forte, 865 F.2d 59 (3rd Cir)(1989)

Counsel's failure to advise defendant of his right to a jury trial, as opposed to a bench trial constituted ineffective assistance of counsel.

McGurk V. Stenberg, 163 F.3d 470 (8th Cir)(1998)

Facts forming a basis of defendant's defense not presented at trial can constitute newly discovered evidence and form a basis for ineffective assistance of counsel claim for a new trial under Federal Rules of Criminal Procedure, Rule 33.

U.S. Kladouris, 739 F.Supp. 1221 (N.D.Ill)(1990)

Defense counsel's failure to investigate and present mitigating evidence in sentencing phase constitutes ineffective assistance of counsel.

Emerson V. Gramley, 91 F.3d 898 (7th Cir)(1996)

Trial counsel's failure to present mitigation witnesses during sentencing of defendant because of counsel's failure to investigate has no strategic value and constitutes ineffective assistance.

Hall V. Washington, 106 F.3d 742 (7th Cir)(1997)

Trial counsel's failure to establish facts through defendant's expert witness, which were favorable and would have cast a reasonable doubt respecting guilt on the charge of first-degree murder constituted ineffective assistance of counsel, and entitled defendant to an evidentiary hearing.

Rogers V. Israel, 746 F.2d 1288 (7th Cir)(1984)

Defense counsel's failure to adequately prepare or invesitigate plausible lines of defense for sentencing, constitutes ineffective assistance of counsel.

Osborn V. Shillinger, 861 F.2d 612 (10th Cir)(1988)

Trial counsel abandoned petitioner's only defense which was inherently prejudicial, where counsel conceded only factual issue in dispute in closing arguments and deprived petitioner of effective assistance of counsel and due process, thus no showing of prejudice was necessary.

U.S. V. Swanson, 943 F.2d 1070 (10th Cir)(1991)

Trial counsel's actions, which opened door for damaging evidence, constitutes ineffective assistance.

Ward V. U.S., 995 F.2d 1377 (6th Cir)(1993)

Trial counsel's failure to move for a post-verdict judgment of acquittal or a modification of verdict for a conviction on a lesser included charge constitutes ineffective assistance of counsel.

Summit V. Blackburn, 795 F.2d 1237 (5th Cir)(1986)

### GROUND THREE

DIRECT APPEAL COUNSEL'S ACTIONS AND/OR INACTIONS ALONG WITH THE OMISSION OF DIRECT EVIDENCE AND CRITICAL WITNESSES TO SUPPORT MANY CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL SUBSTANTIALLY VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND EQUAL PROTECTION OF THE LAW WHICH IS SECURED UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

Due process guarantees defendants the right to effective assistance of counsel on first direct appeal.

Evitts V. Lucey, 105 S.Ct. 830 (1985)

Page V. Frank, 343 F.3d 901 (7th Cir)(2003)

Trial counsel's failure to understand defendants factual or legal claims fails to provide performance within the competency expected from criminal defense counsel.

Young V. Zant, 677 F.2d 792 (11th Cir)(1982)

9

Appellate counsel's failure to raise clearly meritorious issues on direct appeal constitutes ineffective assistance.

Banks V. Reynolds, 54 F.3d 1508 (10th Cir)(1995)

A single error of counsel may constitute ineffective assistance of counsel.

Murray V. Carrier, 106 S.Ct. 2639 (1986)

Constitutionally, ineffective assistance of counsel is "cause".

People V. Flores 606 N.E.2d 1078 (19  )

Appellate counsel's failure to present issue, on direct appeal, * * * prejudiced defendant where counsel's failure prevented defendant from presenting issue for discretionary review to the United States Supreme Court.

Freeman V. Lane, 962 F.2d 1252 (7th Cir)(1992)

Appellate counsel was ineffective in failing to raise arguable issue on appeal created presumption of prejudice in that defendant was essentially left without representation on appeal.

Delagado V. Lewis, 181 F.3d 1087 (9th Cir)(1999)

Petitioner must give the State Courts a "fair presentation and fair opportunity" to act to correct a claim.

Baldwin V. Reese, 124 S.Ct. 1347 (2000)

O'Sullivan V. Boerckel, 119 S.Ct. 1728 (1999)

Howard V. O'Sullivan, 185 F.3d 721 (7th Cir)(1999)

Heck V. Humphrey, 114 S.Ct. 2364 (1994)

Steward V. Gilmore, 80 F.3d 1205 (7th Cir)(1996)

### GROUND FOUR

POST-CONVICTION COUNSEL'S ACTIONS AND/OR INACTIONS ALONG WITH THE OMISSION OF CRITICAL WITNESSES, DIRECT EVIDENCE AND THE REMOVAL OF PETITIONER'S PRO-SE POST-CONVICTION PETITION WHICH MADE IT PAST THE FRIVOLITY STAGE AND WAS DOCKETED FOR FURTHER REVIEW IN THE SECOND STAGE OF POST-CONVICTION PROCEEDINGS DENIED PETITIONER RIGHT TO DUE PROCESS AND EQUAL PROTECTION OF THE LAW WHICH IS SECURED BY THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

A criminal defendant had raised Fourth Amendment violation in a post-conviction proceeding under and through ineffective assistance of counsel for failure to raise or properly litigate the claim.

Kimmelman V. Morrison, 106 S.Ct. 1574 (1986)

When a defendant is constructively denied his right to counsel on appeal by counsel's actions, then prejudice is presumed.

Lofton V. Whitley, 905 F.2d 885 (5th Cir)(1990)

10

## GROUND FIVE

THE CUMULATIVE ERRORS, FAILURES AND OMISSIONS BY
TRIAL, DIRECT APPEAL AND POST-CONVICTION COUNSEL'S
DENIED PETITIONER HIS CONSTITUTIONAL RIGHTS TO
EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND ON
DIRECT APPEAL, AS WELL AS THE CONSTITUTIONAL RIGHTS
TO DUE PROCESS AND EQUAL PROTECTION OF THE LAW
THROUGHOUT PETITIONER'S ENTIRE LEGAL PROCEEDINGS
WHICH IS SECURED BY THE UNITED STATES CONSTITUTION
UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS.

Effects of four errors by defense counsel was sufficiently <u>prejudicial</u>
to constitute ineffective assistance of counsel.

<u>Lindstadt V. Keane</u>, 239 F.3d 191 (2nd Cir)(2001)

"A cumulative-error analysis aggregates all errors found to be harmless
and analyzes whether their comulative effect on the outcome of the trial is
such that collectively they can no longer be determined to be harmless".

<u>Cargle V. Mullin</u>, 317 F.3d 1169 (10th Cir)(2003)

Habeas Court may consider the cumulative effect of defense counsel's
deficiencies in determining whether to grant writ of habeas corpus.

<u>Steidl V. Walls</u>, 267 F.Supp.2d 919 (C.D.Ill)(2003)

The Court found that it must examine each error individually and then
must also consider their cumulative effect in light of the totality of
circumstances.

<u>U.S. V. Brown</u>, 739 F.2d 1136 (7th Cir)(1984)

<u>Strickland V. Washington</u>, 104 S.Ct. 2052 (1984)

Counsel's cumulative errors and omissions by failing to investigate
exculpatory information in police report, failing to interview alibi witnesses,
subpoena alibi witnesses deprived the defendant of his due process right to a
fair trial and constitutes ineffective assistance of counsel.

<u>Washington V. Smith</u>, 48 F.Supp.2d 1149 (E.D.Wis)(1999)

Trial counsel's cumulative errors and omissions constituted ineffective
assistance of counsel, which in the intrerst of justice, required the granting
of a new trial.

<u>U.S. V. Kladouris</u>, 739 F.Supp. 1221 (N.D.Ill)(1990)

Trial counsel's cumulative errors and omissions amounted to ineffective
assistance of counsel in violation of the precepts of <u>**Strickland**</u>.

<u>Harris By the Through Ramseyer V. Wood</u>, 64 F.3d 1432 (9th Cir)(1995)

"Nothing in this Rule precludes taking notice of plain error affecting substantial rights although they were not brought to the attention of the Court".

Federal Rule of Evidence 103(d)

The plain error rule (Supreme Court Rule 615(a)) allows consideration of non-preserved errors in two circumstances: (1) where the evidence is closely balanced, and (2) where the error is so fundamental and of such magnitude that the defendant was denied a fair trial.

People V. Herrett, 561 N.E.2d 1

People V. Young, 538 N.E.2d 461

People V. Sanders, 457 N.E.2d 1241

People V. Valko, 559 N.E.2d 104

People V. Richmond, 559 N.E.2d 104

Because a substantial right is involved, the plain error rule applies.

People V. Lofton & Stewart, 740 N.E.2d 782

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

THOMAS O'FARRELL - K54340,          )

                              Plaintiff,)

                                    )

           vs.                      )      CASE NUMBER _____

                                    )

EDDIE JONES, WARDEN,               )

                       Respondent,)

APPENDIX A IN SUPPORT OF HABEAS CORPUS PETITION

<u>CONTENTS</u>

EXHIBITS 1-39

## ITEMIZED TABLE OF CONTENTS FOR APPENDIX A

EXHIBIT #'S                                                                    PAGES

#1 - Deposition of Thomas Michael Dye                                          1-7

#2 - Affidavit - Thomas C. O'Farrell (Petitioner's father)                     1-7

#3 - Affidavit of Mary A. O'Farrell                                            1-4

#4 - Affidavit of Colleen E. Kohn                                              1-3

#5 - Article - John Marshall Law Review                                        1-5

#6 - Public Act 86-980                                                         1

#7 - Public Act 87-1167                                                        1

#8 - Public Act 88-392                                                         1-2

#9 - Affidavit of Thomas F. O'Farrell (Petitioner)                             1-8

#10- Transcriptions - 88th General Assembly                                    1-10

#11- Statutes from the States of Ca.,Ia.,In.,Ne.,N.M.,Ok., & Tx.              A-G

#12- The mental health services progress notes of the victim, Lesley          A-P
     Chapman-O'Farrell

#13- Affidavit of John Kohn                                                    1-2

#14- Transcriptions - 84th General Assembly                                    1-8

#15- Letter from Chicago Counsel of Lawyers to Atty. Deborah Gubin             1

#16- Affidavit of Joseph Wayda                                                 1-2

#17- Article - Loyola University of Chicago Law Journal                        1-6

#18- Affidavit of Attorney Michael A. Pedicone                                 1

#19- Supplemental report - Chicago Police Department                           1-8

#20- State's Attorney's answer to discovery                                    1-5

#21- Letter to A.S.A. Jeff Kendall, DuPage County State's Atty. from           1
     A.S.A. PAtrick J. Quinn, Supervisor - Orginized Crime Unit

#22- Affidavit of Jose Flecha                                                  1-2

#23- Letter to James Chadd, Asst. State Appellate Defender from                1-2
     Petitioner

#24- Affidavit of Thomas O'Farrell (Petitioner)                               1

#25- People v. Williams, 638 N.E.2d 345                                        1-4

#26- Legal Document from the Estate of the victim, Lesley Chapman-            1
     O'Farrell

#27- Death Certificate of the victim, Lesley Chapman-O'Farrell                 1

#28- Letter to the Honorable Michael P. Toomin from Ms. Kathy Morris           1-3

#29- Letter to Attorney Deborah Gubin from Petitioner                          1-2

#30- Affidavit of Thomas O'Farrell (Petitioner)                               1

ITEMIZED TABLE OF CONTENTS FOR APPENDIX A CONTINUED

| EXHIBIT #'S | PAGES |
|---|---|
| #31- Authorization form by Petitioner to Atty. Deborah Bubin | 1 |
| #32- Authorization form by Petitioner to Atty. Deborah Gubin | 1 |
| #33- Affidavit of Thomas O'Farrell (Petitioner) | 1 |
| #34- Affidavit of Inmate John Turpen | 1 |
| #35- Certified Statement of Conviction/Dispostion sheet generated by Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois in the case People v. Thomas O'Farrell, 95 CR 3046301 | 1 |
| #36- 720 ILCS 5/12-31 - Inducement to commit suicide | 1 |
| #37- 720 ILCS 5/9-2 - Second degree murder | 1 |
| #38- 730 ILCS 5/5-8-1 Sentencing statute | 1 |
| #39- S.Ct. Rule 63, Conon 3(C)(1)(a) | 1-2 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

STEVEN MANNING,                          )
                                         )
                    Plaintiff,           )
                                         )
       vs.                               )
                                         )   Case No. 02 C 0372
THOMAS DYE, et al.,                      )
                                         )
                    Defendants.          )
_____)

DEPOSITION OF THOMAS MICHAEL DYE

VISTA, CALIFORNIA

OCTOBER 18, 2004

Reported by  Mary Patricia Randle, CSR No. 10312

**EXHIBIT**

B

1-1

1  believe that was with the Federal Government, the one he

2  just described.

3  BY MR. LOEVY:

4    Q    Okay.  That's a good point.  That one we just

5  talked about, that was with the Cook County people?

6    A    Yes, sir.

7    Q    Okay.  Did you provide any cooperation with

8  the Federal Government in connection with other people?

9    A    Yes, sir.

10    Q    Who would those be?

11    A    When I was taken into Federal custody from

12  State custody, I was taken from one law enforcement

13  agency to the next and debriefed by Agents at each

14  agency to learn my knowledge as to criminal activity

15  that would pertain to each of their interests.  So to

16  answer your question specifically, the IRS had some

17  people they wanted to ask me about.  The DEA had several

18  people they wanted to ask me about.  The ATF had people

19  they wanted to ask me about.  And I can't remember all

20  the names, but there were several people.  I grew up as

21  a criminal with criminals, and they wanted to know about

22  all of them.

23    Q    Do you remember a guy named O'Farrell,

24  Thomas O'Farrell?

25    A    That wasn't the Feds.

1   Q   Okay.  That was State?

2   A   Yes, sir.

3   Q   What was the nature of your cooperation

4   against Mr. O'Farrell?

5   A   Thomas O'Farrell was accused of killing his

6   wife after having been acquitted of killing a prior

7   wife, both times with large insurance settlements

8   hanging in the balance.  And I was asked to testify in

9   that case in chief by Pat Quinn, who had prosecuted the

10   Pellegrino case against Steve Manning.  He had asked me

11   afterwards to testify in the O'Farrell case as well.

12   Q   Did you testify against Mr. O'Farrell?

13   A   Not in the case, no.  But in sentencing, yes.

14   Q   What was the nature of your testimony?

15   A   They wanted to know what, if anything,

16   O'Farrell had told me pursuant to the circumstances

17   surrounding the murder and the financial gain involved,

18   that the murder was, indeed, committed solely to collect

19   the insurance money.

20   Q   Did you provide that testimony?

21   A   Yes, sir.

22   Q   Did you testify that O'Farrell had confessed

23   to the murder to you?

24   A   Yes, sir.

25   Q   Was that truthful testimony?

1    meetings between Quinn and Fletcha often.  Fletcha and

2    I -- it's not Fletcher with an R.  It's Fletcha with an

3    A.  He would -- he was on my unit.  I wore a wire and

4    testified according to what was on the wire.  Fletcha

5    would testify to anything.  He didn't care.  You could

6    give him a beef sandwich, and he would testify to

7    anything.

8         Q    And you heard Quinn actually talking to

9    Fletcha?

10        A    All the time.

11        Q    What was the nature of the interaction?

12        A    Quinn, as he did with me, would tell Fletcha

13   the details and say, "I need you up on the stand."

14   Fletcha, as long as he got a beef sandwich and some

15   cigarettes and soda pop, he would be on it.

16        Q    All right.  Did Quinn ever pressure you to

17   lie?

18        A    Yes, sir.

19        Q    Could you explain that?

20        A    In the O'Farrell case.  That's where we had

21   our falling out.  I had gotten quite a bit of

22   information from O'Farrell.  It was sad.  O'Farrell

23   couldn't call his -- I have to tell you this to answer

24   the question.

25        Q    Okay.

1     A   O'Farrell couldn't call his son because there

2 was a restraining order and he would have gotten in lot

3 of trouble because he supposedly killed the mother of

4 his son.  So what happened was O'Farrell would have me

5 call through my family, three-way calls, and we would

6 get his son on the phone.  And I'd ask for him, and then

7 I would hand the phone to Tommy O'Farrell and he would

8 talk to him for a while.  It was a very emotional time

9 for him.  His son was three or four years old.  It was

10 hard.  So O'Farrell told me a lot about his case.

11        I didn't even want to cooperate against him.

12 But when it came up when I was talking with Quinn, you

13 know, whether or not I knew O'Farrell he recognized his

14 need and asked me what I knew, and I told him.  And so

15 then at one point Quinn asked me if I would testify.  I

16 told him I wasn't really comfortable testifying in the

17 trial, you know, my understanding is there was already a

18 confession and they didn't need me.  He said, "Well, if

19 I want you to, will you?"  I said, "Well, you know,

20 we'll see how it plays out."  And then he asked me to

21 tell him everything I knew point by point, and he was

22 taking notes, pursuant to O'Farrell killing his wife.

23        And so he stopped the -- towards the very

24 end, he stopped everything and sends his investigator

25 downstairs to get a soda for us, because that's a perk,

1    you get to drink soda when you normally can't.  And when

2    he left, Pat Quinn closes the door and asks me again how

3    come the child didn't hear the gun go off.  And I told

4    him I didn't know.  So Pat Quinn told me that

5    Tommy O'Farrell put a pillow over his wife's head and

6    put the derringer down on her face and shot her that way

7    and killed her.  And that the reason no one heard is

8    because he shot the small caliber gun right through this

9    big pillow, and it was enough to kill her, but it wasn't

10    enough to make a loud noise.  So they wanted me to

11    testify to those elements because that was something

12    they didn't get it on the confession, and they wanted me

13    to testify to in the trial.

14       Q   So the fact that the pillow was involved in

15    the shooting was something that you didn't know

16    independently and Quinn provided to you?

17       A   I had no clue prior to Quinn telling me.

18       Q   Was it your understanding Quinn wanted you to

19    present the pillow information as if it had come from

20    O'Farrell?

21       A   Yes.

22       Q   You understand that Quinn is an appellate

23    justice now?

24       A   I know who he is.

25       Q   You are standing by that he asked you to do

CERTIFIED COPY



*When Every Word Counts...*

**San Diego Office
402 West Broadway
Suite 1890
San Diego, CA 92101**

**Phone: (619) 233-5533
Fax: (619) 233-7828**

**www.caldepo.com**

This Transcript is the sole property of California Deposition Reporters and is intended
for attorney's use only. It is not to be shared or distributed to other parties.

*EXHIBIT 2*

STATE OF ILLINOIS  )
                   )ss
COUNTY OF COOK     )

## AFFIDAVIT OF THOMAS C. O'FARRELL

I, Thomas C. O'Farrell, hereby certify under penalty of perjury and as other wise provided by law that the information and statements below are true and correct to the best of my knowledge;

1) I am sixty (60) years of age and reside in the State of Illinois, Cook County, at 11445 So. Mather Ave., Alsip.

2) I am, subject to rule of admissibility, competent to testify to the matters herein.

3) The defendant in this cause, Thomas (Tom) O'Farrell, is my son.

4) The victim in this cause, Lesley Chapman O'Farrell, was my daughter-in-law who was married to my son Tom.

5) LeRoi (Lee) O'Farrell is the son on Lesley and Tom O'Farrell and is my Grandson.

6) I am a retired Lieutenant of Police with the Alsip, Illinois, Police Department with over thirty (30) years of service.

7) On, or about March 6, 1996, I was appointed Independent Administrator of the Estate of Lesley Chapman O'Farrell in the Circuit Court of Cook County, Illinois, County Department, Probate Division, under case number 96P00684, Docket number 027, Page number 549.

8) I am aware that on, or about, February 21, 1991, Tom had to take Lesley to the hospital because Lesley intentionally tried to overdose on her insulin.

9) I am aware that in 1993, Lesley tried to overdose on a variety of pills (of different

-1-

2–1

colors) but Tom stopped her.

10) I am aware that in June, 1994, at their home located at 3435 W. Ardmore, Chicago,

Illinois, Lesley again overdosed on her insulin, but Tom saved her life.

11) On, or about, July 18, 1994, Tom and Lee had to stay with my wife and I at our home

because of the following;

a) Tom found Lesley with a razor blade threatening to take her life.  Tom took the razor

from her;

b) Lesley then ran from their home at 3435 W. Ardmore, Chicago, Illinois, with her

insulin and a needle;

c) Tom could not run after Lesley because of their son Lee being at home with nobody to

watch him, so Tom called 911 out of fear that Lesley would take her life; and

d) Lesley's Psychologist and the Chicago Police Officer spoke on the phone with each

other and it was decided that it would be better if Tom and Lee spent the night at our home and

have a friend of Lesley's (Abby Glassman) spend the night with Lesley.

12) On, or about, September 23, 1995, Lesley told myself and others, "I would rather die

than go through the rest of my life looking and feeling the way I do (regarding the paralysis to the

right side of her mouth and face and the pain in her head)." Lesley further told us that "I have no

patience with Lee and I yell at him a lot.  He is afraid of me and won't come near me because of

the way I look.

13) On, or about, September 28, 1995, I received a telephone call from Chicago Police

Detective Zeluga (exact spelling unknown) at 7:05 A.M..  He asked me if I would come to 3435

W. Ardmore, Chicago, Illinois to remove Tom and Lesley's dogs from Lee's bedroom.  He also

asked me if I was a Police Officer to which I responded yes. He then said, "There is something 'hinkey' about this whole thing." At this time, I began to form a professional opinion that the Police did not believe Tom's accounting of what had happened and that they (the Police) were beginning to consider Tom a suspect in a crime.

14) On, or about, September 28, 1995, at approximately 10:00 A.M., I arrived at Area 5 Police Headquarters, 5555 W. Grand Ave., Chicago, Illinois, with my daughter and son-in-law. I met with my wife who was there with our grandson Lee. She informed me that she and Tom had been denied their request that Tom ride in my wife's car to help her care for the baby by a Detective at Illinois Masonic Hospital and that Tom had been taken from the hospital by two (2) uniformed police officers in a marked squad car and taken to Area 5 Police Headquarters. She also told me that she has not been able to see or talk to Tom since she arrived there. At this time, as a law enforcement officer, I was able to form the professional opinion that Tom was not free to leave the police station or just walk away on his own free will and was in fact under arrest.

15) On, or about, September 28, 1995, while at Area 5 Police Headquarters, Detective Richard Shack told my wife and myself that Tom had confessed to killing Lesley because of her poor health. Detective Shack further said that he believed Tom and he wanted us to talk to Tom before the State's Attorney from Felony Review arrived.

16) On, or about, September 28, 1995, at approximately 10:30 A.M., Detective Shack allowed my wife and myself to talk to Tom who was in a locked interrogation room. Once inside the room, I noticed that Tom's left hand was handcuffed to the wall.

(17) On, or about, September 28, 1995, during our conversation with Tom, I told him that he did not have to say anything to the State's Attorney unless he wanted to.

-3-

2-3

18) On, or about, September 28, 1995, after speaking with my son Tom, I instructed my daughter and son-in-law to take Tom's son Lee out of Area 5 Police Headquarters and take him to their home.

19) On, or about, September 28, 1995, at approximately 1:45 P.M., Detective Shack told my wife and I, "You better get your son a lawyer. The State's Attorney is 'fucking' with him and trying to get him to change his story about what happened." Detective Shack provided me with a telephone to call a lawyer at which time I called Assistant Public Defender David Baitman at the Bridgeview, Illinois Court house. Attorney Baitman was not in and I left a message and telephone number to him to call at Area 5.

20) On, or about, September 28, 1995, at approximately 2:00 P.M., Detective Shack allowed my wife and myself to speak to our son Tom. We were allowed entry into the locked interrogation room where I notice that Tom's left hand was still handcuffed to the wall. At this time, Tom was complaining about pain in his shoulder from the gunshot wound. Tom also told us that the State's Attorney was trying to get him to change his version about what happened. I told Tom that I had a call into a lawyer for him and that his son Lee was no longer in Area 5.

21) On, or about, September 28, 1995, at approximately 2:05 P.M., I summoned Detective Shack into the locked interrogation room where Tom told him that he did not want to say anything further to the police and that he is invoking his Right to remain silent from this point on.

22) On, or about, September 28, 1995, in the evening hours, I received a telephone call from Assistant Public Defender David Baitman at my home. Mr. Baitman told me that he had called Area 5 Police Headquarters at approximately 2:20 P.M., and asked for me and was told that I was on vacation.

23) On, or about, March 28, 1996, I received a telephone call from Tom who informed me that someone in the Cook County Department of Corrections (Cook County Jail) was in his case file and that some of the file was missing.

24) On May 1 and May 5, 1996, as Independent Administrator, I began to take physical control of Lesley and Tom's jointly owned possessions from their home at 3435 W. Ardmore, Chicago, Illinois. Real Estate Agent, Kirk Hudson was present on both dates. As I was inventorying the contents of the T.V. stand in the master bedroom where Lesley had died, I had to use considerable effort to move the stand so access to the south door could be gained. To open the stand, I had to push on the doors to unlock them and then pull them open to get the contents (the doors do not just swing open). There were a total of sixty eight (68) VHS movie videos that were on the shelves (not loose or overly tight), that could not and did not fall onto the floor when the doors were opened.

25) On, or about, May 23, 1996, during a short recess at the suppression hearing, Tom's Attorney, Assistant Public Defender, Mr. Joseph Kennelly, told my wife and I, "We will not be able to win anything at this level. Our best chance is going to be at the Appellate Court."

26) On, or about, August 22, 1996, I was present at the supression hearing of the State's witness, Mr. Thomas Dye. I witnessed Lesley's best friend, Anne Dworak, enter the room (where the jury would normally enter and exit the Court room) where Mr. Dye was being held prior to testifying. Ms. Dworak stayed in there for approximately ten (10) to fifteen (15) minutes and then re-entered the Court room with Mr. Dye and State's Attorney Nicholas Ford.

27) On, or about, January 21, 1997, I received a telephone call from Tom. He told me of an incident that occurred prior to his trial on this date. The Cook County Sheriff's Deputy

-5-

2-5

assigned to Judge Toomin's court room, Michael Stawczek Sr. (exact spelling unknown), told Tom that he was going to be found guilty and sentenced to fifty (50) years.

28) On, or about, February 24, 1997, I was present at the sentencing hearing for my son Tom, where I witnessed Assistant State's Attorney Ford make a motion with his head toward Ms. Anne Dworak. Ms. Dworak got up from her seat and followed Mr. Ford into the Jury room where State's witness, Mr. Thomas Dye, was sitting prior to testifying. They remained in the room for approximately ten (10) to fifteen (15) minutes and then all exited together (Ms. Dworak, State's Attorney Ford, and Mr. Thomas Dye). Shortly thereafter, Mr. Dye took the witness stand and testified to intimate details of Lesley and Tom's life together which Anne Dworak knew being Lesley's best friend.

29) I, as the Independent Administrator of the Estate of Lesley Chapman O'Farrell, am aware of the following;

a) Tom signed a Pre-Nuptial Agreement prior to his marriage to Lesley;

b) that a large portion of the Estate of Deborah Chapman, Lesley's mother, was seized and placed in probate due to outstanding medical bills and monies that were owed to the Federal Internal Revenue Service and the State of Kentucky Internal Revenue Service for non-payment of taxes on an illegally owned business in the State of Kentucky;

c) that there was no life insurance policy(ies) on Lesley for Tom or anyone else to collect on;

d) that the soul beneficiary of the Estate of Lesley Chapman O'Farrell is Lesley and Tom's son, LeRoi (Lee) O'Farrell; and

e) that Tom forfeited all rights to become the Administrator of Lesley's Estate as the

-6-

2-6

surviving spouse.

(30) I told my son Tom (and my other children as well) several years prior to his arrest in this case at bar, that if he (or any of my children) ever get in trouble with the Law, that they have the Right not to say anything to anyone, especially the police, and have the Right to request counsel and to have counsel present during any questioning.

(31) On, or about, July 3, 1990, Tom recalled my advice in paragraph #30 above, and requested counsel immediately and remained silent until counsel arrived at Area 5 Headquarters after being arrested by Area 5 Detectives for the offense of Murder.

(32) To the best of my knowledge, Tom never gave any statement to Area 5 Detectives or anyone else in regards to the murder he was arrested for on July 3, 1990.

33) During the time Tom lived at home, prior to marrying Lesley, he had different jobs, but was always employed.

34) I told the above information to Tom's attorney, Mr. Joseph Kennelly and/or Dr. Larry Heinrich who was retained to testify on Tom's behalf during his trial on this matter.

Further affiant sayeth nought.

Subscribed and SWORN to before me
on this 28 day of August 1999

_Theresa M Dwyer_
Notary Public

_Thomas C. O'Farrell_
Thomas C. O'Farrell

```
OFFICIAL SEAL
THERESA M DWYER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 10/17/01
```

-7-

*Exhibit 3*

STATE OF ILLINOIS    )
                     ) ss
COUNTY OF COOK       )

## AFFIDAVIT OF MARY A. O'FARRELL

I, Mary A. O'Farrell, hereby certify under penalty of perjury and as otherwise provided by law that the information and statements below are true and correct to the best of my knowledge;

1) I am fifty six (56) years old and reside in the State of Illinois, Cook County, at 11445 So. Mather Ave., Alsip.

2) I am, subject to the rule of admissibility, competent to testify to the matters herein.

3) The defendant in this cause, Thomas (Tom) O'Farrell, is my son.

4) The victim in this cause, Lesley Chapman O'Farrell, was my daughter-in-law who was married to my son Tom.

5) LeRoi (Lee) O'Farrell is the son of Lesley and Tom and is my grandson.

6) In 1993, I was called to Lesley and Tom's home at 3435 W. Ardmore, Chicago, Illinois, by my son Tom to pick up my grandson Lee. While I was present at their home, I witnessed the following;

a) Lesley was sitting on the floor in the master bathroom shower stall fully clothed and crying;

b) Lesley told me, "Leave. I do not want you or Lee to see me like this.";

c) I noticed a variety of different colored pills laying in the sink and on the floor in the same bathroom as Lesley was;

d) I heard Lesley make Tom promise not to call the police on her.

-1-

7) I am aware that on, or about, February 21, 1991, Tom had to take Lesley to the hospital because Lesley had tried to overdose on her insulin.

8) I am aware that in June 1994, Lesley tried to overdose again on insulin at their home located at 3435 W. Ardmore, Chicago, Illinois, and Tom saved her life.

9) On, or about, July 18, 1994, Tom and Lee had to stay with my husband and I at our home because Tom had to call 911 to get help for Lesley because of the following;

a) Tom found Lesley with a razor threatening to take her life. Tom took the razor from her;

b) Lesley then ran out of their home located at 3435 W. Ardmore, Chicago, Illinois, with her insulin and a needle;

c) Tom could not run after Lesley because their son Lee was at home, so Tom called 911 out of fear that Lesley may commit suicide;

d) Lesley's Psychologist and a Chicago Police Officer spoke with each other over the telephone and it was decided that it would be better if Tom and Lee spent the night elsewhere and a friend of Lesley's (Abbe Glassman) would spend the night with Lesley.

10) On, or about, September 23, 1995, Lesley told myself and others, "I would rather die than go through the rest of my life looking and feeling the way I do." Lesley further told us that, "I don't have any patience and I scream at Lee a lot. Lee is afraid of me because of the way I act and look---he won't come near me anymore."

11) I was present at Illinois Masonic Hospital when Tom was released on September 28, 1995.

12) When Tom was released, two (2) uniformed Chicago Police Officers escorted Tom to a

-2-

3-2

marked police car. I requested that Tom ride with me to help take care of Lee but one officer told me, "we would rather he came with us, you can follow."

13) After Tom's release from the hospital, I witnessed the Chicago Police Officer tell Tom "No" after Tom himself requested to ride with me in my car, and was escorted by the Officers to a marked police car and taken to Area 5 Police Headquarters.

14) After Tom's release from the hospital, I witnessed Chicago Police Detective Kernin take Tom's hospital paperwork.

15) At the time of Tom's release from Illinois Masonic Hospital on September 28, 1995, I believed that Tom was under arrest because of paragraphs 12 thru 14 above and that Tom was not free to leave with me.

16) On, or about, September 28, 1995, I was present at Area 5 Police Headquarters at 5555 W. Grand Ave., Chicago, Illinois, with my husband when Detective Shack told us that Tom had confessed to killing Lesley because of her poor health. Detective Shack also told us that he believed Tom.

17) Shortly thereafter, I had my daughter and son-in-law take Lee out of Area 5 and to their home in Midlothian, Illinois.

18) At approximately 1:45 P.M. on September 28, 1995, Detective Shack told my husband and I, "You need to get Tom a lawyer because the State's Attorney is 'fucking' with Tom and is trying to get him to change his story about what happened." Detective Shack then provided my husband with a telephone to call a lawyer.

19) On, or about, May 23, 1996, during a short recess at a suppression hearing, Tom's Attorney, Mr. Joseph Kennelly, told my husband and I that, "We will not be able to win at this

-3-

level, our best chance will be in the Appellate Court."

20) On, or about, August 22, 1996, I was present at the suppression hearing of the State's witness, Mr. Thomas Dye, where I witnessed Lesley's best friend, Anne Dworak, enter the Jury room where Thomas Dye was being held prior to giving his testimony. She remained in that room for approximately ten (10) to fifteen (15) minutes. When she re-entered the Court room, Assistant State's Attorney Ford and Thomas Dye were with her.

21) On, or about, February 24, 1997, I was present at the sentencing hearing for Tom when I witnessed State's Attorney Ford make a head motion toward Anne Dworak. Ms. Dworak left her seat and followed State's Attorney Ford into the Jury room. She stayed there for approximately ten (10) to fifteen (15) minutes and when she re-entered the Court Room, State's Attorney Ford and Thomas Dye were with her. Thomas Dye then went to testify about intimate details of Lesley and Tom's life together which Anne Dworak knew being Lesley's best friend.

22) I am aware that Tom signed a Pre-Nuptial Agreement prior to his marriage to Lesley.

23) I told the above information to Tom's Attorney, Mr. Joseph Kennelly and/or Dr Larry Heinrich who was retained to testify on Tom's behalf during his trial on this matter.

Further affiant sayeth nought.

Subscribed and SWORN to before me
on this _4_ day of _July_, 1999.

_Theresa M Dwyer_
Notary Public

_Mary A. O'Farrell_
Mary A. O'Farrell

```
OFFICIAL SEAL
THERESA M DWYER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 10/17/01
```

EXHIBIT 4

STATE OF ILLINOIS    )
                     ) ss
COUNTY OF COOK       )

## AFFIDAVIT OF COLLEEN E. KOHN

I, Coleen E. Kohn, hereby certify under penalty of perjury and as otherwise provided by law that the information and statements below are true and correct to the best of my knowledge;

1) I am thirty one (31) years old and reside in the State of Illinois, Cook County, Midlothian.

2) I am, subject to rule of admissibility, competent to testify to the matters herein.

3) The defendant in this cause, Thomas (Tom) O'Farrell, is my brother.

4) The victim in this cause, Lesley Chapman O'Farrell, was my sister-in-law who was married to my brother Tom.

5) LeRoi (Lee) O'Farrell is the son of Lesley and Tom and is my nephew.

6) On, or about, July 18, 1994, Tom and Lee had to stay at my parents home because Tom had to call 911 on Lesley due to the following;

a) Tom found Lesley with a razor threatening suicide. Tom took the razor from Lesley;

b) Lesley ran out of their home at 3435 W. Ardmore, Chicago, Illinois, with her insulin and a needle;

c) Tom could not run after Lesley because their son Lee was home and nobody was there to watch him, so Tom called 911 out of fear that Lesley would commit suicide; and

d) Lesley's Psychologist and a Chicago Police Officer talked with each other on the

-1-

telephone and it was decided that it would be better if Tom and Lee spent the night with my parents and to have a friend of Lesley's (Abbe Glassman) spend the night with Lesley.

7) On, or about, September 23, 1995, Lesley told myself and others that, "I would rather die than to go through the rest of my life looking and feeling the way I do." Lesley further told myself and others, "I have no patience and I yell at Lee a lot and he is frightened of me and will not come near me because of how I look."

8) On, or about, September 28, 1995, I was at Area 5 Police Headquarters, 5555 W. Grand Ave. Chicago, Illinois, with my husband and nephew Lee when my parents were told by Detective Shack that Tom confessed to killing Lesley because of her poor health.

9) Later that day, my husband and I took Tom''s son Lee from Area 5 to our home in Midlothian, Illinois.

10) On, or about, August 22, 1996, I was present at the suppression hearing of the State's witness, Mr. Thomas Dye. I witnessed Lesley's best friend, Anne Dworak, enter the Jury room where Thomas Dye was being held prior to him giving testimony. Ms. Dworak stayed in the room for approximately ten (10) to fifteen (15) minutes and when she re- entered the Court Room, she was with Assistant State's Attorney Ford and Mr. Thomas Dye.

11) On, or about, January 20, 1997, the day before Tom's trial was supposed to start, Tom told me that his attorney, Mr. Joseph Kennelly, had told him on an attorney visit that day that Judge Toomin would only give him thirty (30) years if Tom took a bench trial.

12) On, or about, February 24, 1997, I was present at the sentencing hearing for Tom where I witnessed Assistant State's Attorney Ford make a head motion toward Lesley's best friend, Anne Dworak. Ms. Dworak left her seat and followed State's Attorney Ford to the Jury

-2-

4-2

room. She remained in there for approximately ten (10) to fifteen (15) minutes and when she re-entered the Court Room, States Attorney Ford and Mr. Thomas Dye were with her. Mr. Dye later went on to testify to intimate details of Lesley and Tom's life together which Anne Dworak knew of being Lesley's best friend.

13) I am aware that Tom signed a Pre-Nuptial Agreement prior to his marriage to Lesley.

14) I told the above information to my father who relayed it to Tom's attorney, Mr. Joseph Kennelly, prior to the finish of the proceedings.

Further affiant sayeth nought.

Subscribed and SWORN to before me
on this 6th day of July, 1999

_Theresa M Dwyer_
Notary Public

_Colleen E. Kohn_
Colleen E. Kohn

OFFICIAL SEAL
THERESA M DWYER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 10/17/01

-3-

4-3

**Westlaw.**

29 JMARLR 677
(Cite as: 29 J. Marshall L. Rev. 677)

Page 1

C

John Marshall Law Review
Spring 1996

Note

*677 DEATH WITH DIGNITY: AIDS AND A CALL FOR LEGISLATION SECURING THE RIGHT
TO ASSISTED SUICIDE

Introduction

Jeremy A. Sitcoff

Copyright © 1996 John Marshall Law School; Jeremy A. Sitcoff

Albert is a thirty-four year old white male who was diagnosed with AIDS [FN1] four years ago. [FN2] He is pres ently suffering severe wasting syndrome [FN3] and candidiasis [FN4] and is responding poorly to treatment of his third episode of Pneumocystis carinii pneumonia (PCP). [FN5] His T-cell [FN6] count is 120 and over the last six *678 months he has lost T-cells at a very rapid rate. Albert shows no evidence of neurological impairment, and he is mentally competent. His mood is mildly depressed, but the depression is not pronounced given the seriousness of his medical condition. Albert wants nothing but comfort in the end. He also desires to maintain as much autonomy and dignity as possible. However, he is afraid that as his condition deteriorates, he will be unable to bear his pain and suffering with dignity. He has told his friends and family that "if you don't have quality of life, you don't have anything." He has informed his physician that he wishes to end his life before the suffering becomes unbearable. Albert's physician sympathizes with Albert, but fears that if he assists in any way in ending Albert's life, the doctor could be sanctioned by the medical licensing board, sued by Albert's family for Albert's death and criminally charged with Albert's homicide. Albert is also concerned that if he obtains the assistance of one of his friends in ending his life, the friend might be subject to similar difficulties. Yet, Albert has heard horror stories of unsuccessful suicide attempts among people living with AIDS (PWAs). He fears that should the suicide attempt fail, he could experience more pain and suffering than he endures with AIDS. Albert understands his physician's predicament, but still plans for someone to help him end his life.

Sadly, thousands of PWAs experience a similar situation as Albert. Every hour of every day more people become newly infected with HIV. Every day more people fall ill with symptoms of the myriad of disease conditions that can attend AIDS. Additionally, every day more people die of causes associated with AIDS. Indeed, as of October 31, 1995, the cumulative number of deaths of PWAs in the United States was 311,381. [FN7]

In some circumstances, the decision to commit suicide or to seek an assisted suicide is a rational choice. [FN8] When such a decision is made by a competent individual who has been informed by a physician of all of the available medical options, law and public policy should require that this decision be respected.

Although many courts have established uniform precedents allowing passive euthanasia [FN9] -- the right of a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

29 JMARLR 677
(Cite as: 29 J. Marshall L. Rev. 677)

patient to have life-*679 prolonging treatment withheld or withdrawn -- they steadfastly prohibit active euthanasia. [FN10] However, the purpose of passive and active euthanasia is precisely the same. Both serve to end the patient's life and release the patient from the painful, agonizing and dehumanizing loss of function. [FN11] As the New Jersey Supreme Court noted, "the line between active and passive conduct in the context of medical decisions is far too nebulous to constitute a principled basis for decisionmaking." [FN12]

As medical science extends life expectancy, more people who face the prospect of artificially prolonged, but painful and *680 unsatisfying experiences, may wish to end their lives. [FN13] This is a scenario that may be familiar to PWAs. For PWAs, the choice is not between life and death, but choosing whether to die now or to die later. [FN14] More precisely, it is not so much a choice of death as a choice to end irreversible emotional and physical suffering of grave dimensions. However, while euthanasia appears to be justified for terminally ill patients, such as PWAs, none of the legislative proposals permitting physician-assisted suicide have incorpo rated measures which cover PWAs to ensure that PWAs are included.

This Note argues that the decision to seek an assisted suicide is a rational choice when made by a PWA who no longer feels that he is enjoying a sufficient level of quality of life. Part I explores the relationship between suicide and AIDS, profiles the person who commits suicide and examines the incidence of suicide among PWAs. Part II discusses why the time has come to recognize a right to physician-assisted suicide, especially due to the attitudes of the legal system, the medical profession and the general public. Part III outlines the physician-assisted suicide experience in Oregon and shows how other states, most notably California, Massachusetts and Michigan, are attempting to legalize physician-assisted suicide in limited circumstances. Part IV identifies the flaws and shortcomings of the physician-assisted statutes in those four states. Finally, Part V proposes several urgent reforms that are needed in physician- assisted suicide proposals. These changes would ensure that the statute cover terminally ill patients, such as PWAs.

## I. The Relationship Between Suicide and AIDS

In order to understand why suicide is a rational choice for PWAs, it is important for society, the legal system and the medical profession to explore the relationship between AIDS and suicide. Accordingly, Section A examines the profile of people who commit suicide and identifies the common motivating factors associated with suicide. Next, Section B discusses the incidence of suicide among PWAs, as well as the reasons why suicide is more common among PWAs than among the general population and even among people with other terminal illnesses. Finally, Section C considers why PWAs and the doctors who treat them generally approve of assisted suicide.

### *681 A. The Profile of People Who Commit Suicide

Conventional wisdom has taught society that all people who commit suicide are abnormal and "sick." [FN15] However, while some people commit suicide for the wrong reasons, many suicides are rational and justified. [FN16] According to one medical ethicist: "(t)he ethical question is whether we may ever rightly take any rational human initiative in death and dying or are, instead, obliged in conscience to look upon life and death fatalistically, as something that just happens to us willy-nilly." [FN17] Understanding why people commit suicide is not an easy task. A suicide may be the result of situational stress or an imminent crisis. [FN18] However, suicides are more commonly due to identifiable motives on the part of each individual.

A person who commits suicide frequently has experienced social difficulties, [FN19] such as friction with a spouse or partner, a friend, a family member or a fellow worker. [FN20] Many individuals who commit suicide have recently suffered a significant social loss. [FN21] The common element in the profile of those who commit suicide is that they have feelings of guilt or shame, [FN22] which sometimes take the form of public humiliation. [FN23] They commonly feel fear caused by real or imagined threats to bodily integrity or to life itself. [FN24]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

29 JMARLR 677
(Cite as: 29 J. Marshall L. Rev. 677)                                                                    Page 3

Suicidal individuals frequently feel a loss of control over their environment. [FN25] Often the person who commits suicide is suffering great pain. [FN26] This pain may be in the form of real suffering without the possibility of relief, or even the threat of pain, such as the prospect of a chronic or terminal disease. [FN27]

Often, people who commit suicide exhibit altruistic sentiments. They see the option of their death as a benefit to others *682 and believe they will be relieving their friends and family of further emotional and financial burdens. [FN28] Furthermore, suicidal persons often have feelings of overwhelming failure, which result in a loss of pride and making one's own death appealing. [FN29]

Studies suggest that imitative behavior and psychological identification are responsible for a higher incidence of suicide than biological or genetic factors. [FN30] A common psychological fac tor in nearly all suicides is depression and hopelessness. [FN31] Just as there are common motivating factors in suicides, there are also common characteristics of persons who commit suicide.

Males are at least four times more likely to commit suicide than females. [FN32] White males account for seventy-three percent of all suicides. [FN33] The likelihood of suicide tends to be higher among unmarried people. [FN34] Furthermore, the prospect of suicide at tempts and successes is at least thirty times greater for depressed patients with a history of psychiatric hospitalization than for per sons in the general population. [FN35] Upper, middle, professional and managerial classes, particularly artists, intellectuals and scientists (all of whom are less likely to express aggression) have the highest susceptibility to suicide. [FN36] Almost seventy-five percent of all people who committed suicide visited a physician within a year of their death. [FN37] One-third of these people had visited a doctor within three weeks prior to their suicides, [FN38] and about one-half had visited a psychiatrist as an outpatient within thirty days prior to their deaths. [FN39]

## B. The Incidence of Suicide Among PWAs

Studies on the relationship between medical illness and sui cide have generally focused on mental disorders or cancers. [FN40] However, suicide is more common among PWAs than among the *683 general population or even among people with other terminal illnesses. [FN41]

In 1985, Dr. Peter Marzuk and a team of researchers from Cornell University Medical College conducted the first study examining the relationship between AIDS and suicide. [FN42] Marzuk's study found the suicide rate among men in New York City with AIDS aged twenty to fifty-nine was thirty-six times higher than men in the same age group without the diagnosis and sixty-six times higher than the general population. [FN43] Since the time of Marzuk's study, others have examined the relationship between AIDS and suicide in California [FN44] and AIDS and suicide in the U.S. Air Force. [FN45] Dr. Timothy Coté conducted a national study of *684 AIDS and suicide using National Center for Health Statistics Multiple-Cause Mortality Data from 1987 to 1989. [FN46] While the study found a lower suicide rate among PWAs than did previous studies, [FN47] the researchers warned that "(t)he use of multiple- cause death certificate data to determine the number of PWAs who commit suicide engenders biases that may have caused us to underestimate the association of these two causes of death." [FN48]

Whether it is because they are in pain, they no longer enjoy a sufficient quality of life or because they feel AIDS is a fate worse than death, many PWAs look upon suicide as a noble and ethical alternative. [FN49] Over the years, stories of individuals with AIDS who committed suicide appear in the news. [FN50] While the individuals may have chosen various methods of ending their lives, they all had one thing in common -- they believed that committing sui cide was a dignified option and a decision that was theirs to make. [FN51] According to one physician who treats PWAs: "(p)eople with AIDS and their advocates say that virtually everyone with the disease at least thinks about suicide when the end is near and wonders how it might be done." [FN52] Since suicide is a rational *685 choice for many of the PWAs who take their own lives, it is understandable that they share a similar profile and share many of the same motivating factors with people in the general population who commit suicide.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

29 JMARLR 677
(Cite as: 29 J. Marshall L. Rev. 677)

[FN14]. Ogden, supra note 10, at 38.

[FN15]. Joseph Fletcher, In Defense of Suicide, in Samuel E. Wallace & Albin Eser eds., Suicide and Euthanasia 46 (1981).

[FN16]. Glenn C. Graber, The Rationality of Suicide, in Samuel E. Wallace & Albin Eser eds., Suicide and Euthanasia 51 (1981). As an example of a rational suicide, Graber describes the story of Edgar, a wartime agent who is captured by the enemy. Id. at 53. Knowing that he will be tortured to death, he takes a cyanide capsule from a hidden compartment in his shoe, bites into it, and dies. Id.

[FN17]. Fletcher, supra note 15, at 38.

[FN18]. Victor M. Victoroff, The Suicidal Patient 23 (Medical Economic Books 1983).

[FN19]. Id. at 26.

[FN20]. Id.

[FN21]. Id.

[FN22]. Id.

[FN23]. Id.

[FN24]. Id. at 27.

[FN25]. Id.

[FN26]. Id.

[FN27]. Id.

[FN28]. Id.

[FN29]. Id. at 28.

[FN30]. Id.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

29 JMARLR 677
(Cite as: 29 J. Marshall L. Rev. 677)

[FN31]. Aaron T. Beck et al., Hopelessness and Suicidal Behavior, 234 JAMA 1146, 1148 (1975). In their study of 384 people who attempted suicide, the researchers found that hopelessness accounts for 96% of the association between suicide and depression. Id.

[FN32]. Suicide, supra note 8, at 1.

[FN33]. Id.

[FN34]. See Victoroff, supra note 18, at 11. The rate of suicide attempts and successes for married people is one-half what it is for single people. Id.

[FN35]. Id. at 11-12.

[FN36]. Id. at 17.

[FN37]. Id. at 16.

[FN38]. Id.

[FN39]. Id.

[FN40]. Ogden, supra note 10, at 34.

[FN41]. Stephen Mydans, AIDS Patients' Silent Companion is Often Suicide, or Thoughts of it, N.Y. Times, Feb. 25, 1990, at A1.

[FN42]. Peter Marzuk et al., Increased Risk of Suicide in Persons with AIDS, 259 JAMA 1333, 1333 (1988).

[FN43]. Id. at 1335. The New York City population for men aged 29 to 59 years old for the year January 1, 1985 to December 1, 1985 was 1,860,868. Id. Between January 1, 1985, and December 1, 1985, 668 New York City residents committed suicides. Id. During the same period, 3828 people were diagnosed with AIDS living in New York City. Id. Between January 1, 1985, and December 1, 1985, 12 PWAs committed suicide among PWAs. Id. The higher rate of suicide among PWAs was associated with various factors including: drugs causing delirium and depression, the subculture of grief that surrounds the epidemic and the tremendous psychological stressors associated with AIDS. Id. at 1336. The study suggests that there are several reasons to suspect that the true AIDS-related suicide rate may be higher than reported. Id. First, there may have been suicide victims in whom the diagnosis of AIDS was not reported to the medical examiner and who had no reason to suspect the person had AIDS. Id. Second, suicides may be hidden in other death classifications or may be classified as undetermined. Id. Third, it is difficult to estimate the number of patients who refused any form of treatment which is the equivalent to suicide. Id. at 1337. Part of the reason for the dramatic difference in rates between PWAs and the general population was certainly attributable to many factors such as the hysteria, stigma and uncertainty surrounding

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

P.A. 85-980

86th GENERAL ASSEMBLY

office or grounds adjacent thereto, or is in any part of a building used for Public Aid purposes, or upon the grounds of a home of a public aid applicant, recipient, or other person being interviewed or investigated in the employee's discharge of his duties, or on grounds adjacent thereto, or is in any part of a building in which the applicant, recipient, or other such person resides or is located;

(6) Knows the individual harmed to be a peace officer, or a person summoned and directed by him, or a correctional institution employee, while such officer or employee is engaged in the execution of any of his official duties including arrest or attempted arrest;

(7) Knows the individual harmed to be a fireman, paramedic, ambulance driver or other medical assistance or first aid personnel employed by a municipality or other governmental unit and engaged in the execution of any of his official duties;

(8) Is or the person battered is, on or about a public way, public property or public place of accommodation or amusement;

(9) Knows the individual harmed to be the driver, operator, employee or passenger of any transportation facility or system engaged in the business of transportation of the public for hire and the individual assaulted is then performing in such capacity or then using such public transportation as a passenger or using any area of any description designated by the transportation facility or system as a vehicle boarding, departure, or transfer location;

(10) Knowingly and without legal justification and by any means causes bodily harm to an individual of 60 years of age or older;

(11) Knows the individual harmed to be a judge whom the person intended to harm as a result of the judge's performance of his or her official duties as a judge; or

(12) Knows the individual harmed to be an employee of the Illinois Department of Children and Family Services engaged in the performance of his authorized duties as such employee; or

(13) Knows the individual harmed to be a person who is physically handicapped.

For the purpose of paragraph (13) of subsection (b) of this section, a physically handicapped person is a person who suffers from a permanent and disabling physical characteristic, resulting from disease, injury, functional disorder or congenital condition.

(c) A person who administers to an individual or causes him to take, without his consent or by threat or deception, and for other than medical purposes, any intoxicating, poisonous, stupefying, narcotic or anesthetic substance commits aggravated battery.

(d) A person who knowingly gives to another person any food that contains any substance or object that is intended to cause physical injury if eaten, commits aggravated battery.

(e) Sentence.

Aggravated battery is a Class 3 felony.

(Ch. 38, new par. 12-4.2) [S.H.A. ch. 38, 112-4.2]

§ 12-4.2.  Aggravated Battery with a firearm.  (a) Any person who, in committing a battery, knowingly causes any injury to another by means of the discharging of a firearm, commits aggravated battery with a firearm.

(b) Aggravated battery with a firearm is a Class X felony.

(c) For purposes of this Section, "firearm" is defined as in "An Act relating to the acquisition, possession and transfer of firearms and firearm ammunition, to provide a penalty for the violation thereof and to make an appropriation in connection therewith."[1] approved August 1, 1967, as amended.

[1] Paragraph 83-1 et seq. of this chapter.

(Ch. 38, new par. 12-31) [S.H.A. ch. 38, 112-31]

§ 12-31.  Inducement to Commit Suicide.  (a) A person commits the offense of inducement to commit suicide when he coerces another to commit suicide and the other person

5336

1989 REGULAR SESSION

P.A. 86-982

commits suicide as a direct result of the coercion, and he exercises substantial control over that person through (1) control of the other person's physical location or circumstances; (2) use of psychological pressure; or (3) use of actual or ostensible religious, political, social, philosophical or other principles.

(b) Sentence.  Inducement to commit suicide is a Class 2 felony.

Certified: December 13, 1989
Effective: July 1, 1990

_1st_

ASBESTOS ABATEMENT—CERTIFIED INDUSTRIAL HYGIENISTS

PUBLIC ACT 86-981

H.B. 1899

AN ACT to add Section 10b to the "Asbestos Abatement Act", approved September 5, 1984, as amended.

Be it enacted by the People of the State of Illinois, represented in the General Assembly:

Section 1.  Section 10b is added to the "Asbestos Abatement Act", approved September 5, 1984, as amended, the added Section to read as follows:

(Ch. 122, new par. 1410b) [S.H.A. ch. 122, ¶ 1410b]

§ 10b. Certified Industrial Hygienists.  For purposes of this Act and the rules promulgated thereunder, the Department shall use the list of certified industrial hygienists as prepared by the American Board of Industrial Hygiene.

Section 2.  This Act takes effect upon becoming law. [S.H.A. ch. 122, ¶ 1410b note]

Certified: December 13, 1989
Effective: December 13, 1989

STATE CONSTRUCTION ACCOUNT FUND—MOTOR FUEL TAX FUND

PUBLIC ACT 86-982

H.B. 2048

AN ACT in relation to disposition of certain State taxes and fees.

Be it enacted by the People of the State of Illinois, represented in the General Assembly:

Section 1.  Section 2-119 of "The Illinois Vehicle Code", approved September 29, 1969, as amended, is amended to read as follows:

(Ch. 95½, par. 2-119) [S.H.A. ch. 95½, ¶ 2-119]

§ 2-119.  Disposition of fees and taxes.  (a) All moneys received from Salvage Certificates shall be deposited in the Common School Fund in the State Treasury.

(b) All moneys collected for Certificates of Title and for filing of notice of security interests shall be placed in the General Revenue Fund in the State Treasury.

(c) All moneys collected for that portion of a driver's license fee designated for driver education under Section 6-118 shall be placed in the Driver Education Fund in the State Treasury.

5337

## P.A. 87-1166

## 87th GENERAL ASSEMBLY

e) This compact becomes effective July 1, 1984, or at any date subsequent to July 1, 1984, upon enactment by the eligible states. However, Article IX(b) shall not take effect until the Congress has by law consented to this compact. The Congress shall have an opportunity to withdraw such consent every 5 years. Failure of the Congress to affirmatively to withdraw its consent has the effect of renewing consent for an additional 5 year period. The consent given in this compact by the Congress shall extend to the power of the region to ban the shipment of waste into the region pursuant to Article III(j)(1) and to prohibit exportation of waste generated within the region under Article III(j)(4) pursuant to Article III(j)(4).

f) A state which has been designated a host state may withdraw from the compact. The option to withdraw must be exercised within 90 days of the date the Governor of the designated state receives written notice of the designation. Withdrawal becomes effective immediately after notice is given in the following manner. The Governor of the withdrawing state shall give notice in writing to the Commission and to the Governor of each party state. A state which withdraws from the compact under this Section forfeits any funds already paid pursuant to this compact. A designated host state which withdraws from the compact after 90 days and prior to fulfilling its obligations shall be required to pay to the Commission a sum of money which the Commission determines to be necessary to cover the costs borne by the Commission and remaining party states as a result of that withdrawal.

### ARTICLE IX. PENALTIES

a) Each party state shall prescribe and enforce penalties against any person who is not an official of another state for violation of any provision of this compact.

b) Unless otherwise authorized by the Commission pursuant to Article III(l), or otherwise provided in this compact, after January 1, 1986 it is a violation of this compact:

1) for any person to deposit at a regional facility in the region waste from outside not generated within the region;

2) for any regional facility in the region to accept waste from outside not generated within the region;

3) for any person to export from the region waste that which is generated within the region; or

4) for any person to dispose of waste at a facility other than a regional facility;

5) for any person to deposit at a regional facility waste described in Article VII(a)(6); or

c) It is a violation of this compact for any person to treat or store waste at a facility other than a regional facility if such treatment or storage is prohibited by the Commission under Article III(l)(6).

d) Each party state acknowledges that the receipt by a host state of waste packaged or transported in violation of applicable laws, rules or regulations may result in the imposition of sanctions by the host state which may include suspension or revocation of the violator's right of access to the facility in the host state.

e) Each party state has the right to seek legal recourse against any party state which acts in violation of this compact.

## ARTICLE X.  SEVERABILITY AND CONSTRUCTION

The provisions of this compact shall be severable and if any phrase, clause, sentence or provision of this compact is declared by a court of competent jurisdiction to be contrary to the Constitution of any participating state or the United States, or if the applicability thereof to any government, agency, person or circumstance is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person or circumstance shall not be affected thereby. If any provision of this compact shall be held contrary to the Constitution of any state participating therein, the compact shall remain in full force and effect as to the state affected as to all severable matters.

2860

---

## 1992 REGULAR SESSION

(Source: P.A. 83-1528.)

¹ 42 U.S.C. § 2021.
² 42 U.S.C. § 2014.
³ 42 U.S.C. §§ 500 to 559.
⁴ 42 U.S.C. § 1010 et seq.

(Ch. 111½, rep. pars. 230.50 and 230.51) [S.H.A. ch. 111½, ¶¶ 230.50, 230.51 repealed]

Section 49. The Nuclear Waste Interstate Compact Act is repealed.

(Ch. 111½, rep. par. 241-16) [S.H.A. ch. 111½, ¶ 241-16 repealed]

Section 50. The Illinois Low-Level Radioactive Waste Management Act is amended by repealing Section 16.

(45ILCS 141/51)

§ 51. This Act takes effect upon becoming law.

Approved: September 18, 1992
Effective: September 18, 1992

---

## CRIMES—INDUCEMENT TO COMMIT SUICIDE AND RITUALIZED CHILD ABUSE

### PUBLIC ACT 87-1167

### H.B. 3633

AN ACT in relation to criminal law, amending named Acts.

*Be it enacted by the People of the State of Illinois, represented in the General Assembly:*

Section 1. The Criminal Code of 1961 is amended by changing Section 12-31 and by adding Section 12-33 as follows:

(Ch. 38, par. 12-31) [S.H.A. ch. 38, § 12-31]

§ 12-31.   Inducement to Commit Suicide. (a) A person commits the offense of inducement to commit suicide when he coerces another to commit suicide and the other person commits or attempts to commit suicide as a direct result of the coercion, and he exercises substantial control over the other person through (1) control of the other person's physical location or circumstances; (2) use of psychological pressure; or (3) use of actual or ostensible religious, political, social, philosophical or other principles. For the purposes of this Section, "attempts to commit suicide" means any act done with the intent to commit suicide and which constitutes a substantial step toward commission of suicide.

(b) Sentence.  Inducement to commit suicide when the other person commits suicide as a direct result of the coercion is a Class 2 felony.  Inducement to commit suicide when the other person attempts to commit suicide as a direct result of the coercion is a Class 3 felony. ¶ a Class 2 felony.

(Source: P.A. 86-980.)

(Ch. 38, new par. 12-33) [S.H.A. ch. 38, § 12-33]

§ 12-33.   Ritualized abuse of a child.

(a) A person is guilty of ritualized abuse of a child when he or she commits any of the following acts with, upon, or in the presence of a child as part of a ceremony, rite or any similar observance:

(1) actually or in simulation, tortures, mutilates, or sacrifices any warm-blooded animal or human being;

P.A. 87-1167

2861

---

3129                                                    PUBLIC ACT 88-392

when determining individual household benefits.  In setting
assistance levels, the Department shall attempt to provide
assistance to approximately the same number of households who
participated in the 1991 Residential Energy Assistance
Partnership Program.  Such assistance levels shall be
adjusted annually on the basis of funding availability.  In
promulgating rules for the administration of this Section the
Department shall assure that a minimum of 1/3 of funds
available for benefits to eligible households are made
available to households who are eligible for public
assistance and that elderly and disabled households are
offered a one-month application period.

    (c)  If the applicant is not a customer of an energy
provider for winter energy services or an applicant for such
service, such applicant shall receive a direct energy
assistance payment in an amount established by the Department
for all such applicants under this Act; provided, however,
that such an applicant must have rental expenses for housing
greater than 30% of household income.

    (d)  If the applicant is a customer of an energy
provider, such applicant shall receive energy assistance in
an amount established by the Department for all such
applicants under this Act, such amount to be paid by the
Department to the energy provider supplying winter energy
service to such applicant.  Such applicant shall:

        (i)  make all reasonable efforts to apply to any
    other appropriate source of public energy assistance; and
        (ii)  sign a waiver permitting the Department to
    receive income information from any public or private
    agency providing income or energy assistance and from any
    employer, whether public or private.

    (e)  Any qualified applicant pursuant to this Section may
receive or have paid on such applicant's behalf an emergency
assistance payment to enable such applicant to obtain access
to winter energy services.  Any such payments shall be made
in accordance with regulations of the Department.
(Source: P.A. 86-127; 87-14.)

    Section 99.  This Act takes effect upon becoming law.
    Passed in the General Assembly May 24, 1993.
    Approved August 20, 1993.
    Effective August 20, 1993.


                    PUBLIC ACT 88-392
                   (House Bill No. 819)

    AN ACT to amend the Criminal Code of 1961 by changing
Section 12-31.

    Be it enacted by the People of the State of Illinois,
represented in the General Assembly:
    Section 5.  The Criminal Code of 1961 is amended by
changing Section 12-31 as follows:
    (720 ILCS 5/12-31) (from Ch. 38, par. 12-31)
    Sec. 12-31.  Inducement to Commit Suicide.
    (a)  A person commits the offense of inducement to commit
suicide when he *or she does either of the following*:
        (1)  Coerces another to commit suicide and the other
    person commits or attempts to commit suicide as a direct
    result of the coercion, and he *or she* exercises
    substantial control over the other person through *(i)* †1†

New matter indicated by italics - deletions by strikeout.

8-1

control of the other person's physical location or circumstances; *(ii)* †2† use of psychological pressure; or *(iii)* †3† use of actual or ostensible religious, political, social, philosophical or other principles.

*(2)  With knowledge that another person intends to commit or attempt to commit suicide, intentionally (i) offers and provides the physical means by which another person commits or attempts to commit suicide, or (ii) participates in a physical act by which another person commits or attempts to commit suicide.*
For the purposes of this Section, "attempts to commit suicide" means any act done with the intent to commit suicide and which constitutes a substantial step toward commission of suicide.

(b)  Sentence. Inducement to commit suicide under *paragraph (a)(1)* when the other person commits suicide as a direct result of the coercion is a Class 2 felony. *Inducement to commit suicide under paragraph (a)(2) when the other person commits suicide as a direct result of the assistance provided is a Class 4 felony.* Inducement to commit suicide under *paragraph (a)(1)* when the other person attempts to commit suicide as a direct result of the coercion is a Class 3 felony. *Inducement to commit suicide under paragraph (a)(2) when the other person attempts to commit suicide as a direct result of the assistance provided is a Class A misdemeanor.*

*(c)  The lawful compliance or a good-faith attempt at lawful compliance with the Illinois Living Will Act, the Health Care Surrogate Act, or the Powers of Attorney for Health Care Law is not inducement to commit suicide under paragraph (a)(2) of this Section.*
(Source: P.A. 86-980; 87-1167.)
Section 99. This Act takes effect upon becoming law.
Passed in the General Assembly May 24, 1993.
Approved August 20, 1993.
Effective August 20, 1993.


PUBLIC ACT 88-393
(House Bill No. 824)

AN ACT to amend the Illinois Vehicle Code by changing Section 6-110.
Be it enacted by the People of the State of Illinois, represented in the General Assembly:
Section 5.  The Illinois Vehicle Code is amended by changing Section 6-110 as follows:
(625 ILCS 5/6-110) (from Ch. 95 1/2, par. 6-110)
Sec. 6-110. Licenses issued to drivers.
(a)  The Secretary of State shall issue to every applicant qualifying a driver's license as applied for, the license shall bear a distinguishing number assigned to the licensee, the name, social security number, zip code, date of birth, address, and a brief description of the licensee, and a space where the licensee may write his usual signature.
If the licensee is less than 17 years of age, the license shall, as a matter of law, be invalid for the operation of any motor vehicle during any time the licensee is prohibited from being on any street or highway under the provisions of the Child Curfew Act.
Licenses issued shall also indicate the classification

New matter indicated by italics - deletions by strikeout.

8-2

*ExH.BiT 9*

STATE OF ILLINOIS )
        ) ss
COUNTY OF COOK )

# AFFIDAVIT OF THOMAS F. O'FARRELL

 I, Thomas F. O'Farrell, being first duly sworn on oath, hereby certify under penalty of perjury and as otherwise provided by law that the information and statements are true and correct to the best of my knowledge:

 1) I am subject to the rules of admissibility, competent to testify to the matters herein.

 2) I am thirty five (35) years of age and reside at the Pontiac Correctional Center, Livingston County, at 700 West Lincoln Street, Pontiac, Illinois.

 3) I am the defendant in this cause.

 4) The victim in this cause, Lesley Chapman O'Farrell, is my wife.

 5) I told trial counsel, Joseph Kennelly, the contents within this affidavit herein, at which time trial counsel Kennelly directly refused to make use of the information herein, often stating that, "The information is not relevant."

 6) My wife, Lesley, and I met at Erix The Red, County of Cook, at Lincoln and McCormick Avenues, Chicago, Illinois, where Lesley was employed.

 7) On, or about, May 27, 1988, my wife Lesley and I were married.

 8) On, or about, May 29, 1988, my wife Lesley and I moved into an apartment in the County of Cook, at 5550 North Sawyer Avenue, Chicago, Illinois.

 9) On, or about, July 3, 1990, the Detectives at Area Five (5) Police Headquarters, County of Cook, at 5555 West Grand Avenue, Chicago, Illinois, arrested me on the charge of First Degree Murder and detained me at Area 5 Police Headquarters.

 10) Several years prior to the July 3, 1990 arrest, my father told my brothers, sister and I that if we ever got into trouble with the police, we should request counsel immediately, remain silent and never say anything to anyone, especially the police, until we speak to counsel and have counsel present during all questioning.

 11) On, or about, July 3, 1990, after I was arrested and taken into custody by the Detectives

at Area 5 Police Headquarters, I immediately invoked my Right to counsel, my Right to remain silent and never made a statement.

12) On, or about, July 4, 1990, my wife Lesley retained Michael A. Pedicone as my counsel.

13) On, or about, July 4, 1990, the Detectives at Area 5 Police Headquarters withheld food from me for approximately twenty four (24) hours in an attempt to coerce me into making an incriminating statement, until my counsel, Michael A. Pedicone, intervened on my behalf and had a Chicago Police Officer at Area 5 Headquarters provide me food.

14) On, or about, February 28, 1991, I had to rush my wife, Lesley, to the Louis A. Weiss Memorial Hospital, Cook County, at 4646 North Marine Drive, Chicago, Illinois, because I found her in our apartment in Cook County, at 5253 North Winthrop, Chicago, Illinois, unresponsive with hypoglycemic reactions because her blood sugar level was dangerously low, and was bordering on a diabetic coma.

15) On, or about, February 29, 1991, my wife Lesley, told me that she overdosed on her insulin because she no longer wanted to live.

16) In December, 1992, my wife, Lesley and I purchased a childproof T.V. stand for the master bedroom in our home, in Cook County, at 3435 West Ardmore, Chicago, Illinois, because it had safety features which would prevent our young son, LeRoi, from gaining access to the contents and thus preventing any accident from happening.

17) On, or about, August 22, 1993, my wife, Lesley, attempted to commit suicide by overdosing on multiple prescriptions of many different colored pills, but I stopped her thus saving her life, and then I telephoned my mother who came to our house and helped me pick up Lesley and took our son, LeRoi, to her home so I would not be distracted in case my wife attempted suicide again.

18) On, or about, June 19, 1994, I found my wife, Lesley, in our home at 3435 West Ardmore unresponsive with hypoglycemic reactions, at which time I checked her blood sugar level, which was dangerously low and that my wife, Lesley, was bordering on a diabetic coma, so I gave her a glucose shot which raised her blood sugar level, thus saving her life.

19) On, or about, June 19, 1994, my wife Lesley told me that she had attempted suicide by overdosing on her insulin, because she no longer wanted to live.

20) On, or about, July 18, 1994, I found my wife, Lesley, with a razor blade threatening suicide by cutting her wrist, so I took the razor blade from her, at which time she took an insulin needle and her insulin and fled our home at 3435 West Ardmore on foot at which time I began to chase her, but had to stop because I left our young son, LeRoi, alone in the house. I returned to the house and called 911 at which time the police came to our home and had me call my wife's psychologist, Dr. Kenith L. Robins so they could talk to him about the situation.

-2-

21) On, or about, July 18, 1994, Lesley's psychologist and the Chicago Police Officer's at our home felt it would be best if I took our son, LeRoi, and leave for the night and have Abby Glassman, a friend of my wife's, stay with my wife, so my son and I went to my parents home in Cook County, at 11445 South Mather Avenue, Alsip, Illinois.

22) During my employment from October, 1992, through September, 1995, at A.I.P. Trucking, in Cook County, at 9864 Leland Avenue, Schiller Park, Illinois, I missed and/or left work early because I had to take care of my wife, Lesley, when she was seriously ill and could not care for herself and/or our son, LeRoi.

23) My employers insurance carrier would not cover my wife, Lesley, on the companies insurance policy due to her several severe medical problems.

24) From March, 1994, through September 28, 1995, my wife, Lesley, continuously pled with me to help her end her life because she no longer wanted to live with the pain and suffering that she was going through because of her medical conditions.

25) On, or about, September 28, 1995, Chicago Police Officers Maderer and Pettry both had their weapons drawn when Officer Maderer demanded that he and Officer Pettry check on my wife, Lesley, and look for the offender in our home at 3435 West Ardmore, so I did not feel that I had a choice to refuse Officer Maderer's demands and I responded "Yes."

26) On, or about, September 28, 1995, I was never asked by Chicago Police Officers Maderer, Pettry or any of the other Chicago Police personnel at our home at 3435 West Ardmore, to assist them in determining if anything was taken by the intruder.

27) On, or about, September 28, 1995, Chicago Police Officer Maderer demanded in a stern voice that I, "leave with the ambulance!"

28) On, or about, September 28, 1995, I told Chicago Police Officer Maderer that I did not want leave with the ambulance because I was not seriously injured, I could walk on my own, I needed to take care of our dogs, and I wanted to wait for my mother who was already on her way to our home at 3435 West Ardmore to pick up my son, LeRoi, and when she arrived, I would have her take me to the hospital.

29) On, or about, September 28, 1995, Chicago Police Officer Maderer again demanded in a stern voice with his hand resting on his service weapon and in the presence of several other Chicago Police personnel at our home at 3435 West Ardmore, "Leave with the ambulance and get medical treatment" and that he and other officers present were, "Going to stay and search for clues," so I did not feel as if I had a choice to refuse Officer Maderers' demands and responded, "O.K."

30) On, or about, September 28, 1995, I was escorted from our home at 3435 West Ardmore to the Chicago Fire Department ambulance by Chicago Police Officer Cooper and several other

-3-

Chicago Police personnel, where Officer Cooper then escorted me to Illinois Masonic Medical Center, Cook County, at 836 West Wellington Avenue, Chicago, Illinois, for a gunshot wound to my right shoulder and stayed with me until Chicago Police Detective Kernan arrived.

31) On, or about, September 28, 1995, upon my release from Illinois Masonic Medical Center, at 836 West Wellington, for a gunshot wound to my right shoulder, Chicago Police Detective Kernan took my release papers from the nurse in the Emergency Room, refused to give them to me and took me to and placed me in a marked Chicago Police Department vehicle and I was then taken to Area 5 Police Headquarters located at 5555 West Grand Avenue.

32) On, or about, September 28, 1995, I believed that I was under arrest because of the contents within paragraphs 27 thru 31 herein and I was not free to leave Area 5 Police Headquarters at 5555 West Grand Avenue.

33) On, or about, September 28, 1995, I was never asked by the Area 5 Detectives or the Assistant State's Attorney Kougias to sign a "Miranda Waiver."

34) On, or about, September 28, 1995, I was in severe pain due to the gunshot wound to my right shoulder during the entire time I was at Area 5 Police Headquarters at 5555 West Grand Avenue being questioned prior to being told that I was under arrest at 10:30 A.M. and up to the time that I was remanded to the custody of the Cook County Department of Corrections at 26th and California Avenue, Chicago, Illinois, on September 29, 1995, where I was finally given pain medication by the medical staff on September 30, 1999.

35) On, or about, September 28, 1995, none of the Area 5 Chicago Police Detectives or other police personnel ever showed me any photo's of any possible offender or had a sketch artist attempt to get a sketch of the offender from the time I arrived at Area 5 Police Headquarters until I was informed that I was under arrest at 10:30 A.M.

36) On, or about, September 28, 1995, Chicago Police Detectives Schak and Szeluga confronted me with a letter my wife, Lesley wrote me prior to me making a statement.

37) On, or about, September 28, 1995, my statement was made after Chicago Police Detective Schak threatened the well-being of my son, LeRoi, who was still present at Area 5 Police Headquarters at 5555 West Grand Avenue where Detective Schak could, "make good" on his threats and I, "Won't be able to do anything about it."

38) On, or about, September 28, 1995, while I was interrogated and was visited by my parents in the interrogation room at Area 5 Police Headquarters at 5555 West Grand Avenue, my left hand was cuffed to the wall.

39) On, or about, September 28, 1995, Chicago Police Detective Schak, who threatened the well-being of my son, LeRoi, in order to coerce an incriminating statement from me was present

-4-

during the entire conversation with Assistant State's Attorney Kougias at Area 5 Police Headquarters at 5555 West Grand Avenue, so I was unable to speak freely with Assistant State's Attorney Kougias about the psychological coercion, with regard to the threat to my son's well-being, and the misconduct of Detective Schak in order to obtain a statement from me.

40) On, or about, September 28, 1995, after my father, Thomas C. O'Farrell, told me that my son, LeRoi, was no longer at Area 5 Police Headquarters at 5555 West Grand Avenue, and that he was in the custody of my sister and brother-in-law, I knew Chicago Police Detective Schak had no way to physically place my son in the hands of the Illinois Department of Children and Family Services (which he threatened to do) and it was at this point that I refused to cooperate any further with Detective Schak and Assistant State's Attorney Kougias and I invoked my Right to remain silent and demanded counsel in the presence of my father.

41) On, or about, October 25, 1995, I told trial counsel, Joseph Kennelly, on an attorney visit at the Cook County Department of Corrections at 26th and California, Chicago, Illinois, that the Detectives at Area 5 Police Headquarters had arrested me on the charge of First Degree Murder on July 3, 1990, and used coercive methods in an attempt to obtain an incriminating statement from me and that this could be verified by my past counsel, Michael A. Pedicone whose office is in Chicago, Illinois.

42) On, or about, March 28, 1996, my cell mate, and the State's witness, Thomas Dye, took from my personal property upon his departure from the Cook County Department of Corrections at 26th and California Avenue, my legal paperwork pertaining to this cause, notes produced during research, personal letters from my family, and legal paperwork pertaining to my wife Lesley's Estate which included a copy of her death certificate which contained the following;
    a) my wife's full name and that she was the victim in this cause;
    b) address of the offense;
    c) the type of injury to my wife;
    d) cause of death;
    e) time of death;
    f) where in our home at 3435 West Ardmore my wife Lesley died;
    g) that my wife's death was ruled a homicide;
    h) date of the offense.

43) On, or about, March 28, 1996, I immediately notified the authorities of the Cook County Department of Corrections at 26th and California Avenue, about the theft of my legal and personal paperwork by State's witness, Thomas Dye, and was told to file an inmate grievance with Internal Investigations at the Cook County Department of Corrections, which I did, requesting that Internal Investigations notify the Trial Court about the theft committed by the State's witness, Thomas Dye, which they did not do.

44) On, or about, March 28, 1996, I notified trial counsel, Joseph Kennelly, by telephone that my cell mate, and State's witness, Thomas Dye, took my legal and personal paperwork upon his

-5-

departure from the Cook County Department of Corrections at 26th and California Avenue, and that I also witnessed State's witness, Thomas Dye, with inmate Steven Ehrlich's indictment papers that he took from Mr. Ehrlich's cell while Mr. Ehrlich was taking a shower, and brought the paperwork back to our cell and read the Indictment papers out loud and copied it word for word and then returned it to Mr. Ehrlich's cell before Mr. Ehrlich got back from taking his shower. This occurred two (2) weeks prior to Thomas Dye taking my paperwork.

45) On, or about, April 26, 1996, inmate Steven Ehrlich told me that my ex-cell mate and State's witness, Thomas Dye, had tendered a statement against him, so I told Mr. Ehrlich that I had witnessed Thomas Dye with Mr. Ehrlich's Indictment papers and told him that Thomas Dye read them out loud to me and copied them down word for word, I then filed another grievance with Internal Investigations of the Cook County Department of Corrections at 26th and California Avenue, and again requested that they notify the Trial Court of the theft of my legal and personal paperwork by State's witness, Thomas Dye.

46) On, or about, May 1, 1996, I informed trial counsel, Joseph Kennelly, on an attorney visit in the Cook County Department of Corrections at 26th and California, that my cell mate and State's witness, Thomas Dye, had tendered a statement against inmate Steven Ehrlich on April 26, 1996, and that I feared that State's witness, Thomas Dye, would also testify against me and that I wanted trial counsel, Joseph Kennelly, to inform the Trial Court about State's witness, Thomas Dye's theft of my legal and personal paperwork, at which time trial counsel, Kennelly told me, "Do not worry about Dye, he will never testify against you."

47) On, or about, May 1, 1996, I directed trial counsel, Joseph Kennelly, to pursue a defense based on a Second Degree Murder to the charge of First Degree Murder brought in this cause, at which time I spoke to trial counsel, Kennelly at length informing him of all the facts supporting a Second Degree Murder defense, specifically discussing the facts in People v Williams, 638 N.E. 2nd 345 and 720 I.L.C.S.5/9-2, the Second Degree Murder Statute, where I pointed out the obvious comparisons between the facts raised People v Williams, the Second Degree Murder Statute, and the facts in my pending criminal case, wherein after the discussion, trial counsel Kennelly directly refused to raise the facts supporting the Second Degree Murder defense and/or put forward the appropriate motions and/or directly refused to pursue a Second Degree Murder defense at trial stating, "I can not win at trial on the First Degree Murder charges based on a Second Degree Murder defense and that I (me personally) could not raise the defense outlined herein without his (Kennelly's) consent."

48) On, or about, May 22, 1996, trial counsel, Joseph Kennelly, told me on an attorney visit in the Cook County Department of Corrections at 26th and California Avenue, that, "we will not be able to win at this level. Our best shot will be in the Appellate Court."

49) On, or about, May 23, 1996, prior to the suppression hearing in this cause, at the Cook County Criminal Courts building, Room 400 (the Court room of the Honorable Judge Michael P. Toomin) at 26th and California Avenue, Chicago, Illinois, I told trial counsel, Joseph Kennelly, that both my father, Thomas C. O'Farrell, and I could testify that the T.V. stand in this cause, that

-6-

Chicago Police Detective Collins testified opened just by bumping it, was in fact child proof and had safety features to prevent such from occurring thus showing that Chicago Police Detective Collins perjured himself.

50) On, or about, June 25, 1996, trial counsel, Joseph Kennelly, told me prior to closing arguments, while I was in the holding cell in room 400, the Honorable Judge Michael P. Toomin's Court Room, that, "I can not win, but I will try to beat the death penalty and get you the lowest sentence possible."

51) On, or about, August 23, 1996, I told trial counsel, Joseph Kennelly, in Room 400 (the Court room of the Honorable Judge Michael P. Toomin) at the Criminal Court Building at 26th and California, that I had witnessed my wife's best friend, Anne Dworak, enter the Jury room behind Assistant State's Attorney Nicholas Ford, then approximately fifteen (15) minutes later Anne Dworak, Assistant State's Attorney Nicholas Ford, and State's witness, Thomas Dye, all exit the Jury room together.

52) On, or about, January 20, 1997, one day prior to trial in this cause, trial counsel, Joseph Kennelly, told me, on an attorney visit in the Cook County Department of Corrections at 26th and California Avenue, the statements within paragraphs 48 and 50 herein again and then proceeded to use coercive tactics to make me change me mind in taking a Jury trial by telling me, "I can not win, and if you proceed with a Jury trial, Judge Toomin will give you all sixty (60) years, but if you put it in Judge Toomin's hands and take a Bench trial, Judge Toomin will be more lenient and only give you thirty (30) years, I guarantee it.", at which time I requested to call my family and find out what they thought I should do and trial counsel Kennelly told me, "I need an answer now so I can leave and prepare for trial.", so I told him to go with a Bench trial.

53) On, or about, January 20, 1997, after speaking with trial counsel, Kennelly, I tried to contact my parents by telephone, but no one was home, so I called my sister, Colleen Kohn, at her home at 3832 West 138th Place, Midlothian, Illinois, and told her that trial counsel, Kennelly, guaranteed me only thirty (30) years if I took a bench trial instead of a Jury trial.

54) On, or about, January 21, 1997, on the morning of trial in this cause, Judge Toomin's Deputy, Michael Stawczek Sr., while taking me from the Cook County Department of Corrections Lockup to the Criminal Court Building at 26th and California, told me in the elevator, prior to trial, that, "Judge Toomin in going to find you guilty and give you fifty (50) years."

55) On, or about, January 21, 1997, prior to trial, I told trial counsel, Kennelly, about the statement within paragraph #54 herein made to me by Judge Toomin's Deputy, Michael Stawczek Sr..

56) On, or about, January 24, 1997, I told trial counsel, Joseph Kennelly, on an attorney visit in the Cook County Department of Corrections at 26th and California, that my parents, Thomas C. O'Farrell, Mary O'Farrell, my sister Colleen Kohn, and I could all testify to my wife Lesley's past

-7-

attempts at committing suicide and her repeated conversations about wanting to end her life because of her health problems.

57) On, or about, January 28, 1997, during the first phase of the death penalty hearing, in Room 400 of the Cook County Criminal Courts Building at 26th and California, I told trial counsel, Kennelly, about the inconsistencies in the testimony of State's witness, Thomas Dye, and I asked trial counsel Kennelly to inform the Trial Court that the State's witness, Thomas Dye, had stolen my legal and personal paperwork from the cell we shared in the Cook County Department of Corrections at 26th and California Avenue, and that I had copies of the inmate grievances that I had filed and I wanted them placed into evidence.

Further affiant sayeth nought.

Thomas F. O'Farrell
Defendant

Subscribed and SWORN to before me
on this _20m_ day of _January_, 1999

Notary Public

"OFFICIAL SEAL"
Jeannine Kohlmeyer
Notary Public State of Illinois
My Commission Expires 11/13/2001

-8-

9-8

## REPORT: TITLIST — PAGE: 051

LEGISLATIVE INFORMATION SYSTEM
88TH GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
MASTER TRANSCRIPT INDEX

95/07/05
13.36.16

| BILL NUMBER | DATE | PAGE | ACTION |
|---|---|---|---|
| HB-0002 | 02/26/93 | 1 | FIRST READING |
| HB-0003 | 02/26/93 | 1 | FIRST READING |
| HB-0004 | 02/26/93 | 1 | FIRST READING |
| HB-0005 | 02/26/93 | 135 | FIRST READING |
|  | 04/26/93 | 105 | SECOND READING |
|  | 04/28/93 | 105 | THIRD READING |
| HB-0006 | 02/26/93 | 1 | FIRST READING |
| HB-0007 | 02/26/93 | 1 | FIRST READING |
| HB-0008 | 02/26/93 | 128 | FIRST READING |
|  | 04/19/93 |  | SECOND READING |
| HB-0009 | 02/26/93 | 2 | FIRST READING |
| HB-0010 | 02/26/93 | 2 | FIRST READING |
| HB-0011 | 03/02/93 | 9 | FIRST READING |
| HB-0012 | 03/02/93 | 9 | FIRST READING |
| HB-0013 | 03/02/93 | 9 | FIRST READING |
| HB-0014 | 03/02/93 | 134 | FIRST READING |
|  | 04/13/93 |  | SECOND READING |
|  | 04/21/93 |  | THIRD READING |
| HB-0015 | 03/02/93 | 77 | FIRST READING |
|  | 03/30/93 | 9 | SECOND READING |
|  | 04/21/93 |  | THIRD READING |
| HB-0016 | 03/02/93 | 205 | FIRST READING |
|  | 03/30/93 | 16 | SECOND READING |
|  | 04/27/93 | 9 | THIRD READING |
| HB-0017 | 04/02/93 | 42 | FIRST READING |
|  | 04/12/93 |  | SECOND READING |
| HB-0018 | 04/02/93 | 9 | FIRST READING |
| HB-0019 | 03/02/93 | 9 | FIRST READING |
|  | 06/12/93 | 264 | SECOND READING |
|  | 04/22/93 | 308 | SECOND READING |
|  | 06/16/93 | 43 | THIRD READING |
|  |  |  | CONCURRENCE |

## REPORT: TITLIST — PAGE: 052

LEGISLATIVE INFORMATION SYSTEM
88TH GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
MASTER TRANSCRIPT INDEX

95/07/05
13.36.16

| BILL NUMBER | DATE | PAGE | ACTION |
|---|---|---|---|
| HB-0020 | 03/02/93 | 9 | FIRST READING |
|  | 04/16/93 | 235 | SECOND READING |
|  | 04/27/93 | 241 | THIRD READING |
|  | 06/16/93 | 105 | THIRD READING |
| HB-0021 | 03/02/93 | 9 | FIRST READING |
|  | 04/16/93 | 235 | SECOND READING |
|  | 04/13/93 | 235 | THIRD READING |
|  | 06/16/93 | 105 | THIRD READING |
| HB-0022 | 03/02/93 | 9 | FIRST READING |
|  | 04/16/93 | 32 | SECOND READING |
|  | 04/13/93 | 241 | HELD ON SECOND |
|  | 04/27/93 |  | SECOND READING |
|  | 06/16/93 | 105 | THIRD READING |
| HB-0023 | 03/02/93 | 9 | FIRST READING |
| HB-0024 | 03/26/93 | 9 | FIRST READING |
|  |  |  | CONCURRENCE |
| HB-0025 | 03/02/93 | 10 | FIRST READING |
| HB-0026 | 03/02/93 | 10 | FIRST READING |
| HB-0027 | 03/02/93 | 10 | FIRST READING |
| HB-0028 | 03/02/93 | 10 | FIRST READING |
|  |  |  | OUT OF RECORD |
| HB-0029 | 03/02/93 | 10 | FIRST READING |
| HB-0030 | 03/02/93 | 10 | FIRST READING |
| HB-0031 | 03/02/93 | 43 | FIRST READING |
|  | 04/13/93 |  | SECOND READING |
| HB-0032 | 03/02/93 | 10 | FIRST READING |
|  | 04/13/93 |  | SECOND READING |
|  |  |  | OUT OF RECORD |
| HB-0033 | 03/02/93 | 10 | FIRST READING |
| HB-0034 | 03/02/93 | 10 | FIRST READING |
| HB-0035 | 03/02/93 | 10 | FIRST READING |
| HB-0036 | 05/26/93 | 11 | FIRST READING |
|  |  |  | MOTION |
| HB-0037 | 04/03/93 | 11 | FIRST READING |
|  |  |  | CONFERENCE |

STATE OF ILLINOIS
88th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

19th Legislative Day                                    March 2, 1993

House Bill 811, offered by Representative Homer, a Bill for
an Act to change the date of the 1994 general primary
election.   First Reading of the Bill.   House Bill 812,
offered by Representative Homer, a Bill for an Act to amend
the Election Code.   First Reading of the Bill.   House Bill
813, offered by Representative Homer, a Bill for an Act to
provide for open election primaries.   First Reading of the
Bill.   House Bill 814, offered by Representative Turner, a
Bill for an Act to amend the Minimum Wage Law.   First
Reading of the Bill.   House Bill 815, offered by
Representative Dart, a Bill for an Act to amend the
Illinois Solid Waste Management Act.   First Reading of the
Bill.   House Bill 816, offered by Representative Johnson, a
Bill for an Act to amend the School Code.   First Reading of
the Bill.   House Bill 817, offered by Representative
Cowlishaw, a Bill for an Act to amend the Abused and
Neglected Child Reporting Act.   First Reading of the Bill.
House Bill 818, offered by Representative Schakowsky, a
Bill for an Act to amend the Illinois Income Tax Act.
First Reading of the Bill.   House Bill 819, offered by
Representative Sheehy, a Bill for an Act to amend the
Criminal Code.   First Reading of the Bill.   House Bill 820,
offered by Representative Ostenburg, a Bill for an Act
relating to the collection of debts owed the State.   First
Reading of the Bill.   House Bill 821, offered by
Representative Woolard, a Bill for an Act to amend the
Civil Administrative Code.   First Reading of the Bill.
House Bill 822, offered by Representative Schoenberg, a
Bill for an Act concerning future education accounts.
First Reading of the Bill.   House Bill 823, offered by
Representative Schoenberg, a Bill for an Act to create the
Taxpayer Action Board Act.   First Reading of the Bill.

9

10-2

STATE OF ILLINOIS
88th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

45th Legislative Day                                    April 20, 1993

Speaker Steczo: "The Gentleman has moved for the adoption of the
        Amendment.  On that question, the Gentleman from DuPage,
        Representative Johnson."

Johnson, Tom: "Yes, Mr. Speaker, to the Bill.  I just want to
        concur with what the Representative has stated that this is
        an agreement that was made in committee and this fulfills
        that pledge.  Thank you."

Speaker Steczo: "Is there any further discussion?  There being
        none, the Gentleman has moved for the adoption of the
        Amendment.  All those in favor will say 'aye'; all those
        opposed 'nay'.  The 'ayes' have it.  The Amendment's
        adopted.  Mr. Clerk, any further Amendments?"

Clerk McLennand: "No further Amendments."

Speaker Steczo: "Third Reading.  On the Order of Civil Justice,
        Second Reading, appears House Bill 224, Representative
        Pugh.  Mr. Pugh, would you like to... Out of the record.
        House Bill 365, Representative Homer.  Mr. Clerk, please
        read the Bill."

Clerk McLennand: "House Bill 365, a Bill for an Act to amend the
        Code of Criminal Procedure of 1963.  The Bill has been read
        a second time previously.  No Committee Amendments.  Floor
        Amendment #1, offered by Representative Homer."

Speaker Steczo: "The  Gentleman from Fulton, Representative
        Homer."

Homer: "Out of the record, please."

Speaker Steczo: "House Bill 365 will be taken from the record.
        On the Order of Civil Justice, Second Reading, appears
        House Bill 764, Representative Lang.  Out of the record.
        House Bill 819, Representative Sheehy.  Mr. Clerk, please
        read the Bill."



Clerk McLennand: "House Bill 819, a Bill for an Act to amend the
        Criminal Code of 1961.  Second Reading of the Bill.  No

                                                                294

                            10-3

STATE OF ILLINOIS
88th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

45th Legislative Day                                    April 20, 1993

Committee Amendments. Floor Amendment #1, offered by Representative Sheehy."

Speaker Steczo: "The Chair recognizes the Gentleman from Cook, Representative Sheehy on the Amendment."

Sheehy: "Thank you, Mr. Speaker and Ladies and Gentleman of the House. I would like to withdraw Amendments #1 and 2."

Speaker Steczo: "Amendments #1 and 2 will be withdrawn. Mr. Clerk, any further Amendments?"

Clerk McLennand: "Floor Amendment #3, offered by Representative Sheehy."

Speaker Steczo: "The Gentleman from Cook, Representative Sheehy."

Sheehy: "What Amendment #3 is, it adds...this Act takes effect upon becoming law, and also it states additional penalties, and I might add, that this is requested in committee by Members on the other side of the aisle here. I'd be more than happy to answer any questions."

Speaker Steczo: "The Gentleman has moved for the adoption of Amendment #3. On that question, the Gentleman from Vermilion, Representative Black."

Black: "Thank you very much, Mr. Speaker. Will the Sponsor yield?"

Speaker Steczo: "He indicates that he will."

Black: "Representative, I...bear with me. I don't rise to oppose your Amendment or anything like that. My question is, 'Are you sure...have staff check that Amendment #3 actually gives a sentence for the'... Wait a minute. Let me talk to my staff. Mr. Speaker, can we just hold this for just a few seconds?"

Speaker Steczo: "Mr. Black, we'll hold it just a few seconds just for you, Sir. The Chair recognizes the Gentleman from DuPage, Representative Johnson."

Johnson, Tom: "To the Bill. This Amendment is worked out in

295

10-4

STATE OF ILLINOIS
88th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

47th Legislative Day                                         April 22, 1993

Pugh: "Thank you, Madam Speaker, Ladies and Gentlemen of the House. At the risk of...of not trying to make any of my colleagues look soft on crime, I'll withdraw this Bill."

Speaker Flowers: "The Gentleman withdraws his Bill. Out of the record. Representative Dunn, on House Bill 743. Representative Dunn. Read the Bill, Mr. Clerk."

Clerk Rossi: "House Bill 743, a Bill for an Act concerning juveniles. Third Reading of the Bill."

Speaker Flowers: "Representative Dunn."

Dunn: "Thank you, Madam Speaker, Ladies and Gentlemen of the House. House Bill 743 is not what I thought it was. It needs to be taken out of the record. Take it out of the record."

Speaker Flowers: "Out of the record. Representative McPike, in the Chair."

Speaker McPike: "Agreed List #3, all of the Bills received sufficient votes, so on Agreed List #3 these Bills, having received the Constitutional Majority, are hereby declared passed. We have one more Bill dealing with funding of abortion that we intend to call in about ten minutes. House Bill 819, Mr. Sheehy. Read the Bill, Mr. Clerk."

Clerk Rossi: "House Bill 819, a Bill for an Act to amend the Criminal Code of 1961. Third Reading of the Bill."

Speaker McPike: "Mr. Sheehy."

Sheehy: "Mr. Speaker and House Members. House Bill 819, amens the...amends the Criminal Code to expand the offense of inducement to commit suicide, to include providing another person with the physical means to commit or attempt to commit suicide or participate in a physical act by which another person commits or attempts to commit suicide. This Bill puts substance and teeth into the current law we have today and this Bill also is based on the Michigan law which

308

10-5

STATE OF ILLINOIS
88th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

47th Legislative Day                                      April 22, 1993

was passed last month.  I'll be more than happy to entertain any questions or any comments that you might have."

Speaker McPike:  "Mr. Johnson."

Johnson, Tim:  "A question of the Sponsor?"

Speaker McPike:  "Yes."

Johnson, Tim:  "What if you have a...husband and wife of many years, in their latter years and one is terminally ill and...tremendous amount of pain and simply unable to do anything physically and ask the spouse to...give them instrumentality of their death, whether it's some kind of pill or medication or something like that and the other spouse, having lived with this person for 60 years and not wanting to see them suffer anymore, doesn't kill them but says, 'sure, if that's what you want, here you go.'  Well, what about that?  Does that Bill...this Bill covers that, doesn't it?"

Sheehy:  "The    intent,    Representative,    is...really to...put something in place where when Dr. Kevorkian comes here."

Johnson, Tim:  "No.  I didn't say that.  I..."

Sheehy:  "I think what you're..."

Johnson, Tim:  "Now, I don't want to go through what I went through the other day and have to ask the question four times.  Now my question is, I gave you a specific fact situation, 'I want to know whether this Bill makes that person a Class III felon or not?  I don't want to see..."

Sheehy:  "I think that would be up..."

Johnson, Tim:  "I don't want to see Dr. Kevorkian come either.  I just want to know if that fact situation that I've described applies to this Bill?"

Sheehy:  "I would leave that up to the State's Attorney."

Johnson, Tim:  "Well, it's not in the State's Attorney's lap right

309

10-6

STATE OF ILLINOIS
88th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

47th Legislative Day                              April 22, 1993

    now.  It's in the Legislature's lap and it's not going to
be in the State's Attorney's lap until we either act on
this or we don't.  Now, I'm reading the language of the
Bill on page 1, 19...19 through 24, lines 19-24, and it
appears to me that clearly covers the situation that I've
just described.  If it doesn't, I'd like to know where it
doesn't?"

Sheehy: "Yes, it does."

Johnson, Tim: "Okay.  There is a difference, Mr. Speaker and
Members of the House, between being an active
instrumentality in causing somebody to commit suicide by
psychological or other pressure.  Being an active agent in
causing someone else to kill themselves.  Perhaps the
Kevorkian situation, on the one hand, and simply being a
passive agent, on the other hand and this Bill makes
somebody a Class III felon, this is an offense we haven't
created yet.  I...this may be a reason to be for this.
This is a new crime.  Something new for the Illinois
Legislature.  We haven't created a crime of the day, so
this is a crime today.  It clearly covers a situation where
someone is simply a passive agent, 87-year-old spouse says,
'If that's what you want to do, then here, I'm not asking
you to do it, I'm not causing you to do it, I'm not doing
it myself, I'm simply saying because you're terminally ill
and unable to get up, I'm going to be the passive agent of
your will'.  Now, obviously, none of us want to see
suicides.  None of us want to see death.  None of us want
to see Dr. Kevorkian here in Illinois, but whatever the
intention of this Bill is and I have to presume that it is
well-intended by Representative Sheehy, the language of the
Bill doesn't do what he says he wants to do.  It goes
vastly beyond that and creates the situation where there is

310

STATE OF ILLINOIS
88th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

47th Legislative Day                                    April 22, 1993

no right to choose. Your act in many situations creating a
circumstance where someone can not make an active choice to
end their own life. It would be nice if we had a perfect
world where people didn't get terminally ill, where people
didn't want to end their own lives and where we didn't have
passive agents, such as an 87-year-old spouse involved in
it, but we don't live in that perfect world and we do have
that situation, and I believe as offensive as it may be to
some of us in our own personal attitudes and our own
personal moral beliefs, that somebody chooses to end their
own life and asks someone to be a neutral agent in
assisting that, then we ought to be able to allow them to
do it. I don't want to see Dr. Death here. I don't...I
don't think that's appropriate and I think that
ought...that issue ought to be addressed, but this Bill
goes beyond the passive agent. This goes to a situation
where someone is a neutral agent...or an active agent. It
goes to someone who is a neutral agent. It doesn't make
sense to use a cannon to kill a fly, so to speak. We want
to address that situation. It could be done in far more
narrow legislation and for some of those of you who've said
in various ways that people ought to have a right to make a
selection as to what to do with their own bodies and their
own lives, this Bill does precisely the opposite, and I
urge a 'no' vote."

Speaker McPike: "Mr. Sheehy, to close."

Sheehy: "I urge everyone in this House to...for a 'yes' vote on
this Bill. If not, we're sending a bad message to our
young people today. There's a high rate of suicide among
our young people across the state and with that alone, I
think the message we're sending to them if we vote 'no' is
a bad message, and again I ask all of you to vote 'yes' for,

311

STATE OF ILLINOIS
88th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

47th Legislative Day                                    April 22, 1993

this Bill. Thank you."

Speaker McPike: "The question is, 'Shall House Bill 819 pass?'
All in favor vote 'aye'; opposed vote 'no'. Have all
voted? Have all voted who wish? Have all voted who wish?
The Clerk will take the record. On this Motion, there are
65 'ayes' and 33 'noes'. House Bill 819, having received
the Constitutional Majority, is hereby declared passed.
House Bill 602. Read the Bill, Mr. Clerk. Mr. Clerk, read
the Bill."

Clerk Rossi: "House Bill 602, a Bill for an Act to amend the
Illinois Horse Racing Act of 1975. Third Reading of the
Bill."

Speaker McPike: "Mr. Hicks."

Hicks: "Thank you, Mr. Speaker. House Bill 602 is a Bill dealing
with the horse racing industry. Senator Madigan, who has
been working on this in the...in the Senate will be taking
care of this Bill there. I'll be happy to answer any
questions."

Speaker McPike: "The question is, 'Shall House Bill 602 pass?'
All in favor vote 'aye'; opposed vote 'no'. Have all
voted? Have all voted who wish? Have all voted who wish?
The Clerk will take the record. On this Motion, there are
67 'ayes', 38 'noes'. House Bill 602, having received the
Constitutional Majority, is hereby declared passed. House
Bill 935, Mr. Homer. Read the Bill, Mr. Clerk."

Clerk Rossi: "House Bill 935, a Bill for an Act amending the
Illinois Domestic Violence Act of 1986. Third Reading of
the Bill."

Speaker McPike: "Mr. Homer."

Homer: "Thank you, Mr. Speaker. The Bill is advanced by the
Illinois Coalition Against Domestic Violence. It amends
the Illinois Domestic Violence Act to require law

312

STATE OF ILLINOIS
88th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

64th Legislative Day                                    May 24, 1993

Saltsman."

Saltsman: "Yes. Thank you, Mr. Speaker. I do concur with Senate Amendment #1 to House Bill 797. And what this does, if a person files a complaint that is not justified, the accuser can be held liable for attorney fees. I ask for its passage."

Speaker McPike: "On Representative Saltsman's Motion. The question is, 'Shall the House concur on Senate Amendment 2 to House Bill 797?' All in favor vote 'aye'; opposed vote 'no'. Have all voted? Have all voted who wish? The Clerk will take the record. On this Motion, there's 108 'ayes', 6 'noes'. The House does concur on Senate Amendment 2 to House Bill 797. This Bill, having received a Constitutional Majority, is hereby declared passed. Representative Sheehy, 819."

Sheehy: "Mr. Speaker and Members of the House. I concur on Amendment 1 on 819. What... Briefly, what it does, it clarifies the House Bill. It does not in any way interfere with, or make illegal, a lawful compliance of the Living Will Act or the Health Care Act or the Surrogate Act. I ask that we concur with this Amendment."

Speaker McPike: "The question is, 'Shall the House concur with Senate Amendment #1 to House Bill 819?' All those in favor vote 'aye'; opposed vote 'no'. Have all voted? Have all voted who wish? Have all voted who wish? The Clerk will take the record. On this Motion, there is 112 'ayes', 2 'noes'. The House does concur in Senate Amendment 1 to House Bill 819. This Bill. having received a Constitutional Majority, is hereby declared passed. House Bill 824, Representative Giolitto."

Giolitto: "Mr. Speaker...I move to concur on Senate Amendment #1 to House Bill 1824 (sic-824), which is my organ donor

EXHIBIT 11

## Westlaw.

CA PENAL § 401                                                              Page 1

West's Ann.Cal.Penal Code § 401

WEST'S ANNOTATED CALIFORNIA CODES
PENAL CODE
PART 1. OF CRIMES AND PUNISHMENTS
TITLE 10. OF CRIMES AGAINST THE PUBLIC HEALTH AND SAFETY

Copr. © West 1996. All rights reserved.

§ 401. Suicide; aiding, advising, or encouraging

Every person who deliberately aids, or advises, or encourages another to commit suicide, is guilty of a felony.

CREDIT(S)

1988 Main Volume

(Formerly § 400, added by Code Am.1873-74, c. 614, p. 433, § 34. Renumbered § 401 and amended by Stats.1905, c. 573, p. 770, § 11.)

HISTORICAL AND STATUTORY NOTES

1996 Pocket Part

1992 Legislation

Amendment of § 401 proposed by Initiative Measure as Proposition 161, was rejected by the voters at the General Election held Nov. 3, 1992.

1988 Main Volume

Section 401, added by Code Am.1880, c. 104, p. 41, § 1, relating to the killing of diseased animals, was renumbered § 402 1/2 by Stats.1891, c. 40, p. 27, § 2.

Section 401, added by Code Am.1877-78, c. 228, p. 116, § 1, relating to adulteration of candy, was renumbered § 402 1/4 by Stats.1891, c. 41, p. 27, § 1.

CROSS REFERENCES

Felony,
 Defined, see Penal Code § 17.
 Punishment, see Penal Code § 18.

Fine authorized in addition to imprisonment, see Penal Code § 672.

LAW REVIEW COMMENTARIES

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11-A

Westlaw.

Page 1

I.C.A. § 707.5

P

Iowa Code Annotated Currentness
Title XVI. Criminal Law and Procedure (Chs. 687-915) (Refs. & Annos)
   **Subtitle 1. Crime Control and Criminal Acts (Chs. 687-747) (Refs. & Annos)**
      **Chapter 707. Homicide and Related Crimes (Refs. & Annos)**

→ 707.5. Involuntary manslaughter

1. A person commits a class "D" felony when the person unintentionally causes the death of another person by the commission of a public offense other than a forcible felony or escape.

2. A person commits an aggravated misdemeanor when the person unintentionally causes the death of another person by the commission of an act in a manner likely to cause death or serious injury.

Involuntary manslaughter as defined in this section is an included offense under an indictment for murder in the first or second degree or voluntary manslaughter.

CREDIT(S)

Added by Acts 1976 (66 G.A.) ch. 1245 (ch. I), § 705, eff. Jan. 1, 1978.

HISTORICAL AND STATUTORY NOTES

2003 Main Volume

For dispositions of the subject matter of former § 707.5, Code 1977, see disposition table preceding § 687.1

Derivation:
   Codes 1977, 1975, 1973, 1971, 1966, 1962, 1958, 1954, 1950, 1946, §§ 690.10,
690.11.
   Codes 1939, 1935, 1931, 1927, 1924, §§ 12919, 12920
   Acts 1923 (40 G.A.) ch. 210, § 2
   Code 1897, § 4251.
   Code 1873, § 3856
   Revision 1860, § 4199.
   Code 1851, § 2576.

CROSS REFERENCES

Forcible felony defined, see § 702.11.

Maximum sentence for felons other than class A, see § 902.9

LAW REVIEW AND JOURNAL COMMENTARIES

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

Page 2

I.C.A. § 707.5

New Iowa Criminal Law Part II--homicide offenses. Kermit L. Dunahoo, 29 Drake L Rev. 579 (1979-1980).

LIBRARY REFERENCES

2003 Main Volume

   Homicide ⚖️559

   Westlaw Topic No. 203

RESEARCH REFERENCES

Treatises and Practice Aids

4 Iowa Practice Series § 3:30, Involuntary Manslaughter

4 Iowa Practice Series § 3:35, Involuntary Manslaughter -- Penalty -- Public Offense.

4 Iowa Practice Series § 3:36, Involuntary Manslaughter -- Penalty -- Conduct Likely to Cause Death

4 Iowa Practice Series § 3:42, Homicide by Vehicle -- Causation

2 Substantive Criminal Law § 15.4, Criminal/Negligence Involuntary Manslaughter.

2 Substantive Criminal Law § 15.5, Unlawful-Act Involuntary Manslaughter

NOTES OF DECISIONS

Admissibility of evidence, motor vehicles 17
Aggravated misdemeanor 4
Bill of particulars 10
Burden of proof 21
Causation 2-3, 12
   Causation - In general 2
   Causation - Instructions to jury 3
   Causation - Motor vehicles 12
Construction and application 1
Defense, motor vehicles 13
Instructions to jury, causation 3
Instructions to jury, generally 21
Instructions to jury, motor vehicles 19
Intoxication 8
Jury questions, motor vehicles 18
Leaving scene of accident, motor vehicles 15
Lesser and included offenses, generally 9
Lesser and included offenses, motor vehicles 16
Motor vehicles 11-20
   Motor vehicles - In general 11
   Motor vehicles - Admissibility of evidence 17
   Motor vehicles - Causation 12

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

11-B

Westlaw.

*Compatible to the ILCS 5/12-31 (a)(1)* (handwritten)

IC 35-42-1-2

**C**

West's Annotated Indiana Code Currentness
  Title 35. Criminal Law and Procedure
    Article 42. Offenses Against The Person
      Chapter 1. Homicide (Refs & Annos)

→**35-42-1-2** Causing suicide

*Note: No Active* (handwritten note in left margin) *Participate*

Sec. 2. A person who intentionally causes another human being, by force, duress, or deception, to commit suicide commits causing suicide, a Class B felony.

CREDIT(S)

As added by Acts 1976, P.L.148, SEC.2. Amended by Acts 1977, P.L.340, SEC.26.

HISTORICAL AND STATUTORY NOTES

2004 Main Volume

Acts 1976, P.L.148, Sec.2, eff. Oct. 1, 1977.

Acts 1977, P.L.340, Sec.26, eff. Oct. 1, 1977, deleted a legislatively supplied section heading; substituted "human being" for "person"; and inserted "causing suicide".

CROSS REFERENCES

Adoption consent of parent not required, see IC 31-19-9-1 et seq.

Duress, defenses, see IC 35-41-3-8.

Foster homes, denial of license application for conviction, see IC 31-27-4- 13.

Foster homes, denial of licenses, see IC 12-17.4-4-11.

Jurisdiction in homicide case, see IC 35-41-1-1.

Persons convicted of causing the suicide of their own children, termination of parental rights, see IC 31-35-3-3 et seq.

School corporations, use of information obtained through criminal history information policy, see IC 20-5-2-8.

Sentence, mitigating circumstances, see IC 35-50-2-9.

Sentence for class B felony, see IC 35-50-2-5.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11–C

# Westlaw.

NE ST § 28-307                                                    Page 1

Neb.Rev.St. § 28-307

C

**NEBRASKA** REVISED STATUTES OF 1943
CHAPTER 28. CRIMES AND PUNISHMENTS
ARTICLE 3. OFFENSES AGAINST THE PERSON
(A) GENERAL PROVISIONS
§ 28-307. Assisting suicide, defined; penalty.

(1) A person commits assisting suicide when, with intent to assist another person in committing suicide, he aids and abets him in committing or attempting to commit suicide.

(2) Assisting suicide is a Class IV felony.

Source: Laws 1977, LB 38, § 22.

<General Materials (GM) - References, Annotations, or Tables>

Neb. Rev. St. § 28-307, NE ST § 28-307

The Statutes and Constitution are current through the Second Regular
Session of the 99th Legislature (2006).

The text of the Nebraska Statutes and Constitution 2006 was provided

by the Executive Board of the Legislative Council through the Revisor

of Statutes and is subject to a claim of copyright by the State of Nebraska.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11–D

Westlaw.

N. M. S. A. 1978, § 30-2-4

C

West's New Mexico Statutes Annotated Currentness
 ▪ Chapter 30. Criminal Offenses
  ▪ Article 2. Homicide (Refs & Annos)

   → § 30-2-4. Assisting suicide

Assisting suicide consists of deliberately aiding another in the taking of his own life.

Whoever commits assisting suicide is guilty of a fourth degree felony.

L. 1963, Ch. 303, § 2-5.

**Formerly 1953 Comp., § 40A-2-5.**

CROSS REFERENCES

Accessories, aiding or abetting a crime, see § 30-1-13.

Attempt to commit a felony, punishment, see § 30-28-1.

Crime Victims Reparation Act, applicability, see § 31-22-8.

Crime Victim Reparations Act, limitations on awards, see § 30-22-14.

Indigent Defense Act, see § 31-16-1 et seq.

Sentences for noncapital felonies, see §§ 31-18-15 to 31-18-16.1.

LIBRARY REFERENCES

Suicide ⟺3.
Westlaw Key Number Search: 368k3.
C.J.S. Suicide §§ 8 to 12.

RESEARCH REFERENCES

**Encyclopedias**

63 Am. Jur. Trials 1.

**Treatises and Practice Aids**

2 Substantive Criminal Law §§ 15.3, 15.6.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

21 Okl.St.Ann. § 814

**C**

Oklahoma Statutes Annotated Currentness
   Title **21**. Crimes and Punishments
      Part III. Crimes Against The Person
        Chapter 29. Suicide (Refs & Annos)

    → **§ 814. Furnishing weapon or drug**

Every person who willfully furnishes another person with any deadly weapon or poisonous drug, knowing that such person intends to use such weapon or drug in taking his own life, is guilty of aiding suicide, if such person thereafter employs such instrument or drug in taking his own life.

CREDIT(S)

R.L.1910, § 2303.

HISTORICAL AND STATUTORY NOTES

2002 Main Volume

**Source:**
    Comp.Laws Dak.1887, § 6432.
    St.1890, § 2078.
    St.1893, § 2068.
    St.1903, § 2157.
    Comp.Laws 1909, § 2258.
    Comp.St.1921, § 1723.
    St.1931, § 2558.

CROSS REFERENCES

    Health care professional license or certification, revocation or suspension upon conviction or plea of guilty for violation of this **section**, see Title 63, § 3141.8.

    Prescription or administration of drugs to alleviate pain or discomfort even if risk of death increased not a violation of this **section**, see Title 63, § 3141.4.

LIBRARY REFERENCES

2002 Main Volume

    Suicide ⊂3.
    Westlaw Topic No. 368.
    C.J.S. Suicide §§ 8 to 12.

RESEARCH REFERENCES

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

<u>TX PENAL § 22.08</u>                                                          Page 1

V.T.C.A., **Penal Code § 22.08**

**VERNON'S TEXAS** STATUTES AND **CODES** ANNOTATED

COPR. © WEST 1990 No Claim to Orig. Govt. Works

**PENAL CODE**
**TITLE 5. OFFENSES AGAINST THE PERSON**
**CHAPTER 22. ASSAULTIVE OFFENSES**

<u>§ 22.08. Aiding suicide</u>

(a) A person commits an offense if, with intent to promote or assist the commission of suicide by another, he aids or attempts to aid the other to commit or attempt to commit suicide.

(b) An offense under this section is a Class C misdemeanor unless the actor's conduct causes suicide or attempted suicide that results in serious bodily injury, in which event the offense is a felony of the third degree.

1989 Main Volume Credit(s)

Acts 1973, 63rd Leg., p. 883, ch. 399, § 1, eff. Jan. 1, 1974.

Natural Death Act, effect on this section, see V.T.C.A. Health & Safety Code, § 672.017.

"Actor" defined, see § 1.07(a)(2).

Attempt, see § 15.01.

Causation, see § 6.04.

Class C misdemeanor punishment, see § 12.23.

"Conduct" defined, see § 1.07(a)(8).

Criminal solicitation, see § 15.03.

Natural Death Act, affect on this section, see Vernon's Ann.Civ.St. art. 4590h, § 8(a).

"Person" defined, see § 1.07(a)(27).

"Serious bodily injury" defined, see § 1.07(a)(34).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11-G

THE PEOPLE OF THE STATE OF ILLINOIS )
                                     )                    EXHIBIT 12
        -vs-                         )
                                     )   No. 95-CR-30463
THOMAS O'FARRELL                     )
                                     )

## SUBPOENA DUCES TECUM

The People of the State of Illinois to all Peace Officers in the State - GREETINGS:

WE COMMAND THAT YOU SUMMON    DR. KENNETH ROBBINS
                              9701 N. KNOX
                              SKOKIE, IL
                              ATTN: KEEPER OF RECORDS

to appear to testify before the Honorable JUDGE TOOMIN on SEPTEMBER 27, 1996 in Room 400 Circuit Court, 26th Street and California Avenue, Chicago, Illinois at 9:00 A.M.

   YOU ARE COMMANDED ALSO to bring the following: ANY AND ALL RECORDS CONCERNING THE TREATMENT OF LESLIE CHAPMAN O'FARRELL F/W, DOB 1/23/66, SS# 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, OF 3435 W. ARDMORE, CHICAGO, ILLINOIS.

        PHOTO COPIES WILL SUFFICE IN LIEU OF COURT APPEARANCE.

YOUR FAILURE TO APPEAR IN RESPONSE TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISHMENT FOR CONTEMPT OF THIS COURT.

                      WITNESS    AUGUST 29, 1996

                      _____
                                  Clerk of Court

Atty No.    30293
Name        JOSEPH P. KENNELLY, Assistant Public Defender
Attorney for THOMAS O'FARRELL, Defendant
Address     2650 South California, 8th Floor
City        Chicago, Illinois  60608
Telephone   (312) 890-7396 or 890-7400    Fax (312) 890-3247

_____

I served this Subpoena by handing a copy to _____

on _____

                      SERVED BY _____

_____

                              12-A
_____

DIRECT INQUIRIES TO:    AURELIA PUCINSKI
                        Clerk of the Circuit Court, Criminal Division
                        2650 South California, Chgo., IL  60608

        NOT VALID FOR SERVICE ON NEWS MEDIA WITHOUT ORDER OF COURT
        AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

ASSOCIATED MENTAL HEALTH SERVICES
NEW PATIENT REGISTRATION FORM

4416

Chapman —

PATIENT NAME: O'Farrell    Lesley          D.O.B: 1/85/66 M_ F ✓
                (last)        (first)    (m)

ADDRESS: 3435 W. Ardmore Chicago, IL 60659
                          (city)      (state)    (zip)

PHONE: (312) 267-6404  (___)___-___    SS#: 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
         (home)              (work)

EMPLOYER, BUSINESS NAME: _____

ADDRESS: _____
                          (city)      (state)    (zip)

REFERRED BY: Dr. Saeed Kahn      PHONE: (708) 674-7303

WHAT DR. YOU ARE SEEING TODAY?: Dr. Robbins

PRIMARY INSURANCE: _____

ADDRESS: _____
                          (city)      (state)    (zip)

PHONE: (___)___-___   GROUP#:_____  ID#:_____

IS IT YOUR SPOUSE'S PLAN?__Y__N  IS THIS PLAN THROUGH WORK?__Y__N

SECONDARY INSURANCE:_____

ADDRESS: _____
                          (city)      (state)    (zip)

PHONE: (___)___-___   GROUP#:_____  ID#:_____

IS IT YOUR SPOUSE'S PLAN?__Y__N  IS THIS PLAN THROUGH WORK?__Y__N

**PLEASE READ CAREFULLY:**
Payment is to be rendered at the time of service.  We accept
cash, check, Visa or Mastercard.

It is our policy that you will be charged for any appointments
not canceled 24 hours prior to the appointment time.

We do not bill for outpatient services, but if you have completed
the above information, we will be able to assist you should your
insurance company have any questions.

I understand that I am responsible for all outstanding balances,
including that portion of my bill submitted for insurance.

I consent to an initial evaluation/diagnostic assessment and
ongoing treatment if indicated by AMHS.

Signature: Lesley Chapman O'Farrell     Date: Jan. 14, 1992

revised 1/92 ljd

12B

1/14/92

Lesley O'Farrell
24 year old Female case
married to 27 yr old
male - married 3½ yrs
with a 6 month old boy -
May of 1990 - husband was
accused of Murdering his
mother in Lewis maid.
In 1988 F

S In Dec 1988 her Father died of
was dying - of Cancer - and
died Dec 1991. O this past
Christmas depression ~
about his death. Conflict
to mother during Father's dei
this conflict had been long
standing - Mother - was
a powerful woman in business
and died Sept 13th 99½ 2 day
after by my pass surgery ag

Leslie O'Farrell

A well-off — mother's
daughter — she found out
that ~~grandfather~~ ~~was~~
~~gun~~ ~~bit~~
that who she thought
was her father was her
grandfather

_Kenneth L. [signature]_

Lesley O'Farrey

Husband
out work 2 yrs —
had 3 operations, shoulder

Dreams: ← Lee
Death ← Debra - houston
    — Husband - Tom
    = son -

Physical - problem w son —

+ — Histary suicidal — Identon
    as a teenager —

Dysthimia , —

THE CLIENT'S NAME _Lesley O'Farrell_     DATE _1/23/9_

ASSOCIATED MENTAL HEALTH SERVICES
PROGRESS NOTES

1/23/92  IRx — not sleeping —
anxiety about child's surgery
depression related to father-
in-law's death — depression —
Kermit L. Kleinschmidt PhD

1/30/92 — IRx — ↑ stress — court
pending for business, estate
and husband — referred to
verticate support area
Kermit L. Kleinschmidt PhD

2/20/92 IRx — ↑ stress — depression
many Problems, Issues —
eye problems — Kermit L. Kleinschmidt PhD

2/27/92 — Failed appt.
Kermit L. Kleinschmidt PhD

3/12/92 IRx — verbalize "garbage" store
from spouse — female friend
angry that most people use?
— support given — depression
Kermit L. Kleinschmidt PhD

3/2/92 — IRx — ↑ stress son is going in
for surgery Friday — reports
bad dreams — anxiety —
and husband is willing to go to
counseling  Kermit L. Kleinschmidt PhD

12–F

THE CLIENT'S NAME _Lesley_                    DATE _5/14/92_

ASSOCIATED MENTAL HEALTH SERVICES
PROGRESS NOTES

5/14/92 TRX depression *where am I?*
↑ anxiety. conflict ō spouse,
marital conflict poor communicat'n
conflict ū biological mother
on meeting day — _Kenneth Zeh? MD_

5/21/92 TRX · depressive conflict ū
biological parents — relating, worry
has about 4 nannies on a child —
_Kenneth Zeh MD_

6/4/92 TRX — depression · marital conflict
complains of passive aggressive
feels by spouse — sleep disturbance
waking coming home late —
stressed by — child nurture — others
_Kenneth Z. Zeh MD_

6/25/92 TRX — depressed about marital problems
poor communication — "No sex life" — states
Husband is angry but will not
express it directly — he is on pills
for pain — In-law problems, legal problems
↑ stress — _Kenneth Z. Zeh MD_

7/14/92 TRX — depressed — about marital
problems — ↑ stress, anxiety —
"No sex life" — poor communication
_Kenneth Zeh MD_

12–G

ASSOCIATED MENTAL HEALTH SERVICES, LTD.

DATE: 3-25-94   PATIENT: O'Farrell _____   DUR 50 min. Fee rcvd _____

Type session: _✓_ indiv __cpl __fam __group __consult __exam

Themes of Session: (Relate to Problems)

TRX ~ anxious, depressed
Flashbacks, — nightmares
about ~ mother feeling at his
Inc. stress —
Misses her "father" —
Marital conflicts — spinal passive
aggressive
— fear, losing control —
— Pt. instability mood think bluent
hysterical — fits of crying .

Assessment of Current Status (Includes new Sx, Hx, Dx, Prog.)   No change ☐

Compliance: __H __M _✓_   Motivation: __H _✓_ L   Treatment Complexity: __Sim _✓_ R __H __E

Interventions (Include education, change in medication, goal setting, referral as well as specific technical interventions) Relate to goals and treatment plan:

TRX ~

Plan & Prognosis (Include changes to Tx Plan)   No change ☐   Resp ☐   Refer ☐

12-H

Signature: _____

ASSOCIATED MENTAL HEALTH SERVICES, LTD.

DATE: APR 05 1994    PATIENT: O'Farrell Lesley    DUR 50 min. Fee rcvd

Type session: ✓ indiv __ cpl __ fam __ group ✓ consult __ team

Themes of Session: (Relate to Problems)

Pt. Reports - Confused with than
Mother who is dead - critical of her
- then can't sleep -
- Pt. symptoms of depression & mood,
poor concentration, loss of interest in
usual activities, dec. in libido,
low self esteem - wt. problems,
feels ugly - poor concentration -
Identity Issues    Parents deaths -
who Am I? - Reports imag medical
Playmate

✗ Dr. Johnson - will Ax Med Eval
4/13/94 9:30 AM ≃ #409 -

Assessment of Current Status (Include new Sx, Hx, Dx, Prob.)  No change ☐

Compliance: __H ✓M __L    Motivation: __H ✓M __L    Treatment Complexity: __Rout __H __M __L

Interventions (Include education, change in medication, goal setting, referral as well as specific technical interventions) Relate to goals and treatment plan:

Plan & Prognosis (Include changes to Tx Plan)    No change ☐    Hosp ☐    Refer ☐

12-I

Signature: Keith L Rahn PhD

DATE: _____ APR 7 1994 _____ PATIENT: O'Farrell Resley _____ OUR ___ ain. Fee ___

Type session: __ Indiv __ cpl __ fam __ group __ consult __ eval

Themes of Session: (Relate to Problems)

28 yo WF, lives in Chicago ē husband & 3 yo son
Pt stays at home ē son. Married x 6 yrs. Seeing
Dr. Robins for ψ therapy - 1½ yrs. (started again - no sk
no past ψ hospitalizations.

Pt slt sk abt for "no reason" Hopeless ↓ self
esteem, wants to stay in bed, ↓ ability to fall asleep.
↓ appetite - only wt gain if she retains water.
Mood: depressed, empty, irritable. ↓ memory -
x a few months. Anhedonia - ↓ interest in music.
Pt slt she had a depressive episode ~ age 15 ē
⊗ suicidal thoughts, after h.s. - bulimic, ETOH/
drug use. depressed relationship break-up - this
lasted until ~ 1987 (when she met her husband →
stopped drug/etoh use. Last bulimic behavior ~ 1987.
S/t (F) died in 12/90. No ē major mental problems →
Pt + husband moved back in 2 mo, Pt had son 6/91 -
(M) died 9/91. Pt then found out that they were
(F) parents' ins for parents - met bio parents 12/91. Pt
also has idea lawsuits over business that her ⊗ ⊗ had.
Depression worse over ē 2 months - was upset
ē "renewed ē filing in evidence still confusing."
(over)

Assessment of Current Status (Include new Sx, Rx, Dx, Prob.) · No change ☐

Compliance: __ H __ M __ L   Motivation: __ H __ M __ L   Treatment Complexity: __ Ext __ H

Interventions (Include education, change in medication, goal setting, referral as well
specific technical interventions) Relate to goals and treatment plan:

Plan & Prognosis (Include changes to Tx Plan)   No change ☐  Reap ☐  Red

12-J

Signature: _____

ASSOCIATED MEDICAL HEALTH SERVICES, LTD.

DATE: MAY 1 0 1994   PATIENT: O'Farrell Leslie   DUR 50 min. Fee

Type session: ✓ Indiv __ cpl __ fam __ group __ consult __ tel

Themes of Session: (Relate to Problems)

IRX — Nightmares about mother
— didn't go to cemetery for M
— Misses father —
— Angry at mother — screaming
— Hypnosis — Felt like sleeping
spring — Felt father was
disappointed in her — feel-
— Depressed — but more energy
— cleaned in house this past
— NO Ideation — fear of flashbacks

Assessment of Current Status (Include new Sx, Hx, Dx, Prog.)   No change ☐

Compliance: __H __M __L   Motivation: __H __M __L   Treatment Complexity: __Hgh __

Interventions (Include education, change in medication, goal setting, referral as well
specific technical interventions) Relate to goals and treatment plan:

Plan & Prognosis (Include changes to Tx Plan)   No change ☐   Hosp ☐   Refe

12-K

Signature: _____ PhD

JUN 1 4 1994

DATE: _____   PATIENT: O'Farrell, Lesley _____   TIME 50 min. Fee #:
Type session: __ indiv __ cpl __ fam __ group __ consult __ test

Themes of Session: (Relate to Problems)

IRx — reports — continued — marital
conflict. "love-hate relationship" —
2 wks Vacation — next two we
will take seperate Vacation —
— Depression improved —
No libido —
— SAd — she not to have anymore children
due to health problems —
— Reports — anxiety — about sexual
disire is low —
few of flashbacks —

Assessment of Current Status (Include new Sx, Hx, Dx, Prod.) . No change ☐

Compliance: __H __M __L   Motivation: __H __M __L   Treatment Complexity: __Low __H __M __L
Interventions (Include education, change in medication, goal setting, referral as well as
specific technical interventions) Relate to goals and treatment plan:

Plan & Prognosis (Include changes to Tx Plan)   No change ☐   Ecap ☐   Refer ☐

12-L

Signature: Keith R. Palm PhD

ASSOCIATED MENTAL HEALTH SERVICES, LTD.

DATE: JUL 1 2 1994   PATIENT: O'Farrell Lesley   DUR 50 min. Fee cvrd

Type session: _Indiv_ ✓ _Fam_ _Group_ _Consult_ _Eval_

Notes of Session: (Relate to Problems)

Pt. - Given Paxil - 20mg 7 days -
will Sch - Dr Johnson - Friday -
4-9.

Pt. reports - fearfulness - wishes
she could have another "baby" -
Reports - "urge to purge" did do it
- denies bing. -

Reports - she is sad she can't give
husband another baby - "Her lights
up around other women w children"
I can't have any more children
I'm jealous - of them

★low self esteem - self doubts -
Anger D to family God - self

★ passive suicidal Ideation - month ago
- Nightmares about mother - who was
yelling at her - Pt Reports she sat
up - and yelled back at her - Reports
she hears mother voice - but not
see her - lack of sexual desire -
★ Poor concentration, restless sleep -

Assessment of Current Status (Includes new fx, Hx, Dx, Prob.)   No change ☐

Compliance: _H_ ✓_M_ _L_   Motivation: _H_ ✓_M_ _L_   Treatment Complexity: _Low_ _H_ ✓_M_ _L_
Interventions (Include education, change in medication, goal setting, referral as well as
specific technical interventions) Relate to goals and treatment plan:

Plan & Prognosis (Include changes to Tx Plan)   No change ☐   Sdap ☐   Refer ☐

12-M

Signature: Kreil Loeb PhD

ASSOCIATED MENTAL H[EALTH SER]VICES, LTD.

DATE: 7-18-94   PATIENT: O'Farrell Lesie   DUR 50 min. Fee rcvd _____
Type session: _ indiv _ tel _ fam _ group _ consult _ ther

Themes of Session: (Relate to Problems)

Exa Pt — Pt Page Th psychologist
2/17/94 — threaten — hysterical Delore
till been called — marital contlict —
poor communication a spouse
issues about money,
"       "   sex, —
Dt — threaten — divorce —
✗ Pt told to have a friend stay w/ her —
! Husband — out of the house or son —

Safety Contract —

Assessment of Current Status (Include new Sx, Hx, Dx, Prob.) · No change ☐
Situational stress, marital problem
— Seen Dr Johnson — med eval —

Compliance: _ H _ M _ L   Motivation: _ H _ M _ L   Treatment Complexity: _ Exc _ VH _ H _ L
Interventions (Include education, change in medication, goal setting, referral as well as specific technical interventions) Relate to goals and treatment plan:

2 N H — 7/19/94 Ther —
SM

Plan & Prognosis (Include changes to Tx Plan)   No change ☐ Hosp ☐ Refer ☐

12-N
Signature: Kevin L Roh... M.D.

ASSOCIATED MENTAL HEALTH SERVICES, LTD.

DATE: JUL 2 6 1994   PATIENT: O'Farrell Lesley   50 min. Fee paid_____
Type session: ✓ Indiv ___ cpl ___ fam ___ group ___ consult ___ eval

Focus of Session: (Relate to Problems)

"Pt - reports she is depressed doesn't
like to put on the "happy face"
Sleep disturbance — up at 12-3 Am —
Marital conflict — poor communication —
Anxiety — parent attack — when out
Socially — "too many people"
Dreams — about ↓ spouse son
— him walking away from him
↓ Issues of ↓ "faith" in me"
    ± "Trust in me"
"I push back — & tackit all
my life" — ↑money issues — Don't worry"
      ↓ sexual Issues
"External Locus of Control"
Low Self Est — ↑stress

Reports - "I fear Death"

Assessment of Current Status (Include new Sx, Hx, Dx, Prob.) · No change ☐

Compliance: __H __✓ __L   Motivation: __H ✓ __L   Treatment Complexity: __Hard ✓ __M __L
Interventions (Include education, change in medication, goal setting, referral as well as
specific technical interventions) Relate to goals and treatment plan:

        Dr. med eval ~

Plan & Prognosis (Include changes to Tx Plan)        No change ☐   Easy ☐   Refer ☐

        12-9
Signature: Kenith L. Rah___ PhD

ASSOCIATED MENTAL HEALTH SERVICES, LTD.

DATE: AUG 2 3 1994    PATIENT: *O'Farrill Lester*    DUR 50 min. Fee rcvd

Type session: ✓ Indiv __ cpl __ fam __ group __ consult __ eval

Themes of Session: (Relate to Problems)

*Dsh — Reports conflict spouse — resentments from past to spouse — Pt. — depressed about life's situation — money problem — but loves son — misses his father — (grandfather) she goes to cemetery to talk to him —*

Assessment of Current Status (Include new Sx, Hx, Dx, Prob.)  ·  No change ☐

Compliance: __ H ✓ M __ L    Medication: __ H __ M __ L    Treatment Complexity: __ Rtn ✓ H __ M __ L

Interventions (Include education, change in medication, goal setting, referral as well as specific technical interventions) Relate to goals and treatment plan:

Plan & Prognosis (Include changes to Tx Plan)    No change ☐    Hosp ☐    Refer ☐

12-P

Signature: *Herald L. Rahm PhD*

Ex Hi B it 13

STATE OF ILLINOIS )
                  ) ss
COUNTY OF COOK )

# AFFIDAVIT OF JOHN KOHN

I, John Kohn, hereby certify under penalty of perjury and as otherwise provided by law that the statements below are true and correct to the best of my knowledge;

1) I am thirty four (34) years of age and reside in the State of Illinois, Cook County, at 3832 W. 148th Place, Midlothian.

2) I am, subject to the rule of admissibility, competent to testify to the matters herein.

3) The defendant in this cause, Thomas (Tom) O'Farrell, is my brother-in-law.

4) The victim in this cause, Lesley Chapman O'Farrell, was my sister-in-law who was married to my brother-in-law Tom.

5) LeRoi (Lee) O'Farrell is the son of Lesley and Tom and is my nephew.

6) On, or about, September 28, 1995, I was at Area 5 Police Headquarters when Detective Shack told my mother-in-law and father-in-law that Tom had confessed to killing Lesley because of her poor health.

7) Later that day, my wife and I took Tom's son Lee from Area 5 Police Headquarters to our home in Midlothian, Illinois.

8) On, or about, August 22, 1996, I was present at the suppression hearing of the State's witness, Mr. Thomas Dye, where I witnessed Lesley's best friend, Anne Dworak, enter the Jury room where Thomas Dye was being held prior to giving his testimony. She remained in that room

-1-

for approximately ten (10) to fifteen (15) minutes. When she re-entered the Court room, Assistant State's Attorney Ford and Thomas Dye were with her.

9) On, or about, February 24, 1997, I was present at the sentencing hearing for Tom where I testified. I also observed Assistant State's Attorney Nicholas Ford make a head motion toward Lesley's best friend, Anne Dworak. Ms. Dworak left her seat in the Court room and followed State's Attorney Ford into the Jury room. She stayed in that room for approximately ten (10) to fifteen (15) minutes and when she re-entered the Court room, State's Attorney Ford and Mr. Thomas Dye were with her. Thomas Dye then went on to testify about intimate details of Lesley and Tom's life together which Anne Dworak knew being Lesley's best friend.

10) I told the above information to my father-in-law who relayed it to Tom's attorney Joseph Kennelly prior to the finish of the proceedings.

Further affiant sayeth nought.

Subscribed and SWORN to before me
on this _4_ day of _July_, 1999

_John Kohn_
John Kohn

_Theresa M. Dwyer_
Notary Public

OFFICIAL SEAL
THERESA M DWYER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/17/01

-2-

13-2

PROGRAM-LATRHNS7
03/17/87

LEGISLATIVE INFORMATION SYSTEM
HOUSE OF REPRESENTATIVES
MASTER TRANSCRIPT INDEX

PAGE 262

| BILL NUMBER | DATE | PAGE | ACTION |
|---|---|---|---|
| S8-0186(cont'd) | 10/30/85 | 109 | FIRST READING |
| S8-0187 | 06/17/85 | 21 | SECOND READING |
|  | 06/19/85 |  | SECOND READING |
|  | 06/26/85 | 208 | SECOND READING |
| S8-0189 |  |  |  |
| S8-0192 | 05/21/85 | 332 | FIRST READING |
|  | 06/04/85 | 3 | SECOND READING |
|  | 06/24/85 |  | THIRD READING |
|  | 06/18/85 | 113 | THIRD READING |
| S8-0195 | 05/17/85 | 5 | FIRST READING |
|  | 06/04/85 |  | THIRD READING |
|  | 06/18/85 | 24 | THIRD READING |
| S8-0196 | 05/17/85 | 5 | FIRST READING |
|  | 06/04/85 | 21 | SECOND READING |
|  | 06/17/85 |  | THIRD READING |
| S8-0197 | 05/29/85 | 115 | FIRST READING |
|  | 06/25/85 | 10 | SECOND READING |
|  | 06/27/85 | 37 | THIRD READING |
| S8-0492 | 05/29/85 | 5 | FIRST READING |
|  | 06/19/85 | 151 | SECOND READING |
|  | 06/28/85 | 194 | THIRD READING |
|  | 07/03/85 | 252/159 | NON-CONCURRENCE |
| S8-0497 |  |  |  |
| S8-0499 |  |  |  |
| S8-0500 | 05/24/85 | 2 | FIRST READING |
| S8-0501 | 06/17/85 | 3 | FIRST READING |
|  | 06/19/85 | 120 | SECOND READING |
|  | 06/27/85 |  | THIRD READING |
| S8-0502 | 05/29/85 | 156 | FIRST READING |
|  | 10/29/85 | 216 | SECOND READING |
|  | 10/30/85 | 5 | SECOND READING |
| S8-0504 | 05/21/85 | 333 | FIRST READING |
|  | 06/18/85 | 24 | SECOND READING |

PROGRAM-LATRHNS7
03/17/87

LEGISLATIVE INFORMATION SYSTEM
HOUSE OF REPRESENTATIVES
MASTER TRANSCRIPT INDEX

PAGE 263

| BILL NUMBER | DATE | PAGE | ACTION |
|---|---|---|---|
| S8-0505 | 05/24/85 | 2 | FIRST READING |
|  | 06/05/85 | 3 | HELD ON SECOND |
|  | 06/25/85 | 18 | THIRD READING |
|  | 06/29/85 |  | NON-CONCURRENCE |
| S8-0506 | 05/16/85 | 398 | FIRST READING |
|  | 06/20/85 | 92 | HELD ON SECOND |
|  | 06/25/85 | 101 | SECOND READING |
|  | 06/26/85 | 101 | THIRD READING |
|  |  |  | MOTION |
| S8-0507 | 05/29/85 | 115 | FIRST READING |
|  | 06/25/85 | 10 | SECOND READING |
|  | 06/27/85 | 42 | THIRD READING |
| S8-0510 | 05/24/85 | 435 | FIRST READING |
| S8-0512 | 05/29/85 | 2 | FIRST READING |
|  | 06/18/85 | 31 | SECOND READING |
|  | 06/26/85 | 69 | THIRD READING |
| S8-0513 | 05/29/85 | 4 | FIRST READING |
|  | 06/20/85 | 10 | SECOND READING |
|  | 06/28/85 | 39 | THIRD READING |
|  | 07/03/85 | 228 | NON-CONCURRENCE |
|  |  |  | CONFERENCE |
| S8-0517 | 05/17/85 | 170 | FIRST READING |
|  | 06/19/85 | 95 | SECOND READING |
|  | 06/28/85 |  | THIRD READING |
| S8-0518 | 06/04/85 | 10 | FIRST READING |
|  | 06/05/85 | 394 | HELD ON SECOND |
|  | 06/20/85 | 3 | THIRD READING |
| S8-0521 | 06/17/85 | 21 | FIRST READING |
|  | 06/19/85 | 398 | SECOND READING |
|  | 06/24/85 | 232 | HELD ON SECOND |
|  | 06/26/85 | 250 | HELD ON SECOND |
|  | 06/28/85 | 241 | THIRD READING |
|  | 06/29/85 | 18 | NON-CONCURRENCE |
| S8-0532 | 06/17/85 | 5 | FIRST READING |
|  | 06/20/85 | 5 | SECOND READING |
|  | 12/03/86 | 61 | THIRD READING |
|  |  |  | MOTION |
| S8-0535 | 05/23/85 | 465 | FIRST READING |
|  | 06/20/85 | 398 | HELD ON SECOND |
|  |  |  | MOTION |

STATE OF ILLINOIS
84th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

48th Legislative Day                                              May 29, 1985

Bill for an Act in relation to the filing date for returns
for certain state taxes.  First Reading of the Bill.
Senate Bill 522, Homer, a Bill for an Act to amend an Act
to create the offense of first degree murder and second
degree murder.  First Reading of the Bill.  Senate Bill
567, Richmond, a Bill for an Act to amend Beef Market
Development Act.  First Reading of the Bill.  Senate Bill
644, Flowers, a Bill for an Act to amend the Crime Victims
Compensation Act.  First Reading of the Bill.  Senate Bill
651, Parcells, a Bill for an Act to amend the Illinois
Vehicle Code.  First Reading of the Bill.  Senate Bill 670,
LeFlore, a Bill for an Act to amend an Act to permit
employees to review personnel records.  First Reading of
the Bill.  Senate Bill 690, Parcells, a Bill for an Act to
amend the Illinois Income Tax Act.  First Reading of the
Bill.  Senate Bill 729, Olson, a Bill for an Act to amend
an Act in relation to certain state regulatory agencies.
First Reading of the Bill.  Senate Bill 986, Dunn, a Bill
for an Act to amend the Probate Act.  First Reading of the
Bill.  Senate Bill 1031, Hensel, a Bill for an Act to amend
the Code of Civil Procedure.  First Reading of the Bill.
Senate Bill 1105, Van Duyne, a Bill for an Act to amend the
School Code.  First Reading of the Bill.  Senate Bill 1131,
Parcells, a Bill for an Act to amend the Liquor Control
Act.  First Reading of the Bill.  Senate Bill 1174, Anthony
Young, a Bill for an Act to amend the School Code.  First
Reading of the Bill.  Senate Bill 1215, Anthony Young, a
Bill for an Act to amend the School... Illinois School
Student Record Act.  First Reading of the Bill.  Senate
Bill 1244, Homer - McCracken - Cullerton, a Bill for an Act
to amend an Act in relation to the offense involving the
operation of vehicles while under the influence of alcohol
or other drug.  First Reading of the Bill.  Senate Bill

5

14-2

STATE OF ILLINOIS
84th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

128th Legislative Day　　　　　　　　　　　　　June 17, 1986

Cullerton: "Well, we can eliminate one of those requests."

Speaker Greiman: "Well, you can eliminate one.　Mr. McCracken."

McCracken: "Thank you.　With the withdrawal of the Amendment, we'll withdraw the fiscal note."

Speaker Greiman: "The fiscal note on the Bill, as well as on the Amendment?　Alright.　Then the fiscal note request has been withdrawn.　Third Reading.　On the Order of Senate Bills Second Reading, appears Senate Bill 522.　Mr. Clerk, read the Bill.　Mr. Homer, do you wish to proceed with 522?　Mr. Clerk, read the Bill."

Clerk O'Brien: "Senate Bill 522, a Bill for an Act to amend an Act to create the offenses of first degree murder and second degree murder.　Second Reading of the Bill.　No Committee Amendments."

Speaker Greiman: "Are there any Floor Amendments?"

Clerk O'Brien: "No Floor Amendments."

Speaker Greiman: "Third Reading.　On page 4 of the Calendar, Senate Bills Second Reading, appears Senate Bill 937.　Mr.... Out of the record.　On the Order of Senate Bills Second Reading, appears House Bill 943 (sic — Senate Bill 943).　Mr. Nash, do you wish to proceed with that Bill?　Mr. Nash, 943.　Mr. Clerk, read the Bill."

Clerk O'Brien: "Senate Bill 943, a Bill for an Act to amend the baccalaureate assistance law.　Second Reading of the Bill.　Amendment #1 was adopted in Committee."

Speaker Greiman: "Are there any Motions with respect to Amendment #1?"

Clerk O'Brien: "No Motions filed."

Speaker Greiman: "Are there any Floor Amendments?"

Clerk O'Brien: "No Floor Amendments."

Speaker Greiman: "Third Reading.　On the Order of Senate Bills Second Reading, appears Senate Bill 1552, Mr. Giglio.　Mr. Clerk, read the Bill."

5

14-3

STATE OF ILLINOIS
84th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

132nd Legislative Day                                    June 23, 1986

Representative Homer is back in the chamber. With leave of the Body, we will go back to his Bill, Senate Bill 522. Clerk, read the Bill."

Clerk Leone: "Senate Bill 522, a Bill for an Act to amend an Act to create the offenses of first degree murder and second degree murder. Third Reading of the Bill."

Speaker Breslin: "Representative Homer."

Homer: "Thank you, Madam Speaker, Ladies and Gentlemen. This Bill is identical to House Bill 913 which passed out a few weeks ago. It creates new offenses of first degree murder and second degree murder, replacing the current terminology, which we use, 'murder', would be the identical elements that would be in the proposed first degree murder Section, and then, instead of voluntary manslaughter, this Bill suggests that we have a second degree murder and that in those cases where there are mitigating circumstances, such as serious provocation, that would serve as a justification for reducing a murder charge to a voluntary manslaughter, and now a first degree murder charge to a second degree murder charge that the defendant, and not the state, would bear the burden of proving the mitigating circumstance, and that's in order to avoid the anomaly that's found in the current statutes, whereby the state is required to prove beyond a reasonable doubt all of the elements of the offense, including the mitigating circumstance, which, in many cases, the state does not wish to prove. So, this... this is a proposal that's come out of lengthy Law Review articles and studies, the legal scholars. Judge Steigman from Champaign County has been involved in the process as well as Jim 'Haddad', who is a former first assistant state's attorney and a renowned legal scholar from Cook County and others who have worked over the years. We've had special hearings in the summer.

71

14-4

STATE OF ILLINOIS
84th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

132nd Legislative Day                                June 23, 1986

We had one last year at the Civic Center with our Judiciary
Committee, and I would say that I would be happy to answer
any questions, and I would then simply ask that we support
the Bill."

Speaker Breslin: "The Gentleman has moved for the passage of
Senate Bill 522. And on that question, Representative
Cullerton."

Cullerton: "Yes, thank you, Madam Speaker and Ladies and
Gentlemen of the House. I rise in support of this Bill.
The same Bill which was in the form of a House Bill was
voted on and passed out of this Committee, and I wasn't
here. Someone voted me 'present'. I think that they
thought that, perhaps, I normally would not be in favor of
this, but I think this is something which is basically very
fair. It's also very significant. We are going to be
changing the definition of voluntary manslaughter in this
state. We're going to be eliminating the term 'voluntary
manslaughter'. We're going to have murder 1 and murder 2.
And what we're doing, however, is not to change the
elements of the offense of voluntary manslaughter, but
we're basically changing the burden of proof to the
defendant. And the reason why that's fair is that
voluntary manslaughter is really a less culpable form of
murder. It's murder with extenuating circumstances, and
normally, the defendant is the one who wishes to bring to
the attention of the jury or a Judge those extenuating
circumstances, but the way the law works now is that the...
the state has the burden of proving this, and so, you have
some situations where juries have come back, where they're
guilty of murder and guilty of voluntary manslaughter,
saying that the state proved murder, plus they proved the
extenuating circumstances. And these cases have gone to
the Supreme Court and they have indicated that it is indeed

72

14-5

STATE OF ILLINOIS
84th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

132nd Legislative Day

June 23, 1986

a very confusing area. Now, what the effect, then, of this Bill would be is to say that the burden of proving those mitigating factors should be on the defendant with a preponderance of the evidence. The jury would be instructed that in these cases of murder, in which they find it's more likely or not that mitigation is present, then they should find the defendant guilty of the less culpable homicide, that would be of murder 2. It would be murder in the second degree. I think that it's a fair change. I think it's something that which the state is entitled to. I don't think it works any hardship on the defendant, since he is the one or she is the one who, in most cases, is in a better position to prove the mitigating factors, and I think it's a definite plus. This Bill is important to pass today because it will go to the Governor. And for those reasons, I would appreciate your support for the Bill."

Speaker Breslin: "The question is, 'Shall Senate Bill 522 pass?' All those in favor vote 'aye', all those opposed vote 'no'. Voting is open. This is final passage. Have all voted who wish? Have all voted who wish? The Clerk will take the record. On this question there are 101 voting 'aye', 4 voting 'no', and 8 voting 'present'. This Bill, having received the Constitutional Majority, is hereby declared passed. We'd like Representative Daniels, Minority Leader Daniels, in the Chair for a special introduction."

Daniels: "The privilege that I have right now is to introduce a Gentleman to you from Sweden. And in Sweden, as you know, there's just one House, called the House of Parliament, and this Gentleman is the Minority Leader in the Swedish Parliament, which makes him very special to the right side of the aisle. And I've been working on his name very carefully right now, and I'm going to do my best, but he'll

73

STATE OF ILLINOIS
84th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

146th Legislative Day                        December 3, 1986

Representative Koehler, Representative Cullerton has
returned to the chamber. Add him to the Roll Call voting
'aye'. Representative Terzich votes 'no'. Representative
Capparelli votes 'no'. Representative Koehler and
Representative McCracken, with regard to your parliamentary
inquiry, there are only certain Resolutions required under
the rules, under Rule 43, that require 60 votes. This is
not one of those Resolutions. Therefore, a Majority Vote
carries. Those Resolutions that require 60 votes are
listed as those creating special Committees or special
Joint Committees, those calling for the expenditure of
funds, those directing investigations and those directing
audits by the Auditor General. On this question there are
52 voting 'aye', 48 voting 'no', none voting 'present', and
the Resolution is adopted. Ladies and Gentlemen, we are
going to the Order of Amendatory Veto Motions. They appear
on page four on your Calendar. The only one on that Order
that has not yet been called is Senate Bill 522,
Representative Homer, on Motion #1. Turn on Representative
Homer."

Homer:   "Thank you, Madam Speaker. This Senate Bill is the one
that changed the name of murder and voluntary manslaughter
to first degree murder and second degree murder. The
Governor's amendatory veto made technical changes, caught
some references in the statute that did not change the
terminology and also noted that the original Bill, Senate
Bill 522, was introduced in 1985 and had an effective date
of January 1 of '86. So the amendatory veto changed that
effective date correctly to January 1, 1987. I would move,
Madam Speaker, that the House accept the amendatory veto of
the Governor."

Speaker  Breslin:  "The Gentleman has moved to accept the
Governor's amendatory veto on Senate Bill 522. And on that

                                                              61

                        14-7

STATE OF ILLINOIS
84th GENERAL ASSEMBLY
HOUSE OF REPRESENTATIVES
TRANSCRIPTION DEBATE

146th Legislative Day                           December 3, 1986

question, is there any discussion?  Hearing none, the
question is, 'Shall the House adopt the Governor's specific
recommendations for change in Senate Bill 522?'  All those
in favor vote 'aye', all those opposed vote 'no'.  Voting
is open.  60 votes are required for the acceptance of the
amendatory veto.  Have all voted who wish?  Have all voted
who wish?  The Clerk will take the record.  On this
question there are 106 voting 'aye', none voting 'no' and
none voting 'present', and the House does accept the
Governor's specific recommendations for change in Senate
Bill 522.  And this Bill, having received the
Constitutional Majority, is hereby declared passed.
Supplemental Calendar announcement.  Representative Kulas,
for what reason do you rise?"

Kulas:  "Thank you, Madam Speaker.  For the purpose of the record,
I'd like the Journal to reflect that on Senate Bill 1749 I
had voted 'yes' on the Bill and the Roll Call shows me as
being absent.  For the Journal I'd like it to be
journalized that I did vote 'yes' on that Bill."

Speaker Breslin:  "Very good."

Clerk Leone:  "Supplemental Calendar #1 is now being distributed."

Speaker Breslin:  "Ladies and Gentlemen, Supplemental #1 has been
distributed.  On Supplemental #1 under the Order of Motions
appears House Bill 2804, Representative Saltsman.  Excuse
me.  Representative McCracken, for what reason do you
rise?"

McCracken:  "Point of Order, Madam Speaker."

Speaker Breslin:  "State your point."

McCracken:  "I believe that pursuant to Rule 74(a), the Motion to
take from the table must appear on the Calendar of the next
Legislative Day from which it was filed.  And has it... and
it was filed today, I understand."

Speaker Breslin:  "I will check that.  The Sponsor says the Motion

62

14-8

*EXHIBIT E*

EXHIBIT 15

# Chicago Council of Lawyers

Chicago's Public Interest Bar Association

One Quincy Court Building
220 South State Street   Suite 800
Chicago, Illinois 60604
Telephone: (312) 427-0710   Fax (312) 427-0181
E-mail: ccl@interaccess.com   Website: www.chicagocouncil.org

To:       Deborah Gubin
          605 W. Madison St., Suite 331
          Chicago, IL 60661

From:     Chicago Council of Lawyers, Indigent Criminal Defense Panel

Case Assignment:

Defendant:            Thomas O'Farrell
Number:               PC 95-CR 30463
Charge:               Post Conviction Murder
Judge:                Judge Toomin
Initial Court Date:   April 24, 2000

This will confirm that at the request of Judge Thomas R. Fitzgerald, Presiding Judge of the Criminal Division of the Circuit Court of Cook County, you are appointed as counsel for the above named indigent defendant through the Criminal Defense Panel of the Chicago Council of Lawyers. Please note that you are entitled to fees and reimbursements for expenses pursuant to statute.

A Council status report form is enclosed for return upon completion of this case.

cc:   Hon. Thomas R. Fitzgerald
      Julie B. Aimen, Chair, Indigent Criminal Defense Panel

File Date:   _Apr 28, 2008_____

Case No:   _08 cv 2403_____

ATTACHMENT # _____

EXHIBIT   _16 – 1_____

TAB (DESCRIPTION)

_____

STATE OF ILLINOIS )
                 )ss
COUNTY OF COOK   )

## AFFIDAVIT OF JOSEPH WAYDA

I, Joseph Wayda, hereby certify under penalty of perjury and otherwise provided by law that the information and statements below are true and correct to the best of my knowledge, information and belief;

1) I am (55) years of age and reside in the State of Illinois, County of DuPage, at 5N774 Acacia Lane, Medinah.

2) I am subject to rules of admissibility, competent to testify to the matters herein.

3) I am the owner of A.I.P. Trucking, County of Cook, at 9864 LeLand Ave., Shiller Park.

4) Thomas O'Farrell was employed by A.I.P. Trucking from October 1992 up to September 1995.

5) Thomas O'Farrell on numerous occasions would not come into work, because he had to take care of his wife, Lesley, who was very ill.

6) Thomas O'Farrell on numerous occasions was called home by his wife, Lesley, because she was very ill and needed his assistance in caring for her.

7) Thomas O'Farrell was unable to put his wife, Lesley on the company insurance policy, because his wife, Lesley had several severe medical problems that the insurance company

would not cover.

    Further affiant sayeth nought.

Subscribed and Sworn to before me
on this 2ND day of JUNE , 1999

_Anthony J Zenofio_
Notary Public

Joseph Wayda

OFFICIAL SEAL
ANTHONY J ZENOFIO
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 11/30/00

Westlaw.

28 LYUCHILJ 763
(Cite as: 28 Loy. U. Chi. L.J. 763)

Page 1

c

Loyola University of Chicago Law Journal
Summer 1997

**Comment**

**\*763 AN ILLINOIS PHYSICIAN-ASSISTED SUICIDE ACT: A MERCIFUL END TO A
TERMINALLY ILL CRIMINAL TRADITION**

Peter G. Daniels

Copyright © 1997 Loyola University of Chicago School of Law; Peter G. Daniels

I. Introduction

In October of 1996, Nancy DeSoto left her home in Bourbonnais, Illinois, and traveled to suburban Detroit to see Dr. Jack Kevorkian. [FN1] There, in a strange hotel room, Dr. Kevorkian gave Nancy a breathing mask connected to a metal canister and showed her how to turn on the gas. [FN2] A victim of Lou Gehrig's disease, Nancy ended her life through the narcosis of carbon monoxide poisoning. [FN3] The local prosecutor filed no charges, although her death was officially ruled a homicide. [FN4]

Despite it being a criminal offense in nearly every American jurisdiction, [FN5] including Illinois, [FN6] doctors and the friends and family of ill patients continue to engage in "assisted suicide," largely unbothered \*764 by legal sanctions. [FN7] The result is an unsatisfactory nether land where the practice is neither legal and regulated, nor effectively illegal. [FN8]

This Comment begins by examining the history of physician-assisted suicide as a crime. [FN9] Next, it explores the relationship between dying and the law, including the doctrine of informed consent, [FN10] and the principle of "double effect." [FN11] This Comment then examines constitutional foundations of the right to die, [FN12] and the law of physician-assisted suicide in Illinois. [FN13] Discussing the present legal status of physician-assisted suicide, this Comment reviews the contemporary crime of assisting a suicide, [FN14] and the role of double effect. [FN15] This Comment next examines legislative efforts to legalize physician-assisted suicide, and analyzes the provisions [FN16] and outcomes of modern legislative efforts. [FN17] A discussion [FN18] and analysis [FN19] of the constitutional implications of physician-assisted suicide laws follows. This Comment then analyzes the crime of assisting a suicide [FN20] and its relation to double effect. [FN21] Next, various approaches to statutory legalization of physician-assisted suicide are examined. [FN22] To end the uncertainty and to protect the rights of the terminally ill, this Comment proposes that the Illinois General Assembly adopt a law [FN23] authorizing physician-assisted suicide.

**\*765 II. Background**

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

## A. Traditional Criminal Treatment of Physician-assisted Suicide

In medieval England, committing suicide was considered a criminal act. [FN24] This policy endured and was maintained by the American colonies, and later by some states within the United States. [FN25] At common law, one who assisted in a suicide was also guilty of a crime--accessory to suicide. [FN26] Usually, such persons were charged either with murder or manslaughter. [FN27] As long as suicide itself remained a punishable offense, it was not necessary to establish an independent crime of assisting a suicide. [FN28]

A difficulty arose when the states universally de-criminalized suicide. [FN29] This mass elimination did not reflect a new societal *766 acceptance of suicide; rather, it was done for practical reasons. [FN30] An effective suicide was an unpunishable crime. [FN31] Failed attempts were deemed to be the acts of depressed or mentally ill persons, who were in greater need of psychological attention than criminal punishment. [FN32] However, because suicide was still considered an evil to be discouraged, many states enacted assisted suicide laws to continue to punish accessories. [FN33] Criminal codes of at least thirty-four jurisdictions classified assisting a suicide either as manslaughter, or as an independent crime. [FN34] Even in states which have not enacted a specific law to punish assisted suicide, the act could still be punished as a common law subdivision of murder. [FN35] In the history of such laws, no explicit exceptions were made for physicians who knowingly helped suffering patients die. [FN36] The role of physicians and medicine, however, greatly impacted the assisted suicide issue. [FN37]

## B. The Role of Informed Consent

Traditionally, medicine has been viewed as a paternalistic profession, where the educated doctor knew best and made most, if not all, of the decisions related to patient treatment and care. [FN38] In 1914, a phrase in the Schloendorff v. Society of New York Hospital [FN39] case dramatically altered the doctor-patient relationship. [FN40] Writing for *767 the New York Court of Appeals, Justice Cardozo stated: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body." [FN41] The decision did not concern a physician who acted without consent, rather one who acted in contradiction to his patient's explicit wishes. [FN42] However, the decision came to represent that all patients had the right to determine how they will be medically treated. [FN43] This principle of self-determination included the patients' right to make informed decisions about their own health care and established two duties for doctors. [FN44] The first duty requires doctors to give patients sufficient information to allow them to make informed, rational health care decisions. [FN45] The second duty requires doctors to abide by a patient's wishes. [FN46]

Schloendorff represented more than just a redefinition of the physician's role, it was the basis of a dramatic shift of power from the doctor to the patient. [FN47] Informed consent puts patients in charge of their medical decisions and shifts the physician's role from paternalistic decision maker to facilitator of the patient's will. [FN48]

## C. The Double Effect

Reflecting the belief among doctors that occasionally the obligation to alleviate suffering should outweigh a mechanical extension of life, physicians engage in the "double effect." [FN49] The term double effect comes from the philosophical principle that an act having two effects, one good and one bad, is justified when the good outweighs the bad and the actor's intention is to do good. [FN50] In the context of physician-assisted suicide, the double effect describes the practice of knowingly prescribing a lethal dose of pain killers, if the patient is dying and if the *768 primary purpose in administering the drugs is to alleviate pain. [FN51] Usually, though not always, doctors prescribe such medication with the knowledge and consent of their patient. [FN52] In any event, the physician plays an active role, professionally assessing the patient's prognosis and pain level to determine medical options. [FN53]

## D. Dying and the Law: The Constitutional Right To Refuse Medical Treatment

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Nancy Cruzan was a high school student who lost control of her car in early 1983. [FN54] As a result of the accident, Nancy suffered tremendous injuries that rendered her unconscious but still able to breathe. [FN55] At the hospital, Nancy remained in a "persistent vegetative state," and was kept alive by means of a feeding tube. [FN56] When it became apparent that Nancy had virtually no chance of recovering her mental capabilities, Nancy's parents asked that her feeding tubes be removed. [FN57] The hospital staff refused. [FN58]

Nancy's parents sued, and the case went to the Supreme Court. In Cruzan v. Missouri Department of Health, [FN59] the United States Supreme Court ruled that the hospital was not required to allow Nancy to die absent clear evidence that death was her intent. [FN60] The Cruzan Court recognized that the question of intent essentially belonged to the state. [FN61] The Court also recognized that Missouri had a legitimate interest in ensuring that Nancy did not intend to exist in a persistent vegetative state, attached to machines. [FN62] Although the Court did not allow Nancy's parents to terminate her life support, it did generally *769 acknowledge a person's right to refuse treatment. [FN63] The Court based this right on a constitutionally protected liberty interest. [FN64]

In a subsequent state court hearing, Nancy's co-workers told a judge that Nancy said she would not want to live like a vegetable on a machine. [FN65] This testimony established the requisite "clear intent," and a Missouri judge allowed her feeding tube to be removed. [FN66] Nancy died in 1990, shortly after the release of the Cruzan decision. [FN67]

The Cruzan decision sparked a flurry of state regulations permitting the withdrawal or refusal of medical treatment. [FN68] It also helped fuel debate over the scope of a person's right to die and the conditions under which a person should be permitted to end her life. [FN69] Legal scholars argued that Cruzan raised a question that the decision failed to answer directly: does the right to die include physician-assisted suicide? [FN70]

E. The Illinois Perspective

By the turn of the century, Illinois officially recognized assisting or promoting a suicide as a common law subdivision of murder. [FN71] In *770 1990, the Illinois General Assembly made inducing suicide a crime. [FN72] In response to physicians who were openly helping patients die, the statute was amended to include assisting a suicide. [FN73]

As in the rest of the United States, physician-assisted suicide is not an unusual practice in Illinois. [FN74] Yet, no person has ever been charged under the inducement to commit suicide statute. [FN75] In fact, no person has ever endured criminal consequences for assisting a suicide in Illinois. [FN76] A rare prosecution for assisting a suicide ended under unusual circumstances in a finding of not guilty. [FN77]

In that case, Anna Werner, a Chicago resident, suffered from rheumatoid arthritis. [FN78] When the pain inflicted by her disease became *771 unbearable, Mrs. Werner begged to be relieved of her misery, a request that Mrs. Werner's husband, Otto, honored. [FN79] Never denying what he did, Otto pleaded guilty to manslaughter. [FN80] After hearing about the sixty-nine year old man's loyalty and affection for his wife, the trial judge allowed him to withdraw his guilty plea. [FN81] Before acquitting Mr. Werner, the trial judge stated that "if . . . testimony was [sic] brought out of his devotion and care to his wife in her incurable illness and of her constant pain and suffering, the jury would not be inclined to return a verdict of guilty." [FN82]

III. Discussion

A. The Modern Crime of Physician-Assisted Suicide

1. The Prevalence of Physician-Assisted Suicide

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Witness' Signature

Date

Witness' Name (printed)

Witness' Signature

Date

[FN1]. David Lawder, Kevorkian Brings 43rd Assisted Death to Hospital, Reuters, Oct. 17, 1996, available in LEXIS, News Library, Curnws File. Dr. Kevorkian is a well known advocate of physician-assisted suicide. Id. In addition to Nancy DeSoto, Dr. Kevorkian is reported to have provided the means for at least 42 others to end their lives. Id. Dr. Kevorkian is credited with putting the issue on the national agenda, beginning with his first reported assistance in 1990. Melinda Beck et. al., The Doctor's Suicide Van, Newsweek, June 18, 1990, at 46.

[FN2]. See Lawder, supra note 1.

[FN3]. Kevorkian Aids in Woman's Suicide, L.A. Times, Oct. 18, 1996, at A15. Dr. Kevorkian sometimes provides those wishing to die with a device consisting of a breathing mask, connected to a bottle of carbon monoxide. Don Colburn, Debate on Assisted Suicide Gains Steam, Wash. Post, May 10, 1994, at Z8. The user commits suicide by turning a switch that allows the gas to flow into the mask, where the patient inhales it. Id. The effect is that the person first becomes unconscious, then dies of insufficient oxygen. Ian Harvey, Right to Die Activist Speaks From the Grave, Toronto Sun (Final Edition), May 9, 1996, at 7. It is a physically painless experience. Catherine Gibbs, Debate Over Kindest Death for Animals, Sacramento Bee, May 5, 1996 at B1, available in LEXIS, News Library, Curnws File.

[FN4]. Kevorkian Aids in Woman's Suicide, supra note 3, at A15.

[FN5]. See infra notes 34-35 and accompanying text.

[FN6]. See 720 Ill. Comp. Stat. Ann. 5/12-31 (West 1993 & Supp. 1996) (criminalizing the inducement to commit suicide, and making it a Class 2 felony). See also infra note 72 (providing relevant text of statute).

[FN7]. Prosecutions for assisting a suicide are rare and convictions even more scarce. No physician has been successfully prosecuted for assisting a patient in committing suicide. See infra note 83 and accompanying text.

[FN8]. See Julia Pugliese, Don't Ask--Don't Tell: The Secret Practice of Physician-Assisted Suicide, 44 Hastings L.J. 1291, 1293 (1993).

[FN9]. See infra Part II.A.

[FN10]. See infra Part II.B.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

28 LYUCHILJ 763
**(Cite as: 28 Loy. U. Chi. L.J. 763)**

[FN68]. See Rita W. Morales, The Twilight Zone of Nancy Beth Cruzan: A Case Study of Nancy Beth Cruzan v. Director, Missouri Department of Health, 34 How. L.J. 201, 223.

[FN69]. See Scott Charton, Court Stops Father from Transferring Ill Daughter, Commercial Appeal, Dec. 31, 1990, at A2.

[FN70]. See John A. Robertson, Cruzan and the Constitutional Status of Nontreatment Decisions for Incompetent Patients, 25 Ga. L. Rev. 1139, 1172 (1991).

[FN71]. See Burnett v. People, 68 N.E. 505 (Ill. 1903). The defendant, a married man, was having an affair with a married woman. Id. at 506-07. The woman became despondent over the prospect of moving back to Tennessee with her husband. Id. at 506-07. The defendant provided the woman with morphine, which she used to kill herself. Id. at 507. The court stated:
Though the [defendant] may have known that the deceased intended to kill herself, and may have even assented to it ... unless the evidence shows beyond a reasonable doubt that he did or said something which aided, encouraged, or induced the deceased to kill herself, he cannot be held guilty of the charge of murder.
Id. at 511. The defendant's conviction was reversed on a failure of the lower court to instruct the jury to consider evidence of the defendant's amicable relationship with the deceased woman. Id. at 511-12.

[FN72]. 720 Ill. Comp. Stat. Ann. 5/12-31 (West 1993 & Supp. 1996). The statute reads:
(a) A person commits the offense of inducement to commit suicide when he or she does either of the following:
(1) Coerces another to commit suicide and the other person commits or attempts to commit suicide as a direct result of the coercion, and he or she exercises substantial control over the other person through
(i) control of the other person's physical location or circumstances;
(ii) use of psychological pressure; or
(iii) use of actual or ostensible religious, political, social, philosophical or other principles.
(2) With knowledge that another person intends to commit or attempt to commit suicide, intentionally
(i) offers and provides the physical means by which another person commits or attempts to commit suicide, or
(ii) participates in a physical act by which another person commits or attempts to commit suicide.
For the purposes of this Section, "attempts to commit suicide" means any act done with the intent to commit suicide and which constitutes a substantial step toward commission of suicide.
Id.

[FN73]. Id.

[FN74]. See Siegfried M. Pueschel, M.D., Ethical Considerations in the Life of a Child with Down Syndrome, 5 Issues In Law & Med. 87, 91 (1989) (stating that in 1961, a survey of 250 Chicago physicians revealed that 61% admitted knowing of, or participating in, instances of euthanasia. See infra Part III.A.1 for a general discussion of the prevalence of physician-assisted suicide among doctors.

[FN75]. 720 Ill. Comp. Stat. Ann. 5/12-31 (West 1993 & Supp. 1996). See also Tim Landis, Test of State's Assisted-Suicide Law Looms, State Journal- Register, Mar. 18, 1996, at 1. A man who handed a loaded gun to his depressed girlfriend saying "here, do it" might be the first person charged. Id. To date no charges have been filed.

[FN76]. See supra note 71 for a brief discussion of a conviction that was reversed.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[FN77]. See Glanville Williams, Euthanasia and Abortion, 38 U. Colo. L. Rev. 178, 184-87 & n.15 (1966) (quoting a portion of the trial transcript of People v. Werner in the Criminal Court of Cook County, Illinois, Justice A. L. Marovitz presiding, 1958). This case involved a husband (rather than a physician) assisting in a suicide of his wife. Id.

[FN78]. Id. at 185 n.15 (noting that the disease incapacitated the victim).

[FN79]. Id.

[FN80]. Id. at 184 n.15.

[FN81]. Id. at 185-86 n.15. In order to determine whether probation might be an appropriate sentence, Justice Marovitz heard testimony about the Werners' relationship from their children, their physician and their pastor. Id.

[FN82]. Id. at 186 n.15. Justice Marovitz further stated:
Mr. Werner, this is a time in one's life where good reputation and decency over a span of years pay off. I can't find it in my heart to find you guilty. I am going to permit you to go home with your daughter and live out the rest of your life in as much peace as you can find it in your heart to have.
Id.

[FN83]. See H. Tristram Engelhardt, Jr. & Michele Malloy, Suicide and Assisting Suicide: A Critique of Legal Sanctions, 36 Sw. L.J. 1003, 1029 (1982) (noting that as of 1982, "[n]o published American opinions ... reported convictions of physicians for ... assisting suicide"); see also Celocruz, supra note 24, at 383 (stating that "[j]uries seem unwilling to convict doctors of assisted suicide ... even when other citizens are held criminally responsible for such conduct"). A search of the LEXIS mega library and mega file consisting of: (DOCTOR OR PHYSICIAN OR (MEDIC! W/2 PRACTICTION! OR(HEALTH W/2 PROVID!)) W/3 (CONVICT! OR GUILT! OR RESPONSIBL! OR CHARGE! OR LIABL!) W/3 ((AID.! OR ABET! OR PROMOT! OR ASSIST! OR SOLICIT! PROCUR!) W/3 (SUICIDE OR DIE OR DEATH OR DYING)) returned only one case. That decision, People v. Kevorkian, 527 N.W.2d 714 (Mich. 1994), stated that Michigan's statute criminalizing assisted suicide was validly enacted under both the Michigan and the United States Constitutions. Id. at 444-45. On remand, Kevorkian was acquitted of all charges. Michigan Senate Moves to Ban Assisted Suicides, Wash. Post, Dec. 8, 1994, at A2. Another commentator notes that prior to Kevorkian's activities, only nine American doctors were ever charged. Michael J. Roth, A Failed Statute, Geoffrey Feiger, and the Phrenetic Physician: Physician-Assisted Suicide in Michigan and a Patient-Oriented Alternative, 28 Val. U. L. Rev. 1415, 1415 (1994). Similar searches of LEXIS news databases revealed no convictions.

[FN84]. See Pugliese, supra note 8, at 1305-06.

[FN85]. See id. (noting that many physicians assist suicides without receiving Kevorkian's notoriety). See also Anthony L. Back et al., Physician-Assisted Suicide and Euthanasia in Washington State: Patient Requests and Physician Responses, 275 JAMA 919, 919-20, 922 (1996) (reporting that 26% of polled physicians had received a request for physician-assisted suicide and that these physicians wrote lethal prescriptions for 24% of all requesting patients); Paul Jacobs, Quietly, Doctors Already Help Terminal Patients Die, L.A. Times, Sept. 29, 1992, at A1 (noting that many doctors assist in suicide but fear the legal consequences); Andrew H. Malcolm, Giving Death a Hand: Rending Issue, N.Y. Times, June 9, 1990, at A6 (describing the increasing trend of quiet physician-assisted

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT 18

STATE OF ILLINOIS

)  SS:

COUNTY OF COOK  )

# AFFIDAVIT

The undersigned, Michael A. Pedicone, being first duly sworn on oath, deposes and states as follows:

1. I was admitted to the practice of law in the State of Illinois on November 5, 1979, and was a practicing attorney on July 4, 1990.

2. On the Fourth of July, 1990, I went in to my law office located at 29 South LaSalle Street, Chicago, Illinois either late in the morning, or early afternoon, to get some work done on the holiday.

3. Upon my arrival there, I discovered a recorded message on my telephone answering machine, advising me of the fact that Thomas O'Farrell was in custody and requesting that I contact his family.

4. Early that afternoon, I spoke on the telephone and later in person, to Thomas O'Farrell's wife, Lesley O'Farrell, concerning her husband's custodial detention at Chicago Police Department Area 5 headquarters, and she made arrangements to retain me to represent her husband at that time.

5. Later that afternoon, I drove to Chicago Police Department Area 5 headquarters located at 5555 West Grand Avenue, Chicago, Illinois and had an opportunity to confer Thomas O'Farrell while he was in being held there.

6. Thomas O'Farrell indicated that he was not being treated properly and that as of approximately 5:00 - 6:00 p.m. on July 4, 1990, he had not been provided anything to eat. I intervened on his behalf by speaking with Chicago Police officers there to get them to provide him some food.

7. To the best of my knowledge, during the period of my representation of Thomas O'Farrell, he followed my advice to remain silent.

8. Thomas O'Farrell's wife, mother and father were as diligent as they could have been in assisting him in obtaining legal representation relative to his arrest.

FURTHER THY AFFIANT SAYETH NOT.

_____
Michael A. Pedicone

SUBSCRIBED AND SWORN TO
BEFORE ME THIS 21ST DAY OF MAY, 1999

18–1

"OFFICIAL SEAL"
Jill S. Thiel
Notary Public, State of Illinois
My Commission Exp. 07/24/2001

*Now EXHIBIT 99 previously EXHIBIT 19 (2) Orig. Pet.*

CHICAGO POLICE DEPARTMENT
DETECTIVE DIVISION
SUPPLEMENTARY REPORT

R.D. Z 451 499
28 Sep 95
PAGE # 1

all descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

OFFENSE CLASSIFICATION/IUCR CODE: HOMICIDE/1st Degree Murder/0110

OFFENSE RECLASSIFICATION OR DNA: DNA

STATUS/CODE (THIS REPORT): CLEARED/CLOSED-3

IF CLEARED, HOW CLEARED/CODE: ARREST & PROSECUTION-1

ADULT/JUVENILE: ADULT

ADDRESS OF ORIGINAL OFFENSE: 3435 W. ARDMORE (house)

BEAT OF OCCURRENCE: 1711

DATE/TIME OF ORIGINAL OCCURRENCE: 28 SEP 1995-0405 hrs

VICTIM'S NAME: O'FARRELL, Lesley Chapman

GANG RELATED (1 YES 2 NO): 2

BEAT ASSIGNED: 5564

TYPE OF LOCATION/CODE: Residence/290

NUMBER OF VICTIMS: 2

NUMBER OF OFFENDERS: 1

OFFENDER(S) UPDATE: O'FARRELL, Thomas Francis M/2/30    DOB: 17 AUG 64 5'8" 144 lbs Med Comp, Dk Brown Mustache & Beard Med Complexion, Hazel Eyes, C.P.D IR# 0935296, SS# 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 3435 W. Ardmore House 60659 Chicago Il. wearing reddish/orange t-shirt and gray shorts. EMPLOYED: AIT Trucking Schiller Pk Il. CB# 10060603.

This is an Area Five CLEARED/CLOSED Homicide Case Report

| OFFICER | STAR | SIGNATURE |
|---|---|---|
| R. Szeluga | 20659 | Det R. Szeluga |
| OFFICER | STAR | SIGNATURE |
| A. Kouchoukos | 20635 | A. Kouchoukos |
| R. Schak | 20717 | R Schak |
| BIEBEL | 1545 | Biebel |

| | DATE & TIME SUBMITTED | DATE & TIME APPROVED |
|---|---|---|
| | 28 Sep 1995    19-1 | 3 SEP 1995 |

Z 451 499

CHICAGO POLICE DEPARTMENT
DETECTIVE DIVISION
SUPPLEMENTARY REPORT

R.D. Z 451 499
28 Sep 95
PAGE # 2

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

*NUMBER ARRESTED/UNIT:          1/650

*SERIAL NUMBERS:                1 22 Cal. "BSF" 1 shot Derringer SN#
                                78719
                                Chrome

*METHOD ASSIGNED CODE/UNIT:     1/650

VICTIM:                         O'FARRELL, Lesley Chapman F/2/29 DOB 25
                                Jan 1966 5'03" 135 lbs, Brn Eyes, Brn
                                Hair, SS# 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 3435 W. Ardmore
                                Chicago, Il. 60659 House Ph 267-6804 Emp
                                LURVEYS Garden Center, DesPlaines, 6
                                Months

IN CUSTODY:                     O'FARRELL, Thomas Francis M/2/30    DOB:
                                17 AUG 64 5'8" 144 lbs Med Comp, Dk Brown
                                Mustache & Beard Med Complexion, Hazel
                                Eyes, C.P.D IR# 0935296, SS# 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
                                3435 W. Ardmore House 60659 Chicago Il.
                                wearing reddish/orange t-shirt and gray
                                shorts EMPLOYED: AIT Trucking Schiller Pk
                                Il. CB# 10060603.

ARRESTING OFFICERS:             Bt 5564 Det. R. Szeluga # 20659
                                        Det. A. Kouchoukos # 20294
                                Bt 5525 Det. W. Kernan # 20578
                                Bt 5567 Det. H. Collins # 20619
                                        Det. T. Fallon # 20624
                                Bt 5544 Det. L. Holec # 20694
                                        Det. P. Boyle # 20672
                                Bt 5519 Det. R. Schak # 20717
                                Bt 5550 Sgt. F. Cappitelli # 1212

DATE AND TIME OF ARREST:        28 Sep 1995-1030 hrs

LOCATION OF ARREST:             5555 W. Grand, A/5 Det. Division

CHARGES:                        1st Degree Murder

COURT BRANCH AND DATE:          Br 66, 29 Sep 1995

INJURIES:                       Preliminary examination revealed
                                1 Gun shot wound, 2" above the middle of
                                the left ear, no exit visible
                                1 Gun shot wound, upper middle chest
                                no visible exit

TAKEN TO:                       Cook County Medical Examiner Institute
                                Case # 520 SEP 1995-Pronounced by Inv.
                                Wasmund # 41.

29-2

CHICAGO POLICE DEPARTMENT
DETECTIVE DIVISION
SUPPLEMENTARY REPORT

R.D. Z 451 499
28 Sep 95
PAGE # 3

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

WEAPON:

Inv. # 1549577, Crime Lab.
1 22 Cal "BSF" 1 Shot Derringer SN 78719
Chrome.  Per Gun Registration Holec # 35
Clear not registered.

LOCATION, DATE AND TIME:

3435  W  Ardmore,  28  SEP  1995-0405
Estimated Approx 0400 hrs

WEATHER AND LIGHTING:

Cool, upper 60's Interior Lighting

MANNER/MOTIVE:

GSW to head & Chest/Offender claims thr
killing was planned by the victim.

IDENTIFIED BY:

By Husband/offender O'Farrell, Thomas

EVIDENCE:

Inv. # 1549574, Crime Lab.
(Sent to the trace and serology unit)
Floral print pillow case recovered from
the master bedroom.

Inv. # 1549575, Crime Lab.
(Sent to the serology unit)
Blood  standards  and  samples  recovered
from the scene.

Inv. # 1549576, Crime Lab.
(Sent to the firearms unit)
Fired bullet and fragment recovered from
the scene.

Inv. # 1549577, Crime Lab.
(Sent to the lazer unit & firearms unit)
VHS tape case, 4 .22 caliber cartridge
casings, 1 .22 caliber cartridge, one .22
caliber single shot derringer, serial #
78719, and one hypodermic syringe.  All
recovered at the scene of the incident.

Inv. # 1538839, Area Five.
(Sent to E&RPS)
1 consent to search form & 1 box 22 cal.
ammo recovered at the scene.

Inv. # 1538843, Area Five.
(Sent to E&RPS)
Copy of the audio tape of the '911' calls
made by the listed offender and two print
outs related to this tape.

NOTIFICATIONS:

Chief of Detectives office, Det. Fornelli
Felony  Review  -  ASA  Thomas  Kougias
responded.
1st Deputy P/O Farrell 13689 by Pettry

CHICAGO POLICE DEPARTMENT
DETECTIVE DIVISION
SUPPLEMENTARY REPORT

R.D. Z 451 499
28 Sep 95
PAGE # 4

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

PERSONNEL ASSIGNED:

See above listed Arresting officers and below listed personnel
Bt 1711 P/O V. Pettry # 4591 (Paper)
         P/O P. Maderer 18467
Bt 1733 P/O Gillespie & P/O Cooper  (took
         O'Farrell to Hospital)
Bt 1723 P/O Holmes 4323 & Borchers 9510
Bt 1706 P/O Tarara 4740 & Bugajewski 10832
Bt 1742 P/O Stutzki 11321 & Musial # 9553
Bt 1799 Lt Paul Tasch
Bt 1720 Sgt O'Donnell #20272
Bt 9601 Tech R. Rick # 6191 Crime Lab
         Tech P. Moran # 7718
Bt 1772 P/O M. Kuranski # 18895
         P/O B. Escobar # 18240
         Transported victim to M.E.
CFD Amb # 46-D.Gariti transported husband
to Ill. Masonic Hospital

STATEMENTS:

Oral/See Narrative

INTERVIEWED:

O'FARRELL, Thomas, M/W/age 56, dob; 9 Oct 38, 11445 S. Mather, Worth, Illinois, 60482, (708) 385-0617.  Employed as a Lieutenant of Police, Alsip Police Department, 4500 W. 103rd St., Alsip, 60658, (708) 385-6902, X746.
(Father of the listed offender)

KHAN, Dr. Saeed, M/W/age 38, dob; 3 Feb 57, 9669 N. Kenton Ave., Skokie, 60076, (708) 674-7393, pager; 708-817-1419.
(Personal physician of the deceased)

ROBINS, Dr. Kenith L., M/W, 9701 N. Knox St., Skokie, 60076, (708) 933-3622.
(Psychiatrist of the deceased)

ZAGONE, Ellie (nmi), F/W/age 52, dob; 3 Jul 43, 3324 W. Warner, 312-267-0727.
(Friend of the victim)

Additional interviewed and on a canvas report.

INVESTIGATION:

Reporting Detectives were assigned to investigate the homicide that occurred at W. Ardmore, by the 1st Watch Commander, Sgt. Cappitelli.  Upon arrival t the scene, Reporting Detectives spoke to the beat car, 1711, and received n update as to what had occurred.  Briefly the Officers stated that they ere assigned by the CCR to a man shot at this address, upon arrival the ictim, Mr. O'FARRELL, told them that he was awakened by two popping sounds, nd confronted a M/B standing over his wife in their bedroom.  He jumped out

19-4

CHICAGO POLICE DEPARTMENT
DETECTIVE DIVISION
SUPPLEMENTARY REPORT

R.D. Z 451 499
28 Sep 95
PAGE # 5

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

of bed, and grabbed the offender, struggling with him. He then heard a shot being fired, and realized that the offender had a gun. As he further struggled with the offender, into the hallway of the house, he received a gunshot wound to his right shoulder. It was also possible that the offender might have sustained some type of GSW, as he screamed mildly when the final shot went off. The offender subsequently made his escape through the kitchen door. Entry was made through the first floor bathroom window, which faces Ardmore. The victim was taken to Illinois Masonic Hospital, and his 4 year old son went with him. The victim's wife was found to be dead from a gunshot wound to her head, and had no signs of life when the paramedics arrived. The crime lab was notified, along with the coroners office.

Upon going up to the second floor bedroom, Reporting Detectives noted that the victim was lying face up, on the bed, with her head facing W/B towards the headboard. The victim was wearing a short blue T-shirt, and lavender panties. Her left hand was on her abdomen, and her right hand up above her shoulder. There was bleeding to the left side of her head, and there was a pillow, at her feet, with what looked like two holes, burnt around the edges, about five inches apart. there was also a small hole in the middle left of her T-shirt, also with burn marks around the edges.

There was a trail of blood leading from the hallway of the upstairs, down the stairs, into the hallway, and eventually into the kitchen. The upstairs hallway had two small holes in the walls, possibly from a small caliber projectile. One hole was in the North wall, and the other in the East wall. There were several pictures from the hallway walls, lying on the floor of the hallway, two of which were in disrepair. The downstairs bathroom had a pane missing from the lower four pane window. This pane was lying, intact, on the front lawn. The putty from around the pane had been carefully removed, and was lying on the exterior window jamb.

Upon arrival of the crime lab, photos were taken of the scene, and of the victim. Additional Polaroid photos were taken for the Medical examiners office, who were not coming to the scene. Upon examining the body, it was discovered that the victim sustained one gunshot wound to the left side of her head, approx. two inches above the center of her left ear. There was an additional GSW to her chest, located towards the middle part of her left breast. The exit holes on the pillow match the two entry holes into the body of the victim. There were no exit wounds visible on the body. There was a pool of blood on the pillow and mattress which she was lying on, under the head area. There was also a blood stain on the victims right leg, where the pillow (used to muffle the gunshots) had been laid, sometime after the shooting. The victim had her eyes closed. After the crime lab took more photos, and finger printed the body, it was removed to the morgue by 1772.

The crime lab examined the point of entry and the point of exit for prints, they also took photos of the house and the exterior. They took blood samples from several spots on the floors of the residence.

CHICAGO POLICE DEPARTMENT
DETECTIVE DIVISION
SUPPLEMENTARY REPORT

R.D. Z 451 499
28 Sep 95
PAGE # 6

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

Det. KERNAN was assigned to go to Illinois Masonic, and take a statement from the other victim. This will be the subject of a separate supplementary.

After being treated and released from the hospital, Mr. O'FARRELL was transported to Area 5, by beat 1742, for further investigation into the identity of the offender and to view photo albums. While giving his statement, he gave the same basic account of this incident as in the original case report, and as reported above. During the time of this statement, Reporting Detectives received information from beats 5544 & 5567, that while processing the scene of the incident they had discovered a single shot derringer, inventory #1549577, in the bedroom of the victim. This gun appeared to have been recently fired. Also there were four spent .22 cal. shell casings with the weapon. At this time the offender was asked if he owned a gun, or had one in his house. He stated that he did not.

Reporting Detectives then informed Mr. O'FARRELL of his criminal rights, which he stated he understood, and Mr. O'FARRELL was then informed of the fact that he would be treated as a suspect rather than a victim.

Mr. O'FARRELL was then asked to explain the inconsistencies in his story, and the fact that he had no gun in the house, when one was found that was recently fired. Also the fact that the angle of the wound in his shoulder did not appear to be consistent with the way in which he stated he was holding the alleged offenders left hand, which had the gun in it. Thomas O'FARRELL then admitted that he had killed his wife and the story involving the male black subject was not true.

O'FARRELL, Thomas                stated that he had shot his wife at her request. He stated that his wife had attempted to commit suicide on several occasions. Either through injecting herself with an overdose of insulin, or by lying in the middle of the street, attempting to get run over by a car. Approx. six months ago he called the police on his wife, after she overdosed on insulin, and started acting crazy. His wife had him put out of the house that night, for calling the police on her. When he came back home he confronted him with the fact that her kidneys were failing, because of her diabetes, and that she had developed Bells Palsy, and didn't want to live anymore. He did not want to hear about it, and would not discuss it with her. She felt resentful that he would not communicate with her about this. She kept bringing it up, and he would not hear about it. He stated that this lead to a rocky relationship between them the past several months. On 28 Sep 95 he arrived home approx. at midnight. He had gotten off of work at 2300hrs, 27 Sep 95 and went to a tavern at 25th and Grand, in Schiller Park, where he works for AIT Trucking. He had two drinks, and left for home. He spoke with his wife, when he arrived home, as he was still up. She told him that if he loved her he would take her life, tonight, as she was sleeping. She then told him that she had removed a window pane from the first floor bathroom window, so it would look like someone broke into the house. He then would fire a couple of shots into the walls of the hallway, to make it look like he was struggling with the

19-6

CHICAGO POLICE DEPARTMENT
DETECTIVE DIVISION
SUPPLEMENTARY REPORT

R.D. Z 451 499
28 Sep 95
PAGE # 7

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

intruder. She did not want him to injure himself, but he thought it would be a good idea to shoot himself in the arm. He felt that this would be the only way the police would believe his story. He had experience with the police in this matter as he had previously been arrested for homicide. So he received the derringer from his wife, and stayed awake, to get up enough nerve to carry out his wife's wish. His wife woke up several times and asked him why he hadn't done it yet. He promised her he would take care of it this night. Finally at around 0400, while she was asleep, he put a pillow over her head, and fired once into her skull. When he saw her body convulsing, and maybe suffering from the pain of the gunshot, he quickly reloaded the derringer, and shot her a second time in her heart. She then laid motionless. He then waited a short time, to digest what he had done. He then fired a shot into the hallway, and threw the pictures on the floor, to make it look as if there was a struggle. He then decided to shoot himself in the arm. He put himself up against the hallway wall, and shot himself into the meaty part of his left upper arm. He then put the gun away. Called 911, called a friend of the victim's by the name of Ellie ZAGONE, called 911 a second time and then gathered up his dogs, putting them in a bedroom, gathered up his son, walked back downstairs, opened the front door, and waited for the police to arrive.

O'FARRELL claimed that the victim was terminally ill and that he only killed her because she was in constant pain.

O'FARRELL, Thomas (Father/Off): appeared at Area Five and requested to talk with his son. General details of the investigation were explained to him and he was asked if his daughter-in-law had been ill. He stated that she was a diabetic and had recently been diagnosed with bells palsy but she certainly was not terminal. He stated that he had no knowledge of any request that she may had made relative to wanting to be killed. He was allowed to visit with the offender and visited with his several times throughout the morning and afternoon during this investigation.

KHAN, Dr. Saeed is the physician for the victim and he was briefly interviewed. He stated that the victim suffered from diabetes, which had been very manageable. He stated that she had also developed Bells Palsy recently but she certainly was not terminally ill. She was not in any pain and would have no reason to even suspect that she would suffer any painful death. Dr. KHAN will be interviewed further at a later date.

ROBINS, Dr. Kenith was the Psychiatrist of the deceased and he stated that he had been treating the victim who had a difficult childhood. He stated that he would require a subpoena prior to the divulgence of any specific information. He did state that the victim was not suicidal.

ZAGONE, Ellie is a friend of the deceased and she stated that she received a telephone call from the offender at 0418 hrs. who stated that he and his wife had been shot. She was asked to come to the scene by the offender but she stated that she

19-7

CHICAGO POLICE DEPARTMENT
DETECTIVE DIVISION
SUPPLEMENTARY REPORT

R.D. Z 451 499
28 Sep 95
PAGE # 8

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

declined.  She had no knowledge of any suicidal thoughts of the victim.

Chicago Police Department records were checked for any prior reports of any suicide attempts or other reported incidents involving either the victim or the offender.  No reported incidents were discovered during this search.

ASA Thomas KOUGIAS of the Felony Review Unit was notified, and arrived in Area 5. He was apprised of the investigation and the facts in this case.  ASA KOUGIAS interviewed O'FARRELL along with Det. R. Schak #20717.

After again being advised of his rights, which he stated he understood, Mr. O'FARRELL again related that he had killed the victim and that she had requested that he do it.  He related in detail essentially the same account of the incident as recorded above.

At approximately 1430 hrs. during the course of other investigative activity the offender requested to speak with Det. Schak and ASA KOUGIAS.  At that time he asked what was taking place and it was explained that the investigation was an involved process and would take time.  O'FARRELL then made a request for an attorney and he was not questioned any further relative to this incident.

After further review and interviews ASA KOUGIAS then approved felony charges of 1st degree murder.  Mr. O'FARRELL is to appear in Court Branch 66 on 29 Sep 1995.

ASA KOUGIAS and Det. Schak attended to postmortem examination of the victim conducted by Dr. Nancy Jones, Assistant Medical Examiner.  This is case # 520, Sep. 1995 and the cause of death is listed as Multiple Gunshot Wounds, H and the manner is Homicide.

In view of the above stated facts the undersigned request that this case be classified as Closed, Cleared by Arrest.

Det. Richard Szeluga #20659,
Det. Andrew Kouchoukos #20635,
Det. Richard A. Schak #20717.

*Exhibit 20*

STATE OF ILLINOIS)
            ) SS.
COUNTY OF COOK  )

**ENTERED**
JAN - 5 1996
AURELIA PUCINSKI
CLERK OF THE CIRCUIT COURT.

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
                              )
          vs.           ) 95-30465
                              )
THOMAS O'FARRELL          )

## ANSWER TO DISCOVERY

TO:  Attorney of Record

     Now come the PEOPLE OF THE STATE OF ILLINOIS, by their
Attorney, JACK O'MALLEY, State's Attorney of Cook County, Illinois,
through his Assistant, Nick Ford, and answer the defendant's motion
for pre-trial discovery as follows:

1.  (a)  Bill of Particulars:

        Date:  On or about  September 28, 1995

        Time:  At approximately  4:00 am

        Location:  At or near 3435 W. Ardmore, Chgo., IL

  (b)  The physical description of the location of the
      occurrence is contained in the police reports tendered to
      the defense in open court.

2.  (a)  The people may or may not call the following persons as
      witnesses to the trial of this cause:

      Nancy Fay and Family
      Thomas O'Farrell, Sr.
      Mary O'Farrell
      Dr. Saeed Kahn
      Dr. K. Robins
      Ellie Zagone
      Richard Chenow
      Joe Codina
      Any and all witnesses with the reports
      Any and all witnesses from AT&T
      Any and all witnesses listed on reports from Cook County
      Jail and Cermak Hospital
      <u>CHICAGO POLICE DEPARTMENT</u>
      Det. Kouchoukos #20294
      Det. Collins #20619

**FILED**

JAN 0 5 1996

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT



```
        Det. Fallon #20624
        Det. Szeluga #20659
      ⟋ Det. Schalk #20717
      ⟋ P.O. Pettry #4591
        P.O. Maderer #18467
        E.T. Ricks
      ⟋ E.T. Moran
        P.O. Boyle #206782
        P.O. Holec #20694
        P.O. Rappitelli #1212
      ⟋ Dr. Nancy Jones
        Det. Cornelius #20157
      ⟋ Det. Kernan #20578
      ⟋ P.O. Cooper #4895
        P.O. Gillespie #9896
        P.O. Stutzki #11321
        P.O. Musial #9553
        Inv. Wasmund
      ⟋ ASA T. Kougias
        P.O. Holmes #4323
        P.O. Borchers #9510
        P.O. Tazara #4740
        P.O. Bugajewski #10832
        P.O. Kuranski #18892
        P.O. Escobar #18240
        P.O. Salter #13420
      ⟋ Inv Bere
```

Personnel from Crime Lab, any person named in police reports, arrest reports, inventory sheets, medical reports, laboratory reports, Preliminary Hearing or Grand Jury transcripts, evidence reports, or any other document tendered to or available to the defense.

Any witness needed to establish the chain of custody for physical evidence sought to be introduced at trial.

(b)    The following witnesses made written statements:

See the letters from victim as well as all statements alluded to in the reports.

Written statements of witnesses, if any, have been tendered to the defense in open court.

(c)    All memoranda reporting or summarizing oral statements made by witnesses are contained in the police reports tendered to the defense in open court.

3.    The People may or may not call any or all persons listed in 2 (a) as occurrence witnesses at the scene of the offense or at the time of arrest.

4.    (a)    Written or recorded statements of the defendant or co-

25.

defendant(s), if any, have been tendered to the defense in open court.   The date, time, and place of such statement(s), the circumstances under which it was made and the witnesses to the making or acknowledgment of the statement(s), are contained in the police reports tendered to the defense in open court.

(b)   Summaries of oral statement(s) of the defendant or co-defendant(s), if any, the date, time, and place of such statement(s), the circumstances under which the statement(s) were made, and the witnesses present are contained in the police reports tendered to the defense in open court.

See felony review statements tendered

5.   The transcript of the Grand Jury minutes and/or Preliminary Hearing, if any, will be made available to the defense for inspection and copying upon being received by the People.

6.   (a)   The following articles, if any, may or may not be offered into evidence by the People at the time of the trial of this cause:

See all inventoried material mentioned in police or reports in this case

Photographs, plats, charts, diagrams, illustrations, maps, any property inventoried by the Chicago Police Department and reflected in inventory receipts, copies of which are contained in the court file and also available for inspection and copying, certified copies of convictions and certified copies of auto records.

Any and all other property mentioned in the police reports, arrest reports, medical reports, laboratory reports, Preliminary Hearing or Grand Jury transcripts or any other document tendered to or available to the defense in open court.

(b)   The date, time and place of acquisition, the persons involved in the acquisition and the circumstances of the acquisition of the articles are contained in the police reports tendered to the defense in open court.

(c)   The people will comply with all reasonable requests for inspection by the defense.

7.   Reports of experts, if any, made in connection with this particular case, including the results of physical or mental examinations, scientific tests, examinations, and comparisons, will be tendered to the defense upon being received by the



people.

8. please see 6 (a) for any books, documents, photographs, and tangible objects obtained from or which belonged to the defendant which the People may or may not use at the trial of this cause.

9. The People have no knowledge at this time that any of its potential witnesses have any criminal convictions.

10. The People intend to use certified copies of all convictions of the defendant, if any exist, for purposes of impeachment during the trial of this cause. The record of these convictions is available for inspection.

11. The People may or may not rely on the following prior acts or convictions of the defendant of a similar nature for proof of knowledge, intent, motive, scheme, or design:

See B of I, See also police reports.

12. The dates, times, places, circumstances, results, and persons present at any identification confrontations involved in this cause are contained in the police reports tendered to the defense in open court.

Any photographs available to the People which were used in connection with any photographic identification will be made available for inspection.

Any lineup photographs available to the People will be made available for inspection.

13. No electronic surveillance was employed in connection with this cause.

14. Any evidence which was acquired by the execution of any legal process, whether a search warrant, arrest warrant or other process or court order, is listed in 6 (a) and in the police reports and other documents tendered to the defense in open court, if such process was used.

A copy of any legal process executed in connection with this cause will be available for inspection and copy if a copy is not in the court file.

15. No informant that the People intend to call as a witness in the trial of this cause exists.

16. The People are unaware of any evidence or witnesses which may be favorable to the defense in this cause.

17. The People will comply with lawful orders of Court in this

20-4

C-43

cause.

JACK O'MALLEY , 10295
State's Attorney of Cook County

By:

Nick Ford
Assistant State's Attorney

EXHIBIT 21

**OFFICE OF THE STATE'S ATTORNEY**
COOK COUNTY, ILLINOIS

O'MALLEY
'S ATTORNEY

CRIMINAL DIVISION
2650 SOUTH CALIFORNIA AVE.
CHICAGO, ILLINOIS 60608

March 11, 1996

| Post-It™ Fax Note | 7671 | Date | |
|---|---|---|---|
| To Steve Mills | | From | |
| Co./Dept. Tribune | | Co. | |
| Phone # | | Phone # | |
| Fax # | | Fax # | |

Jeff Kendall
Assistant State's Attorney
DuPage County State's Attorney's Office
505 N. County Farm Road
Wheaton, Illinois 60187

Dear Jeff:

I am writing to you regarding a defendant on your call. Tom Dye is charged with theft. I believe his case is up next in DuPage County on March 13, 1996. Dye is charged in Cook County with Possession of a Stolen Motor Vehicle and Theft. Dye has testified in the past for my Office. He initially assisted in the conviction of a correctional officer who was bringing contraband into the Cook County Jail. In 1993 Dye testified for me against Steven Manning. Manning was a professional killer who murdered at least five people. Dye wore a body wire while he was incarcerated on a jail tier with Manning. This tape and Dye's testimony led to Manning's conviction for murder. Manning was subsequently sentenced to death for these offenses. Dye is currently assisting my Office in other murder investigations. It is my understanding from talking to personnel of your Office that Dye has been offered a five year prison sentence in exchange for a guilty plea on your case. I would ask that Dye be given some consideration for his past cooperation if at all possible. Dye's life is seriously in jeopardy due to his cooperation while he is in custody. By no means do I mean to deprecate the seriousness of Dye's offenses or background. Dye would be anxious to plead guilty on your case in exchange for a four year prison sentence. If I can provide any further information to you in this or any other matter, please do not hesitate to contact me.

Gratefully Yours,

Patrick J. Quinn
Supervisor
Organized Crime Unit, ????

STATE OF ILLINOIS    )
                     )ss
COUNTY OF LIVINGSTON)

## AFFIDAVIT OF JOSE FLECHA

I, Jose Flecha - B09185, hereby certify under penalty of perjury and as otherwise provided by law that the information and statements herein are true and correct to the best of my knowledge;

1) I currently am incarcerated in the Illinois Department of Corrections, Pontiac Correctional, Pontiac, Illinois, 61764.

2) I was incarcerated in the Cook County Department of Corrections, Chicago, Illinois, 60608 from May, 1995 to March, 1997 where I was placed in protective custody in division nine (9) wing 1-D.

3) Thomas O'Farrell and Thomas Dye were also incarcerated in the Cook County Department of Corrections, Chicago, Illinois, 60608 on the same wing, 1-D where they were cell mates.

4) On, or about, the beginning of 1996 Thomas Dye came into my cell with some legal documents that belonged to Thomas O'Farrell.

5) Thomas Dye asked me if I wanted to use the documents so that I can try and make a deal with Assistant States Attorney, Patrick Quinn.

6) A short time after Thomas Dye brought Thomas O'Farrell's legal documents to me, Thomas Dye told me that he had a meeting with Assistant States Attorney, Patrick Quinn and the Assistant States Attorney that was prosecuting Thomas O'Farrell in his criminal case.

-1-

7) During my conversation with Thomas Dye, Mr, Dye told me that the Assistant States Attorney that was prosecuting Thomas O'Farrell and Assistant States Attorney, Patrick Quinn encouraged him to take the deal Mr. Quinn offered him and testify against Thomas O'Farrell.   Mr. Dye stated that Mr. Quinn told him that he should do him this favor because they did not beleive that they could get a conviction against Thomas O'Farrell.   Mr. Dye stated that he took the deal that Mr. Quinn offered him.

8) Thomas O'Farrell and/or his attorney did not threaten me in any manner and did not promise me anything for this affidavit and I am providing this affidavit on my own free will.

FURTHER AFFIANT SAYETH NOT.

Jose Flecha,
B09185

Subscribed and Sworn to before me
on this 5 of March , 2002.

Notary Public

"OFFICIAL SEAL"
TRACY LYNN HILL
Notary Public, State of Illinois
My Commission Exp. 11/30/2004

-2-

EXHIBIT 1

EXHIBIT 23

James Chadd                                          January 9, 1998
James R. Thompson Center
100 West Randolph Street-Suite 5-500
Chicago, Illinois 60601

          RE: People v. Thomas O'Farrell

          Indictment No. 95-30463

Dear Mr. Chadd,

     I am writing you in response to the letter you sent me
on December 23, 1997.  Sorry I did'nt respond sooner.  I have
not recieved the information sheet, which you say was sent to
me by your office.

     I have been doing research on the appeal process and i'm
familar with the facts, which you informed me about in your
letter.

     I want you to file an extention on my appeal on my
behalf, so that we can get together and go over my questions
and suggestions on issues I have in mind.

     ✴    I have many issues of ineffective assistance of counsel
against my trial counsel I want to cover in my appeal brief.

     My last court appointed counsel refused to visit me, after
I told him that the phones were not secure and I refused to put
anything in writing, due to past experences and I don's want it
used against me again.  See transcripts H-3 through H-38.

     I do wish to speak with you on an attorney visit, so that
we can speak more freely and you can hear my suggestions and file
a properly prepared appeal on my behalf.

If you wish you can contact Joliet Correctional Center and arrange a phone call, so that we can confirm a date for the attorney visit, but as I said earlier we will not be able to speak freely about any questions, suggestions and notes that I have taken on my case.

Thank you for your time and cooperation in this matter.

Thomas O'Farrell-K54340

P.O. Box 515

Joliet, Il. 60432

XC.FILE

Exhibit 3

EXHIBIT 24

STATE OF ILLINOIS )
                  )ss
COUNTY OF WILL    )

## AFFIDAVIT OF THOMAS O'FARRELL

Thomas O'Farrell, Defendant-Petitioner, Pro-Se, first being duly sworn on oath, deposes and says that as to the matters herein, that he has read the enclosed, and by signing, the statements herein are true and correct to the best of his knowledge.

1) I spoke with Attorney James Chadd by yard phone.
2) Mr. Chadd informed me that we could speak freely about my case because they can not use conversations between attorney/client against me.
3) I told Mr. Chadd about the many ineffective assistance claims against trial counsel, Joseph Kennelly.
4) Mr. Chadd told me that he can only raise claims supported by the record, and the record does not reflect Mr. Kennelly was ineffective.
5) Mr. Chadd told me that I can raise the ineffective assistance claims within a post-conviction petition in the circuit court and then I can appeal them to the Appellate Court.
6) Mr. Chadd informed me that his office was working on a claim which could take my sentence from 100% to 50%.

Thomas O'Farrell, Pro-Se
Defendant-Petitioner

Subscribed and Sworn to before
me on ___ day of _____, 1998

*Law Library Closed for Construction*
Notary Public

24-1

*Second Defense Method*

Page 1 of 7

**638 N.E.2d 345**
(Cite as: 265 Ill.App.3d 283, 638 N.E.2d 345, 202 Ill.Dec. 699)

Page 1

Appellate Court of Illinois,
First District, First Division.

The PEOPLE of the State of Illinois,
Plaintiff-Appellee,
v.
Gerald WILLIAMS, Defendant-Appellant.

No. 1-91-3184.

July 18, 1994.

Defendant was convicted in the Circuit Court, Cook County, Daniel J. Kelley, J., of second-degree murder of his ailing wife, and he appealed. The Appellate Court, Buckley, J., held that: (1) evidence sustained finding that defendant was sane, and (2) sentence of ten years' imprisonment was not excessive.

Affirmed and remanded.

West Headnotes

[1] Criminal Law ⚖️1106(4)
110k1106(4) Most Cited Cases

Although defendant made contemporaneous trial objection to police officer's testimony concerning initial questioning of defendant, and renewed it at the close of her testimony, where he failed to include the issue in his written posttrial motion, it was not preserved for review.

[2] Criminal Law ⚖️1036.1(5)
110k1036.1(5) Most Cited Cases

Any error in admitting police officer's testimony concerning statements made by defendant before he was given Miranda warnings was not error where, even without that error, there was overwhelming evidence that defendant knowingly shot his wife, appreciated the criminality of his act, and could have conformed his actions to the requirements of the law.

[3] Criminal Law ⚖️394.6(5)
110k394.6(5) Most Cited Cases

[3] Criminal Law ⚖️394.6(4)
110k394.6(4) Most Cited Cases

[3] Criminal Law ⚖️531
110k531

All persons are presumed sane, and defendant wishing to assert affirmative defense of insanity bears the burden of proving it by a preponderance of the evidence. Ill.Rev.Stat.1991, ch. 38, ¶ 6-2(e).

[4] Criminal Law ⚖️1159(2)
110k1159(2) Most Cited Cases
(Formerly 203k1237)

Reviewing court will not disturb circuit court's finding on insanity defense unless the finding was against the manifest weight of the evidence. Ill.Rev.Stat.1991, ch. 38, ¶ 6-2(e).

[5] Homicide ⚖️1210
203k1210 Most Cited Cases
(Formerly 203k1237)

Finding that defendant was sane at the time that he committed second-degree murder was supported by testimony of defendant's psychologist that defendant had been under great deal of stress when he committed the offense, but that he had no mental disease at the time of the offense, and could understand his conduct to the criminality of his act, where this conclusion was consistent with the requirements of law, and by type of 911 call, indicating that he was fully aware of the act which he had just committed. Ill.Rev.Stat.1991, ch. 38, ¶ 6-2(e).

[6] Criminal Law ⚖️1042
203k1042 Most Cited Cases
(Formerly 203k1237)

Court's statement, with respect to defendant's health, that defendant might end up dying in the Department of Corrections, but that he did not intend this, did not mean that he might live in both places, and in prison, did not show that court expressly reduced his sentence and did not show the court expressly reduced his sentence and did not show the fact that he had experienced a heart attack and was 69 years old.

[7] Homicide ⚖️1567
203k1567 Most Cited Cases
(Formerly 203k1541)

Sentence of ten years' imprisonment imposed upon defendant who was convicted of second-degree murder of his wife who was suffering from disease was not excessive. Ill.Rev.Stat.1991, ch. 38, ¶ 1005-8-1(a)(4).

Objection and posttreatment motion for reconsideration are not necessary to preserve for review claim that sentence was excessive.

Page 2 of 7

**638 N.E.2d 345**
(Cite as: 265 Ill.App.3d 283, 638 N.E.2d 345, 202 Ill.Dec. 699)

Page 2

[8] Criminal Law ⚖️1147
110k1147 Most Cited Cases

Proper procedure in case where multiple judgments have been entered on a single act is to vacate those judgments which are less serious.

[9] Sentencing and Punishment ⚖️111
350k111 Most Cited Cases
(Formerly 203k345(1))

Trial court adequately considered defendant's background and age in sentencing him for second-degree murder of his ailing wife, but court could have properly considered that defendant, at a police officer, could have understood his past that he had received, and his past acts of good.

[10] Sentencing and Punishment ⚖️342
350k342 Most Cited Cases
(Formerly 110k386(5))

[11] Sentencing and Punishment ⚖️41
350k41 Most Cited Cases
(Formerly 203k345(1))

Court could properly consider deterrence as aggravating factor in imposing sentence for second-degree murder. Ill.Rev.Stat.1991, ch. 38, ¶ 1005-8-1(a)(4).

*285 After Kyle's testimony, the State entered the transcript of defendant's 911 call to the December 24, 1990, at approximately 6 a.m. During the call, defendant reported "I just shot my wife ... . and South Newdsen. Send me some help, please. ..."

Justice BUCKLEY delivered the opinion of the court.

Defendant Gerald Williams was charged with the first-degree murder of his wife, Alice Williams. Following a bench trial, defendant was convicted of second-degree murder and sentenced to 10 years' imprisonment. Defendant appeals his conviction and sentence. We affirm.

Kyle further testified that she had never defendant and his daughter. On the December 24, 1990, at approximately 6 a.m. On December 23, 1990, Kyle has learned on a wheelchair and had had returned her to a wheelchair and had had returned her to a wheelchair and she'd had to her parents' home to a Christmas party organized by defendant's in order Kyle described defendant's spirits as in high light of his condition that she had seen. Jack O'Malley, Cook County State's Atty., Chicago (Renee Goldfarb, Lou Anne Corey, Lisa Travis, Asst. State's Attys., of counsel), for appellee.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

638 N.E.2d 345
(Cite as: 265 Ill.App.3d 283, 638 N.E.2d 345, 202 Ill.Dec. 699)

Ya, I am a retired police officer myself and she is nothing but trouble and she is sick and everything else."

The State's next witness was Officer Womack, who responded to the police radio dispatch concerning the above 911 call. She arrived at defendant's house and entered the house. She got in close proximity to help help her, she kept screaming louder. He asked to help her; she kept screaming louder. He tried to help her and asked her to put down the revolver to let go of the revolver. He was putting his gun, his service revolver, at her holster.

Q. Did he ever indicate to you that he contemplated going to get his gun or that an act of the shooting was going to happen?

A. He stated specifically where the gun was kept. He said behind the headboard, which was kept. He said behind the headboard, which probably would have been 25 feet away from the shooting. He said, I don't remember getting the gun and level his head out, I don't even remember which and the gun was in when it went off."

After the above ruling, Womack testified that the defendant stated that he was defendant's husband, that she had been suffering a debilitating disease for the last 10 years and that she had lost her because she had been crying out and had become the most of the day. Defendant additionally told her suffering and that he told his wife that he would "end her suffering and thereafter, shot her.

The parties then stipulated that if Dr. Robert Stein research in the psychological aspects of people, was called to testify, he would state that the cause of death was a gunshot wound to the head. The State rested its case in chief. Defendant then moved for a directed verdict, which the court denied. He also renewed his objection to the portion of Womack's testimony regarding his statements prior to being Mirandized. The circuit court reaffirmed its previous reasoning and overruled the objection.

Defendant's first witness was Detective Thomas Kush. He was stipulated to defendant's shooting of his wife. The police vehicle arrived at about 7:15 p.m. after reaching him the Miranda warnings. When questioned by Kush, defendant denied ever characterizing the shooting as a mercy killing for his dead wife. He was later unable to appreciate the criminality of his conduct have taken the life of the wife that he loved, telling her, kicking her, and totally taking care of her for the last few years. During trial, Kush summarized defendant's conversation with him at his opinion, defendant suffered from atypical

[followed by additional text]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

---

638 N.E.2d 345
(Cite as: 265 Ill.App.3d 283, 638 N.E.2d 345, 202 Ill.Dec. 699)

psychosis and was so disoriented that he "just contact condition." Following, Rossell stated that it would have been "of interest" to talk to friends or relatives of defendant in forming his opinion, but failed to do so. After the admission of Turner's testimony, defendant rested.

In rebuttal, the State called Dr. Robert Reifman, director of the Psychiatric Institute of the circuit court of Cook County. He testified that he had met with defendant and determined that he had not met with defendant and determined that he had not met with defendant and determined that he did not. Reifman opined that defendant had in his sole understanding of the criminality of his act when he shot his wife.

The next witness for the defense was Ernest Broschmann, who has known defendant since 1956. Chicago police department as partners on the 2nd floor, he and his wife had socialized with defendant and devoted over the years. Broschmann described defendant's relationship with decedent as very good and close.

Dr. Sarah Meisten, a psychiatrist who had done research in the psychological aspects of people, testified that when she met the defendant, Reifman's testimony "to be more realistic and more logical in its scope, and agree to those reasons, [in a preponderance of the evidence as to the issue of sanity." Ultimately, the circuit court found defendant "guilty of second-degree murder because of acting one years and years of firum, difficult situation [and find] [there was a minimum provided for the provocation . . . . "

On September 17, 1991, after hearing, the circuit court denied defendant's motion for a new trial. Thereafter, the prosecuting hearing was held. In aggravation, the State argued for the goal of imprisonment, the court found he is to deter others from committing such crime. Reifman testified that this case at that trial received much wide media coverage. If further argued in aggravation that decedent was over 60 years old and was wheelchair-bound.

Defendant called Broschmann as a witness in

[additional text continues]

mitigation. He testified that defendant was a good man and never commit another crime. Broschmann recounted an instance where defendant saved his life when he was attacked by a man with a butcher's knife and in an instance where defendant exposed children and adults from a burning building. A tavern owner, Richard Baltazar, also testified that in his 1993 defendant intermittently entered a tavern after having gunfire rather than wait for a fee ... fight. Defendant was alert, but managed to down the defendant's own. Defendant also experienced a heart attack and had a prior evidence in mitigation that since he was shooting, he had experienced a heart attack and had a prior mild employment, and therefore might die in a prison environment.

Before handing down the sentence, the circuit court responded to the defendant's argument that the defendant would die in prison, stating: "***[49] ***[793] "[defense counsel], I am going to don't know...[defense counsel], as you stated that very well for the last six years, but with the defendant is pretty general proposition too. His very very well into the general population too. His very very well into might die there; he might or might not." ... The circuit court further

The circuit court further commented that it felt the sentences imposed were not overly severe in order to "deter others from committing such acts or from more than [defendant] was sentenced to 10 years imprisonment for his crime. Defendant appealed from this conviction and sentence.

[1] Defendant's first argument on appeal is that he was denied his right to a fair trial when the circuit court allowed Womack's testimony of her statements to him at the scene of her crime, over defendant's objection. Defendant contends that the claim of Womack's testimony, he failed to give the Miranda warnings and to preserve in the written post-trial motion. It is well settled in Illinois law that, to preserve in issue for review, a defendant must both contemporaneously object at trial and include the issue in a written post-trial motion. (People v. Enoch (1988), 122 Ill.2d 176, 119 Ill.Dec. 265, 522 N.E.2d 1124.) The plain error exception is above waiver rule applies only if "the evidence is

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

638 N.E.2d 345
(Cite as: 265 Ill.App.3d 283, 638 N.E.2d 345, 202 Ill.Dec 699)

Page 5

[2] The evidence in this case is not closely balanced. Even if Womack's testimony regarding defendant's admissions at the home of the crime are disregarded, there was overwhelming expert testimony which indicated that defendant was not insane. Additionally, there was competent expert testimony which indicated that defendant appreciated the criminality of his act and could have conformed his conduct to the requirements of the law. The evidence of defendant's sanity at the time he committed the murder directly denies the accused a fair and impartial trial or sentencing hearing.

*289 "A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."
III.Rev.Stat.1991, ch. 38, par. 6-2(a) (now 720 ILCS 5/6-2(a) (West 1992)).

[3] The Illinois Revised Statutes defines the affirmative defense of insanity as follows:

...

evidence of defendant's sanity at the time he committed the murder. Although there is conflicting expert psychiatric testimony, the circuit court found Reilman's analysis of defendant's mental health at the time of the commission of the crime to be more credible. The circuit court is best able to accept the testimony of one expert over another. The experts' comparative credibilities and the weight to be given their testimonies are matters for the circuit court to resolve.

...

638 N.E.2d 345
(Cite as: 265 Ill.App.3d 283, 638 N.E.2d 345, 202 Ill.Dec 699)

Page 6

The sentence handed down by a circuit court is given great deference and must not be overturned absent an abuse of discretion.

...

[10] Defendant also argues that the circuit court failed to take into account his poor health. The record does not indicate that the circuit court expressly refused to consider defendant's health. The circuit court stated in regards to defendant's health that:

...

[11] Defendant also argues that the circuit court improperly considered deterrence as an aggravating factor.

...

[12] Finally, all parties agree that defendant is accountable, for only one conviction of second-degree murder. According to People v. Latto (1974), 56 Ill.2d 493, 309 N.E.2d 1, where multiple murder convictions arise from a single course of conduct, only one sentence and conviction may be imposed. Accordingly, we remand this cause with instructions to vacate one of the convictions for second-degree murder.

For the foregoing reasons, the conviction and sentence of the circuit court of Cook County is affirmed, but this cause is remanded with instructions to correct the mittimus to reflect only...

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

25-3

Page 7

638 N.E.2d 345
(Cite as: 265 Ill.App.3d 283, 638 N.E.2d 345, 202 Ill.Dec. 699)

one conviction for second-degree murder.

CONVICTION AND SENTENCE AFFIRMED;
CAUSE REMANDED WITH INSTRUCTIONS
TO CORRECT THE MITTIMUS.

CAMPBELL, P.J., and MANNING, J., concur.

638 N.E.2d 345, 265 Ill.App.3d 283, 202 Ill.Dec.
699

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

EXHIBIT 10
EXHIBIT 26

## IN THE MATTER OF THE ESTATE OF LESLEY CHAPMAN O'FARRELL
### CASE NO. 96 P 684

### SERVICE LIST

Thomas F. O'Farrell
#9567062
P.O. Box 089002
Chicago, IL  60608

Leroi Gordon O'Farrell
c/o Thomas C. O'Farrell, Guardian
11445 S. Mather Avenue
Worth, IL  60482

Nancy Fay
212 Jefferson
Wood Dale, IL  60191

Ronald Fay
212 Jefferson
Wood Dale, IL  60191

Shawn Fay
164 N. Ash Street
Wood Dale, IL  60191

Kelly Fay
212 Jefferson
Wood Dale, IL 60191

Nicholas Fay (minor)
212 Jefferson
Wood Dale, IL  60191

Alan Jacobs
Zaban Jacobs & Mayer
33 North LaSalle Street
Suite 2131
Chicago, IL  60602

# FILED

JUN 28 1996

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

SDCH1/50491

26-1



September 23, 1⌣⌣                                                    EXHIBIT 28

Honorable Michael P. Toomin
Supervising Judge
District One
Courtroom 400
2600 South California Avenue
Chicago, Illinois 60608

                                                    Re: Mr. Thomas O'Farrell

Dear Judge Toomin,

        I was a friend of Lesley Champan O'Farrell. I have information for you
about the days and nights before her death I think you should know. My friend
Lesley was very sick and very depressed and had this desire to take her own
life. I tried to talk her out of this idea often, but my efforts were not good
enough. The last year, Lesley tried to overdose on her insulin she took for one
of her illnesses. Her husband Tom saved her life not knowing she tried to kill
herself. Tom found out later. Lesley tried to overdose again one night with me
on cocaine. I stopped her this time. Lesley was doing a lot of cocaine, pain
killers, muscle relaxers and drinking to try to stop the pain she was experienc-
ing. To my dislike, Lesley was giving Tom her medicine for her depression, tell-
ing him his doctor said to take it for his depression. Lesley was also trying to
take advantage of Tom's depression and mentally torturing him to help her end her
life. Lesley would get so angry at Tom when he would not listen to her when she
asked him for his help to take her life. She said she did this often. Lesley would
sometimes make Tom sleep in another bedroom or leave the house altogether. She
said Tom would sleep in his car in their driveway so he could be there for her if
she needed him or if something happened. Lesley found a gun that belonged to her
mother and was trying to get Tom to shoot her to end her life. Lesley told me that
one time he caught her ready to cut her wrists, but he took the razor from her.
Lesley ran out of the bathroom and out of the house. Tom ran after her but stopped
when he realized their son Lee was home alone with the doors open, so Tom returned
to the house and called 911, because Lesley had left the house on foot and he was
afraid she would still try to kill herself as she had a syringe and insulin with
her, having grabbed them as she ran out of the house. Lesley got mad at Tom and
made him sleep in another bedroom for almost three months because Tom embarrassed
her by letting everyone know her business. The last two nights, Lesley told me that
she could not sleep due to the pain she was in because of another illness she had.
Lesley told me Tom stayed up with her all night after working all day to try and
help her get some rest for work the next day. Lesley told me Tom was a good husband
to her, that he never abused her, and he always was there for her to take care of
her when she was sick. Sometimes, Tom almost lost his jobs because he left work or
did not go to work at all so he could take care of Lesley. She felt bad the she drove
him back to heavy drinking which he gave up for her when they met. Lesley also felt
bad that Tom was going through severe depression which Lesley said was because she
made him feel like a bad husband because if he loved her the way he said he did,
he would keep his promise he made to her when they were married. Lesley made Tom
promise he would never let her suffer if she was put on life support, and that he
should help her end her suffering even though she was not on life support. Tom said
he could not do that because he never said that he could kill her in order to end
her suffering. Lesley told me that she thought Tom would help her down. Lesley made
me bring home and keep a suicide note she wrote and her daily diary. I brought
Lesley her diary every night for her to make that days entry in case Tom got into
trouble for helping her. Lesley instructed me I was to take her diary and suicide
note to the State Attorney and not to the police. Lesley told me she was afraid if

                                    28-1-
                                       1

Tom helped her ___ the detectives at Area Five would ___ him up for her murder. Lesley said the detectives at Area Five already set him up with a murder before. Lesley felt that they would try again because Judge Strayhorn had found Tom not guilty and made them all look like real asses. Lesley and I thought up a plan and fixed a downstairs window to make it look like someone broke in and killed her, but if it did not work. I was to take her diary and suicide note to the state's attorney's office to help Tom because the police would possibly lie about what happened.

Now you need to know this very important information about what happened after Lesley's death. I have a boyfriend who is a detective at Area Five that was at Lesley and Tom's house that morning and he testified in your courtroom. His name is Boyle. I am twenty-six years old, divorced, have two young children and I am the other woman in Boyle's life. Boyle told me Lesley had died. Lesley met Boyle before and said she did not like him simply because of where he works. Boyle told me that Tom helped Lesley kill herself, but his superiors told all the officers that Tom was going to prison this time and they were instructed as to what they were to write in their reports. Boyle told me it was wrong but he feared that he might end up shot in some dark alley one night by another officer if he did not go along with their falsifying the police reports. Boyle told me when the first officer got to the house, the door was open and Tom and Lee (Lesley and Tom's son) were sitting on the stairs. The officer asked Tom if the offender had left and Tom nodded his head yes. The officer entered the house, walked past Tom, and went upstairs and started to search for anything that would link Tom to Lesley's murder. All my boyfriend (Boyle) said was they searched their house without a search warrant or permission from Tom which Boyle said was against the law because they had no "probable cause" to do so. Boyle told me that he overheard another detective say if no gun was found, that they would shoot Lesley with another gun and give it to Tom at the police station to get his prints on it, and then say it was found in the house. Boyle was not sure if that took place, but he knew they found a gun. I knew then, I could not tell Boyle about Lesley's diary and suicide note out of fear of what Lesley said would be true, that they might just disappear. So I went to see the State's Attorney on the day Boyle testified in your courtroom on this case. I told Boyle to tell the truth because I did not want him to go to jail for perjury. Boyle said he could not do that but he lied anyway. I talked to Mr. Nick Ford, the state's attorney in your courtroom. Mr. Ford brought me over to talk with another state's attorney named Mr. Pat Quinn. I told them what I knew and gave Mr. Ford Lesley's diary and suicide note. Mr. Ford and Mr. Quinn said, "Thanks for your cooperation." I was back in your courtroom the day you denied Tom's motions. Afterward, I asked Mr. Ford why that happened, that I had given him all the proof to help Tom (Lesley's diary and suicide note in her own handwriting) and Mr. Ford looked at me and told me neither of them ever existed. I told Mr. Ford he left me no choice but to go to the Bar Association and his boss, Mr. Jack O'Malley, to have him fired and disbarred. I also told Mr. Ford I was going to go to Internal Affairs of the Chicago Police Department and tell them what I know. Mr. Ford told me they would not believe me because I had no proof. That it would be my word "a nobody against him, a well known state's attorney" Mr. Ford also told me he was going to see to it that Tom was going to prison and he was going to try to have him put to death. Mr. Ford also said that Tom was not going to embarrass Mr. O'Malley and himself like the last time, not with the election coming up. Later that day, Boyle and O'Farrell is a piece of shit for taking his wife's life for any reason, even out of suffering and love. Tom is going to prison and hopefully by put to death and I cannot or will not do anything to help Tom anymore." Boyle and the other detective named O'Shea came to me and told me "to stay out of it. Tom I've told me to "shut your mouth or something might happen to you and your children." Later that night, I was going to see Boyle and was jumped from behind and beaten. I received a broken nose, a broken arm, four broken ribs, and torn cartilage to my knee. They did not take my car, money, credit cards, jewelry or any other personal property. I do not have to be a 'detective' to figure out who beat me and why. I got their point. I fear for the safety of my children and my life. I am

leaving the state of Illinois and changing my name because after they find out about this leter, they will look for me and I will end up like Lesley, and God knows what they will do to my children. I will not take the chance of anything happening to my children, or their mother. I am sending copies of this letter to the media, television stations and newspapers, because I feel the public has a right to know just how corrupt the Chicago Police Department (Area Five) and the Cook County State's Attorney office is. I also, in good conscience, cannot sit by and watch the state attorney's office and Area Five Police, railroad Tom into prison because it's an election year and their being afraid to say they were wrong in falsifying the police reports and it looks bad on them.

I feel if Tom had had his wits about him, he would not have done this. I know he did it out of love and for no other reason, and he risked his life for Lesley. Tom is a good husband and father. Have mercy on him, and on Lesley and Tom's son Lee. Please do not take Lee's father from him too. I also hope this letter will ensure my protection from the police of Area Five. I am sure you will do what is right.

Sincerely,

Kathy Morris

KM
cc

TV Channels 2, 5, 7, 9, 32, 50
Chicago Sun Times
Chicago Tribune
Chicago Bar Association
American Bar Association
Attorney Registration & Disciplinary Commission
Cook County Bar Association
The Federal Bar Association
Government Bar Association
Illinois Attorneys for Criminal Justice

Thomas O'Farrell
K54340
P.O. Box 99
Pontiac, Illinois 61764

March 13, 2001

Deborah J. Gubin,
Deborah J. Gubin & Associates
605 West Madison - Suite 331
Chicago, Illinois 60661

Ms. Gubin,

Accompanying this letter is my affidavit, police report and authorization for you to remove exhibit #15, the hospital report of my wife, Lesley from my original post-conviction petition as we discussed on the attorney visit dated march 12, 2001. I am also authorizing you to put my wife, Lesley's estate documents in an amended post-conviction petition and file said document in addition to my original post-conviction petition as we discussed in our attorney visit on march 12, 2001. Lastly, I authorize you to add the issue on the amended post-conviction petition on the illegal arrest without probable cause as we discussed on our visit on march 12, 2001. I am enclosing a copy of the arrest report dated september 28, 1995, which I showed you on our visit on march 12, 2001. Please take notice to box #30 of said report, which you will find on line (6) six, (6) boxes to the right of the report, titled arrestee transported. Notice the time of arrest noted on said report. It clearly showes that I was placed under arrest at 7:20 a.m., which was the time I claimed to be arrested in my motion to suppresses arrest. It is clearly approximatly (2) two hours prior to the discovery of the weapon at my home and without probable cause. This document is clearly a chicago police department arrest report. This document is undisputable, is not fabricated by myself or anyone that I know. It clearly showes that detective's Szeluga and Schak perjured themselves during my court proceedings, when they both stated that I <u>was not placed under arrest until after 9:00-9:30a.m.</u>, after the weapon was discovered at my home.

I know that you insisted that I drop the issue on prosecuto-rial misconduct that I raised in my original post-conviction petition on our visit dated march 12, 2001. You did not want to pursue this issue because Appellate Court Judge Patrick Quinn and Cook County Judge Nicholas Ford may/or may not deny your other clients proceedings and make your job difficult. If Judges Quinn and Ford did not violate my constitutional rights secured by both the United States and Illinois Constitutions by illegally using what they knew or what they should have known to be perjured testimony (Thomas Dye) to justify the stiff sentece of (50) fifty years imprisonment, they would not have to be fearing the loosing of their new jobs as judges and/or their licence to practice law. As for Judges Quinn and Ford getting pissed off at you for bringing this issue to the light of the Courts and the public, I do not care. The only thing that I can say is if Judge's Quinn and Ford

show their bias towards your clients because you proceeded with this issue on prosecutorial miscunduct against them, you should appeal or have them remove themselves from those cases, but I refuse to bow down to them simply because the are now Judges in the Appellate Court and Circuit Court of Cook County.

Now if you have a problem with me or the issue I insist to raise, just remove yourself under a conflict of intrest and I will not object.

Thank you for your time and cooperation in this matter.

Sincerely,

Thomas O'Farrell,
Defendant

XC:file
   family

EXHIBIT #30

STATE OF ILLINOIS        )
                         )s
COUNTY OF LIVINGSTON     )

### AFFIDAVIT

I, Thomas O'Farrell, Defendant, hereby certify under penalty of perjury and as otherwise provided by law that the information and statements below are true and correct to the best of my knowledge:

1) On, or about, March 12, 2001, I had a attroeny visit at the Pontiac Correctional Center with my court appointed counsel, Deborah J. Gubin of DeboraH J. Gubin & Associates, 695 West Madison - Suite 331, Chicago, Illinois 60661;

2) On, or about, March 12, 2001, appellate counsel, Deborah J. Gubin refused to fully go through all the issues stated within my original post-conviction petition stating that " I have no time to go through each and every one of your claims within your original post-conviction petition.  It's over (100) one hundred pages long and I must get back to the city for a meeting.";

3) On, or about, March 12, 2001, appellate counsel, Deborah J. Gubin insisted that I remove the prosecutorial misconduct issue from my original post-conviction petition against Appellate Court Judge, Patrick Quinn and Cook County Judge, Nicholas Ford who are Ex-Cook County Prosecutors who were involved in my original court proceedings.  Appellate Counsel, Gubin stated that " I have and will have other clients in the future in front of both judge's Quinn and Ford and I fear that if I proceed on this issue of prosecutor misconduct against these judges they will get pissed off at me and take it out on my clients by ruling against them.";

4) The statements and claims stated within Defendants authorization document are true and correct to the best of my knowledge.

Further affiant sayth nought.

_____
Thomas O'Farrell,
Defendant

Subscribed and Sworn to before me
on this 13th day of March, 2001.

_____
Notary Public

EXHIBIT #31

STATE OF ILLINOIS          )
                           )ss
COUNTY OF LIVINGSTON       )

## AUTHORIZATION

I, Thomas O'Farrell, Defendant, the undersigned, authorize my appellate counsel, Deborah J. Gubin of Deborah J. Gubin & Associates, 605 West Madison – Suite 331, Chicago, Illinois 60661 to do the following on my original post-conviction petition and amended post-conviction petition:

1) To remove exhibit #15, my wife, Lesley's medical record from my original post-conviction petition as we discussed om the attorney visit dated march 12, 2001;

2) In addition to my original post-conviction petition, I authorize the incorporation of my wife. Lesley's estate documents into an amended post-conviction petition as we discussed, on the attorny visit dated march 12, 2001;

3) I also authorize in addition to my original post-conviction petition the incorporation of the chicago police arrest report dated september 28, 1995 and the issue of the illegal arrest without probable cause into an amended post-conviction petition as we discussed on our attorney visit dated march 12, 2001; and

4) Lastly and most important, I do not give you authorization to remove my original petition and/or any issues claimed within my original post-conviction without appellate counsel first submitting to me (Defendant) in writting the legal reasoning why a issue needs to be removed, case law in support to the removal of said issue and most important, the written authorization from Defendant, Thomas O'Farrell.

/s/ _____
Thomas O'Farrell,
Defendant

Subscribed and Sworn to before me on this ___ day of March, 2001.

_____
Notary Public

31-1

EXHIBIT ~~##~~32

STATE OF ILLINOIS    )
                     )ss
COUNTY OF LIVINGSTON )

## AUTHORIZATION

I, Thomas O'Farrell, Defendant, the undersigned, authorize my appellate counsel, Deborah J. Gubin of Deborah J. Gubin & Associates, 605 West Madison - Suite 331, Chicago, Illinois 60661 to do the following on my original & amended post-conviction petition along with the amendment to the amended post-conviction petition:

1) I authorize my counsel, Deborah J. Gubin to add the issues of an illegal arrest and the claim of legal innocents in an amendment to the amended post-conviction petition as per our discussion on the telephone dated April 11, 2001.

2) As stated in the prior authorization form, I do not give you, Deborah J. Gubin authorization to remove my original post-conviction petition and/or any issues claimed within said post-conviction without appellate counsel first submitting to me (Defendant) in writting the legal reasoning why a issue need be removed, case law in support to the removal od said issue and most important, the written authorization from Defendant, Thomas O'Farrell.

/S/ _[signature]_
Thomas O'Farrell,
Defendant

Subscribed and Sworn to before me on this _11_ day of April, 2001.

_Denied Access to Notary_
Notary Public

32-1

STATE OF ILLINOIS      )
                       )ss
COUNTY OF LIVINGSTON   )

### AFFIDAVIT

I, Thomas O'Farrell, Defendant, hereby certify under penalty of perjury and as otherwise provided by law that the information and statements below are true and correct to the best of my knowledge;

1) On, or about, April 11, 2001, I spoke with my legal counsel, Deborah J. Gubin of Deborah J. Gubin & Associates, 605 west Madison - Suite 331, Chicago, Illinois 60661.

2) On, or about, April 11, 2001, I had John Turpen, a inmate here at Pontiac Correctional Center listen to my legal call with Ms. Gubin, above.

3) On, or about, April 11, 2001, Ms. Gubin finnally agreed to add the two (2) meritorious issues in an amendment to the amended post-conviction petition after I firmly insisted that these issues be placed into siad document because it was my life and it was I and I alone that had to do the time in prison and if these issues were denied it would be my fault and not hers. I told Ms. Gubin that these issues needed to be brought in front of the Courts for a ruling.

Further affiant sayeth nought.

_____
Thomas O'Farrell,
Defendant

Subscribed and Sworn to before me
on this _11_ day of April, 2001.

_Denied Access to Notary_____
Notary Public

EXHIBIT XX34

STATE OF ILLINOIS      )
                       )ss
COUNTY OF LIVINGSTON)

### AFFIDAVIT

I, John Turpen, hereby certify under penalty of perjury and as otherwise provided by law that the information and statements below are true and correct to the best of my lnowledge;

1) I am presently incarcerated in the Pontiac Correctional Center, Pontiac, Illinois under I.D.# K54420.

2) I am subject to the rules of admissibilty, competent to testify to the matters herein.

3) On, or about, April 11, 2001, Thomas O'Farrell asked me to listen in to a legal call to his attorney, Ms. Gubin so that I can be a witness to their conversation if necessary.

4) On, or about, April 11, 2001, Thomas O'Farrell insisted that attorney Gubin put the issues of an illegal arrest and a claim of legal innocents in an amendment to his amended post-conviction petition.

5) On, or about, April 11, 2001, attorney Gubin agreed to add Thomas O'Farrell's issues in said document above (see #4 above).

Further affiant sayeth nought.

_John Turpen_
John Turpen-K54420

Subscribed and Sworn to before me on this 12 day of April         , 2001.

**DENIED ACCESS TO NOTARY!**
Notary Public

34-1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

VS

NUMBER 95CR3046301

THOMAS        OFARRELL

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

States Attorney of Cook County filed an INDICTMENT/INFORMATION

| | | |
|---|---|---|
| 09/01 DEFENDANT NOT IN COURT | | |
| TOOMIN, MICHAEL P. | 00/00/00 | |
| 09/01 CONTINUANCE BY AGREEMENT | | |
| TOOMIN, MICHAEL P. | 03/07/01 | |
| 07/01 DEFENDANT NOT IN COURT | | |
| TOOMIN, MICHAEL P. | 00/00/00 | |
| 07/01 CONTINUANCE BY AGREEMENT | | |
| TOOMIN, MICHAEL P. | 03/19/01 | |
| 19/01 CONTINUANCE BY AGREEMENT | | |
| TOOMIN, MICHAEL P. | 03/26/01 | |
| 26/01 CONTINUANCE BY ORDER OF COURT | | |
| URSO, JOSEPH J. | 04/13/01 | |
| 03/01 MANDATE FILED | | |
| 2/01 SPECIAL ORDER | 04/12/01 1701 | |
| | 00/00/00 | |
| APPELLANTS MOTION TO WITHDRAW APPEAL IS ALLOWE | | |
| WOOD, WILLIAM S. | | |
| 3/01 DEFENDANT NOT IN COURT | | |
| TOOMIN, MICHAEL P. | 00/00/00 | |
| 13/01 DEFENDANT IN CUSTODY | | |
| TOOMIN, MICHAEL P. | 00/00/00 | |
| 13/01 SPECIAL ORDER | | |
| LLV TO FILE AMENDED PC | 00/00/00 | |
| TOOMIN, MICHAEL P. | | |
| 13/01 CONTINUANCE BY AGREEMENT | | |
| TOOMIN, MICHAEL P. | 05/30/01 | |
| 07/01 SPECIAL ORDER | | |
| AMENDMENT TO AMENDED P. C. PET. | 00/00/00 | |
| 30/01 DEFENDANT IN CUSTODY | | |
| TOOMIN, MICHAEL P. | 00/00/00 | |
| 30/01 PRISONER DATA SHEET TO ISSUE | | |
| TOOMIN, MICHAEL P. | 00/00/00 | |
| 30/01 SPECIAL ORDER | | |
| LV STATE TO FILE MOTION TO DISMISS | 00/00/00 | |
| TOOMIN, MICHAEL P. | | |
| 30/01 CONTINUANCE BY AGREEMENT | | |
| TOOMIN, MICHAEL P. | 06/28/01 | |
| 28/01 DEFENDANT NOT IN COURT | | |
| TOOMIN, MICHAEL P. | 00/00/00 | |

## Left column group

whether the child was capable of making an emergency call;

(11) whether there was food and other provision left for the child;

(12) whether any of the conduct is attributable to economic hardship or illness and the parent, guardian or other person having physical custody or control of the child made a good faith effort to provide for the health and safety of the child;

(13) the age and physical and mental capabilities of the person or persons who were responsible for the welfare of the child;

(14) any other factor that would endanger the health or safety of that particular child;

(15) whether the child was left alone under the supervision of another person.

(d-1) Child abandonment is a Class 4 felony. A second or subsequent offense after a prior conviction is a Class 3 felony.

Laws 1961, p. 1983, § 12-21.5, added by P.A. 88-479, § 10, eff. Sept. 9, 1993.

1 No (o) in number.

### 5/12-21.6.　Endangering the life or health of a child

§ 12-21.6.　Endangering the life or health of a child. It is unlawful for any person to willfully cause or permit the life or health of a child under the age of 18 to be endangered or to willfully cause or permit a child to be placed in circumstances that endanger the child's life or health. A violation of this Section is a Class A misdemeanor. A second or subsequent violation of this Section is a Class 3 felony.

Laws 1961, p. 1983, § 12-21.6, added by P.A. 88-479, § 10, eff. Sept. 9, 1993.

### 5/12-22.　Probation

§ 12-22.　Probation.

(a) Whenever a parent of a child as determined by the court on the basis before it, pleads guilty to or is found guilty of, with respect to his or her child, child abandonment under Section 12-21.5 of the Criminal Code of 1961 or endangering the life or health of a child under Section 12-21.6 of the Criminal Code of 1961, the court may, without entering a judgment of guilt and with the consent of the person, defer further proceedings and place the person upon probation upon such terms and conditions as require the person to cooperate with the Department of Children and Family Services at the times and in the programs that the Department of Children and Family Services may designate. Upon violation of a term or condition of probation, the court may enter a judgment on its original charge and proceed as otherwise provided.

(b) Upon fulfillment of the terms and conditions imposed under subsection (a), the court shall discharge the person and dismiss the proceedings. Discharge and dismissal under this Section shall be without court adjudication of guilt and shall not be deemed a conviction for purposes of this Section or for purposes of any disqualifications or disabilities imposed by law upon conviction of a crime. However, a record of the disposition shall be reported by the clerk of the circuit court to the Department of State Police under Section 2.1 of the Criminal Identification Act and shall be maintained and provided to any civil authority in connection with a determination of whether the person is an acceptable candidate for the care, custody and supervision of children.

(c) Discharge and dismissal under this Section may occur only once.

(d) Probation under this Section may not be for a period of less than 2 years.

(e) If the child dies of the injuries alleged, this Section does not apply.

Laws 1961, p. 1983, § 12-22, added by P.A. 88-479, § 10, eff. Sept. 9, 1993.

1 720 ILCS 2039/2.1.

### 5/12-30.　Violation of an order of protection

§ 12-30.　Violation of an order of protection.

(a) A person commits violation of an order of protection if he or she:

(1) Commits an act which was prohibited by a court in violation of a remedy in a valid order of protection authorized under paragraphs (1), (2), (3) or (14) of subsection (b) of Section 214 of the Illinois Domestic Violence Act of 1986,¹ or any other remedy when the act constitutes a crime against the protected parties as the term protected parties is defined in Section 112A-4 of the Code of Criminal Procedure of 1963; and

(2) Such violation occurs after the offender has been served notice of the contents of the order, pursuant to the Illinois Domestic Violence Act,² or otherwise has acquired actual knowledge of the contents of the order.

(b) For purposes of this Section, an "order of protection" may have been issued in a criminal or civil proceeding.

(c) Nothing in this Section shall be construed to diminish the inherent authority of the courts to enforce their lawful orders through civil and criminal contempt proceedings.

(d) Violation of an order of protection under subsection (a) of this Section is a Class A misdemeanor. A second or subsequent offense is a Class 4 felony. The court shall impose a minimum penalty of 24 hours imprisonment for defendant's second or subsequent violation of any order of protection; unless the court explicitly finds that an increased penalty or such period of imprisonment would be manifestly unjust. In addition to any other penalties, the court may order the defendant to pay a fine or to make restitution to the victim under Section 5-5-6 of the Unified Code of Corrections.³

Laws 1961, p. 1983, § 12-30, added by P.A. 84-1305, Art. IV, § 401, eff. Aug. 21, 1986; P.A. 85-430, § 1; P.A. 85-670, Art. I, § 88-467, § 25, eff. July 1, 1994; P.A. 88-670, Art. II, § 2-54, eff. Dec. 2, 1994.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 12-30.

1 750 ILCS 60/214.
2 750 ILCS 60/1 et seq.
3 730 ILCS 5/5-5-6.

## Right column group

control over the other person through (i) control of the other person's physical or (ii) control of the use of psychological pressures; or (iii) use of actual or ostensible religious, political, social, philosophical or other principles.

(2) With knowledge that another person intends to commit, or attempt to commit suicide, intentionally (i) offers and provides the physical means by which another person commits or attempts to commit suicide, or (ii) participates in a physical act by which another person commits or attempts to commit suicide.

For the purposes of this Section, "attempts to commit suicide" means any act done with the intent to commit suicide and which constitutes a substantial step toward commission of suicide.

(b) Sentence. Inducement to commit suicide under paragraph (a)(1) when the other person commits suicide is a Class 2 felony. Inducement to commit suicide under paragraph (a)(2) when the other person commits suicide is a Class 4 felony. Inducement to commit suicide under paragraph (a)(2) when the other person attempts to commit suicide is a Class 4 felony. Inducement to commit suicide under paragraph (a)(1) when the other person attempts to commit suicide is a Class A misdemeanor.

Laws 1961, p. 1983, § 12-31, added by P.A. 86-390, § 2, eff. July 1, 1990. Amended by P.A. 87-1167, § 1, eff. Jan. 1, 1988; P.A. 89-392, § 5, eff. Aug. 20, 1993.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 12-31.

1 755 ILCS 40/1 et seq.
2 755 ILCS 40/4-1 et seq.

* Another ¶ 12-32 was renumbered § 12-32.

### 5/12-32.　Ritual mutilation

§ 12-32.　Ritual Mutilation. (a) A person commits the offense of ritual mutilation, when he or she mutilates, dismembers or tortures another person as part of a ceremony, rite, initiation, observance, performance or practice, and the victim did not consent or under such circumstances that the defendant knew or should have known that the victim was physically or mentally incapable of rendering consent.

(b) Sentence. Ritual mutilation is a Class 2 felony.

(c) The offense ritual mutilation does not include the practice of circumcision or a ceremony, rite, initiation, observance or performance related thereto.

Laws 1961, p. 1983, § 12-32, added by P.A. 86-964, § 1, eff. Jan. 1, 1990. Renumbered § 12-32 and amended by P.A. 87-1023, Art. II, § 2-19, eff. Feb. 5, 1990.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 12-32.

1 P.A. 86-1028, the First 1990 Revisory Act, provides in Art. II, for the renaming and renumbering of certain Sections of Acts which have been added or amended by more than one Act of the 86th General Assembly; repeals certain Sections that have been both amended and repealed in the 86th General Assembly and incorporates amendments into Sections by one Act where another Section of that Act makes a change in the section text in such sections contained in P.A. 86-1 through P.A. 86-1099.

### 5/12-33.　Inducement to commit suicide

§ 12-31.　Inducement to Commit Suicide.

(a) A person commits the offense of inducement to commit suicide when he or she does either of the following:

(1) Coerces another to commit suicide through the use of actual or ostensible religious, philosophical or other principles and the coercion results in the person's suicide or attempted suicide, and the other person does not have the capacity to commit suicide as a direct result of the coercion, and he or she exercises substantial

### 5/12-33.　Ritualized abuse of a child

§ 12-33.　Ritualized abuse of a child.

(a) A person is guilty of ritualized abuse of a child when he or she commits any of the following acts with, upon, or in the presence of a child as part of a ceremony, rite or any similar observance:

(1) actually or in simulation, tortures, mutilates, or sacrifices any warm-blooded animal or human being;

(2) forces ingestion, injection or other application of any narcotic, drug, hallucinogen or anaesthetic for the purpose of dulling sensitivity, cognition, recollection of, or resistance to any criminal activity;

(3) forces ingestion, or external application, of human or animal urine, feces, flesh, blood, bones, body secretions, nonprescribed drugs or chemical compounds;

(4) involves the child in a mock, unauthorized or unlawful marriage ceremony with another person or representation of any force or deity, followed by sexual contact with the child;

(5) places a living child into a coffin or open grave containing a human corpse or remains;

(6) threatens death or serious harm to a child, his or her parents, family, pets, or friends that instills a well-founded fear in the child that the threat will be carried out; or

(7) unlawfully dissects, mutilates, or incinerates a human corpse.

(b) The provisions of this Section shall not be construed to apply to:

(1) lawful agricultural, animal husbandry, food preparation, or wild game hunting and fishing practices and specifically the branding or identification of livestock;

(2) the lawful medical practice of circumcision or any ceremony related to circumcision;

(3) any state or federally approved, licensed, or funded research project; or

(4) the ingestion of animal flesh or blood in the performance of a religious service or ceremony.

(c) Ritualized abuse of a child is a Class 1 felony for a first offense. A second or subsequent offense is a Class 1 felony for which the offender may be sentenced to a term of natural life imprisonment.

(d) For the purposes of this Section, "child" means any person under 18 years of age.

Laws 1961, p. 1983, § 12-33, added by P.A. 87-1167, § 1, eff. Jan. 1, 1988.

Formerly Ill.Rev.Stat., ch. 38, ¶ 12-33.

### ARTICLE 13.　VIOLATION OF CIVIL RIGHTS

5/13-1 to 5/13-4.　§§ 13-1 to 13-4.　Repealed by P.A. 81-1216, § 10-108, eff. July 1, 1980.

### ARTICLE 14.　EAVESDROPPING

Section
5/14-1.　Definition.
5/14-2.　Elements of the offense—Affirmative defense.
5/14-3.　Exemptions.
5/14-4.　Recordings, records, and custody.
5/14-5.　Divulging or interception or recording.
5/14-6.　Sentence.
5/14-7.　Evidence inadmissible.
5/14-8.　Civil remedies to injured parties.

shall not be satisfied unless established beyond a reasonable doubt.

(g) Procedure—Jury.

If at the separate sentencing proceeding the jury finds that none of the factors set forth in subsection (b) exists, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections. If there is a unanimous finding by the jury that one or more of the factors set forth in subsection (b) exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether the sentence of death shall be imposed. If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.

For sentencing, conviction, construction and application of P.A. 89-203, P.A. 89-462 referring to amendments by P.A. 89-462.

(h) Procedure—No Jury.

In a proceeding before the court alone, if the court finds that none of the factors found in subsection (b) exists, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections.

If the Court determines that one or more of the factors set forth in subsection (b) exists, the Court shall consider any aggravating and mitigating factors as indicated in subsection (c). If the Court determines that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the Court shall sentence the defendant to death.

Unless the court finds that there are no mitigating factors sufficient to preclude the imposition of the death penalty, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections.

(i) Appellate Procedure.

The conviction and sentence of death shall be subject to automatic review by the Supreme Court. Such review and sentence shall be in accordance with rules promulgated by the Supreme Court.

(j) Disposition of reversed death sentence.

In the event that the death penalty in this Act is held to be unconstitutional by the Supreme Court of the United States or of the State of Illinois, any person convicted of first degree murder shall be sentenced by the court to a term of imprisonment under Chapter V of the Unified Code of Corrections.

In the event that any death sentence pursuant to the sentencing provisions of this Section is declared unconstitutional by the Supreme Court of the United States or of the State of Illinois, the Court having jurisdiction over a person previously sentenced to death shall cause the defendant to be brought before the court, and the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections.

Laws 1961, p. 1983, § 9-1, added by P.A. 80-1099, § 1, eff. Jan. 1, 1982. Amended by P.A. 80-1099, § 6, eff. Jan. 1, 1979; P.A. 79-2638, § 1, eff. Jan. 1, 1973; P.A. 80-26, § 1, eff. June 21, 1977; P.A. 80-1495, § 17, eff. Jan. 8, 1979; P.A. 82-677, § 1, eff. July 1, 1982; P.A. 82-1025, § 1, eff. July 13, 1982; P.A. 83-1067, § 1, eff. July 1, 1984; P.A. 85-006, § 1, eff. Jan. 1, 1988; P.A. 86-006, § 1, eff. Jan. 1, 1990; P.A. 86-884, § 1, eff. Sept. 7, 1989; P.A. 86-1012, § 3, eff. July 1, 1990; P.A. 86-1475, Art. 2, § 2-12, eff. Jan. 10, 1991; P.A. 87-435, § 1, eff. Sept. 18, 1991; P.A. 87-521,

§ 1, eff. Jan. 1, 1993; P.A. 88-176, § 5, eff. Jan. 1, 1994; P.A. 88-433, § 5, eff. Jan. 1, 1994; P.A. 88-670, Art. 2, § 2-54, eff. Dec. 2, 1994; P.A. 89-677, § 39, eff. Dec. 15, 1996; P.A. 89-8, § 5, eff. Aug. 4, 1996; P.A. 89-428, Art. 2, § 292, eff. May 29, 1996; P.A. 89-498, Art. 5, § 5-130, eff. June 27, 1996.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 9-1.

5/9-1.1. Repealed by P.A. 84-1414, § 2, eff. Sept. 19, 1986; P.A. 85-293, Art. II, § 21, eff. Sept. 1, 1987

5/9-1.2. Intentional homicide of an unborn child

§ 9-1.2. Intentional Homicide of an Unborn Child. (a) A person commits the offense of intentional homicide of an unborn child if, in performing acts which cause the death of an unborn child, he without lawful justification:

(1) either intended to cause the death of or do great bodily harm to the pregnant woman or her unborn child or knew that such acts would cause death or great bodily harm to the pregnant woman or her unborn child; or

(2) he knew that his acts created a strong probability of death or great bodily harm to the pregnant woman or her unborn child and

(3) he knew that the woman was pregnant.

(b) For purposes of this Section, (1) "unborn child" shall mean any individual of the human species from fertilization until birth, and (2) "person" shall not include the pregnant woman whose unborn child is killed.

(c) This Section shall not apply to acts which cause the death of an unborn child if those acts were committed during any abortion, as defined in Section 2 of the Illinois Abortion Law of 1975, as amended, to which the pregnant woman has consented. This Section shall not apply to acts which were committed pursuant to usual and customary standards of medical practice during diagnostic testing or therapeutic treatment.

(d) Penalty. The sentence for intentional homicide of an unborn child shall be the same as for first degree murder, except that the death penalty may not be imposed.

(e) The provisions of this Act shall not be construed to prohibit the prosecution of any person under any other provision of law.

Laws 1961, p. 1983, § 9-1.2, added by P.A. 84-1414, § 1, eff. Sept. 19, 1986. Amended by P.A. 85-293, Art. III, § 13, eff. Sept. 1, 1987.

5/9-2. Second degree murder

§ 9-2. Second Degree Murder. (a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraph (1)

er 2 of subsection (a) of Section 9-1 of this Code and either of the following mitigating factors are present:

(a) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; or

(b) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of the mitigating factors of at the time of the killing he was acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill. In a jury trial for first degree murder in which evidence of either of these mitigating factors is presented, the jury must be instructed that if they find all the elements of first degree murder have been proved and the defendant has requested that the jury be given the option of finding the defendant guilty of second degree murder, the jury may not consider whether the defendant has met his burden of proof with regard to second degree murder until and unless it has first determined that the State has proven beyond a reasonable doubt each of the elements of first degree murder.

(d) Sentence.

Second Degree Murder is a Class 1 felony.

Laws 1961, p. 1983, § 9-2, eff. Jan. 1, 1962. Amended by P.A. 77-2638, § 1, eff. Jan. 1, 1973; P.A. 84-1450, § 1, eff. Jan. 1, 1987; P.A. 84-1450, § 2, eff. July 1, 1987.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 9-2.

5/9-2.1. Voluntary manslaughter of an unborn child

§ 9-2.1. Voluntary Manslaughter of an Unborn Child. (a) A person who kills an unborn child without lawful justification commits voluntary manslaughter of an unborn child if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by whom the offender endeavors to kill, but negligently causes the death of the unborn child.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(b) A person who intentionally or knowingly kills an unborn child commits voluntary manslaughter of an unborn child if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

(c) Sentence. Voluntary Manslaughter of an unborn child is a Class 1 felony.

(d) For purposes of this Section, (1) "unborn child" shall mean any individual of the human species from fertilization until birth, and (2) "person" shall not include the pregnant woman whose unborn child is killed.

(e) This Section shall not apply to acts which cause the death of an unborn child if those acts were committed during any abortion, as defined in Section 2 of the Illinois Abortion Law of 1975, as amended, to which the pregnant woman has consented. This Section shall not apply to acts which were committed pursuant to usual and customary standards of medical practice during diagnostic testing or therapeutic treatment.

Laws 1961, p. 1983, § 9-2.1, added by P.A. 84-1414, § 1, eff. Sept. 19, 1986.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 9-2.1.

5/9-3. Involuntary manslaughter and reckless homicide

§ 9-3. (a) Involuntary Manslaughter and Reckless Homicide. A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, except in cases in which the cause of the death consists of the driving of a motor vehicle, in which case the person commits reckless homicide.

(b) In cases involving reckless homicide, being under the influence of alcohol or any other drug or drugs at the time of the alleged violation shall be presumed to be evidence of a reckless act unless disproved by evidence to the contrary.

(c) For the purposes of this Section, a person shall be considered to be under the influence of alcohol or other drugs while:

1. The alcohol concentration in the person's blood or breath is 0.10 or more based on the definition of blood and breath units in Section 11-501.2 of the Illinois Vehicle Code;

2. Under the influence of alcohol to a degree that renders the person incapable of safely driving;

3. Under the influence of any other drug or combination of drugs to a degree that renders the person incapable of safely driving; or

4. Under the combined influence of alcohol and any other drug or drugs to a degree which renders the person incapable of safely driving.

(d) Sentence.

(1) Involuntary Manslaughter is a Class 3 felony.

(2) Reckless homicide is a Class 3 felony.

(e) In cases involving reckless homicide in which the defendant was determined to have been under the influence of alcohol or any other drug or drugs as an element of the offense, or in cases in which the defendant is proven beyond a reasonable doubt to have been under the influence of alcohol or any other drug or drugs, the penalty shall be a Class 2 felony, for which a person, if sentenced to a term of imprisonment, shall be sentenced to a term of not less than 3 years and not more than 14 years.

Laws 1961, p. 1983, § 9-3, eff. Jan. 1, 1962. Amended by P.A. 77-2638, § 1, eff. Jan. 1, 1973; P.A. 79-879, § 1, eff. ...; P.A. 86-1387, § 1, eff. Sept. 10, 1990; P.A. 87-274, § 1, eff. Jan. 1, 1992; P.A. 87-1198, § 601.2.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 9-3.

P.A. 87-1198 incorporated the amendment by P.A. 87-274.

1690

# CORRECTIONS

## 730 ILCS 5/5-8-1

paramedic, ambulance driver, or other medical assistant or first aid personnel, or

(vi) is a person who, at the time of the commission of the murder, had not attained the age of 17, and is found guilty of murdering a person under 12 years of age and the murder is committed during the course of aggravated criminal sexual assault, criminal sexual assault, or aggravated kidnaping.

For purposes of clause (v), "emergency medical technician—ambulance," "emergency medical technician—intermediate," "emergency medical technician—paramedic," have the meanings ascribed to them in the Emergency Medical Services (EMS) Systems Act.[3]

(1.5) for second degree murder, a term shall be not less than 4 years and not more than 20 years;

(2) for a person adjudged a habitual criminal under Article 33B of the Criminal Code of 1961, as amended,[4] the sentence shall be a term of natural life imprisonment.

(3) except as otherwise provided in the statute defining the offense, for a Class X felony, the sentence shall be not less than 6 years and not more than 30 years;

(4) for a Class 1 felony, other than second degree murder, the sentence shall be not less than 4 years and not more than 15 years;

(5) for a Class 2 felony, the sentence shall be not less than 3 years and not more than 7 years;

(6) for a Class 3 felony, the sentence shall be not less than 2 years and not more than 5 years;

(7) for a Class 4 felony, the sentence shall be not less than 1 year and not more than 3 years.

(b) The sentencing judge in each felony conviction shall set forth his reasons for imposing the particular sentence he enters in the case, as provided in Section 5-4-1 of this Code. Those reasons may include any mitigating or aggravating factors specified in this Code, or the lack of any such factors specified in this Code. This court may include other factors as the judge shall set forth on the record that are consistent with the purposes and principles of sentencing set out in this Code.

(c) A motion to reduce a sentence may be made or the court may reduce a sentence within a motion within 30 days after the sentence is imposed. A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed within 30 days following the imposition of sentence. However, the court may not increase the length of any sentence on its own motion or on motion of a party filed thereafter unless the defendant, because of the inadequacy of the sentence, is given the opportunity to withdraw any plea entered. A motion filed pursuant to this subsection shall be heard promptly, and if a sentence is modified thereafter pursuant to the motion, a judgment or sentence shall be within a reasonable time.

If a motion filed pursuant to this subsection is timely filed within 30 days after the sentence is imposed, then for purposes of perfecting an appeal, a final judgment shall not be considered to have been entered until the motion to reduce a sentence has been decided by order entered by the trial court.

A motion filed pursuant to this subsection shall not be considered to have been timely filed unless it is filed with the circuit court together with a notice of motion, which notice of motion shall set the motion on the court's calendar on a date certain within a reasonable time after the date of filing. Except where a term of natural life is imposed, every sentence shall include as though written therein a term in

addition to the term of imprisonment. For those sentenced under the law in effect prior to February 1, 1978, such term shall be identified as a parole term. For those sentenced on or after February 1, 1978, such term shall be identified as a mandatory supervised release term. Subject to earlier termination under Section 3-3-8, the parole or mandatory supervised release term shall be as follows:

(1) for first degree murder or a Class X felony, 3 years;

(2) for a Class 1 felony or a Class 2 felony, 2 years;

(3) for a Class 3 felony or a Class 4 felony, 1 year.

(4) A defendant who has a previous and unexpired sentence of imprisonment imposed by another state or by any district court of the United States and who, after sentence for a crime in Illinois, must return to serve the unexpired prior sentence may have his sentence by the Illinois court ordered to be concurrent with any prior sentence in the other state. The other state shall be furnished with a copy of the order imposing sentence which shall provide that, when the offender is released from confinement of the other state, whether by parole or by termination of sentence, the offender shall be transferred by the Sheriff of the committing county to the Illinois Department of Corrections. The court shall cause the Department of Corrections to be notified of such sentence at the time of commitment and to be provided with copies of all records regarding the sentence.

(5) A defendant who has a previous and unexpired sentence of imprisonment imposed by an Illinois circuit court for a crime in this State and who is subsequently sentenced to a term of imprisonment by another state or by any district court of the United States and who has served a term of imprisonment imposed by the other state or district court of the United States, and must return to serve the unexpired prior sentence imposed by the Illinois Circuit Court may apply to the court which imposed sentence to have his sentence reduced.

The circuit court may order that any time served on the sentence imposed by the other state or district court of the United States be credited on his Illinois sentence and served concurrently. A defendant must apply for reduction of sentence under this subsection within 30 days after the defendant has completed the sentence imposed by the other state or district court of the United States.

P.A. 77-2097, § 5-8-1, eff. Jan. 1, 1973. Amended by P.A. 79-369, § 1, eff. Aug. 14, 1975; P.A. 79-1099, § 3, eff. Feb. 1, 1978; P.A. 80-1099, § 1, eff. July 1, 1980; P.A. 82-717, § 2, eff. Sept. 8, 1981-1318. § 1, eff. July 1, 1982; P.A. 84-1450, § 4, eff. July 1, 1987; P.A. 85-207, § 1, eff. Aug. 21, 1987; P.A. 85-845, § 4, eff. Sept. 22, 1987; P.A. 85-902, § 8 P.A. 85-902, § 6, eff. 1987; P.A. 85-906, § 1, eff. Nov. 6, 1987; P.A. 85-1289, Art. II, § 2-25, eff. Aug. 1, 1988; P.A. 85-1259, § 2, eff. Jan. 1, 1989; P.A. 85-1440, Art. II, § 2-54, eff. Feb. 1, 1989; P.A. 87-1821, § 2, eff. Jan. 1, 1993; P.A. 86-301, § 9, eff. Jan. 1, 1994; P.A. 86-311, 1, 1993; P.A. 86-301, § 9, eff. Jan. 1, 1994; P.A. 88-433, § 10, eff. Jan. 1, 1994; 1, eff. Aug. 11, 1993; P.A. 88-433, § 10, eff. Jan. 1, 1994; § 5, eff. Jan. 1, 1994; P.A. 88-670, Art. 2, § 2-46, eff. Dec. 2, 1994; P.A. 89-203, § 40, eff. July 21, 1995; P.A. 89-428, Art. 2, § 290, eff. Dec. 13, 1995; P.A. 89-462, Art. 2, § 290, eff. May 23, 1996.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 1005-8-1.

[3] 210 ILCS 50/et seq.
[4] 720 ILCS 5/33B-1 et seq.

The amendments by P.A. 89-428 and P.A. 89-462, which were identical, incorporated the amendment by P.A. 89-203.

ILCS Code of Jud.Conduct, Canon 3, S. Ct. Rule 63, [A Judge Should Perform the Duties of Judicial Office   **Page 1**
Impartially and Diligently]

**\*161918 ILCS Code of Jud.Conduct, Canon 3, S. Ct. Rule 63**

**Formerly cited as IL ST S CT R CH 110A ¶ 63, Canon 3**

**WEST'S SMITH-HURD ILLINOIS COMPILED STATUTES ANNOTATED**
**COURT RULES**
**ILLINOIS SUPREME COURT RULES**
**ARTICLE I. GENERAL RULES**
**CODE OF JUDICIAL CONDUCT**

*Current with amendments received through 9/1/ 2000*

**Rule 63. [A Judge Should Perform the Duties of Judicial Office Impartially and Diligently]**

**CANON 3**

**A Judge Should Perform the Duties of Judicial Office Impartially and Diligently**

The judicial duties of a judge take precedence over all the judge's other activities.  The judge's judicial duties include all the duties of the judge's office prescribed by law.  In the performance of these duties, the following standards apply:

A. Adjudicative Responsibilities.

(1) A judge should be faithful to the law and maintain professional competence in it.  A judge should be unswayed by partisan interests, public clamor, or fear of criticism.

(2) A judge should maintain order and decorum in proceedings before the judge.

(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control.

(4) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law.  A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:

(a) Where circumstances require, ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized;  provided:
(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and
\*161919 (ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.
(b) A judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or with other judges.
(c) A judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge.
(d) A judge may initiate or consider any ex parte communications when expressly authorized by law to do so.

(5) A judge shall devote full time to his or her judicial duties;  and should dispose promptly of the business of the court.

(6) A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to the judge's direction and control.  This paragraph does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures

Copyright (c) West Group 2000 No claim to original U.S. Govt. works

of the court.

(7) Proceedings in court should be conducted with fitting dignity, decorum, and without distraction. The taking of photographs in the courtroom during sessions of the court or recesses between proceedings, and the broadcasting or televising of court proceedings is permitted only to the extent authorized by order of the supreme court.

(8) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, or national origin, and shall not permit staff, court officials and others subject to the judge's direction and control to do so.

(9) Proceedings before a judge shall be conducted without any manifestation, by words or conduct, of prejudice based upon race, sex, religion, or national origin, by parties, jurors, witnesses, counsel, or others. This section does not preclude legitimate advocacy when these or similar factors are issues in the proceedings.

B. Administrative Responsibilities.

(1) A judge should diligently discharge the judge's administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.

*161920 (2) A judge should require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge.

(3) A judge having knowledge of a violation of these canons on the part of a judge or a violation of Rule 8.4 of the Rules of Professional Conduct on the part of a lawyer shall take or initiate appropriate disciplinary measures.

(4) A judge should not make unnecessary

appointments. A judge should exercise the power of appointment on the basis of merit, avoiding nepotism and favoritism. A judge should not approve compensation of appointees beyond the fair value of services rendered.

(5) A judge should refrain from casting a vote for the appointment or reappointment to the office of associate judge, of the judge's spouse or of any person known by the judge to be within the third degree of relationship to the judge or the judge's spouse (or the spouse of such a person).

C. Disqualification.



(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:



(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it;

(c) the judge was, within the preceding three years, associated in the private practice of law with any law firm or lawyer currently representing any party in the controversy (provided that referral of cases when no monetary interest was retained shall not be deemed an association within the meaning of this subparagraph) or, for a period of seven years following the last date on which the judge represented any party to the controversy while the judge was an attorney engaged in the private practice of law;

(d) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing, or any other member of the judge's family residing in the judge's household, has an economic interest in the subject matter in controversy or in a party to the proceeding, or has any other more than de

Copyright (c) West Group 2000 No claim to original U.S. Govt. works

*Original*

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

THOMAS O'FARRELL - K54340,      )

                      Plaintiff,)

                                )

          vs.                   )   CASE NUMBER _____

                                )

EDDIE JONES, WARDEN,         )

                   Respondent,)

APPENDIX B IN SUPPORT OF HABEAS CORPUS PETITION

CONTENTS

EXHIBITS 1-16

ITEMIZED TABLE OF CONTENTS FOR APPENDIX B

EXHIBIT #'S                                                                    PAGES

#1 – Transcripts K–13 & 17                                                    1–2

#2 – App. Ct. Order, dated 08/06/07                                          1–21

#3 – Ill, S.Ct Supervisory Order #101468, dated 01/25/06                     1–2

#4 – Petition for rehearing & App. Ct. Order                                 1–12

#5 – Motion to dismiss Appeal #1–03–2619                                     1–3

#6 – Motion to dismiss Appeal #1–03–3404 as moot                            1–3

#7 – Transcripts I–153–156 & I–182–187                                      1–10

#8 – Kevorkian V. Thompson, 947 F.Supp. 1152                                1–16

#9 – People v. Kevorkian, 839 N.W.2d 291                                     1–21

#10– Transcripts I–198                                                        1

#11– Transcripts A–44–45                                                      1–2

#12– Transcripts E–45–47                                                      1–3

#13– Transcripts K43–45                                                       1–3

#14– Transcripts A–114, G–31 & J–20                                          1–3

#15– Transcripts J–42                                                         1

#16– Original pro-se post-conviction petition filed 01/25/00                1–92

1    STATE OF ILLINOIS    )
                          )    SS:
2    COUNTY OF C O O K    )

3                        IN THE CIRCUIT COURT OF COOK COUNTY
                         COUNTY DEPARTMENT-CRIMINAL DIVISION
4
     THE PEOPLE OF THE    )
5    STATE OF ILLINOIS,   )
                          )    Criminal
6            Plaintiff,   )
                          )    No. 95 CR 30463
7        vs.              )
                          )    Charge: Murder
8    THOMAS O'FARRELL,    )    SENTENCING
                          )
9            Defendant.   )

10           REPORT OF PROCEEDINGS had of the hearing

11   in the above entitled cause, before the Honorable

12   MICHAEL P. TOOMIN, Judge of said court, on the 24th

13   day of February, 1997.

14       APPEARANCES:

15           HONORABLE RICHARD A. DEVINE,
                 State's Attorney of Cook County, by:
16       MR. NICHOLAS FORD,
                 Assistant State's Attorney,
17               for the People of the State of Illinois;

18       MS. RITA A. FRY,
                 Public Defender of Cook County, by:
19       MR. JOSEPH KENNELLY,
                 Assistant Public Defender,
20               for the Defendant.

21

22

     Pamela M. Terry, CSR
23   Official Court Reporter
     2650 S. California Ave.-4C02
24   Chicago, Illinois  60608

1     THE COURT:  Overruled.

2     MR. KENNELLY:  Foundation, your Honor.

3     THE COURT:  I assume you are going to tie this up.

4     MR. FORD:

5     Q    Was there anyone present other than you and

6  Mr. O'Farrell?

7     A    In that conversation, no, sir.

8     Q    This conversation occurred probably in the

9  month of November of 1995 you said?

10     A    Yes, shortly after he moved onto the unit, so

11  late November, maybe early December, 1995.

12     Q    Now, what did he tell you regarding his case

13  at that time?

14     MR. KENNELLY:  Objection, Judge.

15     THE COURT:  Overruled.  You may answer.

16     THE WITNESS:  A  Tom had told me that he had

17  killed his wife and that there was a certain amount of

18  insurance money involved and it was a custody battle

19  involved concerning his son and he didn't know how to

20  handle it as far as keeping the insurance money tied

21  into his side of the family because there was a

22  custodial fight between his parents and either the

23  parents or grandparents of his wife, the lady he had

24  killed, and he was kind of at a loss.  He could defend

```
 1   Woods area of Chicago?
 2        A    Far northwest side.  I don't know where
 3   Peterson Woods is.
 4        Q    Did he describe to you at all what happened
 5   during the course of this marriage once they moved
 6   into this location on the northwest side?
 7        A    He said they fought all the time.
 8        Q    And what else did he say?
 9        A    He was unhappy, didn't want to be married to
10   her.  They had a son named Lee, and the relationship
11   deteriorated.  It was not good to start with, and it
12   got worse instead of better as it went on.
13        Q    Did he ever have occasion to explain to you
14   how he went about deciding and eventually killing his
15   wife?
16        A    As far as what or how he decided when to do
17   it, not particularly.  How he would do it, he said
18   that he wanted to make it look like it was a botched
19   robbery or home invasion, and he would blame it on
20   unidentified black males, and he got drunk at a bar in
21   Schiller Park, and once he got drunk enough on the
22   night he decided to do it, he went back to the house,
23   and when he got inside the house, put a pillow over
24   her head and shot her in the head.
```

K-17

1-3

NOTICE
he text of this order may be
ranged or corrected prior to the
me for filing of a Petition for
rehearing or the disposition of
he same.

FIRST DIVISION
Filed:  08/06/07

No. 1-04-2481



IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 95 CR 30463 |
| | ) | |
| THOMAS O'FARRELL, | ) | Honorable |
| | ) | Michael P. Toomin, |
| Defendant-Appellant. | ) | Judge Presiding. |

MODIFIED ORDER UPON DENIAL OF PETITION FOR REHEARING

Defendant Thomas O'Farrell appeals from an order of the
trial court granting the State's motion to dismiss his petition
for relief under the Post-Conviction Hearing Act (Act) (725 ILCS
5/122-1 et seq. (West 2002)) without an evidentiary hearing.  On
appeal, defendant contends that the trial court erred in denying
his pro se motion for substitution of judge at the proceedings on
his postconviction petition.  In a pro se supplemental brief,
defendant also contends that (1) the trial court erred in
dismissing the petition without a hearing to determine whether
defendant had received ineffective assistance of trial counsel;
and (2) his postconviction counsel failed to comply with Illinois
Supreme Court Rule 651(c) (134 Ill. 2d R. 651(c)).  We affirm.

1-04-2481

Following a bench trial, defendant was convicted of first degree murder for the shooting death of his wife, and sentenced to 50 years in prison.  On direct appeal, this court affirmed defendant's conviction and sentence, but modified the mittimus to reflect that defendant was to receive one day of good conduct credit for each day in prison.  <u>People v. O'Farrell</u>, No. 1-97-0911 (1999) (unpublished order under Supreme Court Rule 23).  The facts of the offense are fully set out in our order on direct appeal; we restate here only those facts necessary to an understanding of defendant's current appeal.

Prior to trial, defendant filed a motion to suppress statements allegedly made by him to inmate Thomas Dye.  The court denied the motion.

Evidence at trial showed that at around 4 a.m. on September 28, 1995, defendant killed his wife, Lesley O'Farrell, by shooting her once in the head and once in the chest while she was sleeping, and then shot himself in the shoulder.  Initially, defendant told responding police officers that he awoke to the sound of a gunshot and saw a 6 foot, 3 inch, 200-pound African American man shoot his wife.  He then struggled with the home invader and was shot in the ensuing scuffle.  Later, however, defendant told police officers that he shot his wife pursuant to her request.  Specifically, defendant told officers that, because his wife suffered from many physical ailments and no longer

1-04-2481

wished to live, she devised a plan whereby he would kill her
while she slept.  The court found defendant guilty of first
degree murder.

A capital sentencing hearing was held, after which the court
determined defendant was not eligible for the death penalty.
Prior to sentencing, defendant filed a motion for a new trial
alleging, *inter alia*, that the court erred in denying his
pretrial motion to suppress statements made to Dye.  After
hearing arguments, the court denied the motion.

At sentencing, Dye testified over defendant's renewed
objection that he shared a jail cell with defendant in November
and December 1995.  During that time, he and defendant often
spoke about defendant's crime.  According to Dye, defendant
married the victim and eventually killed her to gain access to
her family's money.  Specifically, defendant and the victim had a
son, Leroi, who was to inherit the victim's money in the event of
her death.  Defendant believed that, at worst, the court would
find him guilty of second degree murder because (1) his father
was a police officer; (2) the victim was so ill that it would be
considered a mercy killing; (3) he had no criminal background;
and (4) he was "clean-cut."  Dye testified that defendant
believed if he was convicted of second degree murder, he would be
out of prison before his son turned 18, and "would control the

- 2- 3 -

1-04-2481

inheritance based on his son being a minor." Dye testified that
defendant never expressed remorse for killing his wife.

On cross-examination, Dye admitted that he had access to
defendant's property because he shared a jail cell with
defendant. He also admitted that he had previously been
incarcerated for theft crimes in which he "worked [his] way into
somebody's confidence and got into their apartments and stole
from them." Dye admitted that he had 14 felony convictions at
the time of this trial, was testifying in connection with a plea
agreement, and that he had testified for the State in previous
unrelated cases.

Clinical psychologist Dr. Larry Heinrich testified as an
expert in forensic psychology. He testified that he met with
defendant and examined the reports of another physician, Dr.
Robbins, who had treated both defendant and the victim. Based on
those reports, Dr. Heinrich believed that, at the time of the
shooting, defendant suffered depression exacerbated by the stress
of both his marriage and the victim's depression. Based on Dr.
Robbins' reports and the victim's diary, Dr. Heinrich believed
the victim had "passive suicidal ideation." On cross-
examination, Dr. Heinrich admitted that he had not spoken with
Dr. Robbins about the victim or defendant.

Defendant's brother and brother-in-law both testified that
defendant was a caring father to his son.

1-04-2481

The court sentenced defendant to 50 years in prison. Defendant's conviction was affirmed on appeal.  <u>People v. O'Farrell</u>, No. 1-97-0911 (1999) (unpublished order under Supreme Court Rule 23).

In January 2000, defendant filed a *pro se* postconviction petition which was later amended by postconviction counsel.  The initial *pro se* petition alleged, in relevant part, that trial counsel was ineffective for failing to present evidence of judicial misconduct in a post-trial motion.  Defendant attached his own affidavit and that of his father.  Defendant attested that the "Deputy *** told [him] in the elevator, prior to trial, that, '[the trial judge was] going to find [him] guilty and give [defendant] fifty (50) years.'"  Defendant's father attested that defendant informed him that the court's "Deputy *** told [defendant] that he was going to be found guilty and sentenced to fifty (50) years."

On the same date that defendant filed his petition, he also filed a *pro se* "motion for different judge to consider" (motion for substitution), alleging that the trial judge would be biased against him in deciding his postconviction petition because he mentioned the trial judge in his petition when he discussed judicial misconduct.  Defendant also alleged that he was prejudiced by the trial court's bias because the trial court had predetermined his guilt.

2 - 5 -

1-04-2481

On February 15, 2000, the court denied the motion for
substitution,[1] noting that

> "[i]t is not supported by affidavit pursuant
> to the statute. *** [Defendant] mentions that
> the judge is under judicial misconduct and,
> therefore, the judge would be biased against
> him.  There is no such allegation in his
> petition.  And he also alleges that since the
> trial court also found the Defendant guilty
> and sentenced him, therefore, he would be
> prejudiced.  The Defendant's motion does not
> rise to a level of allegations to substitute
> [the trial judge] for cause.  It is
> unsupported pursuant to the statute."

Subsequently, appointed counsel amended defendant's
postconviction petition without adopting defendant's *pro se*
postconviction petition.  This amended petition is the subject of
this appeal.  The State filed a motion to dismiss, which the
trial court granted on October 4, 2001.[2]  The amended

---

[1]It appears that defendant appealed the denial of his motion
for substitution of judge, but then moved to dismiss it on his
own motion, which this court allowed.  People v. O'Farrell, No.
1-00-0968 (2001) (dispositional order).

[2]While defendant's first postconviction petition was pending
in the circuit court, defendant filed an appeal, which he
subsequently moved to dismiss.  This court allowed the dismissal.
People v. O'Farrell, No. 1-00-0968 (2001) (dispositional order).

1-04-2481

postconviction petition contained the following claims:  (1) defendant was denied the effective assistance of trial counsel where counsel's performance at the suppression hearing, trial, and sentencing hearing was inadequate; (2) defendant was denied the effective assistance of appellate counsel where counsel failed to raise certain issues on appeal; and (3) the trial court erred in allowing State's witness Dye to testify without ensuring that defendant was tendered all pertinent information and by failing to take judicial notice of "applicable statutes concerning the Probate of Minor Estates laws in Illinois." Defendant's counsel then filed an "amendment to amended post conviction petition" which added a fourth claim, that defendant's sentence was excessive.  Attached to this document is defendant's affidavit, in which he attests, *inter alia*,

> "4. I have reviewed the Amended Post
> Conviction Petition and the Amendment to the
> Post Conviction Petition;
> 5. All factual allegations are true to the
> best of my knowledge."

In May 2003, defendant filed a second *pro se* petition for relief and another motion for substitution of judge.  In July

1-04-2481

2003, the second petition and the motion for substitution of judge were both denied.[3]

On appeal, defendant first contends that the court erred in denying his motion for substitution of judge in February 2000. Specifically, defendant asserts that the court made reversible error when it based its decision on the incorrect belief that (1) defendant's argument was that the trial court would be biased because it had previously found him guilty; (2) defendant did not raise the issue of judicial misconduct in his petition; and (3) the petition was not supported by the necessary affidavit. We disagree.

As an initial matter, defendant's failure to indicate that he was appealing the denial of his motion for substitution of judge in his notice of appeal does not result in this court's loss of jurisdiction over that order because such an order was a step in the procedural progression leading to the order mentioned in the notice of appeal. See <u>Jiffy Lube International v. Agarwal</u>, 277 Ill. App. 3d 722, 727 (1996).

_____

[3]Twice defendant appealed the dismissal of his second postconviction petition, but then moved to dismiss it. This court allowed both dismissals. <u>People v. O'Farrell</u>, Nos. 1-03-2619 and 1-03-3404 (2004) (dispositional orders). Defendant then filed a third postconviction petition, which the circuit court dismissed. Defendant appealed the dismissal, and defendant's appellate counsel moved to withdraw pursuant to <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987). This court allowed the withdrawal and affirmed the judgment. <u>People v. O'Farrell</u>, No. 1-04-1094 (2005) (unpublished order pursuant to Supreme Court Rule 23).

1-04-2481

We next note that defendant incorrectly asserts that the
standard of review is *de novo* because the trial court allegedly
failed to consider crucial evidence in denying his motion for
substitution.  The standard for reviewing the trial court's
denial of defendant's motion for substitution of judge is abuse
of discretion.  See <u>People v. Meeks</u>, 249 Ill. App. 3d 152, 160
(1993).  Furthermore, we review the trial court's judgment, not
its reasons for the judgment.  <u>People v. Lee</u>, 344 Ill. App. 3d
851, 853 (2003).  Accordingly, we may affirm a trial court's
judgment on any basis supported by the record, regardless of its
reasons for reaching the decision.  <u>Lee</u>, 344 Ill. App. 3d at 853.
We now turn to the issue on appeal.

There is no absolute right to substitution of a judge at a
postconviction proceeding.  <u>People v. Enis</u>, 194 Ill. 2d 361, 416
(2000).  Rather, defendant must show that he will be
substantially prejudiced if the motion is denied.  <u>Enis</u>, 194 Ill.
2d at 416.  A defendant seeking substitution of judge for alleged
prejudice must support such an allegation with an affidavit.
<u>People v. Brim</u>, 241 Ill. App. 3d 245, 248-49 (1993).  A mere
conclusory statement, even if made under oath, is insufficient to
establish the violation of any constitutional right.  <u>People v.</u>
<u>Coleman</u>, 32 Ill. App. 3d 949, 952 (1975).  A trial judge who,
prior to hearing any evidence, expresses the opinion that the

1-04-2481

defendant is guilty may be disqualified.  <u>People v. Williams</u>, 272
Ill. App. 3d 868, 874-75 (1995).

Here, contrary to defendant's contention, there are no
affidavits attached to the motion for substitution of judge.
Defendant, however, is apparently asserting that the affidavits
attached to his first postconviction petition were also intended
to support his motion for substitution where the motion and
petition were filed on the same date.  Defendant's motion for
substitution of judge and his petition for postconviction relief
were two separate pleadings.  Defendant was required to attach to
the motion for substitution an affidavit supporting his
allegations of prejudice.  See <u>Brim</u>, 241 Ill. App. 3d at 248-49.

Moreover, even considering defendant's motion in conjunction
with the affidavits attached to the postconviction petition, we
find that the trial court did not abuse its discretion in denying
the motion for substitution.  Defendant alleged in his petition
that the court was prejudiced against him because it determined
his guilt prior to hearing any evidence.  Defendant attested in
his affidavit that, prior to the start of his trial, the court's
deputy informed him that the judge was going to find him guilty
and sentence him to 50 years in prison.  Defendant's father
attested that defendant told him what the court's deputy had
said.  These affidavits merely attest to the deputy's statement
that the judge would find defendant guilty and sentence him to 50

1-04-2481

years.  They give no indication that the judge told the deputy
that he would find defendant guilty and impose a 50-year
sentence.  See <u>Williams</u>, 272 Ill. App. 3d at 874-75.
Accordingly, defendant's allegation in his motion that the judge
had found him guilty prior to trial was a mere conclusory
allegation that did not mandate substitution.  See <u>Coleman</u>, 32
Ill. App. 3d at 951-52.

In addition, the fact that defendant alleged judicial
misconduct in his postconviction petition cannot be used as a
basis to obtain substitution of his trial judge.  See generally
<u>In re Marriage of Hartian</u>, 222 Ill. App. 3d 566, 569 (1991) (the
respondent failed to show prejudice by the trial judge where he
filed a complaint against the judge with the Judicial Inquiry
Board); <u>People v. House</u>, 202 Ill. App. 3d 893, 899-900, 909-910
(1990) (substitution not required where the defendant complained
of the trial judge's rulings in his postconviction petition).
Furthermore, a judge is presumed to be impartial even after
extreme provocation.  <u>People v. Jackson</u>, 205 Ill. 2d 247, 276
(2001); <u>People v. Steidl</u>, 177 Ill. 2d 239, 265 (1997).  Moreover,
if we were to conclude that an allegation of judicial misconduct
in a postconviction petition would require recusal, then
defendants could simply allege misconduct on their trial judge's
part for the purpose of obtaining another judge.  See generally
<u>People v. Smeathers</u>, 297 Ill. App. 3d 711, 716 (1998) (filing a

1-04-2481

complaint against one's trial judge does not require substitution, because to hold otherwise would allow defendants to obtain a new judge by filing frivolous complaints "to force an endless stream of recusals"). Accordingly, we find that the trial court did not abuse its discretion in denying defendant's motion for substitution.

Next, defendant claims he was denied the effective assistance of trial counsel where counsel (1) failed to present "additional" evidence at the suppression hearing to prove defendant's confession was illegally obtained; (2) failed to raise the issue of judicial misconduct in his post-trial motion; (3) failed to present evidence of prosecutorial misconduct at the sentencing hearing; (4) failed to seek a lesser included offense or present a defense that defendant was innocent; (5) misled defendant into signing a jury waiver by promises of a 30-year sentence; and (6) failed to file a pre-trial motion for the recusal of the trial court. We disagree.

Postconviction relief is a collateral proceeding designed to allow inquiry into constitutional issues that could not have been previously adjudicated. People v. Franklin, 167 Ill. 2d 1, 9 (1995). To survive the State's motion to dismiss, the postconviction petition must make a substantial showing that defendant's constitutional rights were violated. People v. Coleman, 183 Ill. 2d 366, 381 (1998). We review the dismissal of

1-04-2481

a postconviction petition without an evidentiary hearing *de novo*.
People v. Lander, 215 Ill. 2d 577, 583 (2005). When a defendant
has taken a direct appeal, any issue capable of being raised on
direct appeal is waived, and any issue that was previously
decided is barred by *res judicata*. Franklin, 167 Ill. 2d at 9.
Furthermore, where an amended postconviction petition, filed by
appointed counsel, does not include allegations from the
defendant's *pro se* postconviction petition, such issues are not
before the court. People v. Phelps, 51 Ill. 2d 35, 38 (1972);
Barnett v. Zion Park District, 171 Ill. 2d 378, 384 (1996)
("Where an amended pleading is complete in itself and does not
refer to or adopt the prior pleading, the earlier pleading ceases
to be part of the record for most purposes and is effectively
abandoned and withdrawn.").

Defendant has waived his claims of ineffective assistance of
counsel for failure to (1) present additional evidence at the
suppression hearing; (2) raise the issue of judicial misconduct
in a post-trial motion; (3) present evidence of prosecutorial
misconduct; (4) failure to seek a lesser included offense or
present an innocence defense; and (5) and for misleading
defendant into signing a jury waiver by promises of a 30-year
sentence because these issues were capable of being raised on
direct appeal and because they were not contained in defendant's
amended postconviction petition. See Franklin, 167 Ill. 2d at 9;

1-04-2481

Phelps, 51 Ill. 2d at 38.  Defendant's argument that we should address these issues under the plain error doctrine does not persuade us differently.

Next, because he failed to include it in his amended postconviction petition, defendant has waived the claim that he was subject to the ineffective assistance of trial counsel where counsel failed to file a pre-trial motion for the recusal of the trial court.  See Phelps, 51 Ill. 2d at 38; Zion Park District, 171 Ill. 2d at 384.

Next, defendant contends that his trial counsel was ineffective for failing to alert the court at the sentencing hearing that State's witness Dye's testimony was perjured. Specifically, defendant claims that Dye's testimony was "bolstered" by personal details of defendant's life which he learned through documents he stole from defendant while they were cellmates and via prosecutorial misconduct wherein the State gave Dye access to specific information about defendant.  Because this issue was contained in defendant's amended postconviction petition, we will address it here.

To establish a claim of ineffective assistance of counsel, a defendant must show that (1) his attorney's representation fell below an objective standard of reasonableness; and (2) he was prejudiced by this deficient performance.  Strickland v. Washington, 466 U.S. 668, 687-688, 80 L. Ed. 2d 674, 693, 104 S.

1-04-2481

Ct. 2052, 2064 (1984); <u>People v. Coulter</u>, 352 Ill. App. 3d 151,
157 (2004). To satisfy the first prong, a defendant must
overcome the presumption that contested conduct which might be
considered trial strategy is generally immune from claims of
ineffective assistance of counsel. <u>People v. Martinez</u>, 348 Ill.
App. 3d 521, 537 (2004); <u>People v. Burks</u>, 343 Ill. App. 3d 765,
775 (2003). Failure to make the requisite showing of either
deficient performance or sufficient prejudice defeats the claim.
<u>People v. Palmer</u>, 162 Ill. 2d 465, 475-76 (1994). After
consultation with the client, trial counsel has the right to make
the ultimate decision with respect to matters of tactics and
strategy, including whether and how to conduct cross-examination.
<u>People v. Ramey</u>, 152 Ill. 2d 41, 54 (1992).

Here, defendant fails to overcome the presumption that
counsel's actions were a product of sound trial strategy. See
<u>Martinez</u>, 348 Ill. App. 3d at 537; <u>Burks</u>, 343 Ill. App. 3d at
775. Defendant asserts that counsel should have (1) had
defendant testify that he never spoke with Dye concerning his
case; (2) had defendant testify that Dye stole documents from his
cell; (3) present into evidence petitioner's inmate grievances in
which defendant reported the alleged theft; (4) present into
evidence copies of the stolen documents; (5) present testimony
that Dye's testimony was perjured; and (6) force Dye to admit on
cross-examination that his testimony was perjured.

1-04-2481

Counsel's representation was reasonable here, where counsel
impeached Dye by eliciting testimony that he was a 14-time
convicted felon who had previously been convicted of theft
offenses in which he "worked [his] way into somebody's
confidence" before stealing from them, that he had testified for
the State in other unrelated cases, and that he was testifying
against Defendant as part of a deal he had made with the State.
Whether to further cross-examine Dye and whether to impeach with
extrinsic evidence were matters of trial strategy.  See Ramey,
152 Ill. 2d at 54.

Next, defendant contends that his trial counsel was
ineffective for failing to present evidence of the mental states
of defendant and the victim.  Specifically, defendant asserts
that this evidence would support a finding of second degree
murder based upon sudden and intense passion resulting from
serious provocation.  We disagree.

The offense of first degree murder requires the State to
prove that the offender, in pertinent part, intentionally killed
another individual without lawful justification.  720 ILCS 5/9-
1(a) (West 2002).  A person commits second degree murder when he
commits first degree murder under the mitigating circumstance of
a sudden and intense passion resulting from serious provocation,
which is conduct sufficient to excite an intense passion in a
reasonable person, or an unreasonable subjective belief that he

1-04-2481

is justified in the use of deadly force.  720 ILCS 5/9-2 (West
2002).  Once the State has proven first degree murder beyond a
reasonable doubt, the burden shifts to defendant to prove one of
the mitigation factors required to reduce the offense from first
degree to second degree murder.  <u>People v. Thompson</u>, 354 Ill.
App. 3d 579, 586 (2004).  For purposes of reducing first degree
murder to second degree murder based on serious provocation, the
only recognized categories of serious provocation are substantial
physical injury or assault, mutual quarrel or combat, illegal
arrest, and adultery with the offender's spouse.  <u>People v.
Chevalier</u>, 131 Ill. 2d 66, 71 (1989).

Here, even if counsel's representation was deficient,
defendant's claim fails because he is unable to show resulting
prejudice.  Defendant contends that evidence of his depression
and the victim's depression, if introduced at trial, would have
mitigated his conviction to second degree murder.  However,
depression is not a recognized category of serious provocation.
See <u>Chevalier</u>, 131 Ill. 2d at 71.  Trial counsel was not
ineffective for failing to present evidence which would not have
supported a finding of second degree murder.

Defendant's reliance on <u>People v. Williams</u>, 265 Ill. App. 3d
283 (1994), does not persuade us differently.  <u>Williams</u> is
inapposite to the case at bar, where in <u>Williams</u> we did not
review whether the trial court erred in reducing defendant's

1-04-2481

sentence from first degree murder to second degree murder. _Williams_, 265 Ill. App. 3d 283.

Finally, defendant asserts that his postconviction counsel failed to substantially comply with the requirements of Rule 651(c). Specifically, defendant argues that postconviction counsel erred by failing to preserve various issues contained in defendant's _pro se_ postconviction petition by not including them in the amended postconviction petition or the amendment to the amended postconviction petition. We disagree.

In second-stage postconviction proceedings, an indigent defendant is entitled to appointed counsel (725 ILCS 5/122-4 (West 2004)), who should provide a reasonable level of assistance. _People v. Pendleton_, 223 Ill. 2d 458, 472 (2006). Pursuant to Rule 651(c), counsel must consult with the defendant to ascertain his contentions of deprivation of constitutional rights, examine the record of trial proceedings, and amend the petition as necessary to ensure that defendant's contentions are adequately presented to the court. 134 Ill. 2d R. 651(c); _Pendleton_, 223 Ill. 2d at 472. Counsel's obligation to amend the petition as necessary does not require counsel to advance frivolous or spurious claims on defendant's behalf. _Pendleton_, 223 Ill. 2d at 472.

Defendant argues that postconviction counsel rendered unreasonable assistance where she (1) filed a "motion to remove"

1-04-2481

defendant's *pro se* postconviction petition and "supplanted" it
with the amended postconviction petition; and (2) refused to
include certain issues of prosecutorial error in the amended
petition because she was worried about the repercussions it would
have on her future clients because the two former assistant
State's Attorneys who were involved in defendant's case are now
members of the judiciary.  We disagree.

We first note that the record does not support defendant's
contention that counsel filed a "motion to remove" his petition.

A careful review of the record reveals that defendant has
misconstrued the record and the motion he claims was erroneously
made does not exist.  Postconviction counsel did not withdraw
defendant's *pro se* petition; rather, postconviction counsel
failed to incorporate the *pro se* allegations into her amended
petition.  This may be a distinction without difference, from
defendant's perspective.  Nevertheless, defendant misreads the
record, and the motion he claims was made in the trial court was
actually made in this court and was a motion to withdraw an
earlier appeal.

In a criminal proceeding, decisions such as what plea to
enter, whether to testify, and whether to appeal belong
exclusively to the defendant.  <u>People v. Bashaw</u>, 361 Ill. App. 3d
963, 969 (2005).  However, those decisions that are matters of
trial tactics and strategy are to be made by trial counsel after

1-04-2481

consultation with the defendant.  <u>Bashaw</u>, 361 Ill. App. 3d at

969.  In <u>Bashaw</u>, this court determined that the decision of

whether to amend a postconviction petition is more analogous to

the strategic decisions entrusted to trial counsel than the "few

core decisions" that belong to the defendant, and:

> "[w]hat amendments to a postconviction
>
> petition, if any, are necessary to adequately
>
> present the defendant's contentions is a
>
> matter calling for the exercise of an
>
> attorney's professional judgment.  An
>
> attorney who surrenders the decision to the
>
> defendant does not fulfill his or her duty to
>
> exercise that professional judgment."
>
> <u>Bashaw</u>, 361 Ill. App. 3d at 969.

Here, we find that postconviction counsel rendered

reasonable assistance to defendant.  Counsel fully complied with

the requirements of Rule 651(c).  The record includes a signed

certificate in compliance with Rule 651(c), stating that counsel

reviewed defendant's pro se petition, record, transcripts, and

brief, and "discussed the contents of the pro-se [*sic*] petition

and the amended petition" with defendant in person.  Defendant

concedes that he spoke with counsel both in person and on the

telephone.  Furthermore, there is an affidavit attached to the

amendment to the amended postconviction petition in which

1-04-2481

defendant attests that he reviewed both the amended

postconviction petition and the amendment thereto.  Accordingly,

we find that counsel rendered the reasonable assistance mandated

by Rule 651(c).

In defendant's petition for rehearing, defendant argues that

postconviction counsel's Rule 651(c) certificate was inadequate.

Defendant failed to raise this argument in either his initial

supplemental brief or his supplemental reply brief.  As this

argument has been raised for the first time in a petition for

rehearing it is waived.  See Supreme Court Rule 341(e)(7) (188

Ill. 2d R. 341(e)(7)) now codified as amended as Supreme Court

Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)).

For the foregoing reasons, we affirm the judgment of the

trial court.

Affirmed.

R. GORDON, J., with WOLFSON, P.J. and GARCIA, J., concurring.

101468

SUPREME COURT OF ILLINOIS
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

EXHIBIT 3

January 25, 2006

Mr. Thomas O'Farrell
Reg. No. K-54340
P. O. Box 99
Pontiac, IL 61764

No. 101468 - People State of Illinois, respondent, v. Thomas
               O'Farrell, petitioner.  Leave to appeal, Appellate
               Court, First District.

The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause and entered the enclosed

supervisory order.

The mandate of this Court will issue to the Appellate Court

on February 16, 2006.

3-1

NO.101468 - SUPERVISORY ORDER

In the exercise of this Court's supervisory
authority, the Appellate Court, First
District, is directed to vacate its judgment
in People v. O'Farrell, case No. 1-04-2481
(08/30/05).  The appellate court is directed
to permit defendant-appellant to file a pro se
supplemental brief raising any appellate
issue(s) defendant deems appropriate, with
appropriate responsive briefing by appellee.
In reconsidering its judgment, the appellate
court is directed to consider all issues
raised by appointed appellate counsel and by
pro se defendant in resolving the appeal.
This order is not otherwise intended to
relax the rules of appellate procedure for
pro se defendant-appellant nor to require
the appellate court to reach the merits of
any issue(s) raised in the pro se
supplemental brief if another resolution
is appropriate.



No. 1-04-2481
APPELLATE COURT OF THE STATE OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| | ) | |
| v. | ) | No. 95 CR 30463 |
| | ) | |
| THOMAS O'FARRELL, | ) | Honorable |
| Defendant-Appellant, | ) | Michael P. Toomin |
| | ) | Judge Presiding |

PETITION FOR REHEARING

TO THE HONORABLE JUSTICES OF THE APPELLATE COURT:

May it please the Court:

Defendant, Thomas O'Farrell (hereafter Petitioner), Pro-Se, requests a rehearing on the issues herein this petition for the following reasons:

1) This Honorable Court erred by failing to recognize the underlying claim of actual innocence within claim 5 (see supplemental petition which was before this Court), requires the relaxation of the waiver doctrine under fundamental miscarriage of justice. In support, Petitioner states:

a) Waiver will be forgiven, however, if the petitioner can show that he was "actually" innocent of the criminal charges against him. Britz v. Cowan, 192 F.3d 1101 at 1103;

b) A fundamental miscarriage of justice occurs when "a constitutional violation has probably resulted in a conviction of one who is actually innocent." McLaughlin v. Moore, 152 F.Supp.2d 123 at 127:

c) Although a protoypical example of "actual innocence" is the case where the state has convicted the wrong person of the

crime, one is also actually innocent if the state has the "right person", but he is not guilty of the crime with which he is charged. <u>Moore</u>, supra at 131-132;

d) The first situation in which a claim of "actual innocence" might arise occurs *** The second occurs when a petitioner claims that his criminal trial was tainted in some manner that violates the Constitution (e.g. ineffective assistance of counsel) and argues that because he is actually innocent of his crime of conviction, the Court should excuse his failure to adhere to the procedural rules ***, instead, consider the merits of his constitutional claims. <u>Moore</u>, supra at 129; and

e) Within this Honorable Courts order dated May 21, 2007, the Court stated that among other claims, claim 5 was capable of being raised on direct appeal and because it was not contained in Petitioner's amended post-conviction petition it is waived.

Therefore, the failure to raise claim 5 at an earlier stage was due to the ineffective assistance of counsel and as the claim contains a claim of actual innocence, the waiver doctrine does not apply.

2) This Honorable Court erred by failing to recognize that claims 1-5 & 7,8 were not waived for review by this Court. In support, petitioner states;

a) Any claim within Petitioner's original post-conviction petition which survived the 90-day period are preserved for review;

b) Circuit Court Cheif Justice Fitzgerald docketed Petitioner's original petition for further determination in the second stage of

4-②

post-conviction proceedings; and

c) At the second stage of post-conviction proceedings, which commences if and when the petition for post-conviction relief is docketed for further consideration, having survived an initial examination for frivolity, the trail court <u>MUST</u> determine whether the petition and any accompanying documents substantially show any constitutional violations. <u>People v. Sawczenko</u>, 767 NE2d 519 at 524;

Therefore, as Cheif Justice Fitzgerald docketed the original petition for further consideration at the second stage, all claims within Petitioner's original petition are not waived and as the petition made it to the second stage, the trial court had a duty to address the claims as Cheif Justice Fitzgerald already determined the claims had merit.

3) This Honorable Court erred by failing to recognize that fundamental fairness requires the relaxation of the waiver doctrine. In support, Petitioner states:

a) Claims 1-5 & 7,8 within Petitioner's supplemental brief, this Honorable Court refuses to address due to the waiver doctrine, stems from the ineffectiveness of trial counsel which violated Petitioner's Constitutional rights;

b) The strict application of the waiver doctrine may be relaxed where required by fundamental fairness which is analyzed in terms of "<u>cause</u>" and "<u>prejudice</u>". <u>People v. Mahaffey</u>, 742 NE2d 251 at 263;

c) Constitutionally ineffective assistance of counsel is "<u>cause</u>". <u>People v. Flores</u>, 606 NE2d 1078 at 1085;

d) Claim 5 within Petitioner's supplemental brief addresses

4-③

trial counsel's failure to present evidence to support a defense or lesser offense;

e) Trial counsel did not advance any evidence or witnesses at trial (Tr. I-198);

f) The attorney did not present any evidence and did not advance a theory of defense.  This Court held that, in this situation, "prejudice" would be presumed, and the defendant did not have to meet the Strickland standard.  People v. Neives, 737 NE2d 150 at 154;

g) The doctrines of res judicata and waiver, however, will be relaxed in three situations: where fundamental fairness so requires; where the alleged waiver stems from the incompetence of appellate counsel or where the facts relating to the claim do not appear on the face of the original appellate record.  People v. Hobley, 696 NE2d 313 at 326, People v. Dockery, 694 NE2d 599 at 602 & Mahaffey, supra at 261; and

h) As claims 1-5 & 7,8 which were within Petitioner's original post-conviction petition was removed by post conviction counsel and were not raised on direct appeal by counsel, the claims are not within the original appellate record;

Therefore, Petitioner has demonstrated all of the three situation above and has also demonstrated "cause" and "prejudice" to relax the waiver doctrine under fundamental fairness and claims 1-5 & 7,8 may be addresses by this Honorable Court.

4) This Honorable Court erred in their failure to recognize that the plain error doctrine does apply to petitioner's claims which this Court refuses to address.  In support, Petitioner states:

4-④

a) As the failure to present claims 1-5 & 7,8 were due to the ineffective assistance of counsel by both trial and direct appeal counsel's, Petitioner's Constitutional Right to effective assistance of counsel secured by both the Illinois and United States Constitutions were substantially violated. (6th amend., U.S. Const & Art. 1, Sec. 8, Ill. Const.);

b) These Constitutional Rights to effective assistance of counsel may only be waived if a defendant chooses to represent himself;

c) Plain error bypasses the waiver rule.  Plain error exists when (1) the evidence is closely balanced (which it does); or (2) or the error is so fundamental and to such magnitude that defendant was denied a fair trial. (which he was).  People v. Nelson, 737 NE2d 632 at 636 and In re Christopher J., 789 NE2d 881 at 882; and

d) This Honorable Court agrees with Petitioner in that the claims 1-5 & 7,8 were claims capable of being raised on direct appeal, Therefore, appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness;

Therefore, the failure to address Petitioner's claims and correct the violation would infringe on Petitioner's due-process rights and damage the integrity of the judicial process.

5) This Honorable Court erred in their failure to recognize the use of perjured testimony by the State at Petitioner's sentencing hearing within was contained within claim 3 in Petitioner's supplemental brief before this court.  In support, Petitioner states;



a) The Supreme Court has "consistently held that a conviction obtained by the knowing use of perjured tesimony is fundamentally unfair, and must be set aside if there is any reasonable likeihood that the false testimony could have affected the judgment of the jury."  This rule seems to also apply whether the prosecutor knew of the perjury or merely "should have known" of the perjury.  US V. Agurs, 96 S.CT. 2392;

b) As long ago as Mooney v. Holohan, 294 U.S. 103, 112, 55 S.CT. 340, 342, 79 L.Ed. 791 (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice." Giglio V. United States, 92 S.CT. 763 at 766, U.S. V. Marrero, 516 F.2d 12 at 14;

c) Petitioner would like to direct this Honorable Courts attention to exhibit 1 which was attached to Petitioner's supplemental brief before this Court; (see Ex. 1 attached)

d) Within exhibit 1, the States witness, Thomas Dye states that he was forced to lie in this case at bar by then A.S.A. Patrick Quinn;

e) Within exhibit 1, Mr. Dye states that it was A.S.A. Quinn who gave him the fact that a pillow was used by Petitioner during his offense;

f) Within exhibit 1, Mr. Dye states that it was A.S.A. Quinn who gave him the fact that a derringer was used by Petitioner, and Petitioner placed the derringer into the pillow and shot the victim;

4-(6)

g) Within exhibit 1, Mr. Dye states that A.S.A. Quinn needed Dye to testify to the facts above because that was something they didn't get in the confession of Petitioner, and they wanted Dye to testify to the facts at trial;

h) Within exhibit 1, Mr. Dye states that A.S.A. Quinn informed him that Petitioner committed the murder for financial gain, to solely to collect the insurance money;

i) Within exhibit 1, Mr. Dye admitts to testifying to the facts given to him by A.S.A. Quinn at Petitioner's Sentencing hearing;

j) The Government's use of perjured testimony warranted new trial. US v. McLaughlin, 89 F.Supp.2d 617 & Giglio v. US, supra at 766;

k) Where Mr. Dye only testified at Petitioner's sentencing hearing, a new sentencing hearing is warranted;

l) Whereas, the use of known perjured testimony by the States is fundamentally unfair, the waiver doctrine does not apply;

m) The plain error doctrine is appropriately invoked when the evidence is closely ballanced or when the error is so fundamental that it, and it alone, denies a fair trial. People v. Lefler, 689 NE2d 1209 at 1212;

n) Whereas, the sentencing hearing is part of the trial proceedings, plain error doctrine would apply;

Therefore, Petitioner has demonstrated the use of perjured testimony by the State through its own witness to require the waiver doctrine to become relaxed and this Honorable Court address petitioner's claim 3 within his supplemental brief before this Court.

6) This Honorable Court erred in failing to recognize the 651(c) violation which ocurred.   In support, Petitioner states:

a) Supreme Court Rule 651(c) clearly states that within counsel's _certification_, counsel MUST state counsel consulted with Petitioner either by mail or in person <u>to ascertain his contentions</u> regarding the deprivation of his constitutional rights, that counsel examined the record of proceedings at trial, <u>and that counsel has made any amendments to the petition filed pro se that are necessary for an adequate presentation of petitioner's contentions</u>.   This is supported by the rulings in <u>People v. Porter</u>, 521 NE2d 1158 at 1160, <u>People v. Jones</u>, 522 NE2d 1325 at 1329 & <u>People v. Vasquez</u>, 824 NE2d 1071 at 1075;

b) It was further ruled that compliance with the duties set forth in this rule is <u>MANDATORY</u>.   <u>Vasquez</u>, supra at 1075;

c) The purpose of the appointed post-conviction attorney is to take a pro-se petition and <u>ensure that it adequately presents the claims that the petitioner wishes to make</u>.   <u>People v. Brown</u>, 808 NE2d 1113 at 1117;

d) Upon a close examination of counsel's _certification_, there is a fatal error as counsel's document is incomplete, as counsel failed to state that <u>she has made the amendments that were necessary to Petitioner's pro-se petition to adequately present Petitioner's contentions</u>; (see certification attached)

e) When reading S.Ct. Rule 651(c), the plain language of the law must be given effect;

f) As nowhere with Rule 615(c) there is no disjunctive term "or" to seperate the certification process.   Therefore all of the aspects must be included within the document;

g) Technically, nowhere within Rule 651(c) does it give counsel the right to withdraw Petitioner's pro-se petition or file an amended petition;

h) Rule 651(c) clearly states that counsel make amendments to the pro-se petition as necessary.  Therefore, counsel should have filed an amendment to Petitioner's pro-se petition raising any additional claims or supporting case law to adequately present Petitioner's contentions (claims) to the trial court for their consideration;

i) Nowhere within Petitioner's affidavit does it state that Petitioner has given counsel authorization to remove his pro-se petition;

j) In fact within exhibits 8-10 & 15 within Petitioner's supplemental brief before this Court, Petitioner made his contentions very clear to counsel <u>that she was not authorized to remove his pro-se petition and that any petition counsel files was in addition to his pro-se petition</u>; (see Ex's 8-10 & 15 attached)

k) As the original petition survived the first stage and was docketed for further consideration by the trial court, where the trial court shall determine whether the petition and any of its accompanying documents and evidence substantially show any constitional violation, the removal of the pro-se petition by counsel violated Petitioner's due-process right and his rights to appeal on the meritorious claims within said petition. <u>Sawczenko</u>, supra, at 524;

l) The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.  <u>Faretta</u>

4-⑨

v. California, 95 S.Ct. 2525 at 2533;

m) Petitioner's original pro-se petition more than adequately presented Petitioner's contentions as Petitioner clearly outlined the constitutional violation which occured; Petitioner made clear legal arguments which the trial court could consider; Petitioner supported his claim with either; a) evidence which was within the record; b) affidavits which were attached; and c) supporting evidence which supports his claim which was also attached to the pro-se petition; (see copy of original petition attached and incorporated herein by and with this reference);

n) Therefore, Petitioner's pro-se petition should not have been removed by counsel;

Whereas, counsel failed to follow the strict guideline within S.Ct. Rule 651(c), Petitioner has clearly demonstrated a 651(c) violation.

7) This Honorable Court erred by stating that the record does not support Petitioner's contentions that counsel filed a motion to remove Petitioner's pro-se petition.   In support, Petitioner states;

a) Petitioner would like to direct this Honorable Court's attention to exhibit 16 which was attached to Petitioner's supplemental brief before this Court;

b) This document is a statement of conviction/dispostion sheet which is generated by the Clerk of the Circuit Court  (a record of proceedings);

c) This document clearly demonstrates Petitioner's contention that counsel on 04/12/01 filed an "APPELLATNS MOTION TO WITHDRAW APPEAL (Petitioner's pro-se petition), which was allowed by Judge William S. Wood;

d) This document also shows that counsel sought leave of the court on 4/13 & 5/7/01 to file an amended petition & amendment to the amended petition;

Therefore, counsel did in fact file a motion to remove Petitioner's original pro-se petition and this Honorable Court has clearly erred in its order, page 19.

WHEREFORE, Petitioner respectfully requests this Honorable Court to reconsider its opinion.

Respectfully submitted,

Thomas O'Farrell, pro-se Petitioner

Dated June 11, 2007

4-(11)

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 1-04-2481 |
| | ) | |
| THOMAS O'FARRELL, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

## O R D E R

IT IS HEREBY ORDERED THAT Defendant-Appellant's petition for rehearing is denied.

ORDER ENTERED

JUL 2 6 2007

APPELLATE COURT, FIRST DISTRICT

_____
JUSTICE

_____
JUSTICE

_____
JUSTICE

DATED:

4-12

No. 1-03-2619

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 95 CR 30463. |
| | ) | |
| THOMAS O'FARRELL, | ) | Honorable |
| | ) | Michael P. Toomin, |
| Petitioner-Appellant. | ) | Judge Presiding. |

## MOTION TO DISMISS APPEAL

Michael J. Pelletier, Deputy Defender, Office of the State Appellate Defender,

respectfully moves that this Court dismiss his appeal.

In support of this motion, Michael J. Pelletier states:

1.    Appellant was convicted of the offense of first degree murder and was sentenced

to a term of 50 years in the Illinois Department of Corrections.

2.    This Court affirmed Appellant's direct appeal under appeal number 1-97-0911.

3.    On May 28, 2003, Appellant filed a motion for substitution of judge and a petition

for post-conviction relief.

4.    Appellant's motion for substitution of judge was denied on July 9, 2003 by the

Honorable Michael P. Toomin.  Appellant's petition for post-conviction relief was denied on

July 24, 2003 by the Honorable Michael P. Toomin.

5.    Defendant is currently incarcerated.

6.    On August 12, 2003, defendant filed two separate notice of appeals. Appeal number 1-03-2619 appeals the order denying Appellant's motion for substitution of judge. Appeal number 1-03-3404 appeals the denial of Appellant's post-conviction petition.

7.    The Office of the State Appellate Defender was appointed to represent Appellant on both appeals.

8.    Pursuant to Supreme Court Rule 604, Appellant is not entitled to appeal the ruling denying defendant's motion for substitution of judge.  Furthermore, Appellate counsel will review the merits of Appellant's motion for substitution of judge as part of its representation in appeal number 1-03-3404.

WHEREFORE, the Office of the State Appellate Defender moves this Court to dismiss the appeal.


Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

No. 1-03-2619

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 95 CR 30463. |
| | ) | |
| THOMAS O'FARRELL, | ) | Honorable |
| | ) | Michael P. Toomin, |
| Petitioner-Appellant. | ) | Judge Presiding. |

**ORDER**

This matter coming to be heard on Appellant's motion, all parties having been duly notified, and the Court being advised in the premises,

IT IS HEREBY ORDERED:

That Appellant's Motion to Dismiss Appeal is allowed/denied.

PRESIDING JUSTICE

JUSTICE

JUSTICE

**ORDER ENTERED**

MAR 2 9 2004

APPELLATE COURT, FIRST DISTRICT

DATE: _____

MICHAEL J. PELLETIER
Deputy Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472
COUNSEL FOR PETITIONER-APPELLANT

5–3

No. 1-03-3404

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 95 CR 30463. |
| | ) | |
| THOMAS O'FARRELL, | ) | Honorable |
| | ) | Michael P. Toomin, |
| Petitioner-Appellant. | ) | Judge Presiding. |

## MOTION TO DISMISS APPEAL AS MOOT

Appellant, Thomas O'Farrell, by Michael J. Pelletier, Deputy Defender, and Kari K. Firebaugh, Assistant Appellate Defender, Office of the State Appellate Defender, respectfully moves that this court dismiss his appeal as moot.

In support of this motion counsel states:

1.    Appellant was convicted of first degree murder and sentenced to a 50-year term of imprisonment by the Honorable Michael P. Toomin on February 24, 1997. On direct appeal, appellant's conviction was affirmed by this court in an unpublished order on March 24, 1999. *People v. O'Farrell*, No. 01-97-0911.

2.    Appellant is currently incarcerated.

3.    On January 25, 2000, appellant filed his first *pro se* post-conviction petition. Counsel was appointed to represent appellant, and filed an amended petition and an amendment to the amended petition. On October 4, 2001, the State's motion to dismiss these petitions was

granted.

4.    On November 1, 2001, appellant mailed four documents to the circuit court clerk: an Affidavit of Intent to File an Appeal to the Appellate Court of Illinois, First Judicial District, a Motion for Leave to File and Proceed In Forma Pauperis, a Motion for Appointment of Appellate Panel Counsel or Pro-Bono Counsel, and a Motion for Transcripts and Common Law Records.

5.    On December 5, 2001, the court denied appellant's motions and declined to recognize his affidavit of intent as a notice of appeal. Appellant continued to make efforts to have his notice of intent filed and processed as a notice of appeal, but was unsuccessful.

6.    On May 27, 2003, appellant filed a second *pro se* post-conviction petition, which the court dismissed on July 24, 2003. A notice of appeal was filed on August 12, 2003, and on August 22, 2003, the Office of the State Appellate Defender was appointed to represent appellant.

7.    Upon review of the record in this appeal, appellate counsel became aware of the clerk's failure to process his notice of intent as a notice of appeal following the dismissal of appellant's first post-conviction petition and, on August 24, 2004, filed a motion asking this court to allow appellant leave to file a late notice of appeal. Appellant's motion was granted on September 7, 2004.

8.    Two of the three issues raised in appellant's second post-conviction petition are also raised in his first *pro se* petition and the third issue concerns post-conviction counsel's failure to file a notice of appeal. That third issue is now moot as this court has allowed appellant to appeal from the dismissal of the first post-conviction, and the other two issues can now be more appropriately addressed in that appeal. The appeal from the dismissal of the second post-conviction petition is thus now moot, and should be dismissed.

6–2

WHEREFORE, appellant, Thomas O'Farrell, respectfully requests that this court grant his motion.

Respectfully submitted,

KARI K. FIREBAUGH
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

1    Q.    When you saw him there, his arm was in a

2    sling?

3    A.    Yes.

4    Q.    He was wearing a hospital gown?

5    A.    Yes, sir.

6    Q.    He had been transported into Area 5 by

7    Chicago Police Department personnel?

8    A.    Yes.

9    Q.    From Illinois Masonic Hospital?

10    A.    Yes, sir.

11    Q.    And at the time that you first saw him, he

12    was also with another detective by the name of

13    Saluda?

14    A.    Saluda was there, yes.

15    Q.    You asked Mr. O'Farrell about this weapon

16    that had been found inside his home, is that right?

17    A.    Yes.

18    Q.    And at that time he told you that he had

19    been involved in the shooting of his wife?

20    A.    Yes.

21    Q.    Now, he told you that Leslie had suffered

22    from a number of ailments, is that right?

23    A.    Yes, sir.

24    Q.    That she had diabetes?

1  A. Yes, sir.

2  Q. That it affected her kidneys?

3  A. Yes, sir.

4  Q. That it affected her eyes?

5  A. He may have.  I don't remember the eyes.

6  Q. He told you about Bell's Palsy?

7  A. Yes.

8  Q. That would be like a partial facial

9 paralysis, is that right?

10  A. I think it is a temporary partial.  I'm not

11 sure.

12  Q. And he told you that Leslie had attempted

13 suicide on another occasion?

14  A. Yes, six months before.

15  Q. And he told you that Leslie had asked him

16 several times to participate in this conduct, is that

17 right?

18  A. In her death?

19  Q. Yes.

20  A. Yes.

21  Q. He told you during the course of your

22 conversations with him that he had argued with her

23 over this, is that right?

24  A. Among other things, yes, sir.

File Date: ~~Apr~~ 28, 2008

Case No: 08 cv 2403

## ATTACHMENT #

## EXHIBIT

## TAB (DESCRIPTION)
Cont'd I-155

1      Q.   He described as having fought with her over

2   this, is that right?

3      A.   Again, he described fights with her over a

4   lot of things, and this was among them, yes.

5      Q.   You said Mr. O'Farrell told you about some

6   plan that Leslie had participated in to accomplish

7   this?

8      A.   He put it to me as if she initiated it, and

9   then they planned it together on how it could be

10  done.

11     Q.   He said when you talked to him at Area 5

12  Headquarters that he came home that night after

13  stopping at the bar after work, is that right?

14     A.   Yes.

15     Q.   He told you that when he came home, he tried

16  to go to sleep, is that right?

17     A.   I don't think so.  I don't know that he told

18  me that.  He told me that he expected that she might

19  be asleep, but she was awake and they talked.

20     Q.   He said he wanted to go to sleep, didn't he?

21     A.   I don't know.  I don't remember if he did.

22     Q.   You said he told you that Leslie had said

23  something about removing the -- that Leslie had

24  removed this window from the bathroom from the

1   downstairs portion of the house?

2      A.   Yes, sir.  He told me that she said she took

3   the window off.

4      Q.   You were again present when Mr. O'Farrell

5   talked to Mr. Kougias, the Assistant State's

6   Attorney, a little while after this conversation you

7   had, is that right?

8      A.   Yes.

9      Q.   And at that conversation Mr. O'Farrell said

10  that he took the window out of the downstairs

11  bathroom window, didn't he?

12     A.   He might have, yes, sir.

13     Q.   And he also said that he only took the

14  window out of the downstairs bathroom window after

15  the shooting of Leslie O'Farrell, didn't he?

16     A.   I think so, yes, sir.

17     Q.   Now, he told you in your conversations with

18  him that after the shooting, he took some time to

19  think about what he had done?

20     A.   He said he looked at her and thought about

21  it.

22     Q.   He said something like to digest what he had

23  done?

24     A.   I think so, yes.

1     A.   I asked him what happened, and it was in a

2   narrative form.  It was Detective Schak, myself and

3   the Defendant.  He started by telling me that his

4   wife Leslie or Les, as he referred to her, he

5   believed that she was terminally ill, that she was a

6   diabetic and that she had recently been diagnosed

7   with something called Bell's Palsy, which made it

8   look like I guess physically that she would have had

9   a stroke.

10        He then indicated to me that she had wanted

11   him to kill her, and they had arguments about that in

12   the past.  He indicated to me that on the date of the

13   murder on September 28th he had gotten home and his

14   wife was up, and she handed him a gun and said that

15   she wanted him to kill her.

16      Q.   Did he tell you how that was planned to be

17   done?

18      A.   He indicated that the night before she had

19   planned out how the killing would occur, and that the

20   putty had been removed from a bathroom window, and

21   that would make it look like that would be the point

22   of entry.  And the story was to include that a

23   six-foot-three-inch African-American male black would

24   break in through that bathroom window, come into the

1  house and then shoot her and then flee.  That was the

2  plan that he had said that she had mapped out for

3  him.

4      Q.   Did he then tell you what happened on

5  September 28, 1995?

6      A.   He indicated that after he arrived home and

7  his wife had given him the gun and told him to kill

8  her, that at approximately 1:00 in the morning she

9  was asleep.  And it was after that time that she had

10 awoken on two separate occasions and looked at him

11 and said why didn't you do it.  And he indicated that

12 he replied to her that he had to get his nerves up.

13         He then further indicated that after that

14 point that he then got the gun and loaded the gun,

15 put a bullet in the gun and got a pillow and buried

16 the gun into the pillow and put the gun to her head

17 and then fired one time.

18     Q.   Did he say what happened then?

19     A.   After he fired the gun, he indicated that it

20 appeared that she was going through convulsions and

21 that she was jumping and moaning.  He then indicated

22 that it appeared that she was flopping like a fish

23 out of water.

24     Q.   Did he say what happened then?

7-6

1    A.    Well, after that, he indicated he did not
2  want her to suffer, so he then reloaded the gun and
3  he got the pillow and at this time he put the gun to
4  her chest and fired a shot into her chest.

5    Q.    What did he say happened then?

6    A.    He indicated that he heard one more breath,
7  and she then stopped breathing.

8    Q.    Did he tell you what he said happened after
9  Leslie stopped breathing?

10    A.    After he made that statement, he indicated
11  that he loaded the gun again and he fired a shot down
12  the hallway away from his son's bedroom. And he said
13  he did that because when he would tell the police a
14  story it would be more believable that a struggle had
15  occurred.

16    After he fired the third shot, he then
17  indicated that he reloaded again and he had propped
18  himself up against the wall, and he wanted to make it
19  look like he had struggled with this offender, and he
20  rationalized that if the offender had the gun in his
21  left hand and was struggling with the Defendant, that
22  the Defendant would have subsequently been shot on
23  the right side. So the Defendant said he propped
24  himself up against the wall and shot himself in the

1    right shoulder, which would make it more believable

2    to the police.

3        Q.    When he talked about shooting himself in the

4    shoulder, did he say whether that had been part of

5    the original plan that he had discussed with Leslie?

6        A.    In terms of the original plan, he had made

7    some statements that his wife had said that she did

8    not want him to get shot, only she was to get shot.

9    As a matter of fact, he also said part of the

10    original plan was that she wanted to be shot --

11        MR. KENNELLY:  Objection.

12        THE COURT:  Overruled.

13    BY THE WITNESS:

14        A.    That she had wanted to be shot in the head

15    and not in the face because if she was to be waked,

16    she didn't want to have her face altered.

17        Q.    Now, after the Defendant told you that he

18    propped himself against the wall and shot himself in

19    the shoulder, what did he say happened then?

20        A.    He said he then walked down the hallway and

21    knocked over some pictures that were in the hallway

22    to make it look like a struggle occurred there as

23    well.  As he was going down knocking the pictures

24    over, his son came out of the room crying.  And he

1  said that he then grabbed a blanket and put it around

2  his son because he didn't want his son to see his

3  dead mother.

4      Q.  Did he say what happened then?

5      A.  He then walked downstairs, went to the

6  screen door and pushed out the screen door beyond its

7  limit where the spring would break, and he said he

8  did that because it would make it more believable

9  that the offender would then have escaped through the

10  screen door and would have broken the door.

11      Q.  What did he say happened next?

12      A.  After that he indicated he then went and he

13  pushed out the window in the bathroom where the putty

14  had been removed.  And then after that he indicated

15  he called 911.  When he called 911, he stated that I

16  believe someone's broken in, Les didn't make it.

17      Q.  Did he tell you whether he made any other

18  calls at that time?

19      A.  He made one other call at that time.  He

20  indicated that he called his father, and he said that

21  he gave his father the same bullshit story except

22  that he played it up by crying.

23      Q.  Did he say what he did then?

24      A.  He then indicated that he went back upstairs

I-186

7-9

1    and put the gun in a video cassette case to conceal

2    it.

3         Q.   Did he tell you what happened then?

4         A.   He then indicated he went to make two more

5    phone calls.  One was to -- I believe they both were

6    to his wife's friends.  The first one was to an

7    Ellie, and the latter one was to a -- I remember it

8    was three on the auto speed dial.

9         Q.   Is that a person by the name of Abby

10   Ginsman?

11        A.   That's correct.

12        Q.   After he said he made those calls, what

13   happened then?

14        A.   After he made those calls, the police

15   arrived shortly thereafter, at which time he gave

16   them the concocted story as to what had transpired;

17   that there was a six-foot-three African-American male

18   that broke in that had shot his wife.  And he gave a

19   description of this offender, that he was wearing a

20   blue-black shirt and I believe blue jeans.

21        Q.   The Defendant told you he called Abby

22   Ginsman.  Did he tell you whether there was any

23   answer when he called her?

24        MR. KENNELLY:  Objection.

## Page 1 (Page 1 of 31)

Westlaw

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

**H**
Kevorkian v. Thompson
E.D.Mich.,1997.

United States District Court, E.D.
Michigan, Southern Division.
Jack KEVORKIAN and Janet Good, Plaintiffs,
v.
Richard THOMPSON, Prosecuting Attorney for the
County of Oakland, Michigan, Defendant.
No. 96-CV-73777-DT.

Jan. 6, 1997.

Physician and terminally ill individual brought injunctive relief and declaratory judgment action seeking to enjoin Michigan county prosecutor and his successor from prosecuting physician for assisted suicide activities or to declare Michigan law allowing such prosecution to be unconstitutional. The District Court, Rosen, J., held that: (1) physician and individual had standing to bring action; (2) under *Younger* abstention doctrine, district court would refrain from adjudicating physician's claims but abstention doctrine did apply to terminally ill individual's claims; (3) individual was not barred under *Rooker-Feldman* doctrine from bringing action seeking to declare Michigan's assisted suicide laws unconstitutional; (4) mentally competent, terminally ill or intractably suffering adult does not have liberty interest in assisted suicide under due process clause of Fourteenth Amendment; (5) Michigan common-law regarding assisted suicide did not violate equal protection; (6) Michigan common-law savings clause was not generally void for vagueness; and (7) Michigan common law defining assisted suicide crime prior to 1992 under authority of 1994 declaration by Michigan Supreme Court that assisted suicide was well-established common-law crime in Michigan was void for vagueness.

So ordered.

West Headnotes

**[1] Constitutional Law 92 ⚞699**
92VI Enforcement of Constitutional Provisions
92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
92k699 Particular Questions or
Grounds of Attack in General

**Cases**
92k698 Criminal Law
92k699 k. In General. Most Cited
Cases
(Formerly 92k42.1(3))

**Declaratory Judgment 118A ⚞300**
118AII Proceedings
118AII(C) Parties
118Ak299 Proper Parties
118Ak300 k. Subjects of Relief in
General. Most Cited Cases

Terminally ill individual, who had expressed her desire to participate in assisted suicide with aid of physician who had been prosecuted for assisting in suicides of terminally ill patients, had standing to bring injunction relief or declaratory judgment action seeking to enjoin county prosecutor and his successor from prosecuting physician for assisted suicide activities or to declare Michigan law allowing such prosecution to be unconstitutional, although constitutional infirmity in law allowing physician to be prosecuted for aiding in suicide directly affected individual's alleged right to obtain suicide assistance and during pendency of action, individual had been prosecuted for assisting suicide of another person in suit; she had sufficient stake in outcome of action. U.S.C.A. Const. Art. 3, § 2, cl. 1; M.C.L.A. § 750.505.

**[2] Constitutional Law 92 ⚞699**
92VI Enforcement of Constitutional Provisions
92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
92k699 Particular Questions or
Grounds of Attack in General

**[3] Federal Courts 170B ⚞54**
170BII Jurisdiction and Powers in General
170BII(B) Right to Decline Jurisdiction; Abstention Doctrine

170BII(B) Right to Decline Jurisdiction; Abstention Doctrine
170Bk54 k. Injunctions in General
Most Cited Cases
Under *Younger* abstention doctrine, district court would refrain from adjudicating physician's claims seeking to enjoin county prosecutor and his successor from prosecuting him for assisted suicide activities or to declare Michigan law allowing such prosecution to be un-

## Page 2 (Page 2 of 31)

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

constitutional, where there were ongoing contempt and criminal proceedings against physician in Michigan courts, contempt proceedings and criminal charges against physician implicated important state interest in criminal law, and opportunity to raise his federal constitutional claims in pending contempt and criminal proceedings before Michigan courts M.C.L.A. § 750.505.

**[4] Federal Courts 170B ⚞54**
170BII Jurisdiction and Powers in General
170BII(B) Right to Decline Jurisdiction; Abstention Doctrine

**Abstention 170Bk54** k. Injunctions in General.
Most Cited Cases
Physician seeking to enjoin county prosecutor and his successor from prosecuting him for assisted suicide activities under Michigan law or to declare Michigan law allowing such prosecution to be unconstitutional failed to demonstrate official harassment or bad faith on part of prosecutor in pursuing contempt and criminal proceedings against physician as would show that he fell within exception to *Younger* abstention doctrine; although there was clearly ill will between parties, prosecutor had reasonable expectation of valid conviction and although previous prosecutions had led to acquittals, prosecutor had proceeded in good faith, and applicable case precedent M.C.L.A. § 750.505.

**[5] Federal Courts 170B ⚞41**
170BII Jurisdiction and Powers in General
170BII(B) Right to Decline Jurisdiction; Abstention Doctrine
170Bk41 k. Nature and Grounds in General. Most Cited Cases
Animus of ill will between parties does not, by itself, place case within narrow exception to *Younger* abstention doctrine for extraordinary circumstances

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works

8-2

## Page 3 of 3

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

**[6] Federal Courts 170B 54**

170B Federal Courts
  170BII Jurisdiction and Powers in General
    170BII(B) Right to Decline Jurisdiction, Abstention Doctrine
      170Bk47 Particular Cases and Subjects, Abstention
        170Bk54 k. Injunctions in General Most Cited Cases

Physician seeking to enjoin county prosecutor and his successor from prosecuting him for assisted suicide activities under Michigan law or to declare Michigan law allowing such prosecution to be unconstitutional failed to demonstrate that challenged law was flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph and in whatever manner and against whomever effort might be made to apply it as would show exception to Younger abstention doctrine. M.C.L.A. § 750.505.

**[7] Federal Courts 170B 51**

170B Federal Courts
  170BII Jurisdiction and Powers in General
    170BII(B) Right to Decline Jurisdiction, Abstention Doctrine
      170Bk47 Particular Cases and Subjects, Abstention
        170Bk51 k. Declaratory Judgment in General Most Cited Cases

Younger abstention doctrine did not apply to claims of terminally ill individual, who had expressed her desire to commit assisted suicide with aid of physician who had been and was being prosecuted for assisting in suicides of terminally ill patients, and who was seeking judgment declaring Michigan law allowing such prosecution to be unconstitutional, where there was no ongoing proceedings against individual in Michigan county courts, even though criminal charges were brought against individual in another Michigan county after oral argument and briefing in federal proceeding was completed. M.C.L.A. § 750.505.

**[8] Courts 106 509**

106 Courts
  106II Concurrent and Conflicting Jurisdiction
    106VII(B) State Courts and United States Courts
      106k509 k. Vacating or Annulling Decisions Most Cited Cases

**Federal Courts 170B 172**

170B Federal Courts
  170BII Federal Question Jurisdiction
    170BIII(B) Cases Arising Under the Constitution
      170Bk172 k. Particular Constitutional Cases and Questions Most Cited Cases

Terminally ill individual, who was not party to any state action involving prosecution of physician and his challenges to Michigan's assisted suicide laws, was not barred under Rooker-Feldman doctrine, in which federal district court may not hear what is effectively appeal of case already litigated in state court, from bringing action seeking to declare Michigan's assisted suicide laws unconstitutional. M.C.L.A. § 750.505.

**[9] Constitutional Law 92 4455**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(G) Particular Issues and Applications
      92XXVII(G)22 Privacy and Sexual Matters
        92k4455 k. Right to Die; Suicide and Euthanasia Most Cited Cases
        (Formerly 92k274(2))

Mentally competent, terminally ill or intractably suffering adult does not have liberty interest in assisted suicide under due process clause of Fourteenth Amendment. U.S.C.A. Const.Amend. 14.
M.C.L.A. § 750.505.

**[10] Constitutional Law 92 3767**

92 Constitutional Law

## Page 4 of 3

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

  92XXVII Equal Protection
    92XXVII(E) Particular Issues and Applications
      92XXVII(E)8 Privacy and Sexual Matters
        92k3767 k. Death and Suicide Most Cited Cases
        (Formerly 92k215.1)

**Suicide 368 3**

368 Suicide
  368k3 k. Advising, Aiding, or Agreeing to Commit Most Cited Cases

Unwritten Michigan common law, which affords patients attached to life support systems the right to terminate life support but denies mentally competent, terminally ill or intractably suffering adult not on life support the right to commit suicide with assistance of physician, does not violate equal protection clause of Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

**[11] Constitutional Law 92 1088**

92 Constitutional Law
  92VII Constitutional Rights in General
    92VII(B) Particular Constitutional Rights
      92k1088 k. Suicide Most Cited Cases
      (Formerly 92k82(6.1))

**Constitutional Law 92 3767**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(G) Particular Issues and Applications
      92XXVII(G)22 Privacy and Sexual Matters
        92k3767 k. Death and Suicide Most Cited Cases
        (Formerly 92k274(2))

There is no fundamental right to assisted suicide, and, thus, all that is needed for law regulating assisted suicide to pass equal protection muster is that classification at issue bear some fair relationship to legitimate public purpose. U.S.C.A. Const.Amend. 14.

**[12] Constitutional Law 92 4509(1)**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)2 Nature and Elements of Crime
        92k4502 Creation and Definition of Offense
        92k4509 Particular Offenses
        92k4509(1) k. In General Most Cited Cases
        (Formerly 92k258(3.1))

**Criminal Law 110 13.1(1)**

110 Criminal Law
  110I Nature and Elements of Crime
    110k12 Statutory Provisions
      110k13.1 Certainty and Definiteness
        110k13.1(1) k. In General Most Cited Cases

Michigan common law savings clause, providing that any person who commits indictable offense at common law may be guilty of punishable felony, is not void for vagueness or uncertainty as definition of underlying crime is defined by Michigan common law. M.C.L.A. § 750.505.

**[13] Constitutional Law 92 4509(14)**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)2 Nature and Elements of Crime
        92k4502 Creation and Definition of Offense
        92k4509 Particular Offenses
        92k4509(14) k. Homicide, Mayhem, and Assault with Intent to Kill Most Cited Cases
        (Formerly 92k258(3))

**Suicide 368 3**

368 Suicide

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

Page 5

mi. Most Cited Cases

Definition of crime of assisted suicide in Michigan was not ascertainable from review of Michigan common law prior to December 1992 when Michigan legislature passed now expired assisted suicide statute and, thus, common law regarding assisted suicide prior to 1992 did not provide individual with fair notice that assisting suicide was crime in Michigan and was void for vagueness to extent that prosecutor intended to prosecute terminally ill individual who had assisted in suicides prior to 1992 under authority of 1994 declaration by Michigan Supreme Court that assisted suicide was well-established common law crime in Michigan. M.C.L.A. § 750.505

*1154 Geoffrey N. Fieger, Southfield, MI, for plaintiffs.

May Massacon Ross, Detroit, MI, for defendant.

AMENDED OPINION AND ORDER REGARDING THE PARTIES' CROSS-MOTIONS FOR SUM-MARY JUDGMENT

ROSEN, District Judge.

I. INTRODUCTION

FN1. This matter originally came before the Court on Plaintiffs' Motion for Preliminary Injunction. However, at the September 26, 1996 hearing, counsel for the parties stipulated to the conversion of Plaintiffs' Motion for Preliminary Injunction to a motion for summary judgment. Defendant also asked for a summary judgment dismissal decision in his Opposition Brief, and Defendant's counsel orally cross-moved for summary judgment in the course of Defendant at the September 26 hearing.

In this declaratory judgment/injunctive relief action, Plaintiffs Jack Kevorkian and Janet Good seek a court order enjoining Defendant Richard Thompson and his successor in the office of Oak-

land County Prosecutor from prosecuting Kevorkian for his assisted suicide activities. At the heart of both Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief and their motion for summary judgment is their contention that the statutes and the common law under which Kevorkian has been prosecuted and threatened with prosecution in the suicides of Marjorie Wantz and Sherry Miller in October of 1991 on the ground that physician-assisted suicide is not a crime in Michigan, are unconstitutional and, therefore, any future prosecutions of Dr. Kevorkian will result in the deprivation of their constitutional rights.

*1155 Plaintiffs' Amended Complaint contains four counts, all asking the Court for declaratory and injunctive relief. In Count I, Plaintiffs ask the Court to find that M.C.L. § 750.505 (the Michigan Supreme Court's December 13, 1994 ruling that Plaintiff Kevorkian may be prosecuted for assisting in a suicide under this statute, is unconstitutionally vague. In Count II, Plaintiffs ask the Court to declare that mentally competent, terminally ill or miraculously suffering adults have a liberty interest protected by the Fourteenth Amendment's Due Process Clause to end their suffering by committing suicide and to seek physician aid in dying. In Count IV, Plaintiffs seek a declaration that any unwritten common law which affords patients attached to life support systems the right to terminate treatment which Kevorkian has contended, terminally ill or miraculously suffering adult cannot be or irreparably suffering adult patients, the assistance of a physician violates the Equal Protection Clause of the Fourteenth Amendment. In Count IV, Plaintiffs allege that should another criminal charge be filed against Dr. Kevorkian and/or Janet Good under M.C.L. § 750.505, they will be deprived of their Fifth and Fourteenth Amendment rights to be free of unreasonable seizure under the Fourth and Fourteenth Amendments. Therefore, they ask the Court to enjoin to enforce M.C.L § 750.505 as it pertains to Plaintiff assistance in any suicide.

FN2. That statute has now expired.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

---

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

Page 6

II. PROCEDURAL BACKGROUND/STATE COURT DECISIONS

In 1992, the Oakland County Court (Breck-J.) entered an order granting Jack Kevorkian's motion to dismiss two counts of open murder for assisting in the suicides of Marjorie Wantz and Sherry Miller in October of 1991 on the ground that physician-assisted suicide is not a crime in Michigan. The Oakland County Prosecutor appealed and the Michigan Court of Appeals reversed the trial court's decision. People v. Kevorkian, 205 Mich.App. 180, 517 N.W.2d 293 (1994).

While the appeal of the Oakland County Circuit Court's 1992 order was pending, on December 13, 1992, the Michigan Legislature enacted a statute, M.C.L. § 752.1021, et seq., which took effect on February 25, 1993, establishing a commission to study voluntary termination of life and created a new crime of "criminal assistance of suicide." Two judges of the Wayne County Circuit Court, in two separate cases, subsequently declared this statute unconstitutional. Judge Cynthia Stephens entered a declaratory judgment declaring the new statute unconstitutional in a declaratory judgment action filed by a terminally ill individual, Teresa Hobbins, and nine health care professionals. Judge Stephens also held that individuals have a constitutional right to commit suicide. Judge Kaufman held that "in some instances" a person has a constitutional right to commit suicide. Finding that one of Kevorkian's "patients", Donald O'Keefe, had a constitutional right to commit suicide, Judge Kaufman dismissed the assisted suicide charge against Kevorkian stemming from his assistance in O'Keefe's suicide.

statute related to voluntary termination of life, with or without assistance, and specifically criminalized assisted suicide, violated the "one-object" provision of the Michigan Constitution. However, the appellate court also found that there is no constitutional right to commit suicide and that (1) assisted suicide is a common law crime in Michigan which may be prosecuted under the common law savings statute, M.C.L. § 750.505. People v. Kevorkian, 447 Mich. 436, 527 N.W.2d 714 (1994). Kevorkian, et al., petitioned the United States Supreme Court seeking to overturn the Michigan Supreme Court's decision. The United States Supreme Court denied that petition for certiorari. Kevorkian v. People, 514 U.S. 1083, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995).

Meanwhile, following Kevorkian's assistance with the June 1990 death of Janet Adkins, on February 5, 1991, (i.e., before the Wantz-Miller suicides which gave rise to this first charge filed against Kevorkian) the Oakland County Circuit Court (Gilbert, J.) entered an "Order of Permanent Injunction", permanently enjoining "Dr. Jack Kevorkian, his agents and employees, and those in active concert with him from ... using, employing, administering, offering or providing any of the "suicide machines", or other similar devices, components, or other modalities or drugs (including nonprescription drugs) in, to or any person's seeking to end a human life, or conducting any acts to help a patient commit suicide, regardless of the modality employed." People v. Kevorkian, Oakland County Cir.Ct. No. 90-390963-NO.

In May of 1993, after the Michigan Supreme Court. The appeals were consolidated and in 1994, the Michigan Court of Appeals held that the assisted suicide statute issued in ruling finding assisted suicide to be a crime at common law under the Michigan statute, created a common law crime of assisted suicide by creating a commission to study the Michigan Court of Ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8-3

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

peals affirmed the circuit court's imposition of the permanent injunction. *People v. Kevorkian,* 210 Mich.App. 601, 534 N.W.2d 172 (1995). The Michigan Supreme Court denied leave to appeal. *People v. Kevorkian,* 549 N.W.2d 566 (1996). Kevorkian subsequently petitioned the US Supreme Court for certiorari. *Kevorkian v. Kevorkian,* 65 U.S.L.W. 3086 (7/25/96). That petition was pending when this federal action was filed. The petition for certiorari was denied on October 15, 1996, i.e., after oral argument on the parties' cross-motions for summary judgment in this action was completed. *Kevorkian v. People,* 519 U.S. 928, 117 S.Ct. 296, 136 L.Ed.2d 215 (1996).

In his cert petition, Kevorkian argued that (1) the injunction's prohibitions against "offering" or "conducting any acts to help a patient commit suicide" impermissibly burden his First Amendment rights, (2) a mentally competent terminally ill adult has a constitutional right to commit suicide which is protected by the Ninth and Fourteenth Amendments, and (3) the Equal Protection Clause of the Fourteenth Amendment is violated by denying the freedom to choose to hasten death on the basis of whether a disease requires the use of life sustaining treatment

*PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF IN THIS ACTION*

Kevorkian and his co-plaintiff in this action, Janet Good, seek a court order precluding the Oakland County Prosecutor from prosecuting Kevorkian for any act of assisted suicide which he has assisted (or may assist) or at which he was or is present, including the death of Lois Howe whose suicide is referenced in Plaintiffs' Amended Complaint in this action.[FN2] Kevorkian and Good claim that an injunction is necessary because any exercise at which Dr. Kevorkian was present—including Ms. Howe's—are under police investigation and that Richard Thompson "is threatening to file charges" in the Howe case. It is on the basis of alleged "ongoing police investigations" and the alleged threatened initiation of

charges against Dr. Kevorkian for the death of Lois Howe that Kevorkian claims he has standing to pursue the *1155 injunctive and declaratory judgment relief he seeks in this action.[FN3]

FN3 Although Lois Howe's September 26, 1992 suicide is the only suicide specifically referenced in Plaintiffs' First Amended Complaint, a number of Plaintiffs' claims and indeed, a number of the arguments of Plaintiffs' counsel in his briefs and in oral argument are "global" arguments, i.e., that Kevorkian should not be prosecuted for having assisted in any suicides in the past or for assisting in any suicides in the future. Accordingly, when necessary, the Court will address the issues raised in this case, both globally and specifically as they apply to Ms. Howe's death in 1992.

FN4 With respect to Kevorkian's co-plaintiff, Janet Good, her "standing" argument is bootstrapped onto Kevorkian's. She claims that "[a]s a result of the purported criminalization of physician aid in dying under an unwritten common law, Mrs. Good is denied constitutional rights under the privacy and liberty provisions of the United States Constitution for she is prevented from seeking and/or obtaining physician aid in dying." [Amended Complaint, ¶ 11.] She rephrases this standing argument in Plaintiffs' Brief, and alleges that the common law under which Kevorkian was last prosecuted "mak[es] it a crime for [her] to seek and/or obtain physician aid in dying gives rise to the Plaintiffs' standing to bring this action." [Plaintiffs' Brief, p. 23.] According to Plaintiffs, the existence of this common law and the threat of future prosecution of Dr. Kevorkian confer them both with standing to pursue the declaratory and injunctive relief they seek.

*POST-HEARING DEVELOPMENTS*

Following completion of oral argument in this case, on October 29, 1996, after the United States Supreme Court denied Kevorkian's petition for a writ of certiorari on October 15, 1996 and allowed the Permanent Injunction entered by the Oakland County Circuit Court in February 1991 to stand, the Oakland County Prosecutor submitted to the Oakland County Circuit Court an ex parte motion for an order to show cause why Jack Kevorkian should not be held in criminal contempt of court for violating the permanent injunction. That show cause order is still pending.

Then, on October 31, 1996, a 20-count criminal complaint was filed in Oakland County against Jack Kevorkian and others for assisting and conspiring to assist in several suicides between June 20, 1996 and September 7, 1996, in violation of Michigan common law and M.C.L. § 750.505 (i.e., the laws challenged in this action). Janet Good is named, but not charged, as a co-conspirator in that Oakland County criminal complaint.[FN5]

FN5 Good was subsequently charged, along with Kevorkian, by an Ionia County Grand Jury on November 6, 1996 for assisting in a suicide with Kevorkian in that county in August 1996.

In light of the foregoing post-hearing developments, the Court entered an Order on November 6, 1996 directing counsel for the parties to submit supplemental briefs addressing the effect of these developments on the parties' previously-asserted legal arguments Supplemental briefing was completed on November 19, 1996.

Having reviewed and considered all of the parties' briefs and supporting documents filed in this matter, and having further considered the oral arguments of counsel at the hearing held on September 26-30, 1996, the Court is now prepared to rule on the parties' cross-motions for summary judgment This Opinion and Order sets forth that ruling

*FACTUAL BACKGROUND*

Plaintiff Jack Kevorkian is a well-known advocate of the right to die and the right to physician-assisted suicide. He has previously been prosecuted in Oakland County for his assisted suicide activities, and was acquitted in each instance. He has admitted assisting in numerous suicides both prior to, and after, his last prosecution.

Plaintiff Janet Good is the former president of the Michigan Hemlock Society. According to Plaintiffs' Amended Complaint, Ms. Good suffers from terminal pancreatic cancer. She alleges in this action that "if she seeks to obtain the assistance of a physician to end her pain and suffering, she faces indictment as a co-conspirator." [Amended Complaint, ¶ 21.]

Although the parties have not included any sufficient "statement of facts' in their briefs to provide a description of specific conduct which allegedly gives rise to the potential prosecutions which Plaintiffs seek to preclude, at oral argument, Plaintiffs' counsel stipulated that Plaintiff Kevorkian's conduct in assisting in a suicide "generally" is the conduct described in the reported Michigan Court of Appeals and Supreme Court decisions concerning him.[FN6] This "general" conduct *1158 was described by Plaintiff Kevorkian, himself, on the record on June 8, 1990, in connection with the Oakland County Prosecutor's request for a preliminary injunction to enjoin Kevorkian from further assisting in suicides following the suicide of Janet Adkins, and is reported in *People v. Kevorkian, supra,* 534 N.W.2d 172:

FN6 The Court asked counsel for the parties to submit a stipulated statement of facts following the September 30 hearing. However, the only fact to which the parties were able to stipulate was that there were no criminal prosecutions against Plaintiff Kevorkian pending as of that date.

Defendant [Kevorkian] admitted that he helped Ms.

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

**Page 9**

Adkins commit suicide by means of his "suicide machine," which consists of a frame holding three chemical solutions fed into a common intravenous line controlled by a switch and a timer. Defendant admitted that he inserted the intravenous needle into Ms. Adkins' arm, but testified that Ms. Adkins activated the switch that turned on the machine.

Kevorkian's conduct in connection with the deaths of Sherry Miller and Marjorie Wantz was described by the Michigan Supreme Court in *People v. Kevorkian, supra,* 527 N.W.2d 714:

According to the testimony presented at the defendant's preliminary examination, the plan was to use his suicide machine. The device consisted of a board to which one's arm is strapped to prevent movement, a needle to be inserted into a blood vessel and attached to IV tubing, and containers of various chemicals that are so released through the needle into the bloodstream. Strings are tied to two of the fingers of the person who intends to die. The strings are attached to clips on the IV tubing that control the flow of the chemicals. As explained by one witness, the person raises that hand, releasing a drug called methohexital, which was described by expert witnesses as a fast-acting barbiturate that is used under controlled circumstances to administer anesthesia rapidly. When the person falls asleep, the hand drops, pulling the other string, which releases another clip and allows potassium chloride to flow into the body in concentrations sufficient to cause death.

The defendant tried several times, without success, to find a vein in Ms. Miller's arm and hand. He then left the cabin, re-turning several hours later with a cylinder of carbon monoxide gas and a mask apparatus. He attached a screw driver to the cylinder, and showed Ms. Miller how to use the tool as a lever to open the gas valve. The defendant then turned his attention to Ms. Wantz. He was successful in inserting the suicide-machine needle into her arm. The defendant explained to Ms. Wantz how to activate the device so

as to allow the drugs to enter her blood stream. The device was activated and Ms. Wantz died. [FN7]

FN7. The Michigan Supreme Court noted that no one who testified at the preliminary examination actually activated the suicide device. The only per-sons in the cabin at the time were the two decedents, Jack Kevorkian, and Kevorki-an's sister, who since has died. Mr. Wantz's sister, who was walking away from the cabin where the deaths occurred. He testified as follows:

Q. You don't know who pulled the string?
A. I have no idea. She knew that she had to pull the string when I left.
Q. You don't know if she tried to pull the string and it didn't work or he pulled her hand at all, do you?
A. I can say this, when I left the room she was in the process of trying to pull the string....

* * * * *

Q. You don't know who pulled the string? That's what you're telling me?
A. I can tell you she was in the process of trying to pull the string when I left the room, but I did not see her pull the string. The only thing I can ... tell you is once I left the room, Dr. Kevorkian did-I heard Dr. Kevorkian say, "Marj, you have to hold your hand up," and that was the only thing I know ...
527 N.W.2d at 734, n. 62

The defendant then placed the mask apparatus on Ms. Miller. The only witness at the preliminary examination who was present at the time said that Ms. Miller opened the gas valve by pulling on the screw driver. The cause of her death was determined to be carbon-monoxide poisoning.
*Id.* at 733-34.

The Court will base its "general" descriptions of Kevorkian's assisted suicide activities as the factual context for its decision in this matter.

---

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

**Page 10**

*1159 DISCUSSION

In seeking summary judgment/dismissal, Defendant Thompson has argued:

(1) that Plaintiffs' complaint should be dismissed on jurisdictional/prudential grounds, (a) for lack of standing, (b) by application of the *Younger* [FN8] ab-stention rule, and (c) by application of the *Rooker-Feldman* [FN9] doctrine; and

FN8. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

FN9. *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), *District of Columbia Court of Ap-peals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)

(2) for lack of merit of Plaintiffs' substantive argu-ments of unconstitutional vagueness, and due pro-cess and equal protection violation.

The Court will address each of these issues seri-atim.

A. *STANDING:*

A plaintiff's standing is a jurisdictional matter for Article III courts and thus, is a threshold question to be resolved before the court may address the substantive issues. *Linda R.S. v. Richard D.,* 410 U.S. 614, 615, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973), *O'Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), *Planned Parenthood Ass'n v. City of Cincinnati,* 822 F.2d 1390, 1394 (6th Cir.1987).

*Separation of Church and State, Inc.* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). As the Supreme Court explained in *Valley Forge:*

The judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutional validity of legislative or executive acts. The power to declare the rights of individuals and to measure the authority of governments, this Court said 90 years ago, "is legitimate only in the last resort, and as a necessity in the determination of real, earnest, and vital controversy." Otherwise, the power "is not judicial ... in the sense in which judicial power is granted by the Constitution to the courts of the United States."

As an incident to the elaboration of this bedrock re-quirement, this Court has always required that a lit-igant have "standing" to challenge the action sought to be adjudicated in the lawsuit.

*Id.*

Examination of the standing issue involves two levels of inquiry. The first level of inquiry is whether the plaintiff has suffered "an irreducible minimum," some actual or threatened injury result-ing from the putatively illegal action. *Valley Forge, supra; O'Shea v. Littleton, supra; Planned Parenthood Ass'n v. City of Cincinnati, supra.* The second level of inquiry involves considering whether the injury involves the plaintiff is the proper proponent of the rights on which the action is based. *Singleton v. Wulff,* 428 U.S. 106, 111-13, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976).

To satisfy the "injury" requirement of the first level of constitutional inquiry, it is not enough for the plaintiff to assert some abstract injury. It must be demonstrated that the plaintiff "has sustained or is immediately in danger of sustaining some direct in-jury" as a result of the challenged statute or official conduct. *Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923), *Val-ley Forge, supra,* 454 U.S. at 476-78, 102 S.Ct. at 761. The injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical." *O'Shea v. Littleton, supra*

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

[1] In this case, although it is conceded that there have been no charges for assisting with the suicide of Lois Hawes brought or threatened against Dr. Kevorkian, and no charges were pending or threatened against him when this case was filed, the cases involving attempts to enjoin prosecutions in which no "case or controversy" injury was [*1160] found seem to hinge on the fact that there was nothing to suggest that the plaintiffs in those cases would again engage in any conduct that would violate the laws they were challenging. See, e.g., Eggar v. City of Livingston, 40 F.3d 312, 316 (9th Cir.1994), cert. denied,515 U.S. 1136, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995), Knox v. McGinnis, 998 F.2d 1405, 1412-13 (7th Cir.1993); Johnson v. Moore, 958 F.2d 92, 94-95 (5th Cir.1992). By contrast, Dr. Kevorkian has openly continued to assist suicides, and he has asserted that he will continue to do so. See, People v. Kevorkian, 534 N.W.2d at 173-74.

More importantly, the Supreme Court has held that when prosecution seems apparent, a litigant need not first expose himself to actual arrest or prosecution to be entitled to challenge the constitutionality of a statute. See, Steffel v. Thompson, 415 U.S. 452, 457-58, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). The Court further stated in Babbitt v. United Farm Workers National Union, 442 U.S. 289, 143 S.Ct. 2301, ---, 60 L.Ed.2d 895 (1979) that when a plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder there is a real ... injury to rest and undergo a criminal prosecution as the sole means of seeking relief." Id. at 298, 99 S.Ct. at 2309, quoting Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973).

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

granted,518 U.S. 1057, 117 S.Ct. 37, 135 L.Ed.2d 1128 (1996), both the Second Circuit and Ninth Circuit determined that physicians and patient plaintiffs had presented a sufficiently justiciable case or controversy to withstand Article III standing scrutiny. As in this case, the Quill and Compassion in Dying plaintiffs were challenging state laws which criminalized assisting in a suicide.

The Court in this case similarly finds that the case or controversy "injury" requirement is met. Although no criminal charges against Kevorkian were pending when this action was filed, as indicated above, an injunction in aid of the criminal law covering Kevorkian and his assisted suicide activities was at the time of filing, and remains now, in place. Furthermore, criminal charges have recently been filed against Kevorkian in Oakland and Iona counties, and those criminal prosecutions are still pending.

As indicated above, however, the finding of a case or controversy "injury" does not end the Article III standing inquiry. The second level of inquiry is whether Kevorkian and/or Good are the proper parties to assert the rights claimed in Plaintiffs' Amended Complaint

The Sixth Circuit explained the standards applicable to this second level of inquiry in Planned Parenthood Ass'n v. City of Cincinnati, supra.

One of the standards relevant to this appeal concerns the well-established principle that a plaintiff 'generally must assert his own legal rights and interests, and cannot rest his claim for relief on the legal rights or interests of third parties." Warth [v. Seldin], 422 U.S. [490], 499, 95 S.Ct. [2197], 2205 [45 L.Ed.2d 1431] (1975).] There are exceptions to this rule, however, under which litigants have been permitted to assert the rights of third parties. There are essentially two types of cases involving jus tertii standing. The first is where the litigants challenge statutes which regulate their activity and, as a result, violate the rights of third parties. Plaintiffs have standing, in these cases, to assert the constitutional rights of their patients.')

Craig v. Boren, 429 U.S. 190, 194-97, 97 S.Ct. 451, 455-57, 50 L.Ed.2d 397 (1976), [discussed in Bond, 405 U.S. 438, 443-46, 92 S.Ct. 1029, 1033-35, 1 L.Ed.2d 346 (1972). The second genre of jus tertii cases involve litigants seeking to assert solely the rights of third parties as being impinged by a statute. Jus tertii standing in this type of case is more difficult to establish, and generally depends on two factual elements. The first is whether the litigant's relationship with the third party whose right he [*1161] seeks to assert is such that 'the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue.' Singleton [v. Wulff], 428 U.S. [106] at 114, 96 S.Ct. [2868] at 2874 [49 L.Ed.2d 826] ( 1976).] The second is whether the third party is not able to assert the affected right on his own behalf. Id. at 115-16, 96 S.Ct. at 2874-75.

822 F.2d at 1394. See also, Volunteer Medical Clinic, Inc. v. Operation Rescue, 948 F.2d 218, 222-23 (6th Cir.1991)

Volunteer Medical Clinic and Planned Parenthood, as well as the cases cited in the above-quoted excerpt from Volunteer Medical, all concern ordinances regulating abortion and contraceptives, and the potential prosecution of doctors, hospitals and abortion clinics under those statutes. In these cases, the Supreme Court and Sixth Circuit have uniformly held that doctors have standing to assert the rights of women patients as against governmental interference with the abortion decision.' Singleton v. Wulff, supra; Accord Doe v. Bolton, 410 U.S. 179, [*189], 93 S.Ct. 739, 745-46, 35 L.Ed.2d 201 (1973).

Defendant argues that because Kevorkian is not entitled to assert this physician-patient standing, because he is not a licensed physician. His medical license has been suspended and he is no longer authorized to practice medicine in Michigan. However, as Plaintiffs' counsel pointed out at oral argument, the Michigan criminal law at issue in this case not only criminalizes 'physician-assisted suicide. The Michigan law sweeps even more broadly than the laws challenged in the abortion cases because it precludes assistance in a suicide by anyone, not only licensed physicians. Thus, that Kevorkian is not a licensed physician is irrelevant for standing purposes in this case, and the Court accordingly finds that Kevorkian may derivatively assert the constitutional rights of his terminally ill clients.

[2] The Court also finds that the Plaintiff Janet Good has standing to pursue this action. As alleged in Plaintiffs' Amended Complaint, Ms. Good, herself, is terminally ill and she has asserted her desire to seek assistance in dying. Thus, the constitutional infirmities which are alleged in the complaint directly affect her rights. Moreover, Ms. Good arguably is also covered by the Oakland County injunction to the extent that it covers not only Kevorkian but also 'his agents, employees and those in active concert with him from conducting any acts to help a patient commit suicide.' Furthermore, during the pendency of this action, Ms. Good, herself, has been charged in a criminal indictment in Ionia County for assisting in a suicide under the two law challenged in this action

Based on the foregoing discussion, the Court rejects Defendant Thompson's argument that this case should be dismissed for lack of Article III standing.

*B. YOUNGER ABSTENTION*

[3] Defendant Thompson also argues that even if the Court is satisfied that Plaintiffs have standing to pursue this action, the Court should nonetheless abstain from acting on the relief sought by Plaintiffs under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works

27, 91 L.Ed.2d 669 (1971). See Ohio Civil Rights Commission v. Dayton Christian Schools, 477 U.S. 619, 625, 106 S.Ct. 2718, 2722, 91 L.Ed.2d 512 (1986) (finding that a ripe controversy existed between the parties but determining that the district court should have abstained from adjudicating the case under Younger v. Harris).

In Harris, the United States Supreme Court held that federal courts should not enjoin pending state criminal prosecutions except in a "very unusual circumstance" where an injunction is necessary to prevent "both great and immediate" irreparable injury. Id. at 44-46, 106 S.Ct. at 751. Grounded on principles of equity and on the "more vital consideration" of the concerns for comity and federalism, id. at 42-44, 106 S.Ct. at 750, the Younger court found it "perfectly natural for our states to repeat time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions" in state court is not to issue such injunctions. Id. at 45, 91 S.Ct. at 751.

The Court explained that federal courts must be sensitive to "the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the states." Id. at 44, 91 S.Ct. at 750. Thus, the Younger court found that the possible unconstitutionality of a statute does not justify an injunction against good faith efforts of the state to enforce it. Id. at 53-54, 91 S.Ct. at 755.

Younger established the principle that in cases seeking to enjoin ongoing state proceedings-be they criminal, civil, or administrative-federal courts should not exercise jurisdiction but should instead defer to the state proceeding. Pennhurst, 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973); Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482

---

(1975), Ohio Civil Rights Commission v. Dayton Christian Schools, supra. In Younger with respect to injunctive relief applies with equal force to request for declaratory relief in federal courts. Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). See also, Younger, supra, 401 U.S. at 41 n. 2, 91 S.Ct. at 749 n. 2.

In determining the applicability of the Younger abstention rule, the court should consider three factors: (1) whether there is a pending state proceeding, (2) whether an adequate opportunity is provided to raise the constitutional claims in the pending state proceeding, and (3) whether that state proceeding involves important state interests which nevertheless was... the doctrine of abstention imposed by the federal intervention. Zalman v. Armstrong, 802 F.2d 199, 202 (6th Cir.1986).

If a state action is pending when the federal complaint was filed, the federal action must be dismissed. Hicks v. Miranda, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). As indicated above, the Supreme Court has held that this rule applies not only to criminal prosecutions but also, it applies with to civil proceedings in aid of the criminal law. Huffman, supra; Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), or a civil enforcement action brought by the state. Trainor v. Hernandez, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977). Moreover, it is well-settled that for Younger purposes, trial-type appeals process is treated as a unitary process. New Orleans Public Service, Inc. v. Council of City of New Orleans, 491 U.S. 350, 369, 109 S.Ct. 2506, 2519, 105 L.Ed.2d 298 (1989).

Furthermore, even if no state prosecution is pending when the federal action is filed, if a state criminal prosecution is initiated after the federal action is filed, the Younger abstention rule will apply. In Hicks v. Miranda, supra the Supreme Court held

---

422 U.S. at 349-50, 95 S.Ct. at 2292

With respect to Dr. Kevorkian, although it is true that there were state criminal proceedings pending against him in Oakland County when this complaint was filed, there has been litigation concerning the permanent injunction imposed by the Oakland County Circuit Court in 1991 pending at the state level throughout this action, at the Oakland County level and the Michigan... That injunction is a state civil proceeding "in aid of the criminal law" under Huffman, and the progeny, and therefore *1163 subject to Younger. See People v. Kevorkian, 210 Mich.App at 601, 534 N.W.2d 172 (finding the permanent injunction was necessary, because with respect to the criminal Kevorkian, ... 534 N.W.2d 172 that the criminal courts alone may not be adequate to restrain unlawful acts or threaten them). Although Plaintiff Kevorkian's appeal from the Supreme Court with the October 15, 1996 denial by the Supreme Court's petition for a writ of certiorari, on October 29, 1996, i.e., during the pendency of this federal action, the Oakland County Prosecutor initiated contempt proceedings against Kevorkian by filing a motion for an order to show cause why Plaintiff Kevorkian should not be held in criminal contempt and, accordingly, by issuing four subpoenas on August and September. On October 31, 1996, a 20-count criminal complaint was filed against Kevorkian [See Defendant's Supplemental Pleading and Additional Facts, Ex. A.] Two days later, on November 5, 1996, the contempt and criminal... by and in suicides from June 1995 through September 1996 by assisting in ten suicides from June 1995 through September 1996. Both the criminal con-

---

tempt proceedings and the 20-count criminal complaint are still pending in Oakland County.

By virtue of these "ongoing" criminal proceedings and the civil injunction proceedings, all of the generic first Younger element satisfied with respect to Dr. Kevorkian.

The second factor for applying Younger abstention is whether the pending state proceedings implicate an important state interest. The proper analysis of this issue is not to look merely to the interest in the outcome of the particular case, but to the important outcome of the generic proceedings to the state. New Orleans, 491 U.S. at 364-65, 109 S.Ct. at 2516-17. See also, Pennzoil Company v. Texaco, Inc., 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). Where the requested federal injunction would interfere with a state's interest in its contempt process, Younger applies. Juidice v. Vail, supra. See also, Middlesex County Ethics Committee v. Garden State Bar Assoc., 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); Moore v. Sims, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979). The Supreme Court has further held that where the state proceedings involve the execution of state judgments, the important state interest is implicated. Pennzoil, supra. 420 U.S. at 603-05, 95 S.Ct. at 1208. See also, NOPSI v. City of Philadelphia, 32 F.3d 785, 791-92 (3rd Cir.1994), cert. denied 514 U.S. 1015, 115 S.Ct. 1355, 131 L.Ed.2d 213 (1995).

The pending contempt proceeding and criminal charges against Kevorkian implicate these important state interests. The Oakland County injunction prohibits Kevorkian from violating the M.C.L. by assisting in suicides as was the case People v. Kevorkian, 210 Mich.App. 601, 534 N.W.2d 172 The Michigan Court of Appeals ruling-which the U.S. Supreme Court let stand-was premised on the fact that an assisted suicide violated the common-law of the State of Michigan. Id. at 605-608, 534 N.W.2d at 172. The Court of Appeals concluded that Kevorkian's actions "implicate criminal law." Id at 608.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

The third requirement for Younger abstention, i.e., that there be an adequate opportunity in the state proceedings to raise constitutional challenges, is also satisfied in this case. Abstention is appropriate unless state law clearly precludes the interposition of the constitutional claims. Moore, supra, 442 U.S. at 426-28, 99 S.Ct. at 2379. The Younger doctrine requires that the federal plaintiff to show that state procedure bars the interposition of the constitutional claims Pennzoil Company, supra, 481 U.S. at 12, 107 S.Ct. at 1527. See also, Fieger v. Thomas, 74 F.3d 740, 745-46 (6th Cir. 1996)

Kevorkian has not made such a showing here. In fact, the petition for writ of certiorari filed by Plaintiff Kevorkian in the course of his appeal of the Oakland County Circuit Court's imposition of the injunction raised several of the very same constitutional issues raised in this action. Kevorkian argued that the Michigan law criminalizing assisted suicide is unconstitutional because it infringes the right of a mentally competent terminally ill or suffering adult to hasten his/her own death and that it is a denial of equal protection to permit persons on life support to hasten their death while denying this right to *1164 those suffering from terminal illness or intractable pain who are not on life support." [Petition for Writ of Certiorari, Defendant's Ex. E.]

Kevorkian also is challenging the injunction on the basis that it is overbroad Id While it is true that Kevorkian did not raise in that petition the argument that the common law savings clause is unconstitutionally vague, overbroad and amounts to an ex post facto law, he will clearly have an adequate opportunity to raise these federal constitutional claims in the pending Oakland County contempt and criminal proceedings. Therefore, the Court finds that the third requirement of Younger abstention is met.

[4][5] Once a court determines that the requirements for Younger abstention are met in a given case, the plaintiff's claims will be dismissed unless the plaintiff can show that the exceptions applies Federal courts will hear a case in which Younger applies only in "extraordinary"

circumstances". Id at 53, 91 S.Ct. at 755, such as official harassment and bad faith. Hicks v Miranda, supra, 422 U.S. 332, 342-52, 95 S.Ct. 2281, 2292-97 Bad faith generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction. Kugler v Helfant, 421 U.S. 1017, 95 S.Ct. 2425, 44 L.Ed.2d 686 (1975) Animus or ill will between the parties does not, by itself, place a case within this narrow exception to Younger abstention Phelps v. Hamilton, 59 F.3d 1058, 1065 (10th Cir. 1995) Nor does the fact that several unsuccessful prosecutions have already been brought against the federal plaintiff. Cameron v. Johnson, 390 U.S. 611, 617-18, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968). Younger, supra, 401 U.S. at 46-48, 91 S.Ct. at 752. See also, Dombrowski v. Pfister, 380 U.S. 479, 482, 85 S.Ct. 1116, 1118, 14 L.Ed.2d 22 (1965). This is particularly true where prosecuting officials rely on judicial authorization for their conduct. Hicks, supra, 422 U.S. at 351-52, 95 S.Ct. at 2293.

Here, although there is clearly ill will between the parties, and perhaps even animus, the Court cannot say that the prosecutions against Kevorkian have been brought in bad faith in the sense that the prosecutor did not have a reasonable expectation of a valid conviction. The fact that previous prosecutions have been unsuccessful does not establish bad faith as to future prosecutions, each of those prior acquittals have turned on the particular facts of those cases, and the Defendant prosecutor has proceeded on legal theories supported, at least on their face, by statute and applicable case precedent.

[6] Nor does Kevorkian come within the ambit of a second recognized exception to Younger abstention, that the challenged statute "is flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." Younger, 401 U.S. at 53-54, 91 S.Ct. at 755. Kevorkian's challenge to the common law savings statute does not fall within this category, and Plaintiff's counsel has provided

no authority that would support such a proposition. Further, Plaintiff's suggestion that the common law savings statute has a "chilling effect" on the exercise of their constitutional rights does not place this case within an exception to Younger. The Younger court held that a "chilling effect", even in the area of first amendment rights (which the Younger Court has historically vehemently protected), has never been considered a sufficient basis, in and of itself, for enjoining state action 401 U.S. at 50-53, 91 S.Ct. at 754. See also, Fieger v. Thomas, supra, 74 F.3d at 750.

Based on the foregoing discussion, and by application of Younger v Harris and its progeny, the Court finds that insofar as the relief sought to abstain from adjudicating Plaintiff Kevorkian's claims in this action. Therefore, the Court will not enjoin Defendant Thompson from proceeding with the ongoing contempt and criminal charges against Kevorkian.

[7] However, the Court's abstention decision with respect to Plaintiff Kevorkian and his requested injunction against the Oakland County Prosecutor does not resolve this action in its entirety because there is another prosecutor. Defendant Good, and her request for a declaratory judgment. There have never been, nor are there are now, any criminal proceedings pending in Oakland County *1165 against Ms. Good. While the Court is aware of reports that criminal charges were filed against Kevorkian arising out of the pendency of this action, those charges were brought by the Iowa County Prosecutor, not the Defendant Oakland County Prosecutor, and those criminal charges are not filed until more than a month after oral argument and briefing in this federal proceeding was completed. Therefore, the new Iowa County indictment cannot be considered an "ongoing proceeding" for purposes of Younger abstention. Se Doran v Salem Inn, Inc., 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). Sullivan v. City of Pittsburgh, 811 F.2d 171, 177-78 (3d Cir.1987), cert. denied, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987) (where no state proceeding against federal plaintiff pending at time of filing of

federal action, and subsequently-filed state action was brought by a party other than the federal defendant, abstention is inappropriate).

Therefore, the Court will proceed to address the remaining arguments raised by Defendant Thompson with respect to Plaintiff Good.

C. THE ROOKER-FELDMAN DOCTRINE

[8] Defendant Thompson has argued that even if the Court finds that Younger does not mandate dismissal of Plaintiff's complaint in its entirety, to the extent that Plaintiff is seeking a reversal of either (1) the Michigan Supreme Court's decision determining that assisted suicide is a common law crime, subject to prosecution under the common law savings statute, and/or (2) the Michigan Court of Appeals' subsequent affirmance of the imposition of a permanent injunction in aid of the criminal law and its re-affirmation that assisted suicide is illegal in Michigan, federal courts lack appellate jurisdiction over state court judgments in connection with modifying them or vacating them. Rooker v Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). Rhodes v. Penfield, 694 F.2d 1043 (5th Cir.1983) The Rooker-Feldman doctrine stands for the proposition that a federal district court may not hear what is, effectively an appeal of a case already litigated in state court. United States v. Owens, 54 F.3d 271, 274 (6th Cir.1995); cert. dismissed, 516 U.S. 983, 116 S.Ct. 492, 133 L.Ed.2d 418 (1995). The Rooker-Feldman doctrine is "inextricably intertwined" with claims asserted in a state court proceeding. Keene Corp v. Cass, 908 F.2d 293 (6th Cir.1990). As the U.S. Supreme Court explained in Pennzoil Co. v. Texaco, Inc.:

The federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. Where federal relief

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

Page 17

**\*166** The foregoing authorities make clear that the Rooker-Feldman doctrine does not apply to Rooker-Feldman Land Good in this action. Ms. Good was never a party in any of the state court actions involving Jack Kevorkian and his challenges of Michigan's assisted suicide laws [sic] Therefore, the Court will proceed to address the Plaintiff Good's constitutional claims in this action.

FN10. The Court notes, however, that Rooker-Feldman would apply to Jack Kevorkian since he was a party to the state court actions and had a full and fair oppor-

However, a party cannot be said to be appealing a decision by a state court when she was not a party to the state action. *United States v. Owens, supra* 54 F.3d at 274. As the Sixth Circuit observed in *Owens,* "A person who was not a party in the state court action did not have an opportunity to litigate its [sic] claims ... That person must be allowed to bring an action in federal court to attempt to vindicate its [sic] claims ... Because the plaintiff was not a party to the action in *Owen,* the Sixth Circuit determined that *Rooker-Feldman* did not preclude the federal district court from exercising its jurisdiction to decide the merits of the federal plaintiff's claims. *See also, Valenti v. Mitchell,* 962 F.2d 288, 297 (3rd Cir.1992) (*Rooker-Feldman* does not apply to bar a suit in federal court brought by a party that was not a party in the preceding action in state court); *Valenti v. Mitchell, Court of Wisconsin,* 579 F.2d 589, 593 (7th Cir.1992), *cert. denied,*508 U.S. 910, 113 S.Ct. 2417, 124 L.Ed.2d 639 (1993) (*Rooker-Feldman* doctrine does not bar her action by a party against whom there is no state court judgment).

*Id.* 481 U.S. at 25, 107 S.Ct. at 1533.

tunity to litigate in the state court most of the constitutional claims raised in this action.

The Michigan Supreme Court and the United States Constitution does not prohibit states from imposing criminal penalties for assisting someone in committing suicide. It is a common law crime in Michigan which may be prosecuted under the common-law savings statute, M.C.L. § 750.505, *People v. Kevorkian, supra,* 527 N.W.2d 714. The Court unequivocally held that:

"the Due Process Clause of the federal constitution does not encompass a fundamental right to commit suicide, with or without assistance, and therefore does not encompass a right to assistance in committing suicide."

527 N.W.2d at 732.

The court further rejected Kevorkian's equal protection argument, i.e., that terminally ill individuals who want help in ending their lives are denied a right enjoyed by normally dying patients who may forego or discontinue life-sustaining medical treatment. *Id* at n.57.

Further, with respect to the "common law savings statute," M.C.L. § 750.505, under which assisted suicide may be criminally prosecuted, the Michigan Supreme Court determined that under its interpretation of the common law regarding assisted suicide, there is no federal or state constitutional violation of the prohibition against *an post facto* laws ...
*Id* at 739.

Thus, *Rooker-Feldman* would bar Kevorkian from proceeding in this court with his due process, equal protection and *ex post facto* claims.

**THERE IS NO COGNIZABLE CONSTITUTIONAL RIGHT TO ASSISTED SUICIDE**

[9] In Count II of their Amended Complaint, Plaintiffs contend that there is a constitutional right to assisted suicide. Plaintiff's argument that a mentally competent adult has a protected liberty interest in a physician assisted suicide is based primarily upon Supreme Court decisions concerning

---

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

Page 18

ing abortion, *e.g., Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1990), and withdrawal of life support, *Cruzan v. Director, Missouri Department of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Thus, Plaintiffs specifically assert that the Michigan Supreme Court ruling and this action do not suggest any inclination on the part of the Supreme Court to expand the notion of constitutionally protected liberty interests to encompass a right to assistance in committing suicide. Although the logic of the decisions relied upon anywhere in the United States Constitution, or in the decisions of the United States Supreme Court, and cannot be reasonably referred ' *People v. Kevorkian, supra,* 527 N.W.2d at 732.

In *Cruzan,* the Court considered whether a severely ill or injured person has a constitutional right to request a hospital to withhold life-sustaining treatment, whether the right could be exercised on behalf of the patient by her parents, and whether the exercise of the right was unduly hampered by an evidentiary ruling imposed by the Missouri state court, precluding the family assisted su-icide. The issue for the former house-mate that she would not wish to continue her life if she were seriously injured unless she could live at least halfway normally.

In resolving these issues, the Supreme Court acknowledged that "the principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions." 497 U.S. at 277, 110 S.Ct. at 2851 (emphasis added). The Court went on, however, to make clear that "determining that a person has a liberty interest under the Due Process Clause does not end our inquiry; whether respondent's constitutional rights have been violated must be determined by balancing [her] liberty interests against the relevant state interests ..." *Id* at 279, 110 S.Ct. at 2851-52 (citation omitted).

Although the *Cruzan* Court stopped short of defining a clearly cognizable liberty interest, it assumed "the existence of such a constitutional right to ter-

minate unwanted life-**\*167** sustaining medical treatment in order to reach the specific issue presented in the case, i.e., whether Missouri's requirement that evidence of a mentally incompetent patient's wishes as to the withdrawal of life-sustaining medical treatment, expressed while she was competent, be established by "clear and convincing evidence" comports with the United States Constitution.

But for purposes of this case, we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition.

*Id* at 279, 110 S.Ct. at 2852.

FN11. The facts of *Cruzan* are set forth as they were summarized by the Supreme Court as follows:

Nancy Cruzan was rendered incompetent as a result of severe injuries sustained in an automobile accident. After it had become apparent that Nancy had virtually no chance of regaining her mental faculties, her parents asked hospital employees to terminate life supporting nutrition and hydration procedures, which all parties agreed would terminate her life. The employees refused to honor the parents' request without court approval. The parents then sought and received authorization from the state trial court for termination of life support. The state court found that a person in Nancy's condition had a fundamental right under the State and Federal Constitutions to refuse or direct the withdrawal of life support. The trial court also found that thoughts Nancy had expressed to her former roommate regarding not wanting to live if she were seriously ill or injured unless she could live at least half way normally suggested that she would not want to continue with her nutrition and hydration

B-9

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

The Missouri Supreme Court reversed. It found no State or Federal Constitutional right that would support the right of a person to refuse life-sustaining treatment in every circumstance, and further found that the Missouri Living Will statute, Mo.Rev.Stat. § 459.010 et seq, embodied a state policy strongly favoring the preservation of life. Id. Despite this strong, life-protecting policy, the Missouri Court concluded that "no person can assume [the choice to terminate life-sustaining medical treatment] for an incompetent in the absence of clear and convincing, inherently reliable evidence ..." 497 U.S. at 269, 110 S.Ct. at 2846. The court found that in Nancy Cruzan's case, the statements she made to her roommate were unreliable for the purpose of determining her intent. Therefore, it found insufficient clear and convincing reliable evidence to support Cruzan's parents' authority to order termination of life support on her behalf.

FN2. Other relevant state interests were delineated by the Ninth Circuit in Compassion in Dying v. State of Washington, supra. According to the Ninth Circuit, in addition to the state's general interest in preserving life, these interests include the interest in preventing suicide, the interest in avoiding the involvement of third parties and in precluding the use of arbitrary, unfair, or undue influence, the interest in protecting family members and loved ones, and the interest in protecting the integrity of the medical profession. 79 F.3d at 816-17.

As Defendant Thompson points out, recognition of rights that are not readily identifiable in the text of the Constitution depends on whether they are "implicit in the concept of ordered liberty," so that "neither liberty nor justice would exist if they are sacrificed." Palko v. Connecticut, 302 U.S. 319,

125-26, 58 S.Ct. 149, 151-53, 82 L.Ed. 288 (1937), 330, 332, 78 L.Ed. 674 (1934). Such rights must be "deeply rooted ... in the Nation's history and traditions." Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977).

This Court finds that a right to suicide or assisted suicide is not "deeply rooted in the Nation's history and traditions." Our analysis begins with the historical and legal status of suicide itself. Suicide has traditionally been a criminal offense. 2 LaFave & Scott, Substantive Criminal Law, § 7.8, pp. 246-251. Indeed, suicide was a crime at English common law, punishable by forfeiture of lands and chattels. People v. Kevorkian, supra, 527 N.W.2d at 731 note 49. English attitudes toward suicide, including its criminality, carried over to America. Thomas J. Marzen, Suicide: A Constitutional Right, 24 Duq.L.Rev. 1, 64-65 (citing A. Scott, Criminal Law in Colonial Virginia at 198-199 & n. 16 (1930)). It remained a crime on the books in the majority of states through most of the nineteenth century Marzen, supra, at 85

With respect to "assisted suicide", as the Michigan Supreme Court pointed out, at the time the Fourteenth Amendment was ratified, at least 21 of the 37 then existing states proscribed assisted suicide either by statute or as a common law offense. Id., 527 N.W.2d at 731. Presently, 32 jurisdictions have statutes that criminalize assisted suicide. Id., 527 N.W.2d at 731, n. 51. The Model Penal Code also provides penalties for assisted suicide. Model Penal Code, §§ 210.5 and 3.07(3).[FN13]

FN13. Three additional states and the District of Columbia do not impose explicit criminal sanctions on assisted suicide, but nonetheless condemn assisted suicide in statutes allowing the withdrawal of medical treatment. See Compassion in Dying v. State of Washington, supra, 79 F.3d at 847 n. 10. The additional states and the District are Florida, Georgia, and Idaho. Four states, including Michigan, impose

criminal penalties under case law. Id. 79 F.3d at 847 n. 12.

As the foregoing discussion makes clear, it cannot be said that assisted suicide is "deeply rooted in the nation's history and traditions." It was this analysis that persuaded the Michigan Supreme Court to reject this same argument. In People v. Kevorkian, the court reviewed the history of suicide in England and in this country and concluded that such "a right is not expressly recognized anywhere in the United States Constitution or in the decisions of the United States Supreme Court, and cannot reasonably be inferred." 527 N.W.2d at 732. Based on this conclusion, the court held that the "Due Process Clause of the federal constitution does not encompass a fundamental right to commit suicide, with or without assistance, and regardless of whether the would-be assistant is a physician." Id at 733.

The Second Circuit also declined to find a fundamental right to assisted suicide in Quill v. Vacco, supra.[FN14] In Quill, the plaintiffs sought a declaratory judgment declaring that the New York statute criminalizing assisted suicide was unconstitutional. The Quill court explained its rejection of the plaintiffs' due process/fundamental right argument as follows:

FN14. As discussed infra, the Quill court, although it based its decision on the Equal Protection Clause, found that New York statute criminalizing assisted suicide violated the Equal Protection Clause.

[T]he Supreme Court has drawn a line, albeit a shaky one, over the expansion of fundamental rights that are without support in the text or history of the Constitution. In Bowers [v. Hardwick 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) ], the Supreme Court framed the issue as whether the Federal Constitution confers a fundamental right for homosexuals to engage in sodomy and hence invalidates the laws of the many States that still make such conduct illegal and have done so for a very long time." 478 U.S. at 190, 106 S.Ct. at 2843. Holding that there was no fundamental right to engage in

consensual sodomy, the Court noted that the statutes proscribing such conduct had "ancient roots" Id. at 192, 106 S.Ct. at 2844-45. The Court noted that sodomy was a common law criminal offense, forbidden by the laws of the original 13 states when they ratified the Bill of Rights, and that 25 states and the District of Columbia still penalize sodomy performed by consenting adults. Id at 192-93, 106 S.Ct. at 2844-46.

As in Bowers, the statute plaintiffs seek to declare unconstitutional here cannot be said to infringe upon any fundamental right or liberty. As in Bowers, the right contended for here cannot be considered so implicit in our understanding of ordered liberty that neither justice nor liberty would exist if it were sacrificed. Nor can it be said that the right to assisted suicide claimed by plaintiffs is deeply rooted in the nation's traditions and history. Indeed, the very opposite is true. The Common Law of England, as received by the American colonies prohibited suicide and attempted suicide. Although neither suicide nor attempted suicide is any longer a crime in the United States, 32 states, including[*1169] New York, continue to make assisted suicide an offense. Clearly no "right" to assisted suicide ever has been recognized in any state in the United States.

In rejecting the due process/fundamental rights argument of the plaintiffs, we are mindful of the admonition of the Supreme court.

Nor are we inclined to take a more expansive view of our authority to discover new fundamental rights embodied in the Due Process Clause. The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution.

Bowers, 478 U.S. at 194, 106 S.Ct. at 2846. The right to assisted suicide finds no cognizable basis in the Constitution's language or design, even in the very limited cases of those competent people who, in the final stages of terminal illness seek the right to hasten death. We therefore decline the plaintiff's invitation to identify a new fundamental right, in the absence of a clear direction from the Court

B-10

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

whose procedures we are bound to follow.' The limited room for expansion of substantive due process rights and the reasons therefor have been clearly stated: 'As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'

80 F.3d at 724-25 (some citations omitted)

The Court is mindful that in its en banc opinion in *Compassion in Dying, supra,* 79 F.3d 790, the Ninth Circuit determined that the Constitution does encompass a substantive liberty interest in committing suicide with a physician's assistance. However, the Court believes that the majority's reasoning in that case is seriously flawed. Like Plaintiffs here, the *Compassion in Dying* majority relied almost exclusively on *Planned Parenthood v. Casey* and *Cruzan, supra,* and whole-heartedly rejected an historical analysis, even though it is conceded that the three-judge panel's historical analysis was indisputably correct.

The Ninth Circuit agreed with the district court's finding of a '[FN5] cognizable constitutional interest' and its finding of the Court's reasoning in *Casey* to be 'highly instructive' and 'almost prescriptive' for determining what liberty interest is concerned ... here in a terminally ill person's choice to commit suicide. 79 F.3d at 813.

FN5. *Compassion in Dying* involved a declaratory judgment action brought in United States District Court for the Western District of Washington by three terminally ill individuals, four doctors and 'Compassion in Dying,' a nonprofit organization whose avowed purpose is to assist competent terminally ill persons to hasten their death by providing them with informed consent and counseling. The plaintiffs sought a declaration that a Washington statute which criminalized assisting in a suicide, R.C.W. 9A.36.060, was unconstitutional. The district court agreed with the plaintiffs and de-

declared that the statute was unconstitutional, finding that the statute 'places an undue burden on the exercise of a ... protected Fourteenth Amendment liberty interest by terminally ill, mentally competent adults' and 'violates the right to equal protection under the Fourteenth Amendment' by prohibiting physician-assisted suicide while permitting the refusal or withdrawal of life support systems for terminally ill individuals.' *Compassion in Dying v. State of Washington,* 850 F.Supp. 1454, 1467 (W.D.Wash.1994).

The State of Washington appealed, and the original three-judge appellate panel reversed the district court's decision in a ruling in ... *Compassion in Dying v. State of Washington,* 49 F.3d 586 (9th Cir.1995). On rehearing en banc, the Court of Appeals vacated the original three-judge panel's decision and held that 'a liberty interest exists in the choice of how and when one dies' and that the provisions of the Washington statute banning assisted suicide as applied to competent, terminally ill adults who wish to hasten their death by obtaining medication prescribed by their doctors, violates the Due Process Clause.' 79 F.3d at 838. (Because it found a due process violation, the en banc panel declared it unnecessary to review the equal protection decision ... 'One constitutional violation is enough to support the judgment that we reach here.' *Id.*)

FN6. The original three-judge panel in *Compassion in Dying,* like the Second Circuit in *Quill v. Vacco,* found that the district court's decision to be[]disappointed found and disappointed by the abortion decisions ... [Citations omitted.] In the two decades of our existence no constitutional right to end life ... never constitutional convention, a federal court should not intervene a constitutional right to be a floating constitutional right unknown to the past and antithetical to the defense of human life that has ... government.' *Id.*

This Court agrees that attempting to equate abortion rights and their constitutional status with a right to assisted suicide is a suicide conflicts constitutional convention, a federal court should not intervene a constitutional right unknown to the past and antithetical to the defense of human life that has ... government.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

This Court believes that the original panel in *Compassion in Dying* correctly saw the flaw in the application of *Casey* to an abortion case.

The language taken from *Casey,* on which the district court panel and Plaintiffs so heavily rely, should not be removed from the context in which it was uttered. Any reader of judicial opinions knows they often attempt a generality of expression and argument that transcends the immediate issues under consideration. To take three sentences out of an opinion over thirty pages in length dealing with the highly charged subject of abortion and to find these sentences 'almost prescriptive' in ruling on the state's interest in protecting that life predominates over the mother's liberty interest to choose to make an enormous leap, to do violence to the context and to ignore the differences between the regulation of reproduction and the abortion of a viable fetus.... See ... at 719 ...

The decision to choose abortion, according to the dictates of *Casey's* terms, involves the choice of killing a fetus which, according to the universe and art of the mystery of human life, is to be boldened to the concepts and of the ... of killing a patient at the end of his life. The district court attempted to tie these concepts have someone ... terminally ill. But there is no way of doing so....

*Id.* at 591. Thus, the three-judge panel found the district court's decision to be[]disappointed by the abortion decisions by affirming the state's paramount interest in protecting viable life....

*Id.*

Whether the Supreme Court has appropriately struck this delicate balance is not for this Court to say. But, the distinction between this fulcrum of constitutional analysis seems clearly different and ... the constitutional right of *Casey* are such as this in ... which there is claimed a constitutional right to have assistance in killing oneself.

The fallacy of equating abortion rights with assisted suicide rights in a constitutional due process context becomes starkly evident by virtue of the fact that the abortion decisions themselves uniformly recognize and affirm the state's interest in protecting that life predominates over the mother's liberty interest to choose... See ... at 163-65, 93 S.Ct. at 732. Clearly, the fulcrum point that the Court has formed in identifying the end point of abortion interest and the beginning of the state's interest in protecting viable life equals that interest is at the point of the fetal ability to achieve and sustain life on its own.

Thus, this Court believes that rather than supporting Plaintiffs' interest in assisted suicide for those who are able to sustain life without life-support systems, the abortion decisions by affirming the state's paramount interest in protecting viable life ... supports the view that the state has a strong interest in protecting vulnerable, but viable, life.

In reaching its determination that no constitutional right and their constitutional status with a right to ... prohibition of assisted suicide, the Court is sensitive to the separation of powers and federalism issues inherent in Plaintiffs' request to declare a constitutional right to assisted suicide. It seems to this Court that this very difficult question is fundamentally and quintessentially a policy question which should be decided by the policy branches of government, not the courts. The issue of assisted suicide presents profound questions of medicine and medical ethics, theology and soci-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B-11

947 F Supp 1152
947 F Supp 1152
(Cite as: 947 F Supp 1152)

ology, and numerous other far-reaching public policy issues. These are precisely the kinds of issues on which public input is vital, and courts are simply not equipped to conduct the type of comprehensive, broad-based hearings at which witnesses and experts on all sides of the question would testify about the broader policy ramifications of creating and regulating a right to assisted suicide. It is the Legislative and Executive branches which, in our system, are uniquely well-equipped to pursue these issues. Courts have before them only the legal arguments of lawyers and, while questions of law are certainly part of the equation, the core issues presented are fundamentally grounded in questions of policy and how we view ourselves as a society. In a democracy, these questions are best answered by those who must answer to the people for their policy product, and by those who have no accountability to the people.

We must be very clear here about what is really being asked of courts when they are requested to strike down laws prohibiting assisted suicide. What is being requested is that judges declare unconstitutional a law which prohibits assistance in taking a viable, self-sustaining life. This strikes the Court as not merely asking courts to venture into uncharted legal waters, but also uncharted moral and ethical waters.

Viewed in this context, it seems particularly critical for the policy branches of government to establish such a right, if one is to be established. Given the historical treatment of suicide and assisted suicide, the Court is loathe to find or create new constitutional rights where none existed before. As this Court has observed in the past, the Constitution is not a Rorschach test in which judges are free to find whatever shapes of morality and "human dignity" we wish. In a democracy, judges are not free to simply look at the Constitution and declare new rights to correct every perceived wrong, for if the Constitution comes to mean everything to everybody's veritable grab-bag of rights-it will mean nothing when we really need it to protect those fun-

damental rights which are clearly delineated, because its legitimacy and grandeur will have been drained from it.[FN7]

[FN7] The Court does not mean to trivialize the state interests presented here, because it is a vitally important one to our society and it presents serious legal and constitutional questions. However, the Court cannot help but observe that we live in an age of instant gratification-people want things when they want them and how they want them. Those who are unable to achieve the result they seek from the policy branches of government (or through the referendum process) immediately come to the courts for relief, and, all too often, courts are seduced by the siren call to "do justice." Indeed, it sometimes seems that the Judiciary is in danger of becoming the "fast-food" institution of government. (If we are not careful, the sign "Welcome to McJustice" may replace "Equal Justice Under Law" above courthouse doors.)

Nor does this Court accept Plaintiffs' argument that because the policy branches of government have not acted, the courts must. First, the fact that the policy branches of government have not acted to create a new right of assisted suicide is an indication that perhaps our society is not yet prepared to declare such a right. It is also of some import that the advocates of this right have been unsuccessful in placing this issue before the people through the ballot initiative process. This absence of a public mandate for action should make courts even more reticent to declare new rights in this area

Finally, important principles of comity and Federalism are implicated here and must inform the Court's decision. Plaintiffs have asked this federal Court to strike down a law which the State of Michigan, through its Supreme Court, in an area which has traditionally been left to the states-the regulation of medical and ethical conduct and the definition of crimes involving the taking of life.

The regulation of this area goes to the heart of a state's traditional responsibility to define crimes and make determinations governing general health and welfare issues. Before federal courts invade and preempt this province of the states, it must be shown that there is an overriding federal constitutional interest. Scalia's concurrence in such extraordinary[*1172] action. Here, there has been no showing made of an overriding federal interest which would require displacement of state law.

For all of these reasons, the Court must decline Plaintiffs' invitation to find a due process liberty interest right in the Constitution which confers constitutionally protected status upon assisted suicide.

PLAINTIFFS' EQUAL PROTECTION CLAIM ALSO IS WITHOUT MERIT

[10] In Count III, Plaintiffs contend that persons seeking physician assistance with suicide are denied equal protection under the laws when the law protects the right to reject medical treatment for those on life support, but those on life support are denied assistance with suicide. Plaintiffs' argument is based on the notion that a withdrawal of life supporting nutrition and hydration is indistinguishable from assisted suicide. They contend that the withdrawal of food, water and respiration are "overt" acts, not "omissive" conduct. They argue that because these acts are overt, there is no rational distinction between them and acts to hasten death by means of assisted suicide

The Michigan Supreme Court rejected this same argument in *People v Kevorkian, supra:*

Indeed, the notion that there is a difference between action and inaction is not unfamiliar to the law. For example, the distinction between "misfeasance" and "nonfeasance" (the distinction between active misconduct and passive inaction) is deeply rooted in the law of negligence. The reason for the distinction is said to lie in the fact that a defendant creates a new risk of harm by misfeasance, but merely fails to benefit another by nonfeasance. As Dean Prosser

explains, the duty to do no wrong is a legal duty, while the duty to protect against wrong, is for the most part, a moral obligation.

527 N.W.2d at 728.

Plaintiffs rely on Justice Scalia's concurrence in *Cruzan* for the proposition that there is no meaningful difference between the withdrawal of life support and an overt act to terminate life. But the *Cruzan* majority rejected Justice Scalia's position. Furthermore, Justice Scalia's discussion does not support an equal protection challenge in these circumstances. Justice Scalia stated that the legislative line-drawing should not be between action and inaction. Instead, the line should be drawn between "those forms of inaction that consist of abstaining from 'excessive' or 'heroic' measures." *Cruzan*, 497 U.S. at 296, 110 S.Ct. at 2861. This reasoning actually supports the notion of the distinction between the withdrawal of artificial life support provided to a comatose, vegetative-state individual, such as Nancy Cruzan, may be permissible while affirmative steps to hasten the death of a medically alert, competent, albeit suffering, adult may not. Thus, even under Justice Scalia's view, Plaintiffs' equal protection claim fails.

Furthermore, although the *Cruzan* court recognized a common law and a constitutional right to reject medical treatment, the court emphasized that no general right to suicide exists:

We do not think a State is required to remain neutral in the face of an informed and voluntary decision by a physically able adult to starve to death.

497 U.S. at 280, 110 S.Ct. at 2852

There is a rational basis for distinguishing withdrawal of life support from assisting at a suicide. As the Michigan Supreme Court explained:

[W]here suicide involves an affirmative act to end a life, the refusal of or request to terminate treatment does not. A death that occurs after the removal of life-sustaining systems is from natural causes; the natural condition is simply permitted to run its course, unencumbered by contrived intervention.

B-12

Put another way, suicide frustrates the natural course, whereas the refusal or withdrawal of life-sustaining medical treatment allows nature to proceed, i.e., death occurs because of the underlying condition.

527 N.W.2d at 728.

This distinction is also recognized in the *Guidelines for Sustaining Medical Treatment* (1992). There are significant moral and legal distinctions between letting die (including the use of medications to relieve suffering during the dying process) and killing (assisted suicide/euthanasia). In letting die, the cause is seen as the underlying disease process or trauma. In assisted suicide/euthanasia, the cause of death is seen as the inherently lethal action itself.

*Id.* at 143-45.

The equal protection clause of the Fourteenth Amendment requires only that states treat in a similar manner all individuals who are similarly situated. Rotunda & Nowak, *Treatise on Constitutional Law*, *supra*, § 18.2. As the Supreme Court has explained, "so, too, the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). As the *Plyler* court declared, the initial discretion to determine what is "different" and what is "the same" resides with the States, and the States "must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that account for competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Id.*

[11] Since, as discussed above, no "fundamental" right is involved, and no "suspect" classification of individuals is made, the classification must be rationally related to some legitimate public purpose. *Quill v. Vacco, supra.*

The *Quill* court looked to the "state interest" identified by the three-judge panel in *Compassion in Dying*. The panel there found that the Washington statute prohibiting assisted suicide furthered the following state interests: the interest in denying to physicians 'the role of killers of their patients'; the interest in protecting the elderly and the infirm from pressures to consent to death in light of their psychological and physical vulnerability; ... so much upon the elderly and infirm to consent to the withdrawal of life-sustaining equipment as to take drugs to hasten death. There is no clear indication that there has been any problem in regard to the former, and there should be none in regard to the latter, even though the state of New York may establish rules and procedures to insure that all choices are free of such pressures with respect to any manner of life support. *See Cruzan supra*, 497 U.S. at 279-84.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works

---

**FN18.** According to the *Quill* court:

Physicians do not fulfill the role of "killer" by prescribing drugs to hasten death any more than they do by disconnecting life-support systems. Likewise, "psychological pressure" can be applied just as much upon the elderly and infirm to consent to the withdrawal of life-sustaining equipment in light of their psychological and physical vulnerability.

This Court disagrees with the conclusion that more of these interests is furthered, and "*FN18* contrary to the *Quill* court's conclusion, the Court particularly believes that the first noted interest—the interest in denying to physicians 'the role of killers of their patients'—is furthered. The *Quill* court obviously found this interest not to be furthered because, like Plaintiffs here, they rely on Justice Scalia's passing discussion in *Cruzan* disagreeing with a distinction between action and inaction. In drawing a line between assisted suicide and the refusal of life-sustaining treatment, this Court finds that distinction is worthy of recognition, and recognizing that distinction, the Court finds that the *Quill* court's conclusion that "[p]hysicians do not fulfill the role of 'killer' by prescribing drugs to hasten death any more than they do by disconnecting life-support systems," 80 F.3d at 730, is wrong.

The Court also impressed with the strength of the state's interest in regulating the circumstances under which an individual may be ended. This is perhaps the strongest interest a state has, and it is precisely the interest the Supreme Court recognized in *Cruzan* and *Glucksberg*. With respect to protection of interest in regulating the withdrawal of life support *See Cruzan supra*, 497 U.S. at 279-84.

**PLAINTIFFS' CLAIMS OF VAGUENESS OVER BREADTH AND EX POST FACTO VIOLATION**

[12] In Count I, Plaintiffs allege that both the common law regarding assisted suicide as "created" by the Michigan Supreme Court in 1994, and M.C.L. § 750.505 (the common law savings statute) are unconstitutionally vague, overbroad and in violation of the prohibition against *ex post facto* laws.

With respect to vagueness and overbreadth and the common law savings statute, Plaintiffs argue that M.C.L. § 750.505 is "impermissibly vague and overbroad" because it does not take into consideration the nature of the "common law" crime which the statute makes a felony. They contend that left standing as a valid statute, M.C.L. § 750.505 gives Michigan courts the unfettered power to impose judicially created law at whim because the statute does not define any crime, yet imposes a penalty of 5 years imprisonment. Plaintiffs have not, however, cited any authority holding that a common law crime in Michigan or anywhere else, can be struck down on the basis of vagueness or overbreadth merely because the statute preserves earlier common law.

---

110 S.Ct. at 2852-54. Here, the Michigan law clearly furthers that interest and a state's regulatory authority to define crimes and issues of public welfare. Too, the Michigan law against assisted suicide furthers the state's legitimate interest in protecting vulnerable, ... from the self-interested interests of third parties. All of these interested interests are furthered by the Michigan ...

---

The common law savings statute at issue, M.C.L. § 750.505 provides as follows:

Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by statute of this state, shall be guilty of a felony, punishable by imprisonment in the state prison for not more than 5 years or by a fine of not more than $10,000, or both in the discretion of the court.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works

8-13

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

work, 234 N.W.2d 243 (N.D.1975). The purpose of such common law offense statutes is to assure that a person who has committed an offense at common law cannot evade prosecution and punishment merely because the offense has not been declared a crime in the statutes of the state Wayne R. LaFave and Austin W. Scott, Jr., 1 Substantive Criminal Law, § 2.1(f) at 101 As the Michigan Supreme Court observed in *People v. Stevenson*, 416 Mich. 383, 391, 331 N.W.2d 143 (1982): "The suggestion that crimes can only be defined by statute is not well-taken, particularly in light of the fact that in Michigan, [even] murder is defined by the common law and by statute."

Thus, to the extent that Plaintiffs challenge the common law savings statute as unconstitutionally vague merely because no crime is defined therein, the Court finds no merit in that argument.

[13] However, at oral argument, it became clear that Plaintiffs' principal unconstitutional vagueness argument is aimed at the Michigan Supreme Court's December 1994 declaration of assisted suicide as a well-established common law crime in Michigan in *People v. Kevorkian*, supra, 527 N.W.2d 714. The Michigan Supreme Court noted in *Kevorkian* that aiding another person in committing suicide was recognized as an indictable crime under the common law since 1920 when the Michigan Supreme Court decided *People v. Roberts*, 211 Mich. 187, 178 N.W. 690 (1920).

In *Roberts*, the defendant was convicted of murder by poisoning his wife with her consent. [FN16] The defendant's wife was bedridden and helplessly with incurable multiple sclerosis. She had previously tried to commit suicide, but was unsuccessful. Therefore, she asked her husband to help her. At Mrs. Roberts' request, the defendant mixed deadly poison in a cup and placed it on a chair near her side. The defendant knew his wife wanted to die and after she did, in fact, drink the poison and die

On appeal to the Supreme Court, the defendant claimed that he committed no crime. He argued that

since suicide was not a crime, aiding his wife in doing something that was not criminal could not be a crime, either. The Supreme Court held that Roberts' acts constituted murder by poison. In reaching that conclusion, the *Roberts* court examined the common law of murder and assisting in a suicide, at length:

In considering the status of one who advises or aids another to commit suicide, 37 Cyc. p. 521, has this to say:

"Where one person advises, aids, or abets another to commit suicide, and the other by reason thereof kills himself, and the advisor is present when he does so, he is guilty of murder as a principal, or in some jurisdictions of manslaughter, or if two persons mutually agree to kill themselves together, and the means employed to produce death take effect upon one only, the survivor is guilty of murder if the one who dies. But if the one who encourages another to commit suicide is not present when the act is done, he is an accessory before the act and at common law escapes punishment because his principal cannot be first tried and convicted. The abolition of the distinction between aiders and accessories in some jurisdictions has, however, carried away this distinction, so that a person may now be absent or present at the time it is committed, provided the suicide is the result of his advise."

It is said in Tiffany on Criminal Law, p.979, that:

"He who kills another at his own desire or command is a murderer as much as if he had killed him of his own head, and the person killed is not a *felo de se.*"

To the same effect, 1 McLain's Criminal Law, 290; *State v. Ludwig*, 70 Mo. 412 (1979); 1 Com-monwealth v. *Hicks*, 13 Mass. 356 [(1816)]; or *Com-monwealth v. Mink*, 123 Mass. 422 (1877) ]; *Com-monwealth v. Hicks*, 118 Ky. 637 (82 S.W. 265) [(1904)]; *People*, 204 Ill. 208 [68 N.E. 505 61, 1 [N.E. 304] [(1903)]; *Blackburn v. State*, 23 Ohio St. 146 (1872) ]

In the last case cited the facts and questions raised were quite close analogy to the case we are considering A like conclusion was made with reference to su-

constitutional vagueness argument. "The absence of a definition of murder in the degree statute is not a defect at all True, the common law may be imprecise, but that is not a determinative factor here. The common law of murder is well-enough defined..." *Id.* at 425.

Michigan courts have repeatedly upheld § 750.505 in cases raising the same void-for-vagueness challenges. *See People v. Pickett*, 339 Mich. 294, 63 N.W.2d 681 (1954); *People v. O'Neal*, 22 Mich.App. 432, 177 N.W.2d 636 (1970). In *Pickett* and *O'Neal*, the Michigan courts examined the common law regarding conspiracy and held that the defendants' argument regarding the vagueness of § 750.505 was without merit because criminal conspiracy was defined in the common law.

Michigan specifically recognizes all common law "offenses except those expressly abrogated by Constitution or statute *Bugbee v. Fowle*, 277 Mich. 485, 492 , 269 N.W. 570, 572 (1936); *People v. Schmidt*, 275 Mich. 575, 267 N.W. 741 (1936) (the common law definition of crimes prevails unless it has been changed by a penal statute); *People v. Mc-Donald*, 409 Mich. 110, 117, 293 N.W.2d 538, 590 (1980) (recognizing that the common law statutory scheme of Michigan is the common law) This policy is further specifically embodied in the Michigan Constitution: "The common law and the statute laws now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed" Mich. Const 1963, art. 3, § 7 The "common law" is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just.'" *Bugbee v. Fowle, supra,* 277 Mich. at 492, 269 N.W. 570.

Providing the statute penalties for crimes undefinable at common law has not statutorily delineated is not a concept unique to Michigan; several states have such "common law savings statutes" *See People v. Causley*, 299 Mich. 340, 350-51, 300 N.W. 111 (1941) and citations therein. *See also, State v. Price*, 672 A.2d 893 (R.I.1996), *State v. Wood-*

"State statutes, like federal ones, are entitled to a presumption of constitutionality" *Dawson Wehkosee Co v. Bowles*, 321 U.S. 144, 153, 64 S.Ct. 474, 479, 88 L.Ed. 635 (1944), *Beech v. Melancon*, 465 F.2d 425, 426 (6th Cir.1972), *cert. denied* 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973).

The doctrine of unconstitutional vagueness now requires only that the legislature establish a general guideline to govern law enforcement. *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). The doctrine imposes a "fair notice" requirement to prevent states from holding an individual criminally responsible for conduct which he could not reasonably understand to be proscribed. *Rose v. Locke*, 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). However, "[i]t is is not required that statutes specify in every detail the proscribed behavior, and courts have found it sufficient "fair notice" to survive a vagueness challenge for the statute to incorporate the common law definition of a crime

FN13. Vagueness and overbreadth are often spoken of together, as Plaintiffs do in this case Although, in non-first amendment areas, generally it is actually only the void-for-vagueness doctrine that applies. Rounds & Nowak, *Treatise on Constitutional Law, Substance and Procedure,* 2d § 20.9 "The arguments of Plaintiffs counsel at the hearing held on this matter make clear that it is, indeed, a "void for vagueness" argument that Plaintiffs assert in this case

For example, in *United States ex rel. Almeida v. Rundle*, 383 F.2d 421 (3rd Cir.1967), the Third Circuit addressed a claim that Pennsylvania's first-degree murder statute was unconstitutionally vague because it did not define murder. The court acknowledged that Pennsylvania had no statutory definition of murder, at all. The definition of murder in Pennsylvania, as in Michigan, is derived from the common law The court found this sufficient to preclude the defendant's un-

---

947 F.Supp. 1152
947 F.Supp. 1152
(Cite as: 947 F.Supp. 1152)

Page 29

cide, and in answering it the court said: "It is said by counsel that suicide is no crime by the laws of Ohio, and that therefore there can be no accessories or principals in the interpretation of the accessories or principals in the second degree in suicide. This is true, but the real criminal act charged here is not the suicide, but the administering of poison here is not the suicide, but the administering of poison and principal in the second degree. If I furnish poison to a guilty agent, an accomplice, to be administered to a third party, and he administers it, I am an accessory before the fact, and if I stand by and counsel or encourage him in the act of administering the poison to another. I am a principal in the second degree. But no question of this kind arises in the present case, either upon the indictment or in the evidence. There is no claim or pretense that there was any guilty third person participating in the transaction. The charge is that the prisoner, as principal in the first degree, to get rid of the deceased, and directly by the strychnine with intent and giving it to the deceased to drink with some opinion says: "We think also that the court was right in instructing the jury, as in substance and effect it did, that it is immaterial whether the party taking the poison took it willingly, intending thereby *1177 to commit suicide, or was overcome by force, or over-reaching in the deceased was murdered, yet the law as we understand it, makes no discrimination on that account. The lives of all are equally under the protection of the law, and under that protection to their last moment. The lives of those to whom life has become a burden of those who are hopelessly diseased or fatally wounded-nay, even the lives of criminals condemned to death, are under the protection of the law, equally as the lives of those who are in the full tide of life's enjoyment, and anxious to continue to live. If discriminations are to be made in such cases as to the amount of punishment due to those who are guilty of taking or of willfully causing the death of their fellows, they must be made by the exercise of executive clemency or legislative provision. Pur-

poorly and maliciously to kill a human being by administering to him or her poison, or by willfully pretences a need to assist culpability to fit the crime more precisely than is achieved through application of existing facts substantially similar to *Roberts.*

[We] perceive such a need here.

to the law to be murder, irrespective of the wishes of giving consent, to whom the poison is ad-ministered, or the manner in which it is adminis-tered, or the condition of party to whom the poison is ad-ministered. The fact that the poison is ad-ministered by the administering of poison party intends also to take his own life, and the ad-ministration of the poison in pursuance of an agree-ment that both will commit suicide, does not, as a legal deduction, relieve the person who furnished the poison to the deceased for the purpose and with the intent that the deceased should with it commit suicide, and she accordingly took and used it for that pur-pose, or if he did not furnish the poison, but was present at the taking thereof by the deceased, par-ticipating by persuasion, force, threats, or otherwise, in the taking thereof, or the introduction of it into her stomach or body, then in either of the cases supposed, he administered the poison to her within the meaning of the statute"

* * * * *

We are of the opinion that when defendant [Roberts] mixed the pass gown with water and placed it within reach of Mrs. Roberts, he knew even though she requested him to do so. By this act he deliberately placed within her reach the means of taking her own life, which she could have since obtained in no other way by reason of her helpless condition.

211 Mich. at 196-198, 178 N.W. 690

In *People v. Kevorkian,* the Michigan court modi-fied the *Roberts* ruling, but expressly declared that the criminality of assisting suicide was not abol-ished. The *Kevorkian* court explained:

In the years since 1920, when *Roberts* was decided, interpretation of causation in criminal cases have evolved in Michigan to recognize factors that were not present, and thus not relevant, to the court that decided *Roberts.* The United States Supreme Court has also addressed the importance of relating culpabil-

[This court has modified the common law when it pretences a need to assist culpability to fit the crime more precisely than is achieved through application of existing facts substantially similar to *Roberts* the Court's view, this decision is seriously undervalued in as to what type of conduct was prosecutable in the context of aiding one to kill himself!

[W]e would overrule *Roberts* to the extent that it can be read to support the view that the common-law definition of murder encompasses the act of inten-tionally providing the means by which a person commits suicide. Only where there is probable cause to believe that death was the direct and natur-al result of a defendant's act can the defendant be properly bound over on a charge of murder. *Where a defendant merely is involved in the events leading up to the death, such as providing the means, the proper charge is assisting in a suicide.*

527 N.W.2d at 738 (emphasis added).

Defendant Thompson argues that the definition of the crime of assisted suicide is ascertainable from a review of the common law and, therefore, Plaintiffs argument that the Michigan's common law savings argument for vagueness should be re-jected.

The Court agrees with Defendant that on a "going forward" basis, i.e., after December *1178 11, 1994, the date on which the Supreme Court decided *Kevorkian,* there is certainly no merit in an uncon-stitutional vagueness challenge with respect to Michigan common law as to assisted suicide. The *Kevorkian* common law and since *Roberts* has never charged or implicated in any of the Ke-vorkian's "assisted suicide" until June 1996, her void for vagueness challenge fails.

However, to the extent that Ms. Good's claim in-volves conduct for her belief that she may be prosecuted for assisting in Lois Hawes' September 26, 1992 suicide, it cannot be said that it would have been readily ascertainable from a review of Michigan common law as it existed prior to the date that assisted suicide was a crime in Michigan

Although it is true that the *Roberts* decision was on the books since 1920, in 1983, the Michigan Court

Page 30

of Appeals decided *People v. Campbell,* 124 Mich.App. 333, 335 N.W.2d 27 (1983), a case in-volving facts substantially similar to *Roberts* to what type of conduct was prosecutable in the context of aiding one to kill himself!

In *Campbell,* the decedent, Kevin Basnaw, and the defendant, Steven Campbell, had been drinking quite heavily when, late in the evening, Basnaw began talking about committing suicide. Some time during the talk of suicide, Basnaw told Campbell that he did not have a gun. At first Campbell told Basnaw that he would not loan or sell him one of his guns, but he subsequently changed his mind, and told Basnaw that he would sell him a gun for whatever amount of money he had in his posses-sion. At first Basnaw refused the offer, but Campbell persisted in alternately encouraging and ridiculing him for thinking about suicide. They drove to Campbell's house to get the gun, leaving Basnaw with the weapon and five bullets 15 minutes later, Campbell left the gun and bullets with Basnaw, and then left with Basnaw's girl-friend. After they left, Basnaw wrote a suicide note and shot himself.

FN20. It appears that about two weeks pre-vious to the evening in question, Campbell caught Basnaw in bed with his wife.

The prosecutor brought charges against Campbell relying on *Roberts,* contending that inciting to sui-cide, coupled with the overt act of providing Kevin Campbell criminally liable for open murder under Michigan common law. After his motion to dismiss was denied, Campbell appealed to the Michigan Court of Appeals. The Court of Appeals found that to indistinguishable from *Roberts.* More import-antly in this analysis, however, the court went on to find in *Campbell* that *Roberts* was no longer good law:

We now consider whether the *Roberts* case still

B-15

PONTIAC CC
AEV8
MAX LIBRARY

O'Farrell
K54340
SPC 852

Page 31

947 F. Supp. 1152
947 F. Supp. 1152
(Cite as: 947 F.Supp. 1152)

represents the law of Michigan, and we find it does not. Recent cases of our Supreme Court cast doubt on the vitality of the 1920 *Roberts* decision.

335 N.W.2d at 29

The *Campbell* court, thus, concluded, "While we find the conduct of the defendant morally reprehensible, we do not find it to be criminal under the present state of the law." *Id.* at 31

Thus, this Court finds that, in light of the *Campbell* decision and the unsettled nature of the law following that decision, it cannot be said that in 1992, the common law would have provided Janet Good with "fair notice" that assisting in a suicide was a crime in Michigan. Indeed, the fact that the Michigan Supreme Court indicated in *Kevorkian* that the law in this area had "evolved" is an implicit recognition by that Court that the parameters of a crime involving assistance in a death were less than clearly defined[FN21] It was not until the Michigan Legislature passed the now-expired assisted suicide statute in December 1992 that it can be said that a reasonable person could have reasonably understood that assisting in a suicide was a crime in Michigan.

FN21. The Court notes that two members of the *Campbell* panel were members of the the Michigan Supreme Court when *Kevorkian* was decided

Thus, to the extent that Defendant may intend to bring charges against Ms. Good under the Michigan Supreme Court's December 1994 interpretation of the common law in *1179 People v. Kevorkian* for assisting in any suicides prior to December 1992, such charges would not pass constitutional muster.

*CONCLUSION*

For all of the reasons stated in this Amended Opinion and Order,

THE COURT HEREBY DECLARES AND ORDERS AS FOLLOWS:

IT IS HEREBY ORDERED that, for the reasons stated in this Amended Opinion and Order, Plaintiffs' request for injunctive relief is hereby DENIED

IT IS HEREBY DECLARED that a mentally competent, terminally ill or mentally suffering adult does not have a liberty interest protected by the Fourteenth Amendment's Due Process Clause in assisted suicide.

IT IS FURTHER DECLARED that the Equal Protection Clause of the Fourteenth Amendment is not violated by denying a mentally competent, terminally ill or mentally suffering adult not on life support the right to assisted suicide

IT IS FURTHER DECLARED that the Michigan law criminalizing assisting in a suicide as interpreted by the Michigan Supreme Court in *People v. Kevorkian, 447 Mich. 436, 527 N.W.2d 714 (1994),* and as applied to acts of assisted suicide prior to December 1992, is unconstitutionally vague, because the law as it existed from the date of the *Campbell* decision in 1983 until December 1992 would not have provided "fair notice" that assisting in a suicide was a crime in Michigan

E.D.Mich.,1997
Kevorkian v. Thompson
947 F.Supp. 1152

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works

8·16

EXHIBIT 9

(MICH) MR. YOUK / ASSISTED SUICIDE / 2ND DEGREE (i.e. CAUSING DEATH/INJECTED SUBSTANCE) / ADMINISTERED LETHAL DRUG

---

Westlaw.

639 N.W.2d 291

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

People v. Kevorkian
Mich.App.,2001.

Court of Appeals of Michigan.
PEOPLE of the State of Michigan,
Plaintiff-Appellee,
v.
Jack KEVORKIAN, Defendant-Appellant.
Docket No. 221758.

Submitted Sept. 11, 2001, at Detroit.
Decided Nov. 20, 2001, at 9:05 a.m.
Released for Publication Feb. 5, 2002.

Defendant was convicted in the Circuit Court,
Oakland County, Jessica R. Cooper J., of
second-degree murder and delivering a controlled
substance, and was sentenced to concurrent prison
terms of 10 to 25 years for murder and seven years
for delivering a controlled substance. Defendant
appealed. The Court of Appeals, Whitbeck, J., held
that: (1) defendant abandoned his argument that he
individually's right to be free from irrevocable pain
and suffering was among rights constitutionally
reserved to the people, (2) any state and federal
constitutional right to privacy did not encompass
right to commit or receive euthanasia, (3) defendant
received effective assistance of counsel prior to his
request to proceed in propria person, (4) granting
defendant's request did not deprive him of effective
assistance of counsel, (5) as a matter of first
impression, prosecutor's objections to portions of
defendant's closing argument did not amount to
improper references to defendant's exercise of his
constitutional right not to testify, and (6) proffered
testimony of brother and sister-in-law of victim was
properly excluded.

Affirmed.
West Headnotes
[1] Criminal Law 110 1148
110XXIV(N) Discretion of Lower Court

110XXIV(N)8 k. Preliminary Proceedings.

Most Cited Cases
Court of Appeals reviews a trial court's decision to
ending a life U.S.C.A. Const.Amend.14.

[2] Criminal Law 110 1139

110XXIV Review
110XXIV(I) Scope of Review in General
110(I)139 k. Additional Proofs and Trial
De Novo. Most Cited Cases
Review de novo is appropriate for core
constitutional questions underlying a trial court's
ruling on a motion to dismiss charges.

[3] Constitutional Law 92 82(6.1)

92 Constitutional Law
92XI Constitutional Guarantees in General
92k82 Particular Rights, Limitations,
and Applications
92k82(6.1) k. In General. Most Cited
Cases

Health 198H 915

198H Health
198H(IV) Consent: of Patient and Substituted
Judgment
198H(IV)3 Terminal Illness; Removal of Life
Support
198H(IV)3 k. Substituted Judgment; Role
of Courts, Physicians, Guardians, Family or Others.
Most Cited Cases
(Formerly 299k44 Physicians and Surgeons)
Limited Fourteenth Amendment due process
life-sustaining medical care does not establish a
right to be free from unbearable pain and suffering
that would make hastened legal. There is a
substantial factual distinction between refusing care,

even if doing so hastens death, and purposefully
ending a life U.S.C.A. Const.Amend 14.

[4] Suicide 368 3

368 Suicide
368k3 k. Advising, Aiding, or Agreeing to
Commit. Most Cited Cases
Statute criminalizing the act of assisting a suicide
violates neither the Due Process Clause nor
Exemption from criminal penalties for medical
efforts to relieve pain or discomfort, even if those
efforts hasten death, does not apply to conduct
efforts designed to cause death. M.C.L.A. §
4,826; M.C.L.A § 752.1027

[5] Suicide 368 3

368 Suicide
368k3 k. Advising, Aiding, or Agreeing to
Commit. Most Cited Cases
Assuming that a suicide, that is, providing the physical
means by which another person attempts or
commits suicide or participating in a physical act by
which another person attempts or commits suicide,
is illegal M.C.L.A. § 752.1027

[6] Constitutional Law 92 90(3)

92 Constitutional Law
92XI Due Process of Law
92k236 Criminal Prosecutions
92k253(4) Particular Statutes and
Ordinances
92k253(4.3) k. Particular
Statutes and
Applications
92k253(7) k. Privacy) in General. Most

361 Statutes

361 Statutes
361III Subjects and Titles of Acts
361III(A) Provisions of
Acts
Relating to Particular Subjects
361k118 Crimes and
Criminal
Prosecutions and Punishments
361k118(1) k. In General. Most Cited
Cases

Suicide 368 3

368 Suicide
368k3 k. Advising, Aiding, or Agreeing to
Commit. Most Cited Cases
Murder defendant abandoned his argument that
individual's right to be free from irrevocable pain
and suffering, whether determinate as such or as a
provision of the Ninth Amendment to the
United States Constitution, by failing to brief
such argument on appeal U.S.C.A. Const. Amend 9
, M.C.L.A. Const. Art 1, § 33

[7] Criminal Law 110 1182

110 Criminal Law
110XXIV Review
110(I)190 In General
110XXIV(O) Briefs
110 XXIV(O)2 k. Specification of Errors

[8] Constitutional Law 92 82(7)

92 Constitutional Law
92XI Due Process of Law
92k82 Particular Rights, Limitations,
and Applications
92k82(7) k. Privacy) in General. Most
Cited Cases
Assuming existence of a state and federal
constitutional right to privacy, such right did not
encompass right to commit or receive euthanasia in
which another would have caused the existence of right, such expansion of right to privacy would place
matter outside proper areas of public debate and
pain, or third party's perception thereof, would
properly be deemed intolerable and irremediable
was not susceptible of determination by any court
U.S.C.A. Const.Amend 14, M.C.L.A. Const. Art

---

Page 1

Page 2

---

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9-1

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

for counsel's judgment regarding trial strategy, in reviewing a claim of ineffective assistance of counsel. U.S.C.A. Const.Amend 6.

**[17] Criminal Law 110 ⚖ 641.13(2.1)**
110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641.13 Adequacy of Representation
            110k641.13(2) Particular Cases and Problems
               110k641.13(2.1) k. In General
Most Cited Cases
Ultimate failure of trial counsel's strategy does not constitute ineffective assistance of counsel. U.S.C.A. Const.Amend 6.

**[18] Criminal Law 110 ⚖ 1137(1)**
110 Criminal Law
   110XXIV Review
      110XXIV(L) Scope of Review in General
         110k1135 Parties Entitled to Allege Error
            110k1137 Estoppel
               110k1137(1) k. Assent to Proceeding; Most Cited Cases
Murder defendant waived appellate consideration of his claim that decision of one member of his defense team to file pretrial motion to quash assisted suicide charge against him amounted to ineffective assistance, where all members of defense team, including defendant himself acting in propria persona, acceded to strategy of seeking dismissal of assisted suicide charge U.S.C.A. Const.Amend 6.

**[19] Criminal Law 110 ⚖ 641.13(2.1)**
110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641.13 Adequacy of Representation
            110k641.13(2) Particular Cases and

Defense counsel's filing of pretrial motion to quash assisted suicide charge against murder defendant did not prejudice defendant and did not amount to ineffective assistance, where trial court denied motion, state eventually dismissed such charge on its own motion, and all members of defense team, including defendant himself acting in propria persona, acceded to strategy of seeking dismissal of assisted suicide charge. U.S.C.A. Const.Amend 6.

**[15] Criminal Law 110 ⚖ 641.13(2.1)**
110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641.13 Adequacy of Representation
            110k641.13(2) Particular Cases and Problems
               110k641.13(2.1) k. In General
Most Cited Cases
Defense counsel's filing of pretrial motion to quash assisted suicide charge was matter of trial strategy and did not amount to deficient performance, where counsel's motion was directed primarily at first-degree murder charge against defendant, and only in the alternative at assisted suicide charge; respect to dismiss assisted suicide charge was merely alternative called by counsel, at least in part, because of possibility that trial court would allow state to proceed on the murder charge U.S.C.A. Const.Amend 6.

**[16] Criminal Law 110 ⚖ 641.13(2.1)**
110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641.13 Adequacy of Representation
            110k641.13(2) Particular Cases and Problems
               110k641.13(2.1) k. In General
Most Cited Cases
Court of Appeals does not substitute its judgment

---

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

Murder defendant lacked standing to assert victim's alleged constitutional right to be free from intolerable pain or unbearable suffering, and enjoyed no constitutional protection from prosecution for having assisted victim in asserting such alleged right by injecting him with lethal dose of controlled substance, where defendant was not licensed to practice medicine in state and was thus not providing victim with medical services. U.S.C.A. Const.Amend 14; M.C.L.A. Const Art 1, § 17

**[12] Criminal Law 110 ⚖ 1156(1)**
110 Criminal Law
   110XXIV Review
      110XXIV(N) Discretion of Lower Court
         110k1156 New Trial
            110k1156(1) k. In General. Most Cited Cases
Court of Appeals reviews a trial court's decision regarding a motion for a new trial for an abuse of discretion.

**[13] Criminal Law 110 ⚖ 1139**
110 Criminal Law
   110XXIV Review
      110XXIV(L) Scope of Review in General
         110k1139 k. Additional Proofs and Trial De Novo Most Cited Cases
With respect to the underlying question of whether defense counsel was ineffective, appellate review of a trial court's decision regarding a motion for a new trial is de novo. U.S.C.A. Const.Amend 6.

**[14] Criminal Law 110 ⚖ 641.13(2.1)**
110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641.13 Adequacy of Representation
            110k641.13(2) Particular Cases and Problems
               110k641.13(2.1) k. In General
Most Cited Cases

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

I, § 17

**[9] Constitutional Law 92 ⚖ 254.1**
92 Constitutional Law
   92XII Due Process of Law
      92k254.1 k. Liberties and Liberty Interests Protected Most Cited Cases
Right to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause; state has legitimate and countervailing interests in preserving life, preventing suicide, protecting the integrity and ethics of the medical profession, protecting vulnerable groups from abuse, neglect, and mistakes, and acknowledging the equal value of all people U.S.C.A. Const.Amend 14.

**[10] Constitutional Law 92 ⚖ 254.1**
92 Constitutional Law
   92XII Due Process of Law
      92k254.1 k. Liberties and Liberty Interests Protected Most Cited Cases
Courts must exercise the utmost care to assure, when asked to break new ground, that the liberty protected by the Due Process Clause of the Fourteenth Amendment not be subtly transformed into an expression of personal belief rather than an adherence to the rule of law. U.S.C.A. Const.Amend 14.

**[11] Constitutional Law 92 ⚖ 42.2(1)**
92 Constitutional Law
   92II Construction, Operation, and Enforcement of Constitutional Provisions
      92k41 Persons Entitled to Raise Constitutional Questions
         92k42.2 Particular Questions or Grounds of Attack
            92k42.2(1) k. In General Most Cited Cases

Suicide 368 ⚖ 3
368 Suicide
   368k3 k. Advising, Aiding, or Agreeing to Commit. Most Cited Cases

9-2

639 N.W.2d 291

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

**Problems**   110k641.13(2) k. In General. Most Cited Cases

Fact that defense counsel in murder prosecution had only been practicing for three years at time of trial and had never tried a murder case was not enough to support claim of ineffective assistance of counsel where counsel's law firm had substantial experience with defendant and with similar prosecutions instituted against him, and where defendant not only failed to articulate any disadvantage caused by counsel's performance during trial, but expressly stated, in response to trial court's questions following defendant's request to be allowed to represent himself, that he was not dissatisfied with counsel's performance and had planned all along to represent himself at trial. U.S.C.A. Const.Amend. 6.

**[20] Criminal Law** 110 ⟷ 641.13(1)

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.13 Adequacy of Representation
               110k641.13(1) k. In General. Most Cited Cases

Ineffectiveness alone is not enough to conclude that a defense counsel acted deficiently or in a manner that prejudiced the defendant. U.S.C.A. Const.Amend. 6.

**[21] Criminal Law** 110 ⟷ 641.4(1)

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.4 Waiver of Right to Counsel
               110k641.4(1) k. In General; Right to Appear Pro Se. Most Cited Cases

United States Constitution, the state constitution, and the state statutes each guarantee a criminal defendant the right to represent himself. U.S.C.A. Const.Amend. 6; M.C.L.A. § 763.1.

**[22] Criminal Law** 110 ⟷ 641.13(2)

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641.13 Adequacy of Representation
            110k641.13(2) Particular Cases and Problems

**[23] Criminal Law** 110 ⟷ 641.13(3)

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.13 Adequacy of Representation

**[24] Criminal Law** 110 ⟷ 641.10(3)

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.10 Choice of Counsel
               110k641.10(3) k. Appearing Both Pro Se and by Counsel; "Hybrid Representation".

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

---

639 N.W.2d 291

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

Pro Se and by Counsel; "Hybrid Representation". Most Cited Cases

Murder defendant's request to proceed in propria persona did not result in any form of "hybrid" representation by his former trial counsel, where trial court specifically denied defendant's request to proceed with hybrid defense and was not required sua sponte to order hybrid representation. U.S.C.A. Const.Amend. 6; M.C.L.A. Const. Art. 1, § 13; M.C.L.A. § 763.1.

**[25] Criminal Law** 110 ⟷ 641.10(3)

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.13 Adequacy of Representation

**Problems**   110k641.13(2) Particular Cases and Problems

Defendant's Choice or Defendant Pro Se. Most Cited Cases

Neither trial courts appointment of murder defendant's former trial counsel as standby counsel, upon its grant of defendant's request to proceed in propria persona, nor standby counsel's subsequent conduct, denied defendant effective assistance of counsel, despite defendant's claim that counsel provided insufficient assistance in light of defendant's difficulties in acting as his own advocate, where counsel did nothing to interfere with defendant's right to control his own case or to alter jury's perception that defendant was representing himself. U.S.C.A. Const.Amend. 6; M.C.L.A. Const. Art. 1, § 13.

**[26] Criminal Law** 110 ⟷ 641.10(3)

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.10 Choice of Counsel
               110k641.10(3) k. Appearing Both Pro Se and by Counsel; "Hybrid Representation".

Defendant's unequivocal waiver of his right to counsel and free choice to proceed in propria persona, standing alone, did not deprive him of effective assistance. U.S.C.A. Const.Amend. 6; M.C.L.A. Const. Art. 1, § 13.

**[27] Criminal Law** 110 ⟷ 641.10(3)

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.10 Choice of Counsel
               110k641.10(3) k. Appearing Both Pro Se and by Counsel; "Hybrid Representation".

Allowing hybrid representation does not compromise a defendant's right to proceed in propria persona. U.S.C.A. Const.Amend. 6; M.C.L.A. Const. Art. 1, § 13; M.C.L.A. § 763.1.

**[28] Criminal Law** 110 ⟷ 641.10(3)

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.10 Choice of Counsel
               110k641.10(3) k. Appearing Both Pro Se and by Counsel; "Hybrid Representation".

Defendant who asserts his right to self-representation has no absolute entitlement to standby counsel. U.S.C.A. Const.Amend. 6; M.C.L.A. Const. Art. 1, § 13; M.C.L.A. § 763.1.

There is no constitutional right to a hybrid defense and, thus, a trial court is not required to order hybrid representation. U.S.C.A. Const.Amend. 6.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

9-3

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

**[29] Criminal Law 110 €==>41.1(X)3**
110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k41.1 Counsel for Accused
        110k41.1(X) Choice of Counsel
          110k41.1(X)3 k. Appearing. Both Pro Se and by Counsel; "Hybrid Representation".
Most Cited Cases
Defendant who represents himself is entitled to maintain actual control over the case, which standby counsel cannot destroy by altering the jury's perception that the defendant is representing himself. U.S.C.A. Const.Amend. 6; M.C.L.A. Const. Art. I, § 13; M.C.L.A. § 763.1.

**[30] Criminal Law 110 €==>41.1(X)3**
110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k41.1 Counsel for Accused
        110k41.1(X) Choice of Counsel
          110k41.1(X)3 k. Appearing. Both Pro Se and by Counsel; "Hybrid Representation".
Most Cited Cases
Defendant who chooses to represent himself does so at his own peril, with no constitutional right to an attorney; a defendant proceeding in propria persona has no basis to claim that the attorney must abide by constitutional standards. U.S.C.A. Const.Amend. 6; M.C.L.A. Const. Art. I, § 13

**[31] Criminal Law 110 €==>41.13(1)**
110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k41.13 Counsel for Accused
        110k41.13 Adequacy of Representation
          110k41.13(1) k. In General Most Cited Cases
To extent standards of effective assistance applicable to trial counsel applied to standby

counsel for murder defendant appearing in propria persona, standby counsel's performance did not amount to ineffective assistance, where counsel's performance did not fall below objective standard of reasonableness and defendant made no showing that, but for standby counsel's alleged errors, result of proceedings would have been different. U.S.C.A. Const.Amend. 6; M.C.L.A. Const. Art. I, § 13; M.C.L.A. § 763.1.

**[31] Criminal Law 110 €==>41.13(1)**
110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k41.13 Counsel for Accused
        110k41.13 Adequacy of Representation
          110k41.13(1) k. In General Most Cited Cases
There is no alternative, common-law test for effective assistance of counsel. U.S.C.A. Const.Amend 6.

**[33] Criminal Law 110 €==>41.13(1)**
110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k41.13 Counsel for Accused
        110k41.13 Adequacy of Representation
          110k41.13(1) k. In General Most Cited Cases

**[34] Criminal Law 110 €==>41.13(2)**
110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k41.13 Counsel for Accused
        110k41.13 Adequacy of Representation
          110k41.13(2) Particular Cases and Problems
            110k41.13(3) k. Counsel of

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

Defendant's Choice or Defendant Pro Se. Most Cited Cases
Assuming existence of alternative, common-law "serious mistake" standard for effectiveness of counsel, performance of standby counsel for murder defendant proceeding in propria persona did not amount to ineffective assistance under such standard, where defendant unequivocally waived his right to counsel and freely chose to proceed in propria persona, counsel did nothing to interfere with defendant's right to control his own case or to alter jury's perception that defendant was representing himself, counsel's performance did not fall below objective standard of reasonableness, and defendant made no showing of prejudice.

**[34] Criminal Law 110 €==>721(2)**
110 Criminal Law
  110XX(E) Arguments and Conduct of Counsel
    110k712 Statements as to Facts, Comments, and Arguments
      110k721 Comments on Failure of Accused to Testify
        110k721(2) k. Nature of Comment or Reference in General Most Cited Cases
Prosecutor's objections to portions of closing argument of nontestifying murder defendant, appearing in propria persona, did not amount to improper direct and unequivocal references to defendant's exercise of his constitutional right not to testify, where prosecutor's objections addressed defendant's self-serving, inculpatory, and unsworn statements which were not supported by record and clearly went beyond evidence presented at trial, and where court properly instructed jury that defendant had absolute right not to testify and that it was not to consider defendant's failure to testify. U.S.C.A. Const.Amend 5.

**[35] Criminal Law 110 €==>1037.1(2)**
110 Criminal Law
  110XXIV Review
    110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
      110XXIV(E)1 In General

Counsel 110k1037 Arguments and Conduct of Counsel
  110k1037.1 In General
    110k1037.1(2) k. Particular Statements, Arguments, and Comments. Most Cited Cases
Murder defendant failed to preserve for appellate review his contention that prosecutor's objections to portions of his closing argument amounted to improper commentary upon his exercise of his right not to testify, where defendant failed to object to prosecutor's comments in timely fashion.

**[36] Criminal Law 110 €==>1037.1(1)**
110 Criminal Law
  110XXIV Review
    110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
      110XXIV(E)1 In General
        110k1037 Arguments and Conduct of Counsel
          110k1037.1 In General
            110k1037.1(1) k. Arguments and Conduct in General Most Cited Cases
Where a defendant fails to preserve alleged prosecutorial error in closing argument for appellate review, such review is limited to determining whether the comments were plain error that affected defendant's substantial rights.

**[37] Criminal Law 110 €==>656(7)**
110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k654 Remarks and Conduct of Judge
        110k656 Comments on Evidence or Witnesses
          110k656(7) k. Comment on Failure of Accused to Testify Most Cited Cases

Criminal Law 110 €==>721(1)
110 Criminal Law
  110XX Trial
    110XX(E) Arguments and Conduct of Counsel

9-4

659 N.W.2d 291
248 Mich.App. 373, 659 N.W.2d 291
(Cite as: 248 Mich.App. 373, 659 N.W.2d 291)

Comments, and Arguments as to Facts,
110k72.1 Comments on Failure of
Accused to Testify
110k72.1(1) k. In General. Most
Cited Cases
Neither a prosecutor nor the trial court may
comment on a defendant's decision to exercise his
constitutional right not to testify. U.S.C.A.
Const.Amend 5.

[38] Criminal Law 110 ☞66.1
110XVII Evidence
110XVII(C) Reception of Evidence
110k66.1 k. Necessity and Scope of Proof
Most Cited Cases
Trial court has discretion when considering whether
to admit relevant evidence.

[39] Criminal Law 110 ☞1154(1)
110XXIV Review
110XXIV(N) Discretion of Lower Court
110k1153 Reception and Admissibility of
Evidence, in General
110k1154(1) k. In General. Most Cited
Cases
Appellate review of a trial court's decision to
exclude evidence is for an abuse of discretion.

[40] Criminal Law 110 ☞629(3.1)
110X Trial
110XX(A) Preliminary Proceedings
110k629(3) List or Disclosure
of Other Matters
110k629(3.1) k. In General. Most
Cited Cases
Prosecutor has no duty to produce its gestae
witnesses, instead, the prosecutor has a continuing
duty to advise the defense of all its gestae witnesses
that the prosecution intends to produce at trial.
M.C.L.A § 767.40a.

[41] Criminal Law 110 ☞629(3.1)
110X Trial
110XX(A) Preliminary Proceedings
110k629(3) List or Disclosure of Witnesses and Disclosure
of Other Matters
110k629(3.1) k. In General. Most
Cited Cases

203 Homicide
203IX Evidence
203IX(D) Admissibility in General
Proffered testimony of brother and sister-in-law of
murder victim was relevant only to unrecognized
defenses of consent and euthanasia and was
properly excluded, testimony concerned
victim's excellent condition, pain, suffering, and
conditions of his daily life, as well as his consent,
and was proffered by defendant in attempt to justify
his killing of victim MRE 401.

[44] Criminal Law 110 ☞338(1)
110X Trial
110XVII(D) Facts in Issue and Relevance
110k338 Relevancy in General
110k338(1) k. In General. Most Cited
Cases
Variety of factors, including the elements of a
charged crimes, the theories of admissibility, and
the defenses asserted all help determine whether any
particular piece of evidence is relevant MRE 401.

203 Homicide

---

659 N.W.2d 291
248 Mich.App. 373, 659 N.W.2d 291
(Cite as: 248 Mich.App. 373, 659 N.W.2d 291)

203VI Excusable or Justifiable Homicide
203VI(A) In General
203VI(A)3 k. Euthanasia and Mercy-Killing
(Formerly 203k100)
Consent and euthanasia are not recognized defenses
to murder.

[45] Homicide 203 ☞1046
203 Homicide
203IX Evidence
203IX(D) Admissibility in General
203k1046 k. Excuse or Justification in
General. Most Cited Cases
(Formerly 203k183)
Trial court did not abuse its discretion in precluding
relatives of murder victim from testifying with
respect to victim's consent and desire to continue
despite tendency of their testimony to contradict
prosecution's assertions that defendant had not
consented and that defendant had acted in pursuit of
his own personal and political agenda, where trial
court allowed defendant to argue victim's consent,
jury saw videotape of victim consenting to
defendant's actions, and defendant himself stated on
videotape and during closing argument that his
motive in killing victim was to relieve victim's pain
and suffering and promote public discussion of
euthanasia.

**298*374 Jennifer M. Granholm, Attorney
General, Thomas L. Casey, Solicitor General,
David G. Gorcyca, Prosecuting Attorney, Joyce F.
Todd, Chief, Appellate Division, and Anica Letica,
Assistant Prosecuting Attorney, for the people.

Mayer Morganroth, Jeffrey B. Morganroth, and
Morganroth & Morganroth by Mayer Morganroth,
Jeffrey B. Morganroth, and Jason R. Hirsch, for the
defendant on appeal.

Before HOEKSTRA, P.J., and SAAD and
WHITBECK, JJ.
WHITBECK, J.

I. Overview

This case is about death, in particular, the death of
former racecar driver Thomas Youk in September
1998. Youk was fifty-two years old and had
developed the fatal disease amyotrophic lateral
sclerosis (ALS), also known as
Lou Gehrig's disease. Defendant twice videotaped
himself interacting with Youk. In the first
videotape, defendant went to Youk's home to
both videotapes were shown. The jury saw the
news show 60 Minutes, during which segmentation
of the second videotape was aired, Defendant later
stamped to persuade the jury not to convict him
because the murder he was charged
convincing was, in his view, a "mercy killing"

Given this factual setting, this appeal presents a
fascinating paradox. Though he made it
abundantly clear to the jury to adopt his views on
euthanasia, in this appeal defendant has given
almost no attention **297 to his claim that this
homicide had a legal justification. Indeed, counsel
for defendant made only a
single reference to this issue.

Nevertheless, euthanasia is at the core of this case.
But for defendant's self-described zealotry, Thomas
Youk's death would, in all probability, not have
been the subject of national attention, much less a
second trial. Defendant, in what is now apparently
something of an afterthought, asks us to conclude
that euthanasia is legal and, therefore, to reverse his
conviction on constitutional grounds. We refuse
Such a holding would be the first step down a very
steep and very slippery slope. To paraphrase the

FN1. MCL 750.317.

FN2. MCL 333.7401(2)(b).

9-5

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

United States Supreme Court in *Washington v. Glucksberg*,[FN1] it would expand the right to privacy to include a right to commit euthanasia and thus place the issue outside the arena of public debate and legislative action. Such a[*376] holding would also involve the judiciary in deciding testimony would have been relevant. Thus, even on this narrow evidentiary issue, defendant's arguments have no merit.

FN1. *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997).

Defendant's other issues are more mundane and we describe the relevant facts in more detail in the appropriate discussion sections. First, defendant asserts that his trial attorney, David Gorosh, did not provide him with his constitutional right to effective representation. However, defendant has failed to demonstrate that Gorosh performed deficiently at any time he actually acted as counsel. Defendant also failed to prove that Gorosh, while acting as standby counsel, took control of the case or did anything to destroy the jury's perception that defendant was representing himself. Even assuming for the sake of argument that a claim alleging ineffective assistance of standby counsel is legally cognizable, defendant still has not proved that Gorosh acted deficiently and prejudicially. Defendant chose-almost certainly unwisely, but nevertheless knowingly, intelligently, voluntarily, and unequivocally-to represent himself. He cannot analyze the theme for his conviction or bemoan who did not act as his trial counsel.

Second, defendant claims that the prosecutor improperly referred, in defendant's decision to exercise his right to remain silent, thereby denying him his rights under the Fifth Amendment. The remarks at issue were the prosecutor's proper objections to defendant's repeated and improper attempts to refer to matters that were not in evidence. As such, the prosecutor's remarks were not direct and unequivocal references to defendant's failure to testify, and therefore the making of those remarks did not constitute misconduct.

---

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

[*377] Third, defendant claims that the trial court erred in excluding the testimony of Terence and Melody Youk, Thomas' brother and sister-in-law. However, defendant enunciated the applicable standards with respect to res gestae witnesses and then fails entirely to demonstrate how the proposed testimony would have been relevant. Thus, even on this narrow evidentiary issue, defendant's arguments have no merit.

## II. The Death of Thomas Youk

### A The September 15, 1998, Videotape

On September 15, 1998, at 9:55 p.m., defendant went to Youk's home to discuss [*378] Youk's condition. As the videotape of this discussion revealed, defendant stated that he was recording their interaction in "conjunction with a request from Thomas [Youk] for help in ... ending his suffering. Youk then described his condition. He explained that his symptoms of ALS first became obvious to him in 1994 and that he had been confined to a wheelchair since 1997. By September 1998, Youk said, he could not move his left arm or his legs, he had minimal use of his right arm, he had difficulty swallowing and breathing, he was fed through a tube, and he was forced to use a machine to help him breathe. Youk stated that, at the time, he could not do anything for himself, that he had discussed his wishes" with his mother, brothers, and wife, and that they "understand why it's my decision".

Defendant then told Youk that he needed to sign a form indicating that he was consenting to a "direct injection instead of using the device, the machine." [*378] Defendant asked Youk if he would donate his organs, and Youk declined. Defendant then read the consent form, which stated in part: "I, Thomas Youk, the undersigned, entirely voluntarily, without any reservation, external persuasion, pressure, or duress, and after patient and thorough deliberation, hereby consent to the following medical procedure of my own choosing, and that you have chosen direct injection, or what they call active euthanasia, to be administered by a competent medical professional, in order to end

---

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

with certainty my intolerable and hopelessly incurable suffering.

The meeting ended at 10:15 p.m.

### B The September 16, 1998, Videotape

On September 16, 1998, at 9:49 p.m., defendant again videotaped himself and Youk at Youk's home. Youk stated that he "wanted to go through with this" and signed the consent form. Defendant remarked that he would reject Youk in the vein because "it's quicker," and stated, "now I'm going to put on a cardiogram so we know when your heart is stopped, okay." Defendant established a connection between Youk and the electrocardiograph machine. Defendant injected Youk with Anectine and Seconal before injecting Youk with potassium chloride. During this time, defendant provided a commentary on what was occurring. Sleepy Tom? Tom are you asleep? And now we'll inject the Anectine. You asleep Tom? Tom? You asleep? He's asleep. Now the Potassium Chloride. This machine is recording for some reason so I'm pulling it by hand until the heart stops. It's been, it's been about two minutes since I injected the, ah, second, and one minute since I injected the. Now we're getting agonal complexes and that's about it. The Potassium Chloride will stop the heart, so. Now there's a straight line. A straight line and the cardiogram will be turned off if his heart is stopped.

### [*379] C. Cause Of Death

The police were dispatched to Youk's house on September 17, 1998, at 1:30 a.m. They found Youk lying on his bed, dead. The police also found a Federal Express receipt with defendant's address at the scene. Officials conducted Youk's autopsy at 10:00 a.m. the same day. The medical examiner listed the manner of death as homicide and the cause of death as intravenous injection of substances. During the autopsy, the medical examiner found two "fresh" needle marks on Youk's left and right wrists that had been covered with makeup. The autopsy protocol stated that the

---

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

cause of death was "poisoning by intravenous injection of substances."

**FN9** Oakland County Medical Examiner Ljubisa J. Dragovic, an expert in neuropathology and pathology who later testified for the prosecution at defendant's trial, witnessed the autopsy. Dr. Dragovic found three significant drugs in Youk's body fluids. First, Youk had a high level of the barbiturate Seconal, also known as Secobarbital, in his blood. Seconal is a Schedule 2 controlled substance [FN4] typically used to induce sleep. Dr. Dragovic believed that the amount of Seconal in Youk's blood would have killed him in a few hours. Second, Dr. Dragovic found Anectine, a paralyzing muscle relaxant, present in Youk's body in an amount that could have killed Youk within five to right minutes by causing brain death. However, Dr. Dragovic determined that it was the third drug, potassium chloride, that defendant injected into Youk that caused his death. As Dr. Dragovic explained, when 580 potassium chloride is injected into the body in a concentrated form at once, rather than in small amounts over time, it stops the heart from beating within a matter of seconds. According to Dr. Dragovic, the toxicology reports did not reveal the presence of potassium chloride in Youk's body because that substance is naturally present in the body after red blood cells die

FN4. Dr. Dragovic explained that the Board of Pharmacy and the Federal Drug Enforcement Agency must license a physician to prescribe Seconal.

Dr. Dragovic also confirmed that Youk had ALS. However, in Dr. Dragovic's opinion, Youk did not die from ALS. ALS was not an underlying cause of Youk's death and ALS did not contribute to Youk's death in any way. Rather, Dr. Dragovic firmly reiterated that the poisons injected into Youk killed him, constituting a homicide.

### D The 60 Minutes Interview

News correspondent Mike Wallace interviewed

---

9-6

## Column 1 (left)

defendant for 90 *Minutes*. In the first clip from the interview, shown to the jury, Wallace stated at the outset, "You killed him." Defendant responded "I did, but it could be Manslaughter not Murder. It's when and how you're gonna determine to determine why it was." I know what it . . . This could never be a crime in any society which deems itself enlightened." Defendant indicated that he was making an example of Youk. Wallace then suggested that Youk was initially a little reluctant because Youk "thought he'd be committing assisted suicide." Defendant replied that "this is better than assisted suicide. I explained that is better than control."

Defendant also explained the process leading to Youk's death. According to defendant, the first injection paralyzed Youk's muscles and slowed his ability to take in oxygen. When asked "why" Youk couldn't breathe, and Youk could not then breathe, defendant injected the "potassium chloride to stop the heart." Defendant then told Wallace that "[o]ften they go or I go," apparently meaning that he would be acquitted for killing Youk or, if convicted, he would starve to death in prison. As defendant put it: "I've got to force them to act on this. Because if they do not, that means they don't think it's a crime. Because they don't need any more evidence do they? Do you have to dust for fingerprints on this[?]"

Wallace suggested that defendant was "engaged in a political, medical, macabre publicity venture" and had a "ghoulish . . . desire to see the deed done." Defendant did not disagree with those assertions, stating, "Well, it could be; I, I can't argue with that . . . it is ghoulish. I don't know what it is . . . it appears that way to you. I can't criticize you for that." In fact, defendant agreed with Wallace, emphasizing that "the man point is . . . that the deed be done." Evidently in response to Wallace, defendant failed to articulate the need for immediate appellate review.[N7]

saying "If you don't have liberty and self-determination, you've got nothing. That's what this country's built on and this is the ultimate self-determination to determine what you're . . . when and how you're gonna determine and how . . .

*[Wallace.]* And those who say that [defendant]. Dr. Death, is a fanatic?"

**382** *[Defendant.]* Zealot. No, not if, sure, you try to take a liberty from me, then you know, I'm gonna fight for it. And I'm a zealot. I want when I, I'm 71, I'll be 71. You don't know what'll happen when you got older. I may end up terribly suffering. I want some colleague to be free to come and help me when I say the time has come that a person should not be forced to suffer unbearably and this is Michigan constitutional counterpart and this and is Michigan constitutional counterpart state and include this . . . it's a right I want, the right of the . . . this is necessary and direct corollary of this position that . . . either under constitutional privacy concepts or as a deprivation of liberty without due process of law . . . then have to be free to . . . suffering.

# III. Euthanasia And The Constitution

## A. Facts And Argument

Before trial, relying on the Ninth Amendment,[N8] filed a motion asking the trial court to dismiss the charges against him. Evidently, defendant intended to argue that the people had retained the right to active euthanasia. The trial court denied the motion on the grounds that it was untimely and that defendant had failed to cite any support for his argument. Defendant then challenging the trial court's ruling, he also claimed the trial court's order with this Court. In addition to the constitutional violation the prosecution violated constitutional counterpart to the Ninth Amendment. FN6 This Court ultimately determined that defendant failed to articulate the need for immediate appellate review.[N7]

**FN6** U.S. Const., Am. IX

**FN7** *People v. Kevorkian*, unpublished order of the Court of Appeals, entered

### 639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

**March 16, 1999 (Docket No. 218077)**

On appeal, defendant makes two related, but separate, constitutional arguments. First, he argues that the unenumerated rights protected by the Ninth Amendment, U.S. Const., Am. IX . . . construed to deny or disparage others retained by the people." The **383** counterpart provision in the 1963 constitution states that the enumeration in this constitution of certain rights shall not be construed to deny or disparage others retained by the people." FN4

**FN3** U.S. Const., Am. IX

**FN4** Const. 1963, art. 1, § 23

The Ninth Amendment of the United States Constitution states that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." FN3 The **384** counterpart provision in the 1963 constitution states . . .

**FN5** U.S. Const., Am. IX

**FN6** Const. 1963, art. 1, § 17

### B. The Nature Of Defendant's Arguments

[1][2] We review a trial court's decision to grant or deny a motion to dismiss charges for an abuse of discretion. FN1 However, review de novo is appropriate that defendant does not raise the underlying the constitutional questions that undergird that the trial court's ruling on the motion to dismiss the charges. FN2

**FN1** See *People v. Adams*, 232 Mich.App. 128, 132, 591 N.W.2d 44 (1998)

**FN2** See *People v. Houstina*, 216 Mich.App. 70, 73, 549 N.W.2d 11 (1996).

### C. Constitutional Provisions

### 639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

The Ninth Amendment of the United States Constitution states that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." FN3 The **384** counterpart provision in the 1963 constitution provides that the enumeration in this constitution of certain rights shall not be construed to deny or disparage others retained by the people." FN4

**FN3** U.S. Const., Am. IX

**FN4** Const. 1963, art. 1, § 23

**FN5** U.S. Const., Am. XIV

**FN6** Const. 1963, art. 1, § 17

**FN10** Const. 1963, art. 1, § 17.

**\*\*301 B. Standard Of Review**

At the outset it is important to understand the nature of defendant's constitutional claims. The nub of defendant's argument as to this is to state clearly his constitutional arguments that defendant does not raise . . .

[3] First, defendant does not ask us to hold that he has a constitutional right to refuse life-sustaining medical treatment. In *Director, Missouri Dept of Health*, FN11 the United States Supreme Court "assume[d] that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition," likely under a Fourteenth Amendment due process liberty interest analysis. FN12 More recently, in *Glucksberg*, FN13 the Court strengthened the **385** constitutional basis for that "the right to refuse unwanted medical treatment

http://web2.westlaw.com/print/printstream.aspx?ord=%7bFFF6ECF1-22BC-4547-80DF-... 11/27/2006

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Page 13 of 42

Page 14 of 42

http://web2.westlaw.com/print/printstream.aspx?ord=%7bFFF6ECF1-22BC-4547-80DF-... 11/27/2006

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Page 13

Page 14

9-7

was so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." Here, defendant does not, and could not, rely on *Cruzan:* factually, this case does not involve removing life support. Further, though not resting their decisions precisely on the Fourteenth Amendment, Michigan courts have arrived at the same conclusion regarding a patient's right to refuse life-sustaining medical care.[FN20] The limited scope of those cases does not establish a right to be free from unbearable pain and suffering that would make euthanasia legal. There is, of course, a substantial factual alternative *that would* have ended Thomas Youk.[FN21]

[4] Second, defendant does not make any claim that this case concerns medical efforts to relieve pain or prolong life, because medical efforts may hasten death. Michigan exempts such medical efforts from criminal penalties. [FN21] Importantly, however, the exemption does not apply to medical efforts designed to *cause* death.[FN22] *Notably, there is no medical evidence that defendant administered potassium chloride to relieve Thomas Youk's pain or discomfort.* Defendant admits as much in his brief on appeal.

FN17. *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 279, 110 S.Ct. 2841, 2843, 111 L.Ed.2d 224 (1990).

FN18. *Id.* at 279, n. 7, 110 S.Ct. 2841.

FN19. *Glucksberg, supra* at 721, n. 17, 117 S.Ct. 2258.

FN20. *See In re Martin,* 450 Mich. 204, 215-216, 538 N.W.2d 399 (1995), discussing *In re Rosebush,* 195 Mich.App. 675, 491 N.W.2d 633 (1992).

FN21. See M.C.L. § 752.1027(1) ("[P]rescribing, dispensing, or administering medications or procedures if the intent is to relieve pain or discomfort and not to cause death, even if the medication or

procedure may hasten or increase the risk of death" is not the felony of assisted suicide.) (emphasis added)

FN22. *Id.*

*386* The only medical relief for Thomas Youk's conditions was the relief that he sought from [defendant]. The injection [defendant] gave to Thomas Youk was the only effective medical way to alleviate Thomas Youk's unbearable suffering. *No pain medication would suffice, and there was no other beneficial medical alternative that would have ended Thomas Youk.*[FN23]

FN23. Emphasis supplied

[5][6] Third, defendant does not ask us to find that this action in this matter constituted some form of *permissible* assisted suicide. In Michigan, assisting in a suicide-that is, providing the physical means by which another person attempts or commits suicide or participating in a physical act by which another person attempts or commits suicide-is illegal.[FN24] *387* Our Supreme Court has upheld the statute in question against both a Title Object Clause challenge under the Michigan Constitution and a Due Process Clause challenge under the United States Constitution.[FN25] In reaching its decision on the due process challenge, a majority of the Court observed

FN24 See M.C.L. § 752.1027.

FN25. *People v. Kevorkian,* 447 Mich 436, 445-446, 527 N.W.2d 714 (1994) (*Kevorkian I*)

Presently, a substantial number of jurisdictions have specific statutes that criminalize assisted suicide and the Model Penal Code also provides for criminal penalties. Further, "[a]lthough many states expressly disapprove of suicide and assisted suicide either in statutes dealing with durable powers of attorney in health-care situations, or in 'living will' statutes. In addition, all states provide for the involuntary commitment of persons who may harm themselves

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

as the result of mental illness, and a number of jurisdictions allow the use of nondeadly force to thwart suicide attempts.[FN26]

FN26. *Id.* at 478-479, 527 N.W.2d 714, Justices Cavanagh, Brickley, and Griffin, joined by Justices Boyle and Riley.

*387* Referring to *Cruzan,* the majority observed Indeed, the United States Supreme Court repeatedly and unequivocally has affirmed the sanctity of human life and rejected the notion that there is a right of self-destruction inherent in any common-law doctrine or constitutional phrase.[FN27]

FN27 *Id.* at 480-481, 527 N.W.2d 714.

Several years after the Michigan Supreme Court decision in *Kevorkian I,* the United States Supreme Court in *Glucksberg* upheld a similar Washington statute against a similar Due Process Clause challenge.[FN28] Under the United States Constitution *388* the *Glucksberg* majority held that the prohibition in the Washington statute against " 'caus[ing]' " or " 'aid[ing]' " a suicide did not offend the Fourteenth Amendment of the United States Constitution.[FN29]

FN28 In *Vacco v. Quill,* 521 US 793, 117 S.Ct 2297, 138 L.Ed.2d 834 (1997), decided the same day, the Court upheld New York's assisted-suicide ban against an Equal Protection Clause challenge.

FN29 *Glucksberg, supra* at 705-706, 117 S.Ct 2258

Here, defendant makes no attempt to assert that he was engaged in euthanasia to assert when he injected Thomas Youk with a potent agent that would cause death. Rather, he asserts that the Ninth Amendment "is to have any substantive meaning," the right to be free from inexorable pain and suffering must be among the unenumerated rights protected by that amendment and its Michigan counterpart. Further,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

defendant asserts that the right to be free from unbearable pain and suffering caused by a medical condition is inherently part of the liberty interests secured by the Fourteenth Amendment and its Michigan counterpart. Defendant then contends that he cannot be prosecuted for "aiding in Thomas Youk's assertion of his *388* constitutional right to be free from intolerable pain and suffering." Although defendant's appellate counsel has carefully avoided using the words, as we have already noted, the record indicates that defendant was quite specific when describing his actions; he said he was engaged in active euthanasia and the consent form that Youk signed directly refers to such active euthanasia.

In summary, defendant does not, and could not, ask us to hold that his actions were legally justifiable because he simply helped Youk exercise his right to refuse medical care. Defendant does not, nor could he, ask us to hold that he was lawfully attempting to alleviate Youk's pain and suffering by any means other than causing his death. Defendant does not, nor could he, ask us to hold that his actions constituted a legal form of assisted suicide. In a nutshell, and using his own terminology, defendant asks us to legalize euthanasia.

E. Reserved Rights

[7] Defendant's argument that the people have reserved the right to euthanasia under the Ninth Amendment and its Michigan counterpart is basically formless. He states that a right to be free from inexorable pain and suffering "must be among" the rights protected by these two constitutional provisions. Further, he argues that the states "should recognize such a right and give it force." Defendant does not cite a single case for this extraordinary theory. As the Supreme Court said in *Michleman v. Detroit,*[FN30]

FN30. *Michleman v. Detroit,* 355 Mich. 182, 94 N.W.2d 388 (1959).

*389* It is not enough for an appellant in his brief simply to announce a position or assert an error and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

Page 17

then leave it up to this Court to discover and rationalize the basis for his claim, or unearth the authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow. Failure to brief a question on appeal is tantamount to abandoning it.[FN31]

FN31. Id. at 200, 94 N.W.2d 388 (citations omitted).

We conclude, therefore, that defendant has abandoned this argument on appeal.

**304 F. Euthanasia As A Due Process Right To Privacy

(1) Defendant's Argument

Defendant starts with the proposition that there is a right to privacy that is part of the liberty interest protected by the Fourteenth Amendment and its Michigan counterpart. He then asserts that the intensely personal and private right of a patient to be free from intolerable and irremediable suffering is either part of or similar to this privacy right. Citing Kevorkian, he argues that if the administration of aggressive painkilling drugs is acceptable even if it may hasten death, then the "necessary and direct corollary of this position is that a person should not be forced to suffer unbearably."

Defendant then reviews the positions of Justices O'Connor, Breyer, Souter, and Stevens in Glucksberg to reach the conclusion that "Justices on the Supreme Court have suggested allowing for interpretation of liberty to apply to the ... guarantee of liberty to personal and private rights, including those **306 related to personal and private medical procedures." FN32 Finally, defendant argues that he has standing to assert Yesodal's constitutional right to be free from intolerable pain, claiming that Justice Stevens in Glucksberg, FN33 "recognized the possibility that an individual who provides assistance to a patient

who was suffering interminably could prevail on a Constitutional challenge" and that "if we agree there is a constitutionally protected right to be free from unbearable suffering, then the charges against him must be dismissed." We do not agree

FN32. This argument reflects defendant's remarks on the second day of trial in which he asserted the basis of the United States Supreme Court case and that "Four of them want this case and that "Four of them said we want to revisit this again."

FN33. Glucksberg, supra at 750, 117 S.Ct. 2258.

It is one thing to assert, as defendant does, that there is a large body of case law suggesting that due process sometimes relies on the right to privacy to protect fundamental liberty interests. It is quite another thing, however, to conclude that the nature of privacy encompasses euthanasia. As Justice Jackson once pointedly noted, the enduring nature of precedent gives judicial opinions a force all their own.FN35

FN35. Korematsu v. United States, 323 U.S. 214, 246, 65 S.Ct. 193, 207, 89 L.Ed 194 (1944) (Jackson, J., dissenting).

The principle then lies about like a loaded weapon. Every repetition embeds that principle more deeply in our law and thinking, and expands it to new purposes. And so, when we observe the work of courts are familiar with what Judge Cardozo described as "the tendency of a principle to expand itself to the limit of its logic."FN36

FN36. We need not address the question whether there is, in fact, a right to privacy under the United States and Michigan Constitutions, for the purposes of dealing with defendant's arguments here, we have assumed the existence of such a right.

Defendant urges us to pick up the loaded weapon of the right to privacy case. He asks us to use this weapon to resolve the situation faced by a person who wishes to end the pain by dying. As Justice O'Connor described it, "Death will be different for each of us. For many, the last days will be spent in physical pain and perhaps the despair that accompanies it." FN37

FN37. Glucksberg, supra at 750, 117 S.Ct. 2258.

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

Page 18

Similarly, in Glucksberg, a majority of the United States Supreme Court concluded that the asserted "right" to assistance in committing suicide "is not a fundamental liberty interest protected by the Due Process Clause." Instead, the Court determined that the State had a legitimate interest in preserving life,[FN] in countervailing interests in preserving the integrity and ethics of the medical profession, protecting vulnerable groups from abuse, neglect, and mistakes,[FN] acknowledging the equal value of all people.[FN] More importantly, the majority noted that once "may fear that permitting assisted suicide will start it down the path to voluntary and perhaps even involuntary euthanasia." In commenting on the Ninth Circuit Court of Appeals decision in the underlying case,[FN] the majority of the Court said:

[9][9] We decline, however, to pick up this loaded weapon for three basic reasons. First, we can find no meaningful precedent for expanding the right to privacy to include a right to commit euthanasia so that an individual can be free from intolerable and irremediable suffering. To our knowledge, no court of last resort in this country has ever recognized such a right. Even in the assisted suicide cases steadfastly refused to expand the right to privacy to include the right to commit or receive euthanasia. As Chief Justice Rehnquist and Justices Brickley and Griffin explained while describing the boundaries of the right to privacy in end-of-life cases:

We do not discern in Cruzan and its historic roots an indication that the federal constitution protects a right more expansive than the right to refuse treatment. Neither do we read [Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)] **372 or in the precedent from which it evolved an intent to expand the liberty interest identified by the Court in such a manner.FN38

FN38. Kevorkian v. ___, supra, at 465 (Cavanagh, C.J., and Brickley and Griffin,

FN39. Glucksberg, supra at 728, 117 S.Ct. 2258.

FN40. Id., noting that the Model Penal Code, § 210.5, Comment 5, p. 100 states that "[T]he interests in the sanctity of life that are represented by the criminal homicide laws are threatened by one who expresses a willingness to participate in taking the life of another."

FN41. Glucksberg, supra at 731, 117 S.Ct. 2258 citing H. Hendin, Seduced by Death: Doctors, Patients and the Dutch Cure, 24-25 (1997) ("Research indicates, however, that many people who request physician-assisted suicide withdraw that request if their depression and pain are treated.")

9-9

639 N.W.2d 291

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

FN43 *Glucksberg, supra* at 728-732, 117 S.Ct. 2258, 2274

FN44 *Id.* at 732, 117 S.Ct. 2258

FN45 *Compassion in Dying v. Washington,* 79 F.3d 790 (C.A.9,1996)

*393 The Court of Appeals' decision, and its expansive reasoning, provide ample support for the [state of Washington's] concerns. The court noted, for example, that the "decision of a duly appointed surrogate decision maker is for all legal purposes the decision of the patient himself;" that "in some instances, the patient *596 may be... unable to self-administer the drugs and ... administration by the physician ... may be the only way the patient may be able to receive them," and that not only physicians but also "family members and loved ones, will inevitably participate in assisting suicide. Thus, it turns out that what is couched as a limited right to "physician-assisted suicide" is likely, in effect, a much broader license, which could prove extremely difficult to police and contain. [The state of] Washington's ban on assisting suicide prevents such erosion.FN46

FN46. *Glucksberg, supra* at 733, 117 S.Ct. 2258 (citations omitted)

The majority then turned, directly, to the "slippery slope" argument. The majority cited *United States v. 12 200-ft Reels of Super 8mm Film*FN47 for the proposition that "if [e]ach step, when taken, appear[s] a reasonable step in relation to that which preceded it, although the aggregate or end result is one that would never have been seriously considered in the first instance.' *394 The majority referred to *Physician-Assisted Suicide and Euthanasia in the Netherlands*FN48 as suggesting

FN47 *United States v. 12 200-ft Reels of Super 8mm Film,* 413 U.S. 123, [127, 93 S.Ct. 2665, 2668, 37 L.Ed.2d 500 (1973)]

FN48 *Glucksberg, supra* at 735, 117 S.Ct. 2258

2258 The Court also referred to Justice Cardozo's observation in *The Nature of the Judicial Process,* 51 (1932) of " '[t]he tendency of a principle to expand itself to the limit of its logic.' *Glucksberg, supra* at 733, n. 21, 117 S.Ct. 2258

FN49 A Report of Chairman Charles T. Canady to the Subcommittee on the Constitution of the House Committee on the Judiciary, 104th Cong., 2d Sess. (Comm. Print, 1996), pp. 16-21

despite the existence of various reporting procedures, euthanasia in the Netherlands has not been limited to competent, *394 terminally ill adults who are enduring physical suffering, and that regulation of the practice may not have prevented abuses in cases involving vulnerable persons, including severely disabled neonates and elderly persons suffering from dementia.FN50

FN50 *Glucksberg, supra* at 734, 117 S.Ct. 2258

Here, expanding the right to privacy would begin, as the steps in the progression of defendant's argument supporting voluntary euthanasia clearly indicate, the slide down the slippery slope toward euthanasia. No court of final jurisdiction has so expanded the right to privacy. As a state court of intermediate appellate jurisdiction, neither will we.

[10] Second, we observe that by expanding the right to privacy as defendant suggests, we would, to a great extent, place the matter outside the serious public debate and legislative action.FN51 Whatever the life experiences of the policy preferences of the members of this Court might be, we must exercise the utmost care to assure, when asked to break new ground, that the liberty protected by the Due Process Clause of the Fourteenth Amendment not be subtly transformed into an expression of personal belief rather than an adherence to the rule of law.FN52 If society is to recognize a right to be free from intolerable and irremediable suffering, it should do so through the action of the majority of the legislature, whose role

---

639 N.W.2d 291

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

it is not social policy,FN53 or by action of the people through ballot initiative As the Michigan Supreme Court observed *547 when analyzing the constitutionality of the prohibition of assisted suicide

FN51 *Id* at 720, 117 S.Ct. 2258

FN52 See *Moore v. East Cleveland (Ohio,* 431 U.S. 494, 502, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) (plurality opinion)

FN53 See *Taylor v. Kurapati,* 236 Mich.App. 315, 355, 600 N.W.2d 670 (1999)

*395 We are keenly aware of the intense emotions and competing moral philosophies that characterize the present debate about suicide in general, and assisted suicide in particular The issues do not lend themselves to simple answers. However, while the complexity of the matter does not permit us to avoid the critical constitutional questions, neither does it, under the guise of constitutional interpretation, permit us to expand the judicial powers of this Court, especially where the question clearly is a policy one that is appropriately left to the citizenry for resolution, either through its elected representatives or through a ballot initiative under Const 1963, art 2, § 9.FN54

FN54 *Kevorkian I, supra* at 481-482, see also *In re Certified Question (Martiniga v Kevorkian),* 456 Mich.1223, 575 N.W.2d 550, 551 (1998), *Kevorkian v. Thompson,* 237 Mich.App. 1, 602 N.W.2d 233 (1999), *People ex rel Oakland Co Prosecuting Attorney v Kevorkian,* 210 Mich.App. 601, 534 N.W.2d 172 (1995)

Third, we observe that by expanding the right of privacy to include a right to commit euthanasia in order to end intolerable and irremediable suffering, we would inevitably involve the judiciary in deciding questions that are simply beyond its capacity There is no court that can answer the

question of how much pain or perception of pain by a third party, is necessary before the suffering becomes intolerable and irremediable. The role of the courts is to serve neither as physicians nor as theologians. In *Glucksberg,* Justice Stevens briefly discussed the United States Supreme Court's changing attitude toward the death penalty, noting that "there is no absolute requirement that a State treat all human life as having an equal right to preservation." FN55 Though other jurisdictions may no value all life equally, that is not true in Michigan.FN56 In a state that constitutionally prohibits *596 putting to death the convicted perpetrator of even the most heinous of crimes,FN57 courts are simply unsuited to make that decision with respect to the innocent No judge, no matter how learned, can assess the quality of human life and determine, as a matter of law, that putting an end to suffering is justifiable in one case while in another case it is not This type of subjective determination would be unavailable if we begin, through judicial intervention, to decide who shall live and who shall die

FN55 *Glucksberg, supra* at 738, 117 S.Ct. 2258

FN56 See generally, *Taylor, supra*

FN57 See Const 1963, art 4, § 46; *Glucksberg, supra* at 741, 117 S.Ct. 2258 (Stevens, J., concurring) (emphasizing the incompatibility of Washington's argument that life must be saved with the fact that it has the death penalty)

Rather, the role of the courts is to apply the rule of law. As Chief Justice Burger once eloquently explained:

It is often observed that hard cases make bad law—I suspect there is some truth to that adage, for the "hard" cases always tempt judges to exceed the limits of their authority ... to reach a "desirable" result Cardozo no doubt had this type of case in mind when he wrote

"The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure He is not a longforemant, roaming at will in pursuit of his own

9-10

ideal of beauty or of goodness. He is to draw his inspiration from elevated principles. He is to yield to spasmodic sentiment, to vague or indisciplined benevolence. He is to exercise a regulated benevolence informed by tradition, methodized by analogy, disciplined by **308 system, and subordinated to the primordial necessity of order in the social life." Wide enough in all conscience is the field of discretion that remains." The Nature of the Judicial Process, 141 (1921).

What Cardozo tells us is beware the "good result," achieved by judicially unauthorized or intellectually dishonest means on the appealing notion that the desirable ends justify the improper judicial means. For the danger is always that the seeds of bad precedent sown by **307 good result, for the best of motives, will yield a rich harvest of unprincipled acts of others also aiming at "good ends." FN58

FN58. See United Steelworkers of America, AFL-CIO-CLC v. Weber, 443 U.S. 193, 216-219, 99 S.Ct. 2721, 2735, 61 L.Ed.2d 480 (1979) (Burger, C.J., dissenting).

Simply put, the courts are not free to create new rights out of whole cloth. We will not do so here.

### (3) "A More Particularized Challenge"

The structure of the Glucksberg opinion reflects the complexity of the assisted suicide issue, an issue considerably less complex than euthanasia. In Glucksberg, Chief Justice Rehnquist wrote the opinion announcing the Court's decision. Justices O'Connor, Scalia, Kennedy, and Thomas joined this opinion, constituting a solid five-person majority. Nevertheless, Glucksberg consists of more than the concurrence of which Justices Stevens, Souter, Ginsburg, and Breyer each wrote their own concurring opinions Thus, while the majority opinion in Glucksberg is plainly identifiable, the nine individual justices' views on the assisted suicide issue are far from uniform.

Defendant seizes on these concurrences in Glucksberg as evidence that the United States Supreme Court would find a constitutional basis for assisted suicide if presented with "a more particularized challenge." Defendant's assumption is that this is the perfect case; this is the "more particularized challenge" that will bring sweeping changes to the social law affecting not only assisted suicide, but creating a right to commit euthanasia. As we have **398 already outlined, there is no right here. Yet, even if we were to concede that there is a right to commit assisted suicide is not at issue here. So we turn to commit euthanasia. Defendant's observation that the concurring justices in Glucksberg each expressed, in varying degrees, some reservations about the sweep of the majority opinion is accurate. However, as is profoundly clear from each of their concurring opinions, there is not a hint in any of the language that any of the concurring justices used would recognize a right to commit euthanasia.

FN59. Glucksberg, supra at 750, 117 S.Ct. 2258 (Stevens, J. concurring).

Justice O'Connor attempted to avoid dealing directly with the limits on a patient's right to avoid suffering, stating that **[There is] no need to address the question whether suffering patients have a constitutionally cognizable interest in obtaining relief from the suffering that they may experience in the last days of their lives [because] ... patients in Washington and New York can obtain palliative care, even when doing so would hasten their deaths. The difficulty in defining terminal illness and the risk that a dying patient's request for assistance in ending his or her life might not be truly voluntary justifies the prohibitions on assisted **409 suicide we uphold here." FN60

FN60. Id. at 737-738, 117 S.Ct. 2258 (O'Connor, J. concurring).

However, she also agreed with the majority that there is no generalized right to "commit suicide."

FN61. Id. and that the "State's interest in protecting those who are not truly competent or facing imminent death, or those whose decisions to hasten death would not truly be voluntary, are sufficiently weighty to justify a prohibition against physician-assisted suicide." FN62

FN62. Id. at 737, 117 S.Ct. 2258

**399 Justice Ginsburg's concurrence consisted of the single statement that she "concur[red] in the Court's judgments" substantially for the reasons stated by Justice O'Connor.

FN63. Id. at 789, 117 S.Ct. 2258.

Justice Breyer disagreed with the way the majority framed the issue on appeal as the right to assisted suicide, instead preferring to examine whether a "right to die with dignity" existed FN63 Despite reframing this issue, as "tough" has as it was, Justice Breyer ultimately adopted a tack quite close to that of Justice O'Connor, stating:

I do not believe ... that this Court need or now should decide whether or not such a right [to die with dignity] is "fundamental." That is because, in my view, the avoidance of severe physical pain (connected with death) would have to constitute an essential part of any successful claim and because ... the laws before us do not force a dying person to undergo that kind of pain

* * *

Were the legal circumstances different-for example, were state law to prevent the provision of palliative care, including the administration of drugs as needed to avoid pain at the end of life-then the law's impact upon serious and otherwise unavoidable physical pain (accompanying death) would be more directly at issue. And ... the Court might have to revisit its conclusions in these cases.FN65

FN64. Id.

FN65. Id. at 790, 117 S.Ct. 2258 (Breyer, J. concurring.)

FN65. Id. at 791-792, 117 S.Ct. 2258

Thus, Justice Breyer's concurrence implies that he, too, believes that the state has a legally cognizable interest in preventing death, even when it is desired, as long as the state does not bar other efforts to alleviate suffering.

**400 Justice Souter's concerns were somewhat different. He drew parallels between the right to "bodily integrity" and patients' insistence that they not merely be dragged into a "stupor" to make them unaware of their pain, but that they had a right to exercise their autonomy by dying on the process avoiding their pain. FN66 He noted also their "dependency" and "dependency" ministers" to patients as whole individuals FN67 Justice Souter reflected on the complexity and necessity of the patient-physician relationship in this regard, but noted that a "right to ... 'mechanic' of the human body", but one who "ministers" to patients as whole individuals FN67 Justice Souter reflected on the complexity and necessity of the physician in the minimization of pain, as a whole issue as the doctor as the mechanic of the human body, but one who **310 to die with dignity." FN68 Despite recognizing the importance of these individual interests at stake ,FN68 Justice Souter did not close the door to the Court regarding the assisted suicide issue. However, in the end, he concluded that the legislature, not the Court, had the "institutional competence" **310 to address this issue FN69

FN66. See id at 777-779, 117 S.Ct. 2258 (Souter,J. concurring)

FN67. Id at 779, 117 S.Ct. 2258

FN68. Id at 782, 117 S.Ct. 2258

FN69. Id at 789, 117 S.Ct. 2258.

Nevertheless, Justice Souter emphasized time and again the risk that acknowledging a right to assisted suicide would lead to legalized euthanasia He clearly saw euthanasia as having "dangers [that] are concededly fatal to the State's authority to address the assisted suicide issue, Souter, in a concurring statement, also noted that "the barrier between assisted suicide and euthanasia could become porous [if there were a right to assisted suicide] and the line between voluntary and involuntary euthanasia as well. Thus, while Justice Souter was able to see many

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

9-11

639 N.W.2d 291

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

beyond the possible purview of the concurring justices in *Glucksberg*.

**(4) The "Dutch Cure"**

[11] Finally, defendant urges us to recognize that his position is the only way to put an end to his suffering at the request of Mr. Youk. In support of his position, he asserts, first, that Youk had a constitutional right to be free from intolerable pain and, second, that defendant's provision of "Constitutionally guaranteed medical services" allows him to assert Youk's rights.

There is no authority whatsoever for the proposition that a right to be free from intolerable and irremediable suffering, if it exists, somehow migrates to an "individual," such as defendant, who provides assistance to a patient who is suffering intolerably. The thin reed on which defendant apparently relies is Justice Stevens' concurrence in *Glucksberg*.

There may be little distinction between the intent of a terminally ill patient who decides to remove her life support and one who seeks the assistance of a doctor in ending her life, in both situations, the patient is seeking to hasten a certain, impending death. The doctor's intent might also be the same in prescribing lethal medication as it is in terminating life support. A doctor who fails to administer medical treatment to one who is dying from a disease could be doing so with an intent to harm or kill that patient. Conversely, a doctor who prescribes lethal medication does not necessarily intend the patient's death-rather that doctor may seek simply to ease the patient's suffering and to comply with the patient's wishes. The illusory character of any differences in values invoked by the fact that the American Medical Association unequivocally endorses the practice of terminal sedation-the administration of sufficient dosages of pain-killing medications to terminally ill patients to protect them from excruciating pain even when it is clear that the time of death will be advanced. The purpose of terminal sedation is to ease the suffering of the patient and comply with her wishes, and the actual cause of death is the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

administration of heavy doses of lethal sedatives. The same intent and causation may exist when a doctor complies with a patient's request for lethal medication to hasten her death.[FN77]

FN77 *Glucksberg, supra* at 750-751, 117 S.Ct. 2258.

We first note Justice Stevens' equivocal language: "[there may be little distinction" between the intent of a terminally ill **\*312** patient who decides to remove life support and one who seeks the assistance of a doctor to end her life, a doctor "may seek simply to ease the patient's suffering," "[t]he same intent and causation *may* exist when a doctor complies with a patient's request for lethal medication." Such language "is worlds away from a justification for euthanasia.

Second, we note that Justice Stevens' references are entirely within the context of a doctor treating a patient. Defendant is not licensed to practice medicine in Michigan. Therefore there was not, and could not be, a doctor-patient relationship between defendant and Youk. Defendant's argument can only be construed to mean that an individual can, if requested by another person, kill that person.

This is the messy killing argument-the argument for its most extreme advocates. Under defendant's theory, if one who is not a doctor became convinced that one's dear friend was suffering from a painful or terrible disease and that the friend wished to die, one could at the request of that friend about his "with guilty of murder. Indeed, under defendant's theory, the same result might well be reached if one's friend were severely depressed, or perhaps simply unhappy with his lot in life. This is the slippery slope with a vengeance and we will not take a single step down it, into the abyss.

**G. Conclusion**

We conclude by noting that the jury, no doubt

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

---

639 N.W.2d 291

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

shades of gray in the assisted suicide issue, he saw euthanasia as pure darkness.

FN70. *Id.* at 755, 117 S.Ct. 2258

FN71. *Id.* at 785, 117 S.Ct. 2258

**\*401** Justice Stevens distinguished between challenging a statute as facially unconstitutional and challenging the constitutionality of its application when framing the issues in the appeal.[FN72]

FN72. *Id.* at 739-740, 117 S.Ct. 2258 (Stevens, J., concurring).

[J]ust as our conclusion that capital punishment is not always unconstitutional did not preclude later decisions holding that it is sometimes impermissibly cruel, so it is equally clear that a decision upholding a general statutory prohibition of assisted suicide does not mean that every possible application of the statute would be valid. A State, like Washington, that has authorized the death penalty, and thereby has concluded that the sanctity of human life does not require that it always be preserved, must recognize that there are situations in which an interest in hastening death is legitimate. Indeed, not only is it that interest sometimes legitimate, I am also convinced that there are times when it is entitled to constitutional protection.[FN73]

FN73. *Id.* at 741-742, 117 S.Ct. 2258.

Of all the justices, Justice Stevens' view in this and other passages came the closest to reflecting on the notions that a possible constitutional right to commit euthanasia might exist. However, we cannot forget that Justice Stevens, in fact, concurred in the majority's opinion. He readily acknowledged the majority's conclusion that there were principled reasons for "refusing to recognize an expanded constitutional right to commit suicide," including assistance in committing suicide.[FN74] He also found persuasive John Donne's famous statement that "No man is an island," commenting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

FN74 *Id.* at 740, 741, 117 S.Ct. 2258

The State has an interest in preserving and fostering the benefits that every human being may provide to the community-a **\*402** community that thrives on the exchange of ideas, expressions of affection, shared memories, and humorous incidents, as well as on the intimate and responsibilities that others create and support. *The value to others of a person's life is far too precious to allow the individual to claim a constitutional entitlement to end that life.*[FN75]

FN75. *Id.* at 741, 117 S.Ct. 2258 (emphasis added)

Further, Justice Stevens clearly expressed his views in the context of the right to end the life of a patient for whom death is relatively imminent. In fact, after delineating the state's legitimate interests in preventing assisted suicide, Justice Stevens not only declined to say "as a categorical matter that these state interests **\*511** are invalid," he made the statement with respect to "the entire class of terminally ill, mentally competent patients."[FN76] More importantly, nowhere in his concurrence did Justice Stevens consider whether a right to commit euthanasia exists. Even if, in the future Justice Stevens would hold that the United States Constitution grants a right to physician-assisted suicide, it appears that he would limit the right to the terminally ill and would not extend it to euthanasia.

FN76. *Id.* at 750, 117 S.Ct. 2258 (emphasis added)

These five concurring justices held in common a concern that the states neither bar adequate treatment for pain nor adequate care in the name of prohibiting assisted suicide nor force patients to receive unwanted medical treatment. Here, defendant asserted that "no pain medication would suffice" and that "there was no other beneficial medical alternative that would have aided Thomas Youk." Defendant's **\*403** own words taken well

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

9-12

639 N.W.2d 291

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

influenced by the grimy realities of the videotapes he's going to conduct the trial in its entirety on his own in pro per.

that he believed "*313 defendant intended to "say to jury selection, opening statements, and closing statements, he would be bound by the rules of the court and that there would be a permanent record that he could be used on other proceedings. The trial court stated that you could attend this counsel table with defendant in order to consult with, but don't want you to jeopardize your position.

*Defendant* ] No, I said as advisors, consultation and advise. That's what I meant.
*408 The Court*: And that's what you wish to do?
*Defendant* ] Yes.
*The Court*: You're aware of all of these dangers?
*Defendant* ] Very much so.
*The Court*: Very well, and write talking about something that could carry a sentence of life imprisonment without any possibility of parole?
*Defendant* ] If I'm convinced, Your Honor, we get
*314 *The Court*: And so you have any residual dissatisfaction with your attorney?
*Defendant* ] None

Page 25

FN79: See *Revelation I, supra* at 514 (Levin, J., concurring in part and dissenting in part)

IV. Defense Counsel

A. Facts And Arguments

Before trial, defendant retained Gorcyk to serve as his defense attorney. However, at the December 9, 1998, preliminary examination, defendant indicated that he waived his right to counsel and wished to proceed in propria persona. Gorcyk and attorney Lisa Dwyer entered their appearances in the trial court on defendant's behalf. Later, however, at a proceeding on the trial court's charges, defendant can ask that any attorney might seek to proceed in propria persona. Indeed, on March 19, 1999, Gorcyk informed the trial court

In any event, while defendant did the one motion on his own behalf, it is apparent that Gorcyk and Dwyer represented defendant at all times through questioning, defendant first stated that he was confused. Gorcyk and Dwyer placed their colloquy in which he completely revised this statement.

*407 The Court*: ... on behalf of defendant. However, Gorcyk then stated to the trial court that defendant "does want to represent himself in the trial in its entirety" ...

The Court: You planned all along to represent yourself?
[Defendant ] Yes.
The Court: And so you have any residual dissatisfaction with your attorney?
[Defendant ] None.

Page 26

639 N.W.2d 291

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

The trial court informed defendant that, with respect to represent himself in order to consult with, but don't want you to jeopardize your position.

*Defendant* ] No, I said as advisors, consultation and advise. That's what I meant.

After clearing up this point, the trial court explained to defendant that he could spend the rest of his life in prison and that a criminal trial is a formal, complex, and dynamic proceeding. Further, the trial court noted, the rules of evidence applied, as did "certain decorum and certain ways in which there are presentations made to the jury and certain rules of evidence that we can't say and you can't court again asked defendant if he still wished to proceed in propria persona. Defendant indicated that he still wished to represent himself, and the trial court again pointed out the difficulties of self-representation, to which defendant replied *409 I don't want you to agonize,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

9-13

639 N.W.2d 291)
248 Mich.App. 373, 639 N.W.2d 291)
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

On March 25, 1999, the third day of trial, defendant rested and gave his closing argument, during which he stated several times that he was acting as his own attorney. The trial court instructed the jury that defendant had a constitutional right to represent himself and that they, the jurors, must not give any negative consideration to defendant's decision to do so

The following morning, while the jury was deliberating, defendant told the trial *315 court that he would "take your well-advised instructions and withdraw in favor of my two attorneys' advice." Gorosh, Dwyer, and defendant's appellate counsel represented him at sentencing. Subsequently, defendant moved for a new trial, alleging that he had been denied the effective assistance of counsel. The trial court denied this motion.

On appeal, defendant asserts that the trial court erred in denying his motion for a new trial because the assistance that Gorosh provided fell below the constitutional standards required for effective assistance of counsel. Defendant also asserts that the trial court erred in denying his motion for a new trial based on the doctrine of "serious mistake of counsel."

**B Standard Of Review And Legal Standard**

[12][13] We review a trial court's decision regarding a motion for a new trial for an abuse of discretion. FN80 With respect to the underlying question *411 whether Gorosh was ineffective, our review is de novo. FN81

FN80 People v. Leonard, 224 Mich.App. 569, 580, 569 N.W.2d 663 (1997)

FN81 People v. Toma, 462 Mich. 281, 310, 613 N.W.2d 694 (2000)

As this Court explained in People v. Knapp: FN82

FN82 People v. Knapp, 244 Mich.App. 361, 385-386, 624 N.W.2d 227 (2001).

To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, but for defense counsel's errors, there was a reasonable probability that the result of the proceeding would have been different. People v. Stanaway, 446 Mich. 643, 687-688, 521 N.W.2d 557 (1994). A defendant must affirmatively demonstrate that counsel's performance was objectively unreasonable and so prejudicial as to deprive him of a fair trial. People v. Pickens, 446 Mich. 298, 303, 521 N.W.2d 797 (1994). The defendant must also overcome the presumption that the challenged action might be considered sound trial strategy. People v. Tommolino, 187 Mich.App. 14, 17, 466 N.W.2d 315 (1991), citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**C Gorosh's Representation Before March 22, 1999**

**(1) Overview**

Defendant's briefs on appeal contain a litany of complaints aimed at Gorosh. At various places, defendant argues that Gorosh did not provide him with "appropriate advice or advocacy," that Gorosh was "not qualified" to handle his defense, that Gorosh lacked "personal competence to handle the case," that Gorosh "completely shut out" Dwyer, that Gorosh "prepared no defense," that Gorosh "withheld advice during the trial in hope of causing [defendant] to feel helpless and turn over all aspects of the case *412 to Gorosh," that Gorosh "put his own interests ahead of those of his client," that Gorosh "did ally by as inappropriate comments were made in the presence of the jury," that Gorosh "allowed the relationships among ... counsel to deteriorate to such a point that it was impossible for them to provide effective assistance to [defendant]," that Gorosh "allowed the ... strategy to ... deteriorate to such a point that ... it was impossible to such a point that ... Gorosh "did not maintain adequate communication," that Gorosh's behavior in the courtroom was *314 inappropriate. Indeed, at one point, defendant actually suggests

639 N.W.2d 291)
248 Mich.App. 373, 639 N.W.2d 291)
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

that Gorosh did not allow Dwyer to sit next to defendant at trial "so that she could provide advice." Further, defendant alleges that Gorosh threatened to tell the court that Dwyer's pretrial motion to quash the murder count was "ridiculous." FN83

FN83 Defendant relies on Dwyer's affidavit as support for this allegation. We have reviewed that affidavit and can find no such support.

Lost in this corrosive barrage of verbiage is the simple fact that on March 22, 1999, the relationship between defendant and Gorosh changed completely. Before March 22, Gorosh and Dwyer represented defendant at trial counsel; from March 22 through March 25, defendant now contends with Gorosh and Dwyer serving as standby counsel. With respect to the period before March 22, as nearly as we are able to determine, defendant claims that Gorosh was ineffective because he moved to quash the assisted suicide charge and because he was unqualified and incompetent

**\*413 (2) The Motion To Quash The Assisted Suicide Charge**

[14] There is no question that Gorosh represented defendant when the defense filed a pretrial motion to dismiss the assisted suicide charge. Had the jury been presented with that charge, Gorosh could have decided to convict him of that charge rather then murder, thereby subjecting defendant to a prison term no longer than four years and a fine not exceeding $2,000. By removing this charge, the jury was forced to consider convicting him of first- or second-degree murder, both of which carry much stiffer prison terms. FN84

FN84 See M.C.L. § 750.316 (mandatory life imprisonment for first-degree murder), M.C.L. § 750.317 (life imprisonment or any term of years for second-degree murder)

In denying defendant's motion for a new trial regarding this claim, the trial court stated

Defendant argues ineffective assistance of counsel due to trial counsel's alleged error in moving to dismiss the assisted suicide charge despite the warnings from co-counsel as well as others, to refrain from making such a motion. Defendant's argument is without merit, evidencing neither harm to Defendant nor a claim for ineffective assistance of counsel The Court, in fact, denied counsel's motion to dismiss the assisted suicide charge in the Court's Opinion and Order dated March 9, 1999 and further, the People dismissed said charge on their own motion.

We fully agree with the trial court. Even if Gorosh performed deficiently by bringing the motion, defendant cannot demonstrate that doing so caused him any prejudice. The trial court itself protected what defendant now contends was an essential component of his defense by denying the motion. Moreover, on *414 March 12, 1999, the prosecutor declined to proceed on the assisted suicide charge, pursuing only the charges of first-degree murder and delivering a controlled substance. Gorosh had no influence over the prosecutor's decision to take this action There is no possibility that, but for Gorosh's decision to move to dismiss the assisted suicide charge, the outcome would have been different in this case.

[15][16][17] Further, Gorosh's decision to seek dismissal of the assisted suicide charge may have been a matter of trial strategy. During the motion hearing, Gorosh argued for dismissal of the first-degree murder charge and, in the alternative, the assisted suicide charge. Gorosh presented a lengthy and coherent argument *317 that the first-degree murder charge should be dismissed because defendant's conduct fell within the "participation language" in the assisted suicide statute. In the alternative, he explained that if the participation language did not encompass the facts of this case, the assisted suicide charge should be dismissed. Gorosh pursued dismissal of the murder charge, which clearly was a good strategy that may have benefited defendant had it succeeded. The request to dismiss the assisted suicide charge was merely an alternative argument crafted, at least in part, because of the possibility that the trial court would allow the prosecutor to proceed on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

9-14

659 N.W.2d 291
(Cite as: 248 Mich.App. 373, 659 N.W.2d 291)

Page 29

murder charge, in fact, Gorosh stated as much during the motion hearing. This Court does not substitute its judgment for counsel's judgment regarding trial strategy. *415 That the strategy Gorosh chose ultimately failed does not constitute ineffective assistance of counsel.

FN85. See People v. Stewart (On Remand), 219 Mich.App. 38, 42, 555 N.W.2d 715 (1996).

FN86. Id.

[18] Although defendant relies on Dwyer's affidavit averring that she urged Gorosh not to file the motion, Dwyer herself signed the pleading immediately below Gorosh's signature. Defendant also filed his own motion to dismiss all the charges against him, including the assisted suicide charge. This evidence, evidently, that with every motion other than the defense accepted defendant cannot now claim that this strategy denied him his right to effective assistance of counsel. To allow him to do so, to use the well-worn adage, would permit him to "harbor error as an appellate parachute."FN87

FN87. People v. Carter, 462 Mich. 206, 214, 612 N.W.2d 144 (2000).

(3) Gorosh's Qualifications And Competence

[19] Defendant also claims that Gorosh was not qualified to handle his defense. To support this argument, defendant relies on the affidavits from Dwyer and Michael Schwartz, a former partner at the law firm where Gorosh was employed. According to Schwartz, Gorosh was practicing for only three years, had limited experience, and it, "Gorosh was running the show, despite his lack of experience to do so alone."

[20] This claim does not warrant a new trial on the basis of ineffective assistance of counsel. Inexperience alone is not enough to conclude that a defense counsel acted deficiently in a manner that prejudiced the defendant. As the comment

following MRPC 1.1 notes *416 A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar. A newly admitted lawyer can be as competent as a practitioner with long experience. Some important legal skills, such as the analysis of precedent, the evaluation of evidence and legal drafting, are required in all legal problems. Perhaps the most fundamental legal skill consists of determining what kind of legal problems a situation may involve, a skill that necessarily transcends any particular specialized knowledge. A lawyer can provide adequate representation in a wholly novel field through necessary study. Competent representation can also be provided through the association of a lawyer of established competence in the field in question.

Indeed, Gorosh was, before this trial, associated with a law firm and lawyers who had substantial experience with this defendant and the similar prosecutions instituted against him. Further, defendant never brought any dissatisfaction with Gorosh to the trial court's attention, nor did he seek to end his relationship with Gorosh until after defendant indicated to the trial court. On the first day of trial after defendant asked him whether he was dissatisfied with counsel defendant stated: "There's **418 no dissatisfaction." In fact, defendant said that he had "planned" to proceed in propria persona "all along."

The trial court then asked defendant whether he was dissatisfied with counsel and he responded that he was not, but that there were certain points that he could bring out better than an attorney. Further, during jury deliberations, defendant again chose to have Gorosh represent him during sentencing. Moreover, defendant has failed to demonstrate that but for Gorosh's alleged deficiencies, the outcome of the trial would have been different.

D Gorosh's Representation After March 22, 1999

(i) Overview

[21] Defendant argues that Gorosh's performance during the trial itself so deficient and prejudiced that it constituted ineffective assistance of counsel, asserting *417 that Gorosh was unprepared, withheld advice, ignored his wishes, shut out" Dwyer, and was concerned only with his own reputation. Inherent in this argument is the assumption that we would evaluate Gorosh's performance as standby counsel in accordance with the same legal standards that we would use in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Page 29 of 42

---

659 N.W.2d 291
(Cite as: 248 Mich.App. 373, 659 N.W.2d 291)

Page 30

connection with the evaluation of full-blown trial counsel.

(2) The Right To Self-Representation

[22] The United States Constitution,FN88 the Michigan Constitution,FN89 and M.C.L. § 763.1 each guarantee a criminal defendant the right to represent himself.FN90 As the United States Supreme Court noted in Faretta v. California,FN91 the right of self-representation is deeply rooted in English legal history:

FN88. U.S. Const., Am. VI.

FN89. Const. 1963, art. I, § 13

FN90. See Martinez v. Court of Appeal of California, Fourth Appellate Dist., 528 U.S. 152, 154, 120 S.Ct. 684, 687, 145 L.Ed.2d 597 (2000); People v. Adkins (After Remand), 452 Mich. 702, 720, 551 N.W.2d 108 (1996).

FN91. Faretta v. California, 422 U.S. 806, 821-823, 95 S.Ct. 2525, 2534-2535, 45 L.Ed.2d 562 (1975).

In the long history of British criminal jurisprudence, there was only one tribunal that ever adopted a practice of forcing counsel upon an unwilling defendant in a criminal proceeding. The tribunal was the Star Chamber. That curious institution, which flourished in the late 16th and early 17th centuries, was of mixed executive and judicial character; and characteristically departed from common-law traditions. *418 For those reasons, and because it is specialized in trying "political" offenses, the Star Chamber has for centuries symbolized disregard of basic individual rights. The Star Chamber itself not merely allowed but required defendants to have counsel. The

defendant's answer to an indictment was not accepted unless it was signed by counsel. When counsel refused to sign the answer, for whatever reason, the defendant was considered to have confessed. Stephen commented on this procedure: "The unfortunate prisoner in such a matter as to debar a prisoner from defending himself, especially when the professed object of the rules so used is to provide for his defence." The Star Chamber was, in short, a court of star chamber, and it was the hated symbol of the unlimited power of the Crown as wielded by the revolutionary fervor *319 of the Long Parliament. The notion of obligatory counsel disappeared with it.FN92

FN92. Citation omitted.

In upholding a criminal defendant's right to represent himself, the Court recognized that there was a tension between the two accused defendant himself.FN93 For reasons resting primarily on respect for the individual, the Court determined that the right to self-representation and the right to assistance of counsel.

There can be no blinking the fact that the right of an accused to conduct his own defense seems to cut against the grain of this Court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel. For decisions holding that the Constitution requires that... is surely that the assistance of counsel is essential to assure the defendant a fair trial. And a strong argument can surely be made that the whole thrust of those decisions must inevitably lead to the conclusion that a State can constitutionally impose a lawyer upon even an unwilling defendant. But it is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want. The value of state-appointed *419 counsel was not unappreciated by the Founders, yet the notion of compulsory counsel was considered... *418 For those reasons, and whatever else may be said of those who wrote the Bill of Rights, surely there can be no doubt that they understood the inestimable worth of free choice.FN93

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Page 30 of 42

9-15

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

FN101. Id. at 263, n. 1, 280 N.W.2d 840 (emphasis added).

FN102. Id.

[26] The very short discussion of representation in Griffin provides no more support for defendant's argument. In Griffin, the

[d]efendant requested that his assigned counsel be dismissed. This request was granted but at the judge's request, counsel remained to help defendant, if needed. Counsel conducted the voir dire examination of the jury and cross-examined some witnesses. Defendant's claim of reversible error because he was denied his right to proceed in propria persona is not sustained on this record.[FN103]

FN103. Griffin, supra at 372, 194 N.W.2d 104.

Thus, Griffin stands for the negative proposition that allowing hybrid representation does not compromise a defendant's right to proceed in propria persona. It certainly does not stand for the affirmative proposition that a failure to allow hybrid representation constitutes error requiring reversal.

Defendant fares no better in citing federal precedent. He refers us to United States v. Hill[FN104] and to United States v. Tuimo.[FN105] In Hill, the United States Court of Appeals for the Tenth Circuit interpreted numerous federal opinions as "not foreclos[ing] a trial judge from allowing hybrid representation in appropriate cases"[FN106] but rather, they indicate no right to hybrid[FN107] representation exists."[FN108] In Tuimo, the court wrote that "[t]he decision to grant or deny hybrid representation lies solely within the discretion of the trial court." Tuimo, which explicitly noted "that a criminal defendant has no constitutional or statutory right to represent himself as co-counsel with his own attorney," plainly did not reach the holding defendant wishes us to reach. In holding defendant[FN107] whatever "appropriate" circumstances might explain a trial court's decision to allow a defendant to proceed with hybrid representation,

defendant has failed to demonstrate that they existed here.

FN104. United States v. Hill, 526 F.2d 1019 (C.A.10, 1975)

FN105. United States v. Tuimo, 383 F.2d 1125, 1141 (C.A.2, 1985)

FN106. Hill, supra at 1024 (emphasis added).

FN107. Tuimo, supra at 1141

(4) Standby Counsel

[27][28] Defendant also claims that he was denied the effective assistance of counsel when Gorosh functioned as standby counsel. A defendant who asserts his right to self-representation has no absolute entitlement to standby counsel.[FN108] As the Michigan Supreme Court explained in People v. Dennany,[FN109] "[A] defendant has a constitutional entitlement to represent himself or to be represented by counsel-but not both." Consequently, the Court held in Dennany that Const 1963, art. 1, § 13 "permits the use of standby counsel as a matter of grace, but not as a matter of right."[FN110]

FN108. See People v. Dennany, 216 Mich.App. 47, 55-56, 549 N.W.2d 1 (1996).

FN109. See People v. Dennany, 445 Mich. 412, 442, 519 N.W.2d 128 (1994).

FN110. Id. at 443, 519 N.W.2d 128.

The defendant in McKaskle v. Wiggins[FN111] placed the proper role of standby counsel squarely in front of the United States Supreme Court. In McKaskle, defendant "423 Carl Wiggins vacillated between asserting his right to represent himself and his right to assistance of counsel at both of his trials.[FN112] Whatever Wiggins claimed is that his standby counsel impinged on his right to present his own defense, as Faretta guaranteed.[FN113] As

---

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

FN93. Id. at 832-834, 95 S.Ct. 2525 (citations omitted).

[23] Here, defendant made a free choice to represent himself. He clearly and unequivocally waived his right to counsel. Indeed, defendant represented himself in "420 he somehow denied his right to counsel or that the trial court failed to comply with the necessary requirements regarding a proper waiver. As the Court also noted in Faretta, a defendant who exercises the free choice to represent himself faces certain consequences.

The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law. Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel.[FN94]

FN94. Id. at 835, n. 46, 95 S.Ct. 2525

Therefore, defendant cannot now suggest that his free choice to represent himself, standing alone, denied him effective assistance of counsel. As the trial court accurately put it, defendant cannot use this waiver of counsel as both a sword and a shield in order to achieve the outcome he desires.

(3) "Hybrid" Representation

[24][25] Defendant suggests, however, that he represented himself and was "hybrid" representation. This "420 argument is wholly unconvincing. In denying defendant's motion for a new trial, the trial court stated that it had denied defendant's request to proceed with a hybrid defense. As the record reflects even acknowledges that the trial court denied this request. Further, contrary to defendant's suggestion, there is no constitutional right to a hybrid defense and, thus, a trial court is "420 not required to order hybrid representation.[FN95]

FN95. See McKaskle v. Wiggins, 465 U.S. 168, 183, 104 S.Ct. 944, 953, 79 L.Ed.2d 122 (1984).

Defendant, however, argues that "hybrid representation can be and has been allowed in appropriate situations." In support of this assertion, he cites two Michigan cases, People v. Ramsey[FN96] and People v. Griffin.[FN97] In Ramsey, this Court cited Faretta for the proposition that "standby counsel" may be appropriate to assist a defendant who represents himself.[FN98] Again referring to Faretta as well as Chief Justice Burger's concurrence in Mayberry v. Pennsylvania,[FN99] this Court went on to say that "these cases do not stand for the proposition that a defendant has a right to share trial defense responsibilities with an attorney."[FN100] Only in a footnote did this Court suggest that hybrid representation "might be appropriate in some cases[.]"[FN101] Even then, this Court still noted that "the administrative difficulties inherent in such a scheme."[FN102] Though making this vague and definitely hedged statement, this Court in Ramsey still affirmed the trial court's decision to deny the defendant a form of hybrid representation. This dictum in Ramsey provides no basis for us to conclude that the trial court erred here in denying defendant's request for hybrid representation.

FN96. People v. Ramsey, 89 Mich.App. 260, 280 N.W.2d 840 (1979).

FN97. People v. Griffin, 36 Mich.App. 368, 194 N.W.2d 104 (1971), overruled on other grounds in People v. Reed, 393 Mich. 342, 351, 224 N.W.2d 867 (1975)

FN98. Ramsey, supra at 263, 280 N.W.2d 840.

FN99. Mayberry v. Pennsylvania, 400 U.S. 455, 467-468, 91 S.Ct. 499, 506, 27 L.Ed.2d 532 (1971)

FN100. Ramsey, supra at 263, 280 N.W.2d 840.

9-16

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

Page 33

Justice O'Connor put it, Wiggins contended that his right to represent himself "was impaired by the standby counsel's distracting, intrusive, and unsolicited participation of counsel throughout the trial." FN118

**FN118** *McCaskle, supra.*

**FN112** *Id.* at 170-171, 104 S.Ct. 944

**FN113** *Id.* at 173, 104 S.Ct. 944

**FN114** *Id.* at 176, 104 S.Ct. 944

The Court agreed with Wiggins' underlying premise that a defendant who represents himself "must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." FN115 However, the Court concluded that the Wiggins Court had been accorded all of these rights. FN116 Further, the Court noted that the right to self-representation "must impose some limits on the extent of standby counsel's unsolicited participation." FN117 Consequently, the Court held that a defendant "is entitled to preserve actual control over the case he chooses to present to the jury," and that "participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself." FN118

**FN115** *Id.* at 174, 104 S.Ct. 944

**FN116** *Id.*

**FN117** *Id.* at 177, 104 S.Ct. 944

**FN118** *Id.* at 178, 104 S.Ct. 944

[29][30] Here, defendant asserts the opposite. He claims that Gorosh did *too little*. Defendant placed himself in the untenable position of suggesting that, in light of his own inadequacies in representing himself at trial, Gorosh should have done more to help him. *McCaskle* stands for the proposition that a defendant who chooses to appear pro se can lose much of it if standby counsel destroys the jury's perception that the defendant is representing himself. In other words, "the right to appear pro se exists to affirm the ... of the accused." It is important only if the defendant is representing himself. *McCaskle* cannot destroy by altering the jury's perception that the defendant is representing himself. FN119 Conceptually, it is difficult to conceive of a situation in which a reticent, rather than assertive, standby counsel could wander into the absence of a right to standby counsel or even a right to hybrid representation, *McCaskle* provides no intellectual foundation for the proposition that a defendant who chooses to represent himself does so at his own peril. With no constitutional right to an attorney, a defendant proceeding in propria persona has no basis to claim that the attorney must abide by constitutional standards.

**FN119** *Id.* at 178, 104 S.Ct. 944

[31] Two federal opinions support this view. In *United States v. Schmidt,* FN121 the defendant claimed that the attorney appointed to serve as standby counsel at trial was "so deficient and prejudicial that the defendant's unflattering image of the argument in *McCaskle,* the defendant rather than *too much.* The *Schmidt* court rejected this claim on two different levels. First, the court noted that because the defendant had asserted her right to represent herself FN123 and asserted her right to control the case, standby counsel was not required to represent her. Second, the defendant did not have the right to

**FN120** *Id.* at 179, 104 S.Ct. 944

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

---

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

Page 34

hybrid counsel. FN124 Rather, "[a]bsent a constitutional right to standby counsel, a defendant cannot prove standby counsel was ineffective." FN125 As the court remarked:

**FN121** *United States v. Schmidt,* 105 F.3d 82 (C.A.7, 1997).

**FN122** *Id.* at 90.

**FN123** *Id.* at 89.

As might be expected, a standby counsel's duties are considerably more limited than the obligations of a retained or appointed counsel. Although the defendant's standby counsel's role expanded as the case continued, he did not play the same role that defense counsel normally would in preparing the strategy for a criminal defense. Perhaps in a case where standby counsel had title in name only and, in fact, acted as the defendant himself, lawyer as well as in name. Because defendant chose to represent himself, we would consider a claim of ineffective assistance of standby counsel. FN126 ... proceeded pro se, she may not now assign blame for her conviction to standby counsel. FN126

**FN125** *Schmidt, supra* at 90.

**FN126** *Id.,* citing *United States v. Cochrane,* 985 F.2d 1027, 1029 & n. 11 (C.A.9, 1993); *United States v. Windsor,* 981 F.2d 943, 947 (C.A.7, 1992).

**FN127** *Id.* at 90-91.

The more recent decision in *United States v. Morrison* interpreted *Schmidt.* FN128

**FN128** *United States v. Morrison,* 153 F.3d 34, 55 (C.A.2, 1998) (citations omitted).

As we held in *Schmidt,* without a constitutional right to standby counsel, a defendant is not entitled to relief for the ineffective assistance of standby counsel. While we stated in *Schmidt* that we might entertain a claim for ineffective assistance of standby counsel if standby counsel acted as the defendant's lawyer throughout the proceedings, the record indicates that the defendant retained control of his own defense throughout his trial ... standby counsel was in a subsidiary role.

Going one small step beyond *Schmidt,* the court in *Morrison* concluded that this rule of law did not require the additional, and therefore superfluous, process of deciding whether standby counsel provided effective assistance. FN128

[31] We find this reasoning in *Schmidt* and *Morrison* persuasive. From March 22 through March 25, defendant represented himself. During this time, Gorosh was his standby counsel in reality and did not fail below an objective standard of reasonableness and defendant has made no showing that, but for Gorosh's alleged errors, the result of the proceedings would have been different.

**E. The "Serious Mistake" Doctrine**

[31] Applying its holding to the facts of the case, the Court noted that the performance of Wiggins' standby counsel "should not serve as a model for the future trials," but the Court nevertheless determined that standby counsel had waived her right to count short of infringing on Wiggins' *[Faretta]* rights.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

9-17

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

[32][33] Defendant claims that he is entitled to a new trial under the common-law "serious mistake" standard for evaluating ineffective assistance of counsel claims. Substantively, he claims that Garcia's failures, described in his traditional ineffective assistance of counsel argument, also constituted a violation of this serious mistake doctrine. The cases defendant cites [FN129] as announcing this serious mistake doctrine rely on *People v. Garcia*,[FN130] In *Garcia*, this Court, following that serious mistake standard relied on the statement in *People v. DeGraffenreid*,[FN132] that

FN129. See *People v. Seaby*, 136 Mich.App. 168, 175-176, 356 N.W.2d 614 (1984); *People v. Smith*, 108 Mich.App. 338, 343, 310 N.W.2d 235 (1981); and *People v. Loiter*, 103 Mich.App. 386, 389, 302 N.W.2d 879 (1981).

FN130. *People v. Garcia*, 398 Mich. 250, 266, 247 N.W.2d 547 (1976)

FN131. *Id*

FN132. *People v. DeGraffenreid*, 19 Mich.App. 702, 717, 173 N.W.2d 317 (1969)

*324 [a] claim that an adequate lawyer makes a serious mistake does not raise the constitutional issue of the right to counsel, it does not involve the concept of "effective assistance of counsel," it should ... Although the sham trial standard which circumscribes the constitutional right ...

*428 Thus, the Court in *Garcia* held that even where assistance of counsel satisfies the constitutional requirements, defendant is still entitled to a fair trial. Defendant can be denied this right if his attorney makes a serious mistake. But a court should not grant a new trial unless it finds that but for this mistake, defendant would have had a reasonably likely chance of acquittal.[FN133]

FN133. *Garcia, supra* at 266, 247 N.W.2d

547.

Subsequently, the United States Supreme Court set forth the federal standard for determining whether a defendant received the effective assistance of counsel in *Strickland, supra*, which the Michigan Supreme Court adopted in *Pickens*.[FN134] Having moved away from the "sham trial" test previously used to analyze effective assistance of counsel claims, which was the basis for the comment in *DeGraffenreid* regarding an attorney's serious mistake,[FN135] the *Pickens* Court reexamined *Garcia*.

FN134. *Pickens, supra* at 326-327, 521 N.W.2d 797.

FN135. *DeGraffenreid, supra* at 717, 173 N.W.2d 317.

Our Court of Appeals ... has interpreted this Court's decision in *Garcia* as requiring the reversal of a conviction even if defense counsel's ineffective assistance did not prejudice the defendant. While we recognize that the opinion is less than a model of clarity and might be interpreted, such a procedure is not mandated by federal law. *Garcia* essentially relied on Sixth and Fourteenth Amendment jurisprudence, and did not formulate the standard from the intentions, history, or common law undergirding the Michigan Constitution. *Garcia*, therefore, does not stand for the proposition that the Michigan Constitution was intended to grant stronger protections than federal authority with regard to the standards applied to the issue of ineffective assistance of counsel.[FN136]

FN136. *Pickens, supra* at 312-313, 521 N.W.2d 797.

*429 Thus, in *Pickens*, the Michigan Supreme Court put to rest any notion that there is an alternative, common-law test for effective assistance of counsel. Again, defendant has failed to provide any persuasive authority to disprove this clear decision in *Pickens*, which excuses us from engaging in an exhaustive search of our own.[FN137]

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

As the First Circuit Court of Appeals so aptly put it, "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.[FN138] Moreover, even if there were such a standard for an attorney's conduct, the same flaws in defendant's reasoning concerning Garcia's performance apply in this context, especially because he wholly relies on his arguments concerning ineffective assistance to outline what he considers serious mistakes. Thus, there is no merit to this issue.

FN137. See *Mitcham, supra*.

FN138. *United States v. Zannino*, 895 F.2d 1, 17 (C.A.1, 1990).

V. Defendant's Closing Statement

A. Facts And Argument

[34] Defendant gave his own closing argument to the jury on March 23, 1999. ... *325 Although he did not testify at the trial, at several points in his closing argument defendant injected what would appear to be first-person testimony:

[Defendant:] Next time he [the prosecutor] uses the word "kill" or "murder" please ask yourselves, please-why? Did you ever ask him why I did that, why I did this act he calls killing? He says just to murder Thomas Yrouk that's all, to *426 kill him. Next time he [sic] you hear him utter kill, say why, and why.
Why they? Why on the 17th of September? Why not a month earlier or three years earlier? Ask him why not earlier didn't he call me to kill him. Those are unanswerable questions. He can't answer those. Why did Tom Yrouk call name [sic] on the 15th or [sic] 16th? Why did he call me? Because he had-testify now. He can't tell the facts now. That person's now...
*The Court:* You have something in evidence. You don't know whether he's going to talk about what's in evidence.
***

[Defendant:] I I staged the whole thing. Really I'm not much of a producer or a director in movies. We-I wanted to protect the family from possible charges-
[Prosecutor:] Objection. Again, he's testifying. He can't put facts into-
[Defendant:] I'm trying to show why I did it.
[Prosecutor:] He cannot put facts before the jury which might not have been proven before or through testimony or other evidence. He cannot testify now.
***
[Defendant:] There were no witnesses there. Now can I say why?
[Prosecutor:] I'm objecting.
*The Court:* Well, sir, it depends on how you phrase it.
[Defendant:] There were no witnesses there because I didn't want anyone else-
[Prosecutor:] Objection
[Defendant:]-implicated.
[Prosecutor:] Objection
[Defendant:] Well, that's-can I say why?
[Prosecutor:] Judge, you know, he could have gotten on-you know, he didn't-
***
*431 [Prosecutor:]-he didn't-he can't testify now-
He cannot testify now.
[Defendant:] Why-why I took so much time with the needle-why here? Can I say that?
*The Court:* You can comment about what is in evidence. You can comment about what is on the tape.
[Defendant:] I took my time down here in this one vein, trying to get a small vein, trying to keep-
[Prosecutor:] Your Honor, I'm going to object again. He's now testifying. He's putting new facts before the jury. He can't do that.
[Defendant:] Okay. The covering up of the needle sticks was to try to keep this-
[Prosecutor:] Objection
[Defendant:] Well, objection, Judge. He can't testify now. He talked about the needle sticks
[Prosecutor:] You can't say-Judge, he's giving reasons for these things. That has to come through testimony. It can't be presented through his closing argument to the jury.
*326 *The Court:* You may make argument about

659 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

what they saw, but you can't introduce something new. Okay?

[Defendant:] After they saw the slip of paper on the floor with my name on it, this became known. It became known. Why didn't I come forward immediately after I did it? It became known only after that became known. My name on it became known—everyone knew it would become known. It wasn't done for staging, it wasn't done to show it wasn't videotaped for that purpose. And why was a narration which he brings up? Can I give reasons for the narration?

[Prosecutor:] I object.

* * *

[Defense:] That's the implication given by the prosecutor and other other assertion, implying that it's very cursory, that I don't really know these patients. I don't know anything about them. No doctor who's got integrity and is competent would proceed without definitive medical information on the patient. The only point is they don't have that information. I do.

[Prosecutor:] Well, objection. The jury doesn't have that, either. Again, I'm going to object to him putting in facts that didn't come during trial. The Court: Let's see if we can break this one down. You may comment about anything, that's in evidence. You may not comment about anything he said. You just can't introduce something.

The next day, while the jury was deliberating, defendant moved for a mistrial on the basis of the prosecutor's comments. The trial court denied the motion.

B. Preservation And Standard Of Review

Defendant now contends that the prosecutor, while opposing in his closing argument, several times improperly referred to defendant's allegedly improperly referred to defendant's allegedly exercise his right to remain silent. Although defendant later moved for a mistrial, he failed to object to the prosecutor's comments at the time the prosecutor made them. Accordingly, this was a calculated decision not "to disrupt the flow of closing" and an effort "to get a copy of the transcript —" of the prosecutor's comments to be used for the motion for a mistrial.

---

[35][36] Defendant failed to preserve this issue for appeal by objecting to the prosecutor's allegedly improper comments in a timely fashion.[FN38] Accordingly, our review is limited to determining whether the comments were plain error that affected defendant's substantial rights.[FN39]

FN38. See *People v. Schutte*, 240 Mich.App. 713, 720, 613 N.W.2d 370 (2000).

FN39. See *People v. Carines*, 460 Mich. 750, 761-762, 597 N.W.2d 130 (1999).

*433 C. Right Not To Testify

[37] Neither a prosecutor nor the trial court may comment on a defendant's decision to exercise his constitutional right not to testify.[FN40] Published precedent does not address the particular situation presented in this case. The cases that defendant cites are distinguishable because they do not involve a defendant who proceeded in propria persona. However, *People v. Marcus Jones*[FN41] is instructive.

FN40. See *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965); *People v. Fields*, 450 Mich. 94, 108-109, 538 N.W.2d 356 (1995).

FN41. *People v. Marcus Jones*, 442 Mich. 893, 496 N.W.2d 344 (1993).

FN42. *People v. Marcus Jones*, 442 Mich. 893, 496 N.W.2d 344 (1993).

In *Marcus Jones*, while the prosecutor was giving his closing argument to the jury, the prosecutor described a piece of *327 trial testimony, prompting the defendant to interject, "They didn't say that." The trial court admonished the defendant, stating, "- 'If you want to testify, or, your chance to do that is over with you [sic]. You can't sit there, Mister—you had an opportunity to testify. You can't testify now—. " FN43 Defense counsel then objected, prompting the trial court to ask, "- 'Objection to what? He's out now speaking. [defense counsel] [sic]. He had that opportunity. The jury knows that he can't have it both ways.

---

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

---

(FN43)

639 N.W.2d 291
248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

FN43. *Id.* at 893, 496 N.W.2d 344.

FN44. *Id.* at 894, 499 N.W.2d 344.

FN45. *Id.* at 894, 499 N.W.2d 344.

Though the Court reversed the defendant's conviction, in an unpublished opinion per curiam issued July 10, 1992 (Docket No. 127207), the Michigan Supreme Court, in lieu of granting leave to appeal, preemptorily vacated the judgment of the Court and remanded the matter to this Court for reconsideration.[FN46] After acknowledging that "neither the prosecutor nor the trial court may comment on a defendant's exercise of his constitutional right not to testify," the Supreme Court nevertheless concluded that the trial court's remarks were a proper response to the defendant's interruption. Further, the Court noted, "[although awkwardly phrased, the judge's statements were consistent with his obligation to maintain orderly proceedings and proper decorum in the courtroom."[FN47] Finally, the Court concluded that the defendant was not entitled to a new trial having not been denied a fair trial in the first instance.[FN48]

FN46. *Id.* at 893, 496 N.W.2d 344.

FN47. *Id.*

FN48. *Id.*

The Mississippi Supreme Court reached a similar conclusion in *Larry Jones v. State*.[FN49] The defendant in *Larry Jones* did not testify during trial, but the prosecutor, during the sentencing phase of his capital murder prosecution.[FN50] During his argument, the defendant referred to facts that were not in evidence.[FN51] Consequently, the prosecutor objected in the presence of the jury

FN49. *Larry Jones v. State*, 381 So.2d 983 (Miss. 1980).

---

sta' --(FN53)

FN50. See *Id.* at 993.

FN51. *Id.* at 997.

That's testifying and there's no way to contradict that. It would be impossible. If the Judge, if the Judge let him, if he let the State, if the State cross-examine him on that but the State does not have a right to cross-examine him to stand up here if it not proper. The State didn't have a right to cross-examine him on is not proper . The State didn't have a right to stand up, Judge, we couldn't put him on the stand ...[FN52]

FN52. 

*435  The Mississippi Supreme Court acknowledged that defendants must make a difficult choice between arguing their own case and invoking the right not to testify.[FN53] However, the court remarked that

FN53. *Id.* at 998.

[a] criminal defendant who takes advantage of his right to argue his case to the jury must not be permitted to say all the things he might have testified to had he chosen to call himself as a witness. When he does so, he will be deemed to have waived the right not to take his failure to take the stand commented upon.[FN54]

FN54. *Id.* at 993.

**328 Though the court noted that a defendant representing himself all had to follow the court rules, it nevertheless indicated that trial courts should give these defendants some "leeway" in arguing their case.[FN55] However, the court cautioned,

FN55. *Id.* at 993-994.

[i]n those instances where a defendant, arguing pro se, clearly goes beyond the evidence in the record on a material point, as he did in this case, he must

---

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

9-19

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

accept as a consequence the prosecution's comment on his failure to swear to the testimony. The defendant's remarks in this case cannot be dismissed as a failure to 'grasp' legal niceties." They are unsworn testimony, and as such, constitute a partial waiver of the constitutional privilege against self-incrimination and the prohibition against a district attorney from commenting on his not taking the stand.

We do not say that defendant who argues pro se loses the privilege against prosecutorial comment or his failure to testify. Only when the defendant's remarks go beyond the evidence does he waive this privilege. FN156

FN156. Id at 994.

*436 Thus, as did the Michigan Supreme Court in Moore v Jones, the Mississippi Supreme Court in Larry Jones concluded that there was no error requiring reversal because the "defendant's own statements which were exculpatory and self-serving in nature, not under oath and not supported by the record," prompted the prosecutor to make the comment at issue FN157

FN157. Id at 993.

The Missouri Supreme Court used a variation of this "proper response" rationale in State v Bronson FN158 to reject the defendant's contention that the prosecutor's objections and remarks improperly referred to his decision not to testify through proceeding in propria persona. Describing the context in which the references to the defendant's decision not to testify arose, the Bronson court explained:

FN158. State v. Bronson, 679 S.W.2d 246 (Mo., 1984).

This is not a case in which a defendant sits mute at counsel table and the prosecution points up the defendant's failure to testify. On the contrary, this is a case in which defendant interjected himself into the

defense and during his protracted trial participation effectively injected himself into the mainstream of the evidence. He attempted not only to argue the various points in issue but in the presentation of evidence through his lengthy interrogation of the State's witnesses, sought repeatedly to state as facts items not otherwise in evidence and in certain instances to establish as fact matters of which the witnesses had no knowledge. Clearly these were points which defendant considered vital to his case and on which he was apparently otherwise unable or unwilling to obtain proof. In effect he was attempting in that manner to supply to these otherwise unproved "facts." The objections of the prosecutor to those attempts of defendant, some of which were successful, some not, accurately pointed out what defendant was trying to do-and lodged the objections in those terms (e.g., defendant "is *437 attempting to testify to that ..." "He's trying to testify ..." "Defendant is again trying to testify.") The objections went to the form of the questions and in several instances were sustained ... [T]his is not a case in which defendant failed or refused to testify and in which comment was made on that fact Indeed it is the opposite. Defendant *439 sought in the jury's presence to state as evidence matters not in proof and in so doing he sought to testify without having been sworn and the prosecutor objected for that reason in those terms. FN159

FN159 Id at 249 (citations omitted).

The Bronson court then described a rule that was easy to apply:

The orthodox standard prohibiting comment by the prosecution on the failure of the accused to testify is applicable when the accused is silent, but when the accused conducts his own defense and attempts-innocently or otherwise-to testify or to inject facts not in evidence into the case, a different problem arises For then it is defendant's "attempt to testify" to which objection is made. FN160

FN160 Id at 250.

In the absence of a "direct and unequivocal"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 Mich.App. 373, 639 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

reference to the defendant's right not to testify, the court held that there was no error requiring reversal

Here, the prosecutor's objection to defendant's failure to testify fits squarely within the reasoning of both Jones cases and Bronson. Defendant's decision to testify to the jury during closing argument, rather than confronting the evidence admitted at trial prompted the prosecutor's response. Defendant's comments can only be characterized as repeated and improper attempts to present the jury with facts not in evidence. The prosecutor's comments were properly focused on preventing defendant from continuing *438 down this wrong path. The prosecutor's comments certainly were not the sort of "direct and unequivocal" reference to the court in Bronson would have found plain error requiring reversal. To defendant's benefit, the trial court also instructed the jury that every defendant has an absolute right not to testify, that the jurors must not consider the fact that defendant did not testify, and that the fact must not affect their verdict in any way. In sum, given the circumstances of this case, we conclude that defendant has failed to demonstrate a plain error requiring reversal. We note that our conclusion does not hinge, as did the Mississippi Supreme Court's decision in Larry Jones, on the notion that the defendant partially waived his constitutional privilege against self-incrimination when his remarks went beyond the evidence. We simply conclude that the prosecutor's objections and comments did not constitute direct and unequivocal references to defendant's failure to testify Rather, they merely amounted to objections to defendant's repeated and improper attempts to inject facts not in evidence into his closing statement.

VI. Testimony of Terrence and Melody Youk

A. Facts And Argument

Before trial, the prosecution moved to preclude defendant from asserting the defenses of consent and euthanasia and from introducing any irrelevant testimony, particularly with respect to the victim's pain and suffering, and quality of life, and to prevent a

jury nullification argument. In its opinion and order the trial court granted the prosecution's motions, but allowed evidence of Youk's pain and suffering, and quality of *439 life, where such evidence related to the assisted suicide charge, which was still pending at that time. When the prosecutor decided not to pursue the assisted suicide charge, defendant asked the trial court to reconsider its decision to exclude evidence relating to Youk's pain and suffering, among other things. The trial court denied this motion.

*430 When defendant submitted his witness list, however, it included Melody and Terrence Youk. The trial court instructed defendant that he needed to make an offer of proof concerning the two witnesses. On the second day of trial, defendant made an offer of proof indicating that Terrence Youk would testify that defendant did not intend to murder Thomas Youk. With regard to Melody Youk, defendant indicated that her testimony was relevant to Thomas Youk's background and his own intent.

The trial court made a special record regarding defendant's offer of proof. Melody Youk testified that when she met with defendant she explained Youk's condition, and she indicated that they understood that defendant may be able to "assist [them] in relieving his pain and suffering." According to Melody Youk, in a subsequent conversation, she, Terrence Youk, and defendant discussed what defendant could do "to bring an end to this situation."

Defendant argued that Melody Youk's testimony was relevant to establish Thomas Youk's state of mind and defendant's perception In response, the prosecutor argued that Melody Youk's testimony was relevant to consent and euthanasia, which were both recognized defenses to murder, and that Melody Youk's testimony did not concern defendant's state of mind. The trial court then allowed defendant to make an offer of proof. Defendant testified that he never told Terrence Youk that he never discussed the words "kill or murder." Defendant again argued that Melody Youk's testimony was relevant to show that he did not intend to kill Youk

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9-20

659 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

Following arguments of the parties, the trial court ruled that Melody Youk's testimony was appropriate. The trial court stated that defendant was attempting to introduce evidence of a mercy killing, which is not cognizable under state law, and that his proffered evidence related to the fact that Melody Youk did not want defendant to "do something" was not relevant to defendant's state of mind.

With regard to Terrence Youk's testimony, defendant argued that he had a constitutional right to present it. The trial court ultimately ruled that Terrence and Melody Youk's proposed testimony was hearsay and irrelevant. The issue was again raised during defendant's motion for bond pending appeal. Terrence and Melody Youk could have testified about Youk's death, the effect of his disease, his daily life conditions, and his consent, as well as rebutting the prosecutor's argument that defendant's purpose was to seek publicity and to advance his own agenda.

**B. Standard Of Review**

[38][39] The trial court has discretion in considering whether to admit evidence.[FN161] Thus, we review the trial court's \*331 decision to exclude this evidence for an abuse of that discretion.[FN162]

FN161 People v. Starr, 457 Mich. 490,

**C. Res Gestae Witnesses**

[40][41] Defendant states that because Terrence and Melody Youk were res gestae witnesses, "the Prosecutor himself was obligated to call [them] to the stand." In making this claim, defendant apparently relies on M.C.L. § 767.40a [FN164] as it appeared before the Legislature amended it in 1986, because as well as in the cases interpreting that former version of the statute. However, under the current version of the statute, the prosecutor no longer has a duty to produce res gestae witnesses.[FN165] Instead, the prosecutor has a continuing duty to advise the defense of all res gestae witnesses that the prosecution intends to produce at trial.[FN166 → res gestae witnesses was replaced with the duty to provide notice of all known witnesses and to give reasonable assistance in the locating of witnesses if a defendant \*442 requests such assistance.[FN167] Thus, even if Terrence and Melody Youk could be considered res gestae witnesses, the prosecutor had no duty to produce them to testify.

FN163 1941 PA 336.

FN164 1986 PA 46.

FN165 See People v. Burwick, 450 Mich. 281, 298, 537 N.W.2d 813 (1995)

FN166 See People v. Snider, 239 Mich.App. 393, 423, 608 N.W.2d 502 (2000).

FN167 Id

**D. Relevance**

[42][43] We have a separate, and further, rationale for affirming the trial court's decision to exclude this evidence. As the trial court noted repeatedly, the two witnesses simply had no relevant testimony to offer to the jury.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

---

659 N.W.2d 291
(Cite as: 248 Mich.App. 373, 639 N.W.2d 291)

evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." [FN168] A variety of factors, including the elements of the charged crime, the theories of admissibility, and the defenses asserted, help determine whether any particular piece of evidence is relevant.

FN168 MRE 401.

[44] The testimony that Terrence and Melody Youk would have provided in this case concerned Youk's medical condition, pain, suffering, and consent. By proffering such evidence, defendant sought to justify his killing Youk. In fact, although defendant claims that he proffered their testimony for other reasons, the crux of their claims consistently relate to consent and euthanasia. Simply put, consent and euthanasia are not recognized defenses to murder. At the trial court noted, the concept from the jury testimony from the Legislature as a defense to be the charged crime. Thus, Terrence and Melody Youk's testimony was inconsequential to the determination of this case.

FN169 People v. Brooks, 453 Mich. 511, 517-518, 557 N.W.2d 106 (1996), quoting People v. Mills, 450 Mich. 61, 67-68, 537 N.W.2d 909 (1995).

FN170 People v. Demers, 195 Mich.App. 205, 207, 489 N.W.2d 171 (1992).

[45] Within this issue, defendant also suggests that he was prejudiced because the prosecutor discussed his "lack of consent" and defendant's political and personal agenda. Defendant asserts that the testimony \*332 of Terrence and Melody Youk could have contradicted those claims. This argument is entirely unpersuasive. The trial court allowed defendant to argue that Youk consented to the two witnesses simply saw the videotape of Youk consenting to defendant's

actions. Similarly, defendant himself stated on the videotape, and during closing argument to the jury, that his move in killing Youk was to relieve Youk's pain and suffering, and to bring the issue of euthanasia to the forefront. Accordingly, we conclude that the trial court did not abuse its discretion in precluding Terrence and Melody Youk from testifying.

Affirmed.

Mich.App.,2001.
People v. Kevorkian
248 Mich.App. 373, 639 N.W.2d 291

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

9-21

*Kennelly failed to present a due/trial*

1          THOMAS O'FARRELL, SR.,

2    called as a witness on behalf of the Defendant, being

3    first duly sworn, was examined and testified as

4    follows:

5                    DIRECT EXAMINATION

6                    BY MR. KENNELLY:

7         Q.    Sir, what is your name, please?

8         A.    Thomas O'Farrell, O'F-a-r-r-e-l-l.

9         Q.    And are you related to the Thomas O'Farrell

10   seated here in the courtroom also?

11        A.    Yes, sir.

12        Q.    What is that relationship, sir?

13        A.    I am his father.

14        Q.    Sir, are you aware of what your son's

15   predominant hand is?

16        A.    Yes, sir, I am.

17        Q.    What is that?

18        A.    His right hand.

19   MR. KENNELLY:   No other questions.

20   MR. FORD:   I have no questions based on that.

21        THE COURT:   Thank you, Mr. O'Farrell.

22                              (Witness excused.)

23   MR. KENNELLY:   Judge, we have no other evidence.

24   We rest.

1        Q        What happened when you made that

2    request?

3        A        I was denied that request again, sir.

4        Q        After they denied that request, what

5    happened, Mr O'Farrell?

6        A        They locked me in that room and left

7    again.

8        Q        Did anybody come to talk to you again

9    after that?

10        A        Yes.  The other lieutenant --  the same

11    lieutenant came and talked to me and he was

12    trying to be very polite to me.

13        Q        What was said to you at that point,

14    sir?

15        A        He told me that I was going to

16    cooperate with him, I wasn't going to be getting

17    an attorney.  And at that point in time that he

18    kind of threatened me as far as taking my son --

19        Q        What did he say to you in regards to

20    your son?

21        A        That he was going to call the

22    Department of Children and Family Services and

23    have my son taken away.

24        Q        After they told you this thing about

A44

11-1

1    your son, what happened, sir?

2        A    I told them if they wanted to mess with

3    me, they can do that, but to please leave my son

4    out of this.

5        Q    After you said that to the police

6    officer what happened, sir?

7        A    He said I was going to cooperate with

8    him or my son would be taken away.

9        Q    Were you again questioned concerning

10    the death of Leslie O'Farrell after that, sir?

11        A    Yes, sir.

12        Q    Did you answer questions at that time,

13    sir?

14        A    Yes, sir.

15        Q    Who conducted that questioning,

16    Mr O'Farrell?

17        A    At that time it was just the lieutenant

18    that was in the room with me.

19        Q    Did you later speak with other

20    detectives?

21        A    Yes, sir.

22        Q    Were they questioning you regarding the

23    death of Leslie O'Farrell?

24        A    Yes, sir.

11-2

1      Q    The total conversation.

2      A    Including -- okay.  We started at about 11:40 after I

3    advised him of his rights and then until about 2:00 to 2:15 but

4    in the interim there were -- there were a couple of bathroom

5    breaks.

6      Q    And during the course of that conversation time were you

7    asking him questions and was he just talking about things?

8      MR. KENNELLY:  Object.

9      THE COURT:  Overruled.

10      A    Yes.  Detective Shack and I were present.  And I was

11    asking him questions and he was -- he was pretty much telling in

12    a narrative what had happened.

13      MR. FORD:  Q  What happened at about 2:00 or 2:15 when

14    you're indicating that you broke off this initial conversation?

15      A    At approximately 2:00 o'clock, someone had brought food

16    which I believe if I remember correctly was his dad that brought

17    him food from McDonald's.  And at that time he was allowed -- he

18    wanted to eat so he went into a different room outside of this

19    big room that we were in and that's where he ate his food.

20      Q    At the time he was eating his food, was he alone or were

21    you with him or who was with him?

22      A    No.  When he was -- well, when he went back into the --

23    in the smaller room which was outside of this big one, I don't

24    know -- when I went back into that room, he was in there and I

E-45

1    assume he was eating food.  When I went afterwards, I went back

2    to see him when he was just about finished eating his food.

3        Q    What was he eating?

4        A    Cheeseburger, McDonald's.

5        Q    And when you went back into the room, was he alone in

6    the room?

7        A    When I -- when I -- when I first went, his -- his father

8    who I believed at that time who is the gentleman with the

9    glasses.

10       MR. FORD:  For the record indicating, your Honor, I think

11   Mr. O'Farrell, Sr.

12       THE COURT:  Very well.

13       A    He was -- he -- he had momentarily been in the room.

14   And when I came, he stepped out and then I went into the room.

15       MR. FORD:  Q  When you -- did you speak to Mr. O'Farrell

16   again after that?

17       A    Yes.  When I --

18       Q    At that time?

19       A    At this time when his dad stepped out?

20       Q    Yes.

21       A    Yes, I did.

22       Q    What was the first thing you said to him then?

23       A    I just asked him how was the food.  He said it was fine.

24   And then he looked -- he looked at me and said, "I don't" -- "I

E-46

12-2

1    don't want to say anything more without a lawyer present."

2        Q    And at that point did your interview with Mr. O'Farrell,

3    the young Mr. O'Farrell discontinue?  You ended it?

4        A    That's where it ceased at that point.

5        MR. FORD:  If I can just have a moment, your Honor.

6        THE COURT:  Um-hm.

7                    (Brief pause)

8        MR. FORD:  Q  At any point prior to the time that he did

9    request to speak to an attorney, if any further questioning was

10   to occur did Mr. O'Farrell indicate to you that he wished to

11   have an attorney present?

12       A    I'm sorry?

13       Q    At any point prior to the time at the end of your

14   conversation with him when he said I want an attorney, before

15   that at any time had he said --

16       A    No.  When he told me the first time, he told me that he

17   wanted a lawyer present was when I saw him, he was eating the

18   cheeseburger in the smaller room.

19       Q    At any point when you were with the Defendant, did you

20   tell him unless he helped you his four year old son would end up

21   in state custody and would end up in state custody?

22       A    No.

23       Q    Did Mr. O'Farrell ever complain to you of any sort of

24   conduct like that by the detectives or anyone else?

                            E-47


                            12-3

1    A    No.

2    Q    Do you know who he is?

3    A    I believe one of the physicians involved,

4    yes.

5    Q    He was the one that actually treated Leslie

6    O'Farrell?

7    A    Yes.

8    Q    You were probably aware that it was his

9    opinion that her diabetes was very manageable?

10    A    Yes.

11    Q    Now, you have talked a few times about

12    something that really caught my ear, Doctor.  You

13    talked about personal notes or a diary.  I have never

14    seen a diary, so if you have got notes or a personal

15    diary from Leslie O'Farrell, where did you get them?

16    A    I got them from Mr. Kennelly, the Defense

17    attorney.

18    Q    And, if you could, Doctor, I would like to

19    see the diary you are talking about.

20    A    I returned the diary to him.

21    MR. FORD:  Judge, I would ask that the diary be

22    tendered.  I have never received this, Judge.  For the

23    record, Judge, one of the things I addressed with the

24    Court earlier today was this issue of a diary as it

1  relates to an accusation of an unknown person named

2  Kathy Morris that I was in possession of a diary and I

3  had prevented Mr. O'Farrell from presenting the diary

4  to the Court.  I want to indicate that this is the

5  first time I have seen this diary.  Is that correct?

6      MR. KENNELLY:  Your Honor, whatever is referred to

7  in this letter, I have no knowledge of a person named

8  Kathy Morris.  We tried by way of subpoena to find out

9  who she was.  I have never had any contact with that

10  person.  These notes, I believe, were prepared by

11  Mrs. O'Farrell at the request of Dr. Robbins during

12  treatment, and they are -- that is what they are.

13  They were tendered to us by Dr. Robbins in response to

14  subpoena.

15      MR. FORD:  Judge, I --

16      THE COURT:  Let me ask you this.  Assuming that is

17  a diary, is this the first time Mr. Ford has received

18  it?

19      MR. KENNELLY:  Yes, but I don't believe this has

20  anything to do with any person named Morris being in

21  possession of.  These things, I believe Dr. Robbins

22  received from Mrs. O'Farrell, and they have been in

23  his possession until he sent them to us within the

24  last six weeks.

1      THE COURT:  Well, it may or may not be.  She

2  referred to a diary she claimed she delivered to

3  Mr. Ford.  Mr. Ford has denied receiving any diary.

4  If this is the same, so be it.  If not, we won't have

5  that.

6      MR. FORD:  I never had this diary or any other

7  diary, and Mr. Kennelly never gave me any diary until

8  today.

9      THE COURT:  The record will reflect that is the

10  case.

11      MR. FORD:

12      Q   So, these materials were tendered to you by

13  the psychologist that was treating them in their

14  marriage?

15      A   No, they were sent to Mr. Kennelly's office.

16  He gave them to me within the last two weeks along

17  with treatment notes.  He said they came from her

18  therapist, although I had some of those treatment

19  notes previously, but this time this diary was

20  included.

21      Q   Doctor, --

22      A   Partial diary, I think.

23      Q   For the record, Doctor, this is nine and a

24  half pages of handwritten material; is that correct?

EXHIBIT 14

*Illegally Obtained Evidence (see prev)*
*Kennelly Ineffective Defense (supp Hearing + Sentencing)*

1    have a signed consent form from Thomas O'Farrell

2    at the time you went there?

3         A    No.

4         Q    You did not have any consent to search

5    form?

6         A    No.

7         Q    When you entered the house did you take

8    some property from within the house?

9         A    Yes.

10        Q    You took a handwritten letter; is that

11   right?

12        A    Yes.

13        Q    And you picked that letter up off the

14   dresser within the home?

15        A    Yes.

16        Q    Did you have any search warrant to look

17   for that letter at the time you picked that up?

18        A    No.

19        Q    Detective, you inventoried that letter;

20   is that right?

21        A    Yes.

22        Q    And that letter consists of about six

23   pages?

24        A    I don't recall.

1    defense has cited at 88 App.3d 387.

2          While that may, indeed, be the case, and if that

3    was all we had here, then, perhaps, the result would be

4    different, but here on the basis of Officer Maderer's

5    testimony, there is uncontradicted evidence of consent and

6    I believe that obviates the legal need for the officers to

7    obtain a search warrant and does not require me to analyze

8    or uphold the absence of a murder scene exception to the

9    4th Amendment because even those cases discuss and

10   distinguish consensual entries such as we have here.

11         Nonetheless I do not believe that the officers

12   had carte blanche authority to go through everything in his

13   dwelling.  What was discovered in the bedroom I believe was

14   fair game as far as the investigation was concerned.  Even

15   had there not been the inadvertent bumping and opening of

16   the cabinet, certainly under the doctrine of inevitable

17   discovery, the officers would have had the right to go into

18   that cabinet and ascertain if it appeared to have contained

19   indications of having items jostled or moved or what have

20   you.

21         The same analysis would not hold true for the

22   letter obviously.  I believe in a different bedroom, a

23   son's bedroom, a dresser, the Court would grant the motion

24   as to the letter.  It will be denied as to all other

G   31

14-2

1 daughter-in-law, but her son who had called when she

2 received the call earlier that morning.

3          Further, your Honor, I believe that

4 Detective Kiernan would testify that upon leaving

5 Illinois Masonic Hospital, he drove to the scene of

6 3435 West Ardmore followed by Mrs. O'Farrell.

7          That at 3435 West Ardmore, he recovered a

8 letter which was previously identified during the

9 motions as the Petitioner's Exhibit Number 2, your

10 Honor.

11          And for convenience, I would ask that that

12 be still considered as Petitioner's Number 2 or

13 Defendant's Number 2 for identification, and that he

14 recovered that on top of a dresser in open view at

15 the home at 3435 West Ardmore.  So stipulated?

16     MR. FORD:     So stipulated.

17     MR. KENNELLY:     Your Honor, also tender to the

18 Court Defendant's Exhibit Number 2 for

19 identification, and we would ask that that be entered

20 into evidence in this phase.  I don't believe it was

21 entered into evidence at the trial.

22          Further, your Honor, if called to testify,

23 Detective Saluga would testify he's also a member of

24 the Chicago Police Department assigned to Area 5,

J-20

14-3

Exhibit 15

1  discussed this in full with Mr. O'Farrell, and that

2  that was the story that the police were left with.

3          From these two versions, the Court at this

4  juncture must satisfy itself beyond a reasonable

5  doubt that there was a cold and calculated killing

6  here that was pursuant to a preconceived plan or

7  scheme or design to take a human life.

8          If the second story is true, perhaps there

9  would be, where it indicates some planning by both,

10 the victim and the defendant, and the successful

11 execution of that plan by the defendant who

12 embellished upon it by shooting himself and then

13 calling the police and giving the initial version

14 that was later recanted.

15          Another element has been introduced today,

16 the written statement or letter to the defendant from

17 Leslie O'Farrell, which is at odds with any

18 preconceived plan or a mercy killing or any other

19 type of killing.  It substantially contradicts any

20 hint that there was -- that the victim would have

21 been part of any type of plan.  It also suggests a

22 basis for a confrontation when the defendant arrived

23 home.

24          Obviously, none of us know what really


J-42


15-1

EXHIBIT 16

STATE OF ILLINOIS )
                ) ss
COUNTY OF COOK )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT - CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| PLAINTIFF-RESPONDENT, | ) | |
| | ) | |
| v. | ) | CASE NO. 95 CR 3046301 |
| | ) | |
| THOMAS O'FARRELL, | ) | JUDGE _____ |
| DEFENDANT-PETITIONER, | ) | |

## POST-CONVICTION PETITION

Petitioner, Thomas O'Farrell, Pro-Se, pursuant to Ill. Rev. Stat. 725 ILCS 5/122-1 and Federal and State Constitutions, respectfully moves this Honorable Court for the entry of an order vacating the judgement and sentence in this cause and granting post-conviction relief. In support of this petition the following is offered;

1. A superseding indictment charged O'Farrell with two (2) counts of the first degree murder of Lesley Chapman-O'Farrell on September 28, 1995.

2. O'Farrell waived his right to trial by jury, the Trial Court found O'Farrell guilty as charged in the superseding indictment on January 21, 1997, merging count two (2) into count one (1).

3. On January 31, 1997, the Trial Court denied O'Farrell's motion for a new trial.

4. On February 24, 1997, the Trial Court denied O'Farrell's motion to reconsider sentence.

5. On Febuary 28, 1997, the Trial Court imposed a fifty (50)

sentence on O'Farrell to be served in the Illinois Department Of Corrections.  O'Farrell is presently incarcerated at the Pontiac Correctional Center, Pontiac, Illinois.

6. On February 28, 1997, trial counsel, Joseph Kennelly filed a timely notice of appeal on behalf of O'Farrell.

7. In February 1998, appellate counsel, James Chadd of the State Appellate Defenders Office, First Judicial District filed a brief and argument on behalf of O'Farrell.

8. On March 24, 1999, the Honorable Justices of the Appellate Court of Illinois, First Judicial District affirmed O'Farrell's conviction and modified the sentence imposed due to a violation of the single subject rule of the Illinois Constitution.

9. On May 1, 1999, O'Farrell, Pro-Se filed a motion for leave to file petition for rehearing instanter and a petition for rehearing.

10. On May 26, 1999, the Appellate Court granted O'Farrell's motion for leave to file petition for rehearing instanter.

11. On September 8, 1999, the Appellate Court subsequently denied O'Farrell's petition for rehearing.

12. On September 25, 1999, O'Farrell, Pro-Se filed a timely notice of appeal with the clerk of the Supreme Court.

13. On October 7, 1999, O'Farrell, Pro-Se filed a brief and argument in the Supreme Court of the State of Illinois.  Said appeal is still pending.

14. On October 16, 1999, O'Farrell, Pro-Se filed a motion for writ of habeas corpus with the Circuit Court of Cook County, Illinois.

15. On November 2, 1999, the Circuit Court denied O'Farrell's motion for writ of habeas corpus.

16. On December 2, 1999, O'Farrell, Pro-Se filed a timely notice of appeal on the denial of the motion for writ of habeas corpus with the clerk of the Circuit Court of Cook County, Illinois.

17. This petition is filed within three (3) years from the date of O'Farrell's conviction and therefore timely.

18. Other than the noted proceedings herein, O'Farrell has not taken any other steps to secure relief from his conviction and sentence.

19. Denying this petition without reaching the merits of the issues raised herein would violate Petitioners rights secured to him by the Constitution of the United States of America. The Post-Conviction Hearing Act 725 ILCS 5/122 et. seq. (1998) of the State of Illinois affords Petitioner this avenue of appeal as a matter of law. Although there is no United States Constitutional right of post-conviction remedy, there is a remedy based in Illinois law. Due Process requires that Petitioner receive effective assistance of counsel. Trial counsel's performance was deficient and ineffective severely prejudiced Petitioner.

Trial counsel's performance is addressed later herein this petition.

20. Petitioner in this cause took the life of his wife, the victim in this cause after the victim plead with Petitioner to help her take her life because she was in severe pain and suffering due to her several medical conditions and then proceded

16 -3-

to conceal the truth of the homicide.

21. The Fourteenth Amendment of the United States Constitution provides in pertient part that no state shall deprive any person of life, liberty, or property without due process of the law; not deny to any person within its jurisdiction the equal protection of the law.

22. Article I Section 2 of the Illinois Constitution states that, no person shall be deprived of life, liberty, or property without due process of the law nor be denied the equal protection of the law.

23. Under the Due Process and Equal Protection Clauses of the State and Federal Constitutions, similar situated persons have the right to be treated in a similar manner.

24. Article I Section 11 of the Illinois Constitution states that, all penalties shall be determined both according to the seriousness of the offense and with the objective to restore the offender to useful citizenship.

25. Under the Sixth and Fourteenth Amendments of the United States Constitution and Article I Section 8 of the Illinois Constitution, Petitioner has the right to effective assistance of counsel, these constitutional rights extend to all levels of the courts.  Trial counsel's performance was deficient and fell below an objective standard of reasonableness and not effective of several aspects.

### CLAIM A
### ~~ONE~~

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel, Joseph

Kennelly failed to adequately investigate and articulate a proper motion to reconsider sentence on the behalf of Petitioner. Trial counsel on the other hand presented an incompetent motion to reconsider sentence without any case citations supporting the meritorious claim of a sentence that was grossly disproportionate and excessive from other sentences imposed for the same and/or similar offenses described herein this argument. Furthermore, on trial counsel's motion to reconsider sentence he hand wrote two (2) more issues on the already typewritten boilerplate motion prior to tendering it to the trial court to be considered, at which point the trial court asked trial counsel if he had anything he wished to say other than what was expressed in the motion, where trial counsel replied "no your honor" and gave no oral argument. (R.K88) and (see exhibit 1 attached)

In addition to trial counsel's motion to reconsider sentence, trial counsel could have presented the following meritorious issues:

a) The State relies extensively upon the testimony of State's witness, Thomas Dye to support the fifty (50) year sentence imposed upon Petitioner for an offense of a cold, calculated and premeditated murder. Moreover, Dye's testimony is inconsistent with the testimony of Dr. Larry Heinrich, a Licenced Clinical Psychologist and a Board-Certified Forensic Examiner in psychology who testified at Petitioner's sentencing hearing in this cause. Dr. Heinrich examined Petitioner twice and received the reports of Dr. Kenith Robins, the marriage therapist of the Petitioner and victim in this cause. (R.K34-35) According to Dr. Heinrich's testimony, while Petitioner was in marriage

counseling, he stated he did not want his marriage to end and wanted to do everything possible to keep his marriage together. (R.K37)

This testimony was completely different from the testimony of Dye, who claimed that Petitioner never loved his wife, the victim in this cause, only married her for her money, and killed her in a cold-blooded scheme to obtain control of her inheritance, (R.K16) but what Dye did not know is that Petitioner signed a pre-nuptial agreement prior to his marriage to the victim, forfeiting all rights to the victims inheritance; (see exhibits 2-4 attached and incorporated herein by and with this reference) and ((R.K82)

b) State's witness, Thomas Dye testified that Petitioner was unemployed at the time he and the victim in this cause met, but what Dye did not know is that Petitioner was employed prior, during and after the victim and Petitioner met and were married; (see exhibits 2 and 5 attached and incorporated herein by and with this reference)

c) Moreover, State's witness, Dye's testimony is inconsistent with the evidence presented at trial in this cause. Dye testified that Petitioner got drunk, decided to kill his wife, the victim in this cause, went home, got inside the house, put a pillow over her head and shot her in the head. (R.K17)  Yet the evidence showed that Petitioner had a few beers and/or few drinks, (R.I61) got home at approximately 11:30 p.m., (R.I61) but the victim was not killed until approximately 4:00 a.m., (R.I151) and the victim died from multiple gunshot wounds, (R.I159) not from just one gunshot wound as testified to by Dye;

16 -6-

d) State's witness, Dye further testified that Petitioner immediately became his cellmate when Petitioner arrived on the deck Dye was already on within the Cook County Department Of Corrections, (R.K10) but a few minutes later changed his testimony to Petitioner became his cellmate 2-3 weeks after Petitioner got to Dye's deck; (R.K11)

e) Most importantly, State's witness, Dye had taken Petitioners legal and personal paperwork upon his departure from Cook County Department Of Corrections which contained a copy of the death certificate of the victim in this cause, (see exhibit 6 attached and incorporated herein by and with this reference) at which point Petitioner filed an inmate grievance with Internal Investigations at the Cook County Department Of Corrections, (see exhibits 7-9 attached and incorporated herein by and with this reference) that Dye had also taken from inmate Steven Ehrilch's cell his copy of his indictment papers, copying and reading it out loud word for word, (see exhibit 9) where inmate Ehrilch filed an inmate grievance with the Cook County Department Of Corrections, (see exhibits 10 and 11 attached and incorporated herein by and with this reference) and that Dye gave a statement to the State's Attorney's Office which was tendered in Ehrlich's cause. (see exhibit 12 attached and incorporated herein by and with this reference)

State's witness, Thomas Dye's testimony completely contradicts the evidence presented in this cause and herein this argument, not to say the testimony of Dr. Heinrich and the reports of Dr. Robins are far more creditable and should be given far more credence than the self-serving testimony of Dye.

16 -7-

Furthermore, the testimony of Dye, however, is completely untrustworthy and should be given no credence by this Honorable Court in assessing whether Petitioners sentence is grossly disproportionate and excessive;

f) The total testimony of State's witness, Dye should be suppressed due to the misconduct and/or witness tampering of Assistant State's Attorney, Nicholas Ford who brought together the State's witness, Dye and Anne Dworak, the best friend to the victim in this cause two (2) times prior to Dye testifying in this cause at the suppression and sentencing hearings, (see exhibits 2,3,4,9 and 13 attached and incorporated herein by and with this reference) so Mrs. Dworak could give Dye some intimate details of the victim and Petitioners life together to enhance his testimony, making it more believable that Petitioner had confessed to him about the murder of the victim. These meetings took place in the jury room from the trial court. Mrs. Dworak was not a potential witness for the State and did not testify during the suppression or sentencing hearings. (see exhibit 20 attached and incorporated herein by and with this reference) Furthermore, State's Attorney, Ford deceived and mislead the trial court during the sentencing hearing by telling the trial court that the intimate details of the victim and Petitioners life together that State's witness, Dye testified to could have only been told to Dye by Petitioner; (R.K72)

g) Under State and Federal Constitutions under Due Process and Equal Protection Clauses, "similar situated persons have a right to be treated in a similar manner;" (Ill. Const. Art. 1 Sec.2 and U.S. Const. Amend. 14 Sec. 1)

16 -8-

h) Two (2) cases with some similarities where the defendants received much lower sentences than the fifty (50) years sentence imposed on Petitioner are People v. Hammerli, 277 Ill.App.3d 873, 662 N.E.2d 452 (1st Dist. 1996) where the sentencing court found the defendant, Hammerli had acted methodically and logically in committing the first degree murder of his ex-wife, and then escaping and covering up the offense. Hammerli, 622 N.E.2d at 453-457. Nevertheless, Hammerli was sentenced to only thirty five (35) years of imprisonment, fifteen (15) years less than Petitioners sentence and People v. Crow, 168 Ill.App.3d 744, 521 N.E.2d 594 (5th Dist. 1988) where the defendant, Crow planned and carried out the first degree murder of her husband. Crow, 521 N.E.2d at 595-597. Despite the clear premeditated nature of the offense, Crow was sentenced to thirty five (35) years imprisonment, fifteen (15) years less the sentence imposed upon Petitioner;

i) The Illinois Department of Corrections put together the Statistical Presentation of the Illinois Department of Corrections where they complied and broke-down all the offenses and sentences imposed to assist the reviewing courts in their imposing and/or reviewing sentences. People v. Neither, 230 Ill.App.3d 546, 595 N.E.2d 126 and 127. According to the Statistical Presentation, the average sentence imposed for first degree murder in Cook County, Illinois was 36.8 years in 1996, 37.6 years in 1995, 36.1 years in 1994 and 34.5 years in 1993. Illinois Department of Corrections, Statistical Presentation, 67 (1996). All of these sentences were significally lower than the

fifty (50) year sentence imposed on Petitioner;

j) In the case of <u>People v. Williams</u>, 638 N.E.2d 345, Circuit Court of Cook County, Illinois, Judge Daniel Kelly found the defendant, <u>Williams</u> guilty of second degree murder of his ailing wife.  Petitioners case at bar mirrors the <u>Williams</u> case on many issues.  <u>Williams</u> and Petitioner in this cause both suffered from depression at the time of the offense which was brought on by years and years of living a difficult situation which resulted in a sudden and intense passion and both <u>Williams</u> and Petitioner promised their wives that they would end their suffering; (R.I149-150) and (<u>Williams</u>, 638 N.E.2d at 347)

k) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person; (Ill. Rev. Stat. (1991) 720 ILCS 5/9-2.(2)(b)

l) During the first phase of the death penalty hearing in this cause, the trial court ruled that the State did not prove the elements of a offense committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme or design to take a life by unlawful means (R.J44) to warrant the fifty (50) years imposed upon Petitioner by the trial court;

m) The victim in this cause attempted suicide by overdosing on her insulin on February 28, 1991, then attempted suicide by overdosing on her prescription medication on August 22, 1993, then again attempted suicide by overdosing on her insulin once again on June 19, 1994, then tried to commit suicide by cutting her wrist with a razor and then overdosing on her insulin on July 18, 1994.  All of the attempts on her life that the victim took, Petitioner saved her life and/or prevented the attempt; (see

16 -10-

exhibits 2,3,4,9 and 15 attached and incorporated herein by and with this reference)

n) The victim in this cause continuously plead with Petitioner from March 1994 through September 28, 1995 to help her end her life because she no longer wanted to live with the pain and suffering that she was going through due to her severe medical conditions; (see exhibit 9)

o) The victim in this cause told her in-laws on September 23, 1995, only five (5) days prior to her death that she would rather die than to go through the rest of her life looking and feeling the way she did (regarding the paralysis to her right side of her mouth and the pain in her head). (see exhibits 2-4)

On Petitioners direct appeal the State Appellate Counsel appointed to represent Petitioner, brought the meritorious issue of the excessive sentence up for review which the Appellate Justices ruled to be "misplaced". (see exhibit 14 attached and incorporated herein by and with this reference)  The Appellate Justices went on to rule Petitioner "waived review of his argument" (see exhibit 14) due to trial counsel's ineffectiveness in failing to raise the issue at the sentencing hearing in this cause and in Petitioners motion to reconsider sentence. (see exhibit 14)

Trial counsel was ineffective in investigating and presenting the meritorious claim herein for review to the trial court.  Petitioner was prejudiced by trial counsel's deficient performance where trial counsel incompetely presented for review a shotty motion to reconsider sentence, therefore, violating Petitioners Sixth and Fourteenth Amendment Rights secured by the

16 -11-

United States Constitution.

### TWO

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel, Kennelly failed to adequately argue and/or present evidence of judicial misconduct in a post-trial motion.  The meritorious evidence which supports this claim is as follows:

a) On the morning of trial in this cause, trial courts Bailiff, Deputy, Michael Stawczek Sr. told the Petitioner prior to trial, that "Judge Toomin (trial court) is going to find you guilty and give you fifty (50) years." (see exhibit 2 and 9)

Trial counsel was ineffective for his failure to present this meritorious claim to the trial court which seriously prejudiced Petitioner, violating his Sixth and Fourteenth Amendment Right secured by the United States Constitution.

### CLAIM B
~~ONE~~

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel, Kennelly failed to adequately investigate and refused to present relevant meritorious mitigating evidence favorable to Petitioner at the sentencing hearing in this cause.  The meritorious evidence is as follows:

a) Petitioner had to rush the victim in this cause to Louis A. Weiss Memorial Hospital on February 28, 1991 because he found the victim unresponsive with hypoglycemic reactions due to the victims blood sugar level being dangerously low, boardering a

16 -12-

diabetic coma, (see exhibit 15 attached and incorporated herein by and with this reference) because the victim tried to commit suicide by overdosing on her insulin because she no longer wanted to live; (see exhibits 2,3 and 9)

b) Petitioner prevented the victim in this cause from committing suicide on August 22, 1993 where the victim was trying to overdose on multiple prescriptions which were prescribed to her by her doctor; (see exhibits 2,3 and 9)

c) Petitioner saved the life of the victim in this cause on June 19, 1994 when he gave the victim a glucose shot, raising the victims blood sugar level after finding the victim in their home unresponsive with hypoglycemic reactions and checking her blood sugar level, noticing that it was dangerously low boardering a biabetic coma. The victim later that day told Petitioner that she tried to commit suicide by overdosing on her insulin because she no longer wanted to live; (see exhibits 2,3 and 9)

d) Petitioner prevented the victim in this cause from committing suicide when she threatened to cut her wrists with a razor blade on July 18, 1994. Petitioner took the razor blade from the victim, at which time the victim fled their home taking a insulin needle and her insulin. Petitioner began to chase the victim, but had to stop because their young son was home alone, so Petitioner called 911 police emergency because he feared the victim would commit suicide by overdosing on her insulin; (see exhibits 2,3,4 and 9)

e) Petitioner often missed work and/or left work early because the victim in this cause (his wife) was seriously ill and

*16* -13-

needed Petitioner to take care of her because she could not take care of herself and/or the victim and Petitioners young son, LeRoi; (see exhibits 9 and 16 attached and incorporated herein by and with this reference)

f) Petitioners employer could not cover the victim in this cause (Petitioners wife) on the companies insurance policy due to her several severe medical problems; (see exhibits 9 and 16)

g) The victim in this cause continuiously plead with Petitioner (her husband) from March 1994 through September 28, 1995 to help her take her life because she no longer wanted to live with the pain and suffering that she was going through because of her medical conditions; (see exhibit 9)

h) The victim in this cause told her in-laws on September 23, 1995, only five (5) days prior to her death that she would rather die than to go through the rest of her life looking and feeling the was she did (regarding the paralysis to the right side of her mouth and the pain in her head); (see exhibits 2-4)

i) Petitioners actions in this cause was like a Doctor Kevorakian assistant suicide and Petitioner was acting under a extreme mental and emotional disturbance at the time of the offense; (see exhibit 17 attached and incorporated herein by and with this reference) and (R.K50)

j) At the time of the offense Petitioner was acting under a sudden and intense passion resulting from serious provocation; (Ill. Rev. Stat. (1991) 720 ILCS 5/9-2.(1)

k) Serious provocations is conduct sufficient to excite an passion in a reasonable person; (Ill. Rev. Stat. (1991) 720 ILCS

5/9-2.(2)(b)

1) Under State and Federal Constitutions under Due Process and Equal Protection Clauses, "similar situated persons have a right to be treated in a similar manner;" (Ill. Const. Art. 1 Sec. 2 and U.S. Const. Amend. 14 Sec. 1)

m) In People v. Williams, 638 N.E.2d 345, defendant, Williams was convicted of the first degree murder for the shooting death of his ailing wife. Ultimately, Circuit Court Judge, Daniel Kelly of Cook County found Williams guilty of second degree murder because there was "a sudden and intense passion, * * * he was acting on years and years of living a difficult situation [and that] [t]here was a stimulus provided for the provocation * * *. Both Williams and Petitioner in this cause were acting under the same sudden and intense passion, both promised their wives that they would end their suffering, (R.I149-150) and Williams, 638 N.E.2d at 347) and both were acting under the same years and years of living a difficult situation which insighted the offenses;

n) The factual evidence that State's witness, Thomas Dye testified to was obtained through the legal and personal paperwork that Dye had taken from Petitioner which contained the specifics details of the offense; (see exhibits 7-9 attached and incorporated herein by and with this reference) and

o) The private intimate details of the Petitioner and victim in this cause life together that State's witness, Thomas Dye testified to was provided to him when Assistant State's Attorney, Nicholas Ford had Anne Dworak, the best friend to the victim in

16-15-

cause meet with Dye in the jury room for the trial court two (2) times prior to Dye testifying, so Mrs. Dworak could give Dye some intimate details of the victim and Petitioners life together to enhance Dye's testimony, making it more believable that Petitioner had confessed to him about the murder of the victim. (see exhibits 2,3,4,9 and 13)  Mrs. Dworak was not a potential witness for the State and did not testify after either of these meetings at the suppression or sentencing hearings. (see exhibit 20)

Petitioner was severely prejudiced by trial counsel's ineffective investigation and refusal to present this relevant meritorious evidence herein this claim which was favorable to Petitioner, therefore, violating Petitioners Sixth and Fourteenth Amendment Right secured by the United States Constitution. ▶

TWO

Trial counsel's performance was deficient and fell below and object standard of reasonableness where trial counsel, Kennelly failed to adequately raise at the sentencing hearing in this cause, the inconsistent testimony of State's witness, Thomas Dye which was inconsistent with his previous testimony, previous testimony of other witnesses, and Dye's previous testimony which is inconsistent with the evidence presented at the trial in this cause, plus additional relevant evidence which would have proven that Dye prejured himself, by presenting the following:

a) State's witness, Dye's testimony is inconsistent with the testimony of Dr. Larry Heinrich, a Licensed Clinical Psychologist and Board-Certified Forensic Examiner in Psychology who

16 -16-

testified at Petitioners sentencing hearing in this cause. Dr.
Heinrich examined Petitioner twice and reviewed the reports of
Dr. Kenith Robins, the marriage therapist to the Petitioner and
victim in this cause. (R.K34-35) According to Dr. Heinrich's
testimony, while Petitioner was in marriage counseling, he stated
he did not want his marriage to end and wanted to do everything
possible to keep his marriage together. (R.K37)

This testimony was completely different from the testimony
of Dye, who claimed that Petitioner never loved his wife, the
victim in this cause, only married her for her money, and killed
her in a cold-blooded scheme to obtain control of her
inheritance, (R.K16) but the fact remains that Petitioner signed
a pre-nuptial agreement prior to his marriage to the victim,
forfieting all rights to the victims inheritance; (see exhibit 2-
4) and (R.K82)

b) State's witness, Dye testified that Petitioner was
unemployed at the time that he and the victim in this cause met,
(R.K16) but the fact remains that Petitioner was employed prior,
during and after the victim and Petitioner met and were married;
(see exhibits 2,5 and 9 attached and incorporated herein by and
with this reference)

c) State's witness, Dye testified that he and Petitioner
immediately became cellmates upon Petitioners arrival on the deck
that Dye was already on at the Cook County Department of
Corrections, (R.K10) then a minute later Dye changed his
testimony to it was 2-3 weeks after Petitioner arrived on Dye's
deck that they became cellmates; (R.K11) and

d) Moreover, the most important incosistencies in Dye's testimony comes when Dye contradicts evidence already presented during the trial in this cause. Dye testified that Petitioner got drunk, decided to kill his wife, the victim in this cause, went home, got into the house, put a pillow over the victims head and then shot her in the head. (R.K17) Yet the evidence presented at trial in this cause showed that Petitioner was no drunk, but only had a few beers, (R.I61) got home at approximately 11:30 p.m., (R.I61) and the victim was killed at approximately 4:00 a.m. (R.I151) some 4½ hours after Petitioner arrived home from the bar, which makes Dye's testimony totally inconsistent with the facts. An extreme inconsistency is that the victim died of multiple gunshot wounds, (R.I159) not just one gunshot wound to the head as testified to by Dye.

Trial counsel was ineffective in investigating and presenting the inconsistencies in State's witness Dye's testimony herein at the sentencing hearing in this cause, therefore, violating Petitioners Sixth and Fourteenth Amendment Right secured by the United States Constitution.

~~THREE~~

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel, Kennelly failed to adequately present additional evidence at the sentencing hearing in this cause which would have proven State's witness, Thomas Dye perjured himself, by presenting the following:

a) Petitioner and the victim in this cause met at the

16 -18-

victims place of employment (a bar) at the corner of Lincoln and McCormick avenues, Chicago, Illinois, (see exhibit 9) not a a bar in the Peterson and Devon area as testified to by Dye; (R.K15)

b) Petitioner and the victim in this cause (his wife) did not move into the victims parents (grandparents) home at 3435 W. Ardmore after they were married as testified to by Dye. (R.K16) The fact remains that they moved into an apartment at 5550 N. Sawyer, Chicago, Illinois, (see exhibits 5 and 9) some three (3) years after they were married; and

c) State's witness testified to insurance money that was involved in this cause. (R.K13)  When the fact is that there was no insurance money(ies) at all involved in this cause. (see exhibit 2)

Petitioner was prejudiced by trial counsel's deficient and ineffective performance by not presenting the relevant evidence herein this claim at the sentencing hearing in this cause, violating Petitioners Sixth and Fourteenth Amendment Right secure by the United States Constitution.

## CLAIM C
~~ONE~~

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel, Kennelly failed to properly present meritorious evidence at trial in this cause that would have proven that Chicago Police Detective, Harry Collins and/or Chicago Police Evidence Technician, Patrick Moran perjured themselves at trial to conceal an illegal search of the Petitioner and the victim in this cause furnishings within their home and the seizure of evidence, by

/6 -19-

presenting the following:

a) It is physically impossible for detective, Collins, a man of over two hundred fifty (250) pounds to have fit into the two (2) foot space between the tv stand in this cause and the wall, (see Petitioners exhibits 3-5 admitted in the suppression hearing in this cause) where he needed to be in order to have bumped into the side door of the tv stand to cause the door to swing open and to have the evidence (the derringer) allegedly fall to his feet (R.I119-120) making it legal under the plain view doctrine;

b) The tv stand in this cause is childproof and has safety features to prevent the side door from opening in the manner as detective, Collins claimed to have happened; (see exhibits 2 and 9)

c) The Independent Administrator of the Estate of Lesley Chapman-O'Farrell, the victim in this cause had to inventory the contents of the tv stand in this cause, where he had to use considerable force to move the stand to gain access to the side door and contents of the tv stand. The tv stand has safety features where he had to push on the door to unlock it and then had to pull the door open to gain access to the contents within the stand, the doors do not just swing open as detective Collins testified to, not even when great effort to move the tv stand is needed and none of the contents could not and did not fall onto the floor (see exhibit 2) as testified to by detective Collins;

d) Detective Collins testified that he "opened" the cassette case exposing the evidence used against Petitioner at the trial in this cause the first time he testified in the suppression hearing in this cause, (R.A132) later to testify at the trial in

*ib* -20-

this cause, that the cassette fell from the tv stand to his feet and "opened" on it's own exposing the evidence used against Petitioner in the trial in this cause, (R.I120) making the seizure legal under the plain view doctrine; and·

e) When evidence technician Moran testified he testified that it was he alone who "opened" the cassette case exposing the evidence use against Petitioner in the trial in this cause, (R.I114-115) not detective Collins.

Trial counsel's deficient performance prejudiced Petitioner due to trial counsel's failure to present the meritorious evidence herein this claim, violating Petitioners Sixth and Fourteenth Amendment Right secured by the United States Constitution.

### TWO

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel Kennelly directly refused to put forth and/or argue a lesser included offense and/or defense on behalf of Petitioner at the trial in this cause to support a second degree murder. Petitioner offers the relevant evidence as follows:

a) Trial counsel, Kennelly did not put forth any type of defense of the behalf of Petitioner in his opening or closing arguments at the trial in this cause; (R.I10 and I199-200)

b) Instead of putting forth a defense on behalf of Petitioner or trying to acquit Petitioner of the charges brought against him at trial in this cause, trial counsel, Kennelly was busy laying the groundwork to beat the first phase of the death

penalty hearing, even before there was any evidence presented at
trial or Petitioner was found guilty of the charges brought
against Petitioner, by stressing the point of the inconsistent
statements made by Petitioner, which were inconsistent with the
evidence at the scene of the offense to the trial court in this
cause, (R.110) which would prove that Petitioners offense was not
in a cold, calculated and premeditated manner to warrant the
death penalty;

c) Trial counsel, Kennelly did not call Petitioners expert
witness in psychological forensics at trial in this cause to
offer meritorious evidence that Petitioner was suffering from
"extreme mental and emotional disturbance" at the time of the
offense, (see exhibit 17 attached and incorporated herein by and
with this reference) to warrant a second degree murder defense of
Petitioners behalf;

d) Trial counsel, Kennelly could have called witnesses and
presented the meritorious evidence within Claim B, One herein
this petition to support a second degree murder defense on
Petitioners behalf at the trial in this cause;

e) Trial counsel, Kennelly did not call any rebuttal
witnesses at the trial in this cause to rebut any evidence of the
volunteered statement of Petitioner, or the conduct of the
Chicago Police Department and the Assistant State's Attorney
involved in this cause to support misconduct and psychological
coercion to obtain an incriminating statement from Petitioner;
(see exhibits 2,3,9 and 18 attached and incorporated herein by
and with this reference) and

16 -22-

f) Trial counsel, Kennelly only called one (1) witness to testify on the Petitioners behalf and only asked one (1) question of relevance which pretained to the predominant hand of Petitioner and then rested. (R.I198)

Petitioner was prejudiced by trial counsel's ineffective assistance and failure to present the relevant evidence discussed herein this claim at the trial in this cause, thus violating the Sixth and Fourteenth Amendment Right of Petitioner secured by the United States Constitution.

### THREE

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel, Kennelly used coercive tactics denying Petitioner his right to a trial by jury secured by the United State Constitution and made promises to Petitioner about his sentence which trial counsel, Kennelly could not keep and/or should not have made.  Petitioner offers the following meritorious evidence to support this claim:

a) On January 20, 1997, trial counsel, Kennelly told Petitioner on an attorney visit that "we wil not be able to win at this level.  Our best shot will be in the Appellate Court." and "I can not win, but i will try to beat the death penalty and get you (the Petitioner) the lowest sentence possible;" (see exhibit 9) and

b) On January 20, 1997, trial counsel, Kennelly used coercive tactics to make Petitioner change his mind about taking a jury trial by telling Petitioner on an attorney visit that "I can not win, and if you proceed with a jury trial, Judge Toomin

16 -23-

will give you all sixty (60) years, but if you put it in Judge
Toomin's hands and take a bench trial, Judge Toomin will be more
lenient and only give you thirty (30) years." Then trial
counsel, Kennelly made a promise that he could not keep to
Petitioner by telling him "I guarantee it." Petitioner then told
trial counsel, Kennelly that he wanted to call his family to see
want they thought he should do, but trial counsel, Kennelly
responded "I need an answer now so I can leave and prepare for
trial." Petitioner (forced into a decision) told trial counsel,
Kennelly to go with a bench trial; (see exhibits 4 and 9)

Trial counsel's deficient performance violates the right to
effective counsel secured by the Sixth and Fourteenth Amendment
of the Unites States Constitution.

CLAIM D
ONE

Trial counsel's performance was deficient and fell below an
objective standard of reasonableness where trial counsel,
Kennelly failed to adequately investigate and articulate a proper
pre-trial motion and present the meritorious evidence which
supports a lesser included offense of second degree murder
pursuant to Illinois Revised Statute 720 ILCS 5/9-2. prior to
trial in this cause on Petitioners behalf. Petitioner offers the
relevant evidence as follows:

a) At the time of the offense Petitioner was acting under a
sudden and intenses passion resulting from serious provocation;
(Ill. Rev. Stat. (1991) 720 ILCS 5/9-2.(1)

b) Serious provocation is conduct sufficient to excite an
intense passion in a reasonable person; (Ill. Rev. Stat. (1991)

*16* -24-

720 ILCS 5/9-2.(2)(b)

c) Under State and Federal Constitutions under Due Process and Equal Protection Clauses, "similar situated persons have a right to be treated in a similar manner;" (Ill. Const. Art. 1 Sec. 2 and U.S. Const. Amend. 14 Sec.1)

d) In <u>People v. Williams</u>, 628 N.E.2d, defendant, <u>Williams</u> was convicted of the first degree murder for the shooting death of his ailing wife. Ultimately, Circuit Court Judge, Daniel Kelly of Cook County, Illinois found <u>Williams</u> guilty of second degree murder because there was "a sudden and intense passion, * * * he was acting on years and years of living a difficult situation [and that] [t]here was a stimulus provided for the provocation * * *. Both <u>Williams</u> and Petitioner in this cause were acting under the same sudden and intense passion, both had promised their wives that they would end their suffering, (R.I149-150) and (<u>Williams</u>, 638 N.E.2d at 347) and both were acting under the same years and years of living a difficult situation which insighted their offenses;

e) Petitioner saved the life of the victim in this cause when he rushed the victim to Louis A. Weiss Memorial Hospital on February 28, 1991 when he found the victim unresponsive with hypogycemis reactions due to the victims blood sugar level being dangerously low, boardering a diabetic coma, (see exhibit 15) later to find out from the victim that she tried to commit suicide by overdosing on her insulin because she no longer wanted to live; (se exhibits 2,3, and 9)

f) Petitioner prevented the victim in this cause from

16 -25-

committing suicide on August 22, 1993 when the victim was trying to overdose on multiple prescriptions which were prescribed to her by her doctor; (see exhibits 2,3 and 9)

g) Petitioner saved the life of the victim in this cause on June 19, 1994 when he gave the victim a glucose shot, raising the victims blood sugar level after finding the victim in their home unresponsive with hypoglycemic reactions and checking her blood sugar level, noticing that it was dangerously low, boardering a diabetic coma. The victim later told Petitioner that she tried to overdose on her insulin because she no longer wanted to live; (see exhibits 2,3 and 9)

h) Petitioner prevented the victim in this cause from committing suicide when she threatened to cut her wrists with a razor blade on July 18, 1994. Petitioner took the razor blade from the victim, at which time the victim grabbed a insulin needle and her insulin and fled their home on foot. Petitioner began to chase the victim, but had to return to their home because he had left their young son, LeRoi in the home alone. Petitioner then called 911 police emergency because he feared that the victim (his wife) would commit suicide by overdosing on her insulin; (see exhibits 2,3,4 and 9)

i) Petitioner often had to miss work and/or leave work early because the victim in this cause (his wife) was seriously ill and needed Petitioner to take care of her because she could not take care of herself and/or the victim and Petitioners young son; (see exhibits 9 and 16)

j) Petitioners employer could not cover the victim in this cause (Petitioners wife) on the companies insurance policy due to her several severe medical problems; (see exhibits 9 and 16)

k) The victim in this cause continuiously plead with Petitioner (her husband) from March 1994 until September 28, 1995 to help her take her life because she no longer wanted to live with the pain and suffering that she was going through because of her medical conditions; (see exhibit 9)

l) The victim in this cause told her in-laws on September 23, 1995, only five (5) days prior to her death, that she would rather die than to go through life looking and feeling the way she did (regarding the paralysis to the right side of her mouth and the pain in her head); (see exhibits 2-4) and

m) Petitioners actions in this cause was like a Doctor Kevorakian assisted suicide and Petitioner was acting under a extreme mental and emotional disturbance at the time of the offense. (see exhibit 17) and (R.K50)

Trial counsel's ineffective performance in investigating and articulating, and presenting the meritorious claim herein for review to the trial court, violated Petitioners Sixth and Fourteenth Amendment Right secured by the United States Constitution.

## TWO

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel, Kennelly failed to apprise the trial court and argue that the State's witness Thomas Dye's past and/or future testimony should be suppressed due the misconduct and/or witness tampering of the prosecutor in this cause, Assistant State's Attorney, Nicholas Ford during the suppression hearing in this cause by presenting the following meritorious evidence:

a) The private intimate details of Petitioner and the victim in this cause life together that State's witness, Dye testified to was provided to him when State's Attorney, Ford had Anne Dworak, the best friend to the victim in this cause meet with Dye in the jury room for the trial court prior to Dye testifying on August 22, 1996 at the suppression hearing in this cause, so Mrs. Dworak could give Dye some intimate details of the victim and Petitioners life together to enhance Dye's testimony, making more believable that Petitioner had confessed to him about the murder of the victim, therefore making Dye's testimony creditable and accepted by the trial court. (see exhibits 2,3,4,9 and 13)

Petitioner was severely prejudiced by the testimony of State's witness, Dye and the ineffective assistance of trial counsel, Kennelly for his failure to apprise the trial court and argue the meritorious claim herein at the suppression hearing in this cause which was favorable to Petitioner, therefore, violating Petitioners Sixth and Fourteenth Amendment Right secured by the United States Constitution.

### THREE

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel, Kennelly failed to apprise the trial court during the suppression hearing in this cause to the truth as to how State's witness, Thomas Dye had became apprised of the specific details in this cause by presenting the meritorious evidence as follows:

a) The factual evidence that State's witness, Dye testified to was obtained through the legal and personal paperwork that Dye had taken from the cell that he and Petitioner shared at the Cook

*i6* -28-

County Department of Corrections where Petitioner filed two (2) seperate inmate grievances with the Internal Investigations Department at the Cook County Department of Corrections and notified trial counsel, Kennelly about Dye's theft of his property by telephone and on attorney visits; (see exhibits 7-9)

b) The second inmate grievance that Petitioner filed with the Internal Investigations Department at the Cook County Department of Correction was filed after Petitioner was told by another inmate, Steven Ehrlich, who was also on the same deck in the Cook County Department of Corrections with the State's witness, Dye and Petitioner, that Dye had tendered a statement against him, at which time Petitioner told Mr. Ehrlich that he witnesses Dye with his indictment papers in the cell they shared reading it out loud and writing it down word-for-word. (see exhibit 8)  Inmate Ehrilch told Petitioner that he was going to file an inmate grievance with the Cook County Department of Corrections (see exhibits 10-11 attached and incorporated herein by and with this reference) and would give Petitioner a copy of the transcripts of the Dye incident; (see exhibit 12 attached and incorporated herein by and with this reference)

c) Petitioner told trial counsel, Kennelly on May 1, 1996 on an attorney visit that State's witness, Dye had tendered a statement against inmate Ehrilch and he wanted trial counsel, Kennelly to inform the trial court that Dye had took his legal and personal paperwork which contained a copy of the death certificate of the victim in this cause from their cell they shared prior to Dye's departure from the Cook County Department of Corrections (see exhibits 6 and 9) and that Petitioner had filed a second inmate grievance with Internal Investigations at

16 -29-

the Cook County Department of Corrections because he feared that Dye would also testify against him. (see exhibits 8 and 9)

Trial counsel's deficient performance as demonstrated by his neglect and/or failure to present this meritorious claim herein severely prejudiced Petitioner. The result is that trial counsel, Kennelly was constitutionally ineffective and deprived Petitioner of his Sixth and Fourteenth Amendment Right to effective assistance of counsel secured by the United States Constitution.

FOUR

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counse Kennelly failed to adequately investigate and present additional meritorious evidence during the suppression hearing in this cause to support Petitioners claim of misconduct and/or coercive tactics to obtain an incriminating statement from Petitioner by the Area Five (5) detectives and Assistant State's Attorney, Kougias which is as follows:

a) Petitioner and his siblings were told by their father, a retired police Lieutenant with over thirty one (31) years of service, several years prior to Petitioners arrest in this cause, that if they ever got into trouble with the law, that they have the right not to say anything to anyone, especially the police, and have the right to request counsel and to have counsel present during any questioning; (see exhibits 2 and 9)

b) Petitioner was falsely arrested for first degree murder on July 3, 1990 by the detectives at Area Five (5) Headquarters,

where Petitioner immediately retained counsel, never made an incriminating statement and remained silent until counsel arrived; (see exhibits 2,9 and 18 attached and incorporated herein by and with this reference)

c) During the twenty four (24) hours after the July 3, 1990 arrest of Petitioner the Area Five (5) detectives withheld food from Petitioner in an attempt to coerce Petitioner into making an incriminating statement against himself; (see exhibits 9 and 18)

d) Chicago Police Detective, Schak, a detective at Area Five (5) Headquarters used psychological coercion on Petitioner during the interrogation in this cause by threatening the well-being of Petitioners young son, LeRoi, by telling Petitioner that if did not cooperate that detective, Schak would give Petitioners son to the Illinois Department of Children and Family Services; (R.A44)

e) Petitioner was denied his Constitutional Right to counsel when he was denied his request for counsel until he cooperated with the Area Five (5) detectives and Assistant State's Attorney, Kougias and was continued to be questioned; (R.A41-42) and (R.A46)

f) After the Petitioners arrest in this cause at 10:30 a.m., Area Five (5) detective, Schak told Petitioners parents "you better get your son (Petitioner) a lawyer, the State's Attorney is 'fucking' with him and trying to get him to change his story about what happened." (see exhibits 2 and 3)  Detective Schak then provided Petitioners father a telephone to call a lawyer, where he then called Assistant Public Defender, David Baitman at the Bridgeview, Illinois Court House.  Attorney, Baitman was not

in, so Petitioners father left a message and telephone number for him to call him at Area Five (5) Headquarters; (see exhibits 2)

g) Chicago Police Detective, Schak, the one who used psychological coercion by threatening the well-being of Petitioners young son, LeRoi to obtain as incriminating statement (R.A44) was present during the entire conversation between Assistant State's Attorney, Kougias and Petitioner, (R.E45) so Petitioner was unable to speak freely with State's Attorney, Kougias about the psychological coercion (threats to Petitioners young son) and misconduct of detective, Schak; (see exhibit 9)

h) Assistant State's Attorney, Kougias along with the Area Five (5) detectives, Schak and Szeluga confronted Petitioner with a letter (see exhibit 9) and (R.A46 and E55) which Chicago Police Detective, Kernan took from a room within the home of Petitioner and the victim in this cause that the trial court ruled dismissed due to it being illegally obtained; (R.G31)

i) Petitioners confession came after the psychological coercion of Detective, Schak and prior to Petitioners young son leaving Area Five (5) Headquarters, where Petitioner then invoked his right to remain silent and demanded counsel in the presences of his father, (see exhibits 2,3,4,9 and 13) because the Area Five (5) detectives and the Assistant State's Attorney lost their hold and leverage over Petitioner when his young son was removed from the Area and cound not be taken by the Illinois Department of Children and Family Services;

j) During the entire Six (6) hours of interrogation of Petitioner in this cause (R.F7 and E56) by the Area Five (5)

detectives and the Assistant State's Attorney, Petitioner was in severe pain and without pain medication (see exhibits 2 and 9) due to a gunshot wound to his right shoulder; (see exhibit 9) and (R.F10 and I58)

k) The Chicago Police Personal at Area Five (5) Headquarters prevented Assistant Public Defender, David Baitman from speaking with Petitioners father when he returned Petitioner fathers call at Area Five (5) Headquarters at approximately 2:20 p.m. on the afternoon of Petitioners arrest in this cause by telling Attorney Baitman that Petitioners father (a Lieutenant in the Alsip police department) was on vaction (see exhibit 2) preventing Petitioner his right to counsel; and

l) During the testimony at the suppression hearing in this cause, both the Chicago Police Detectives and Assistant State's Attorney claimed that on the morning of Petitioners arrest he never made a request for counsel during questioning, (R.E47 and F19) He volunteered an incriminating confession to the murder of the victim in this cause (R.E44 and F15) without ant threats or psychological coercion of any kind, (R.E47 and F19) which would support the State's claim and argument that the confession should stand, but when asked by the trial court the State could not produce a signed confession, (R.E57) which strongly supports Petitioners claims that the confession was involuntary and that his Miranda warnings were violated due to police misconduct. Furthermore, the State never produced a signed Miranda Waiver into evidence during any of the proceedings in this cause to support their claim and argument.

16-33-

Trial counsel's deficient performance was ineffective due to his failure to raise the meritorious claim herein to the trial court, showing a clear violating of Petitioners right to counsel, misconduct and/or coercive tactics used to obtain an incriminating confession from Petitioner by the Area Five (5) detectives a common policy, procedure and practice of the Area Five (5) Headquarters and their detectives, along with the other Chicago Police Personal at Area Five (5) and Assistant State's Attorney, Kougias misconduct. Petitioner was prejudiced by trial counsel's deficient performance, violating his Sixth and Fourteenth Amendment Right secured by the United States Constitution.

FIVE

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel, Kennelly failed to present additional meritorious evidence at the suppression hearing in this cause to support Petitioners claim that Petitioner was illegally detained therefore "seized" without probable cause and therefore arrested for the sole purpose to detain Petitioner while the Chicago Police Personal at Petitioner and the victim in this cause home were conducting an illegal search of the home and furniture for evidence linking Petitioner to the offense. Petitioner offers the following relevant evidence:

a) On the morning of the offense in this cause at Petitioner and victims home, Chicago Police Officer, Maderer demanded in a stern voice that Petitioner "leave with the ambulance!" (see exhibit 9) and (R.E21) at which time Petitioner refused (R.E32)

telling officer, Maderer that he was not seriously injured, he could walk on his own, he needed to take care of his dogs, and that he wanted to wait for his mother who was already on her way to their location to pick up Petitioner and the victim in this cause young son, LeRoi, at which time he would have her drive him to the hospital; (see exhibit 9) and (R.E20-21)

b) On the morning of the offense in this cause Chicago Police Officer, Maderer made a second demand in a stern voice, with his hand resting on his service weapon and in the presence of several other Chicago Police Personal who were in Petitioner and the victim in this cause home that Petitioner "leave with the ambulance and get medical treatment" and that he and the other officers were "going to stay and search for clues," at which point Petitioner did not feel as if he had a choice to refuse officer, Maderer demands; (see exhibit 9) and (R.E21-22)

c) When Chicago Police Officer, Cooper arrived on the scene on the morning of the offense in this cause he noticed several other Chicago Police Personal within the house; (R.I52)

d) Chicago Police Officer, Cooper on the morning of the offense in this cause was assigned to accompany Petitioner to the hospital (R.I46) at which time officer, Cooper and several other Chicago Police Personal escorted Petitioner to a Chicago Fire Department ambulance where he then escorted Petitioner to the Illinois Masonic Medical Center, where he stayed until Chicago Police Detective, Kernan arrived; (see exhibit 9),(R.I47-48) and R.I52 and I55)

e) Upon Petitioners release from the hospital on the morning

16 -35-

of the offense in this cause Chicago Police Detective, Kernan denied Petitioners mother and Petitioners request that Petitioner ride with his mother, ((R.A9) and (R.A36-37) where Petitioner was then grabbed by his left arm by the officers present and put into a marked Chicago Police Squad (R.A37) and was transported to Area Five (5) Headquarters; (see exhibit 9 and 19 attached and incorporated herein by and with this reference) and (R.A112)

f) Chicago Police Detective, Kernan testified in the suppression hearing in this cause that Petitioner was asked and agreed to accompany the other Chicago Police officers to Area Five (5) Headquarters (R.A111-112) instead of leaving with his family, (R.A121) however detective, Kernan made no notation in his report of Petitioners agreement to go with the other two (2) officers; (R.A112)

g) At approximately 7:05 a.m. on the morning of the offense in this cause, Chicago Police Detective, Szeluga contacted Petitioners father at his home, asking him if he was a police officer which Petitioners father replied "yes." Detective, Szeluga then told Petitioners father that "there is something 'hinkey' about this whole thing," at which time Petitioners father (a retired police officer) began to form a professional opinion that the police did not believe Petitioners accounting of what happened and that the police were beginning to consider Petitioner a suspect in the offense in this cause; (see exhibit 2)

h) Chicago Police Detective, Szeluga Stated in the Chicago Police Department Supplementary Report that Petitioner was

16 -36-

transported to Area 5, by beat 1742, for further investigation into the identity of the offender and to view photo albums; (see exhibit 19)

i) Petitioner was present at Area Five (5) Headquarters from approximately 7:00 a.m. (R.F6) on the morning of the offense in this cause up to his arrest at 10:30 a.m. (see exhibit 19) that same day where Chicago Police Detective, Szeluga had numerous conversations about the description of the offender and the details of the offense to see if Petitioner could be more specific about what he originally said, (R.F8 and F10) but from the time of Petitioners arrival at Area Five (5) up to his arrest Petitioner was never shown any photo's of any possible offender by detective, Szeluga or any other Chicago Police Personal at Area Five (5) nor was there a sketch artist brought in to attempt to get a sketch of the offender; (see exhibit 9)

j) Petitioners father who is also a retired police lieutenant with over thirty one (31) years of service (one who throughout the years the courts considered to be a creditable witness) was present at Area Five (5) Headquarters at approximately 10:00 a.m. on the morning of the offense in this cause where Petitioners mother told him that Chicago Police Detective, Kernan denied her and Petitioners requests at Illinois Masonic Medical Center that Petitioner ride with her and Petitioners young son and that two (2) uniformed officers put Petitioner into a marked squad car and he was then taken to Area Five (5). Petitioners mother also told him that she was unable to see or talk to Petitioner since she arrived at Area Five (5). As a law enforcement official, Petitioners father was able to

form a professional opinion that Petitioner was not free to leave the police station or just walk away on his own free will and was in fact under arrest: (see exhibit 2) and

k) On the morning of Petitioners arrest in this cause Petitioners parents were allowed to visit with Petitioner at approximately 10:30 a.m. and 2:00 p.m. in an interrogation room within Area Five (5) Headquarters where Petitioner was being held. Petitioners father noticed that the room that Petitioner was being held in was "locked" and Petitioner was "handcuffed" to the wall by his left arm, (see exhibit 2 and 9) which totally contradicts the testimony of Chicago Police Detective, Szeluga who testified that Petitioner was "never locked" in a room (R.F10) and Petitioner was "never handcuffed" (R.F16) while at Area Five (5).

Trial counsel's deficient performance as demonstrated herein this meritorious claim severely prejudiced Petitioner. As a result of trial counsel's ineffective assistance, Petitioners Sixth and Fourteenth Amendment Right secured by the United States Constitution was violated.

## SIX

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel, Kennelly failed to present additional meritorious evidence at the suppression hearing in this cause which would have proved that Chicago Police Detective, Harry Collins perjured himself in order to cover up his illegal search of the furniture within Petitioner and victim in this cause home and the illegal seizure of evidence found within the furniture and that Assistant State's Attorney,

Nicholas Ford further deceived the trial court by assisting in the cover up by fabricating a false set of concerns and circumstances for detective, Collins illegal search and seizure. Petitioner offers the following relevant evidence:

a) Chicago Police Officer, Maderer the first on the scene on the morning of the offense in this cause asked Petitioner if anything had been noticeably disturbed or if anything was missing; (R.E16)

b) Petitioner was not physically limited, was able to walk, (see exhibit 9) and (R.E20) had knowledge of what was within Petitioner and the victim in this cause home prior to the break-in, was never asked by officer, Maderer and his partner officer Pettry or any other Chicago Police Personal at the scene (victim and Petitioners home) to assist them in determining if anything had been taken by the intruder; (see exhibit 9)

c) Chicago Police Officer, Maderer testified that the tv stand did not appear disturbed in any way upon his search of the master bedroom on the morning of the offense in this cause; (R.E30)

d) The Chicago police Personal within the Petitioner and the victim in this cause home who were conducting a search to ascertain if anything had been taken had "no prior" knowledge of the contents contained within the home and could not possibly and accurately determine if anything had been missing within the home without the prior knowledge previously mentioned or the assistance of either the victim in this cause who was dead or Petitioner who was previously removed from the home and transported to the hospital;

*16* -39-

e) Chicago Police Detective, Collins arrived at the scene at approximately 5:00-5:30 a.m. on the morning of the offense in this cause, (R.I117) well after Chicago Police Officer, Maderer had searched Petitioner and the victim in this cause home, immediately went to the second floor bedroom (R.A127) where he looked for evidence that would be directly related to a crime scene; (R.A137)

f) At approximately 9:00-9:30 a.m. on the morning of the offense in this cause, Chicago Police Detective, Collins while looking behind the tv stand in this cause for any marks of penetration, (R.A131) not trying to ascertain if anything had been taken, bumped into the side door with his foot causing the door to swing open and to have the evidence fall right to his feet; (R.I119-120)

g) There were several Chicago Police Personal at the scene, Petitioner and the victim in this cause home on the morning of the offense in this cause; (R.A15) and (R.I52)

h) It is totally unbelievable and ludicrous to believe it took Chicago Police Detective, Collins and the several other Chicago Police Personal at the scene in this cause four (4) to four and a half (4½) hours to ascertain if anything had been missing from the tv stand, the same tv stand which was ten (10) feet from the victim in this cause (R.A138) and in the same room where detective, Collins immediately went upon his arrival on the scene; (R.A127)

i) It is physically impossible for detective, Collins, a man of over two hundred fifty (250) pounds to have fit into the two (2) foot space between the tv stand in this cause and the wall,

(see Petitioners exhibits 3-5 admitted in the suppression hearing in this cause) where he needed to be in order to have bumped into the side door of the tv stand to cause the door to swing open and to have the evidence (the derringer) used against Petitioner at the trial in this cause allegedly fall to his feet (R.I119-120) making it legal under the plain view doctrine;

j) The tv stand in this cause is childproof and had safety features to prevent the side door from opening in the manner as detective, Collins claimed to have happened; (see exhibits 2 and 9)

k) The Independent Administrator of the Estate of Lesley Chapman-O'Farrell, the victim in this cause had to inventory the contents of the tv stand in this cause, where he had to use considerable force to move the tv stand to gain access to the side door and the contents of the tv stand.  The tv stand has safety features where he had to push the door to unlock it and then had to pull the door to gain access to the contents within the stand, the doors do not just swing open as detective, Collins testified to, not even when great effort to move the tv stand is needed and none of the contents could not and did not fall onto the floor (see exhibit 2) as testified to by detective, Collins.

Trial counsel was ineffective in his deficient perfomance herein this meritorious claim that prejudiced Petitioner, violating his Sixth and Fourteenth Amendment Right secured by the United States Constitution.

SEVEN

Trial counsel's performance was deficient and fell below an objective standard of reasonableness where trial counsel,

Kennelly failed to present additional meritorious evidence at the suppression hearing in this cause to support Petitioners claim that the search of Petitioner and the victim in this cause home was illegal and without voluntary consent by presenting the following relevant evidence:

a) On the morning of the offense in this cause Chicago Police Officers Maderer and Pettry both had their weapons drawn (see exhibit 9) and (R.E10) when officer, Maderer demanded that he and officer, Pettry check on Petitioners wife, the victim in this cause, and look for the offender in their home. Petitioner did not feel as if had a choice to refuse officer, Maderer's demands and responded "yes"; (see exhibit 9)

b) On the morning of the offense in this cause Chicago Police Officer, Maderer demanded in a stern voice, with his hand resting on his service weapon and in the presence of several other Chicago Police Personal who were in Petitioner and the victim in this cause home that Petitioner "leave with the ambulance and get medical treatment" and that he and the other officers were "going to stay and search for clues,: at which time Petitioner did not feel as if he could refuse officer, Maderer's demands and responded "o.k." (see exhibit 9)

Petitioner was prejudiced by the deficient performance of trial counsel, Kennelly as demonstrated herein this meritorious claim, violating Petitioners Sixth and Fourteenth Amendment Right secured by the United States Constitution.

26) Petitioners rights under the above quoted State and Federal Constitutional provisions have been substantially violted.

*16* -42-

27) Prior to the indictment at issue in this cause, O'Farrell has been convicted of a felony, in fact he has never been convicted of any offense his whole life.

28) Petitioner, O'Farrell offrers the folloeing remedies, and respectfully moves this Honorable Court to grant either of the following: (a) Grant a new hearing on Petitioners motion to reconsider sentence; (b) grant Petitioner a new sentencing hearing; (c) grant Petitioner a new sentence under second degree murder as provided by Ill. Rev. Stat. 725 ILCS 5/122-6; (d) reduce Petitioners sentence to twenty (20) years under first degree murder as provide by Ill. Rev. Stat. 725 ILCS 5/122-6; (e) grant Petitioner a new suppression hearing on the confession; (f) grant Petitioner a new suppression hearing on the evidence; (g) grant Petitioner a new suppression hearing on the search and seizure; (h) grant a new suppression hearing on the testimony of State's witness, Thomas Dye; (i) grant Petitioner an evidentiary hearing on the meritorious claims herein as provided by Ill. Rev. Stat. 725 ILCS 5/122-1.

29) Wherefore, based upon the foregoing, Petitioner, Thomas O'Farrell respectfully moves this Honorable Court to deem this petition not frivolous, hold a hearing on any contested aspect of this petition, vacate the judgment of conviction and sentence, and grant post-conviction relief in the form as mentioned above.

Respectfully submitted,

Thomas O'Farrell, Pro-Se,
Defendant, Petitioner

Subscribed and Sworn to before me
on this 30 day of January, 2000

N/A

Notary Public

*i6* -43-

EXHIBIT 1

STATE OF ILLINOIS )
                  )  SS
COUNTY OF COOK    )

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT-CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS    )
                                   )
                -vs-               )
                                   )    No.  95-CR-30463
THOMAS O'FARRELL                   )
                                   )

### MOTION TO RECONSIDER SENTENCE

Now comes the defendant, THOMAS O'FARRELL, by his attorney, RITA A. FRY, Public Defender of Cook County, through JOSEPH P. KENNELLY, Assistant Public Defender, after a finding of guilty of 1st degree murder and respectfully moves this Honorable Court to reconsider its sentence of      in the above-entitled cause and grant him a new sentencing hearing or in the alternative reduce his sentence.

In support of this defendant states:

1.    That pursuant to 730 ILCS 5/5-8-1 (c) defendant has timely filed this motion.

2.    That the sentence imposed fails to take into account the mandate of Article 1 Section 11 of the Constitution of the State of Illinois that "all penalties be determined ... with the objective of restoring the offender to useful citizenship.

3.    That the sentence imposed fails to give adequate weight to the defendant's lack of criminal history.

4.    That the sentence imposed fails to give adequate weight to the defendant's history gainful employment.
5. The court erred in denying the defendant's Motion to
Wherefore, defendant requests that this court grant his    Suppress
motion to reduce sentence.                                 statements
                                                           testified
                                                           to by
                                                           Thomas eye
6. The court erred in considering
victim impact evidence from more
than one source 16-44 725 ILCS 120/2 p 3

Respectfully submitted,

RITA A. FRY
Public Defender of Cook County


BY:    JOSEPH P. KENNELLY
Assistant Public Defender  30295

FOR EXHIBITS 2-4 See Appendix A, Exhibits 2-4
In Support of Habeas Corpus Petition

**EXHIBIT 5**

**W-2 — 1987**

18874   09101/066437T   1987

2 EMPLOYER'S NAME, ADDRESS AND ZIP CODE

DOMINICKS FINER FOODS INC.
333 NORTHWEST AVE.
NORTHLAKE, ILLINOIS 60164

3 EMPLOYER IDENTIFICATION: 36-3168270

PENSION PLAN: X

| 6 EMPLOYEE SOCIAL SECURITY NO | 9 FEDERAL INCOME TAX WITHHELD | 10 WAGES, TIPS, OTHER COMPENSATION | 11 SOCIAL SECURITY TAX WITHHELD |
|---|---|---|---|
| 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 | 160.48 | 1493.02 | 106.75 |

12 EMPLOYEE'S NAME, ADDRESS AND ZIP CODE

09101
THOMAS F. O'FARRELL
11445 MATHER
WORTH, IL. 60482

13 SOCIAL SECURITY WAGES: 1493.02

16 CD APPEAL   2.63

| 17 STATE INCOME TAX | 18 STATE WAGES, TIPS, ETC | 19 NAME OF STATE |
|---|---|---|
| 37.32 | | ILLINOIS |

W-2 WAGE AND TAX STATEMENT-1987

COPY-C FOR EMPLOYEES RECORDS

---

PLEASE CUT ON DOTTED LINE

**FORM 1988**

2 Employer's name, address, and ZIP code

SAIX TAX RED INC
3360 N 111TH
CHICAGO IL 60655

3 Employer's identification number: 36-2728544

Department: 603
Co. 570   Corp.
File Number: 54342

| 8 Employee's social security number | 9 Federal income tax withheld | 10 Wages, tips, other compensation | 11 Social security tax withheld |
|---|---|---|---|
| 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 | 9.36 | 143.56 | 10.70 |

12 Employee's name, address, and ZIP code

THOMAS F O'FARRELL
11445 MATHER
WORTH IL 60482

13 Social security wages: 143.56

| 17 State income tax | 18 State wages, tips, etc. | 19 Name of State |
|---|---|---|
| 3.57 | 143.50 | IL |

W-2

---

Control Number: 0740709   OMB No. 1545-0008

Copy C For employee's records
This information is being furnished to the Internal Revenue Service.

2 Employer's Name, Address, and ZIP Code

NATIONAL TERMINALS CORP.
7459 NORTH HARLEM AVENUE
CHICAGO, ILLINOIS 60648

3 Employer's identification Number: 34-0422090
4 Employer's State I.D. Number: 34-0422090

| 6 Employee's Social Security Number | 9 Federal Income Tax Withheld | 10 Wages, Tips, Other Compensation | 11 Social Security Tax Withheld |
|---|---|---|---|
| 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 | 1517.00 | 11182.50 | 839.82 |

12 Employee's Name, Address, and ZIP Code

THOMAS FRANCIS O'FARRELL
5550 N. SAWYER
CHICAGO, ILL. 60659

13 Social Security Wages: 11182.50

| 17 State Income Tax | 18 State Wages, Tips, Etc. | 19 Name of State |
|---|---|---|
| 253.73 | 11182.50 | ILLINOIS |

Form W-2 Wage and Tax Statement 1988
36-2515832 I.R.S. APP.

Department of the Treasury Internal Revenue Service

16-45

# COOK COUNTY DEPARTMENT OF CORRECTIONS
## INMATE GRIEVANCE

NAME: _Thomas O'Fallon_   DATE: _March 28, 1996_

ID.: _9567062_   DIV.: _9_   TIER: _1-D_

**PART A Complaint:**

Today I found out my cellmate, Thomas Dye, Inmate No. 9579312, took my legal paperwork concerning my case, and also, personal paperwork from my son's attorney, in regards to his case, upon his departure from CCDOC. I informed the authorities of this and was instructed to file this grievance with Internal Investigations.

**Name of staff or detainees/inmates having information regarding this complaint:**

Administration of Division Nine, Inmate Steven Ehrlich

**Action you are requesting:** I would like Internal Investigations to conduct an investigation and inform the courts of Mr. Dye's activity, and charges be brought against Mr. Dye for theft. I am making a copy of this grievance for my files.

**Signature:** _____

Note: Decisions of the disciplinary hearing board cannot be appealed through the grievance procedure. Such appeals may be made directly to the Superintendent of your division.

16-48



# COOK COUNTY DEPARTMENT OF CORRECTIONS
## INMATE GRIEVANCE

**NAME:** Thomas O'Farrell                    **DATE:** 4-26-96

**ID.:** 9567062          **DIV.:** 9          **TIER:** 1-D

### PART A Complaint:

This is a follow-up to my grievance filed on March 28, 1996, because I have

received no response. The contents of my first grievance are as follows: On 3-28-96

my cellmate in Div. 9, 1-D, Cell 1183, Mr. Thomas Dye, Inmate No. 9577312, took my legal

paperwork concerning my case, and very personal letter from my son's attorney in regards

to his case, upon his departure from CCDOC. I had informed the authorities of this and

was instructed to file an inmate grievance with Internal Investigations. I did so on

3-28-96, but I have received no response to my first grievance. Today, 4-26-96, I was

informed by Mr. Steven Ehrlich, Inmate No. 9575329, !-D, Cell 1186, that Thomas Dye was

testifying against him in his case. I informed Mr. Ehrlich that I knew how Thomas Dye

got his information, and told Mr. Ehrlich that I witnessed Thomas Dye with his legal

[Cont.]

### Name of staff or detainees/inmates having information regarding this complaint:

Administration of Divison Nine, Mr. Steven Ehrlich, 9575329.

### Action you are requesting:

I would like Internal Investigations to conduct an investigation and inform the courts

of Thomas Dye's activity, and charges be brought against Thomas Dye for theft. I am
making a copy of this grievance for my files.

**Signature:** _____

Note: Decisions of the disciplinary hearing board cannot be appealed through the grievance procedure.
Such appeals may be made directly to the Superintendent of your division.

16-49

Inmate Grievance of 4- 96
Thomas O'Farrell
I.D. 9567062
Page 2


paperwork in our cell, 1188, reading it to me and copying word-for-word what was on

the legal paperwork, he had of Steven Ehrlich's. I truly believe Thomas Dye will try

to testify against me also.

16-50

For Exhibit 9  see Appendix A, Exhibit 9
In Support of Habeas Corpus Petition



# COOK COUNTY DEPARTMENT OF CORRECTIONS
## INMATE GRIEVANCE

Name: Steven A. Ehrlich                          Date: 5-16-96

ID: 9575329          Division: Div. 9          Tier: 1-D

### PART A  Complaint

On March 05, 1996, I was relocated from Division 8, RTU E-4, to Division 9, 1-D, 1186, for security reasons. Approximately one week after arriving at Div. 9, 1-D, I discovered one morning upon returning from the shower, that someone had been through my legal paperwork (arrest warrant & copy of complaint) as the papers were out of order. I immediately reported this to the officer in charge of 1-D. In addition, I advised my attorney. When I appeared in court, April 26, 1996, a statement was tendered by Mr. Thomas Dye, ID # 9577312 that is based upon the information contained in the legal paperwork in my room that had been previously gone through. I then knew who had read the aforementioned. Upon my return to Cook County Jail, I spoke with Mr. Thomas O'Farrell, Mr. Tommie Dye's roommate. Mr. O'Farrell then advised me he had witnessed and listened to Mr. Dye read aloud, the information contained in the legal documents in my room. Mr. O'Farrell also advised me that some of his legal paperwork is missing, and fears Mr. Dye will try to testify against him as well.

Name of staff or detainees/inmates having information regarding this complaint:
Mr. Thomas O'Farrell; Div. 9, 1-D, 1187    (9567062)
Mr. Carlos Morales; Div. 9, 1-D, 1190    (9511544)

Action you are requesting:
That this become a matter of record. That a copy of said greivance be given me, and a copy is being forwarded to my attorney.

Signature: _____

Note: Decisions of the disciplinary hearing board cannot be appealed through the grievance procedure. Such appeals may be made directly to the Superintendent of your division.

16-52

COOK COUNTY DEPARTMENT OF CORRECTIONS
INMATE GRIEVANCE

Name: Steven A. Ehrlich                                           Date: 8-15-96

ID: 9575329                    Division: 9                        Tier: 1-D

## PART A  Complaint

This grievance is being resubmitted from May 16, 1996, as I have never received a response from the original submission. I have been asked by our social worker, Mr. John Jaros, to resubmit it. The original grievance reads as follows:

On March 05, 1996, I was relocated from Division 9, RTU E-4, to Division 9, 1-D, 1186, for security reasons.

Approximately one week after arriving at Div. 9, 1-D, I discovered one morning upon returning from the shower, that someone had been through my legal paperwork (arrest warrant & copy of complaint) as the papers were out of order. I immediately reported this to the officer in charge of 1-D. In addition, I advised my attorney. When I appeared in court, April 26, 1996, a statement was tendered by Mr. Thomas Dye, ID# 9577312, that is based upon the information contained in the legal paperwork in my room that had been previously gone through. I then knew who had read the aforementioned. Upon my return to Cook County Jail, I spoke with Mr. Thomas O'Farrell, Mr. Tommie Dye's roommate. Mr. O'Farrell then advised me that he had witnessed and listened to Mr. Dye read aloud the information contained in the legal documents in my room. Mr. O'Farrell also advised me that some of his legal paperwork is missing, and fears Mr. Dye will try to testify against him as well.

(A copy of this grievance has been forwarded to my attorney.)

Name of staff or detainees/inmates having information regarding this complaint:
Mr. Thomas O'Farrell; Div. 9, 1-D, 1187, ID# 9567062
Mr. Carlos Morales, Div. 9, 1-D, 1190, ID# 9511544

Action you are requesting:
That this case become a matter of record. That a copy of this grievance, bearing notations to indicate inclusion in your records, be returned to me.

Signature: _S A Ehrlich_

Note: Decisions of the disciplinary hearing board cannot be appealed through the grievance procedure. Such appeals may be made directly to the Superintendent of your division.

16-53

1  STATE OF ILLINOIS    )
                        )   SS:
2  COUNTY OF C O O K    )

3              IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
4                COUNTY DEPARTMENT - FOURTH JUDICIAL DISTRCIT
                              CRIMINAL DIVISION

5  THE PEOPLE OF THE STATE              )
   OF ILLINOIS,                         )
6                                       )
                                        )
7                -vs-                   )        95 CR 34264
                                        )        97 CR 623
8  STEVEN A. EHRLICH,                   )
                                        )
9                    Defendant.         )

10             REPORT OF PROCEEDINGS had at the hearing

11 of the above-entitled cause before the Honorable

12 DANIEL WEBER, Judge of said court, on Friday, the 26th

13 day of April, A. D. 1996, at the hour of 10:00 A.M.

14             PRESENT:

15                     MR. JACK O'MALLEY,
                       STATE'S ATTORNEY, by
16                     MR. RUSSELL BAKER,
                       ASSISTANT STATE'S ATTORNEY,
17
                          appeared on behalf of the People of
18                        the State of Illinois;

19                     MS. RITA FRY,
                       PUBLIC DEFENDER, by
20                     MR. JAMES MULARSKI,
                       ASSISTANT PUBLIC DEFENDER,
21
                          appeared on behalf of the Defendant.
22

23 Jeanette Hansen
   Official Court Reporter
24 Maywood - 4th District

THE CLERK:  Steven Ehrlich.

MR. MULARSKI:  James Mularski ste ping up on behalf of Mr. Scott Suva representing Mr. Ehrlich who is present before the court.

MR. BAKER:  I am aking leave to tender a statement from a witness, Tom Dye, to Counsel.

MR. MULARSKI:  Thank you.  We acknowledge receipt of that.

Judge, Mr. Suva's investigation notes in the matter, to be continued.  He is here on Mondays in May.  If there is a --

THE COURT:  Do you want the same date, the 20th?

MR. MULARSKI:  May 20th, okay, for status.

THE CLERK:  Okay.

MR. EHRLICH:  May I address the court, please.

THE COURT:  Why don't you talk to the attorney first because everything you say is on the record.

MR. BAKER:  What are these?

MR. MULARSKI:  Motion transcript of bail bond hearing.

MR. EHRLICH:  On February 21st we had a hearing and there were statements there --

MR. MULARSKI:  Mr. Ehrlich has made a motion for the transcript of the bail bond hearing.  I

-2-

16-55

would indicate that Mr. Ehrlich is presently being represented by the Office of the Public Defender. If there are transcripts that he wishes for us to procure, we will certainly order it.

THE COURT:  Fine.

MR. MULARSKI:  I will indicate for the record that this is February 21, 1996.

MR. EHRLICH:  Yes.

MR. MULARSKI:  That is the transcript you want?

MR. EHRLICH:  Yes.

MR. MULARSKI:  I will order it from the court reporters office.  Let me take a copy so I can have the date.

By agreement 5-20.

* * * * * * * * *

(Which were all of the proceedings had
in the above-entitled cause, this date,
and continued to May 20, 1997.)

-3-

File Date: _Apr 28, 2008_____

Case No: _08 cr 2403_____

ATTACHMENT # _____

EXHIBIT _____

TAB (DESCRIPTION)
_Cont'd 16-57_____

1  STATE OF ILLINOIS      )
                          )  SS:
2  COUNTY OF C O O K      )

3          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - FOURTH JUDICIAL DISTRICT
4                        CRIMINAL DIVISION

5                  I, JEANETTE HANSEN, an Official Court

6  Reporter of the Circuit Court of Cook County, County

7  Department - Probate Division, do hereby certify that

8  I reported in shorthand the proceedings had in the

9  above-entitled cause, and that the foregoing is a true

10 and correct transcript of the proceedings had.

11

12

13

14

15

16  _____
17        Official Court Reporter
          Circuit Court of Cook County
18        Lic. No. 084-000442

19

20

21  Dated:  June 4, 1997.

22

23

24

**NOTICE**

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

No. 1--97--0911

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 95 CR 30463 |
| THOMAS O'FARRELL, | ) | Honorable Michael Toomin Judge Presiding. |
| Defendant-Appellant. | ) | |

## O R D E R

Following a bench trial, defendant Thomas O'Farrell was convicted of first degree murder and sentenced to 50 years' imprisonment. On appeal, defendant contends that: (1) his sentence was excessive; (2) he should not have been subject to the truth-in-sentencing law because it violates the single subject rule of the Illinois Constitution; and (3) the mittimus should be amended to reflect that he was convicted and sentenced for only one count of first degree murder. For the reasons set forth below, we affirm and modify the mittimus.

In the early morning hours of September 28, 1995, defendant's wife, Lesley O'Farrell, was shot and killed by two gunshot wounds,

1--97--0911

one to her head and the other to her chest. Defendant, who was 31 years old at the time, was charged by indictment with first degree murder of his wife. Defendant waived his right to a jury trial. Prior to trial, the court denied defendant's motions to quash his arrest and suppress his statements. The trial court also denied defendant's motion to suppress physical evidence with respect to a firearm the police found, but granted the motion with respect to a letter written by defendant's wife which had been taken off of a dresser by the police. The trial court also denied defendant's motion to suppress statements he made about why he shot his wife to Thomas Dye, a police informant, while both were being held in the Cook County jail.

At defendant's trial, Chicago police officer Veronica Pettry testified that she and her partner, Peter Maderer, received a radio call at 4:20 a.m. that a shooting or a burglary was in progress at defendant's address. When they arrived at defendant's house, the front door was open and defendant was sitting with his son on the base of a staircase inside the house. Defendant was bleeding from a gunshot wound and he told Officers Pettry and Maderer that he and his wife had been shot in their bedroom. Defendant described the shooter as "a six-foot-three inch, black man with short black hair, approximately 200 pounds." Defendant also stated that he thought his wife was dead and asked Pettry and Maderer to check on her. While Maderer checked the upstairs bedroom, defendant told Pettry that "he was sleeping, and he awoke, he heard a loud boom, which he

2

16-59

1--97--0911

suspected was a gunshot. And as he awoke, he saw this six-foot-three, 200 pound black man offender." After Maderer checked the upstairs master bedroom of the house and confirmed that defendant's wife was dead, Pettry and Maderer asked defendant how he became injured. Defendant told them he "tried to disarm the offender" and a struggle ensued from the bedroom and continued outside into the hallway, "at which time the gun went off." Defendant further told Pettry and Maderer that he thought that the offender had been shot in the stomach. Officer Maderer then searched the house to see if the intruder was still present but did not find him. When an ambulance arrived at the house, Pettry and Maderer told defendant to get medical treatment and that they would look around for more clues and check to see if there was anything missing.

Chicago police officer Ronald Cooper testified that he rode with defendant, who appeared to be injured in his shoulder, and defendant's son in the ambulance to the hospital. While in the ambulance, defendant told Cooper that "while he was sleeping he heard a loud noise followed by a second loud noise. At that time he awoke, and he observed *** [a] male black in his bedroom standing over his wife." Defendant also told Cooper that he "jumped out of his bed, and he grabbed the male black in his bedroom and they began to wrestle." Just outside the bedroom, in the hallway, two shots were fired. Defendant thought the black man was shot and one shot had struck defendant in the shoulder. Defendant also told Cooper that the black man ran down the stairs

3

16-60

1--97--0911

and out the door next to the kitchen, and defendant followed the man out of the house onto the street.

Chicago police detective William Kernan testified that he was assigned to go to the hospital and interview defendant. Defendant told Kernan that he was employed as a truck driver, got off work at 10:30 p.m. on September 27, 1998, stopped at a bar for a few beers, and left at approximately 11 p.m. Defendant also told Detective Kernan that he briefly spoke with his wife before going to bed and she told him that their two dogs had been barking. Defendant further told Kernan the same story he had told the other officers at his house and in the ambulance about how he and his wife had been shot.

Chicago police officer Patrick Moran testified that he was assigned to investigate the scene of the murder. Officer Moran stated that "[a] pane of the window [from the first floor bathroom] was missing and a pane of window glass was on the lawn in front of the window"; "below the window was a pile of flagstone and pieces of lumber"; and on the second floor of defendant's home he found two bullet holes in the wall and discovered pictures and broken wooden picture frames on the floor. Moran also identified a police photograph that showed a bed pillow that was lying across the victim's legs that had two bullet holes in it and powder burns and another photograph of a pillow with blood on it that was underneath the victim.

Detective Harry Collins testified that he arrived at

4

16-61

1--97--0911

defendant's home around 5 or 5:15 a.m. to conduct a search of defendant's bedroom. Collins did not have a warrant to search the furniture, but he found a video cassette box that fell out of the inside of a television cabinet when he bumped into it with his foot. Inside the box was a single-shot derringer pi..ol, some expended shell casings and a hypodermic needle. Collins also saw a glass window pane which had been removed from the first floor bathroom lying on the lawn and that putty had been removed from around the window.

Detective Richard Schak testified that he learned at approximately 8:30 a.m. on September 28, 1995, that a small derringer pistol had been found in a movie video case in the bedroom where Leslie O'Farrell was shot. Detective Schak asked defendant at the Area Five police headquarters if he owned a gun or if there would be any reason for a gun to be in his home. Defendant told Schak that "there wouldn't be any reason for a gun to be there, and he didn't own a gun." Schak then gave defendant *Miranda* warnings. According to Schak, after he told defendant that a gun was found in the bedroom in a closed video case, defendant responded, "You're right," and further stated "I did it. I killed her, but she wanted me to. I did it for her." Defendant explained to Schak that his wife had been sick and she had diabetes, was beginning to experience kidney failure, was diagnosed with Bell's Palsy and was concerned about being disfigured. Defendant also stated that six months earlier his wife had tried to kill herself

5

*16-62*

1--97--0911

with an insulin overdose. Defendant also told Schak that his wife
pleaded with him to help her take her own life, she asked him to
shoot her, she "came up" with the weapon, they made a plan, and he
did "take her life for her."

Defendant further told Schak that on the day of the shooting,
he went home after work and his wife talked to him about taking her
life. Defendant also stated that his wife had taken the glass out
of the bathroom window and removed the glass so it would look like
somebody came into the house through the bathroom. Defendant
further stated that his wife asked him to take her life after she
went to sleep. Defendant waited after she fell asleep and she woke
up several times and continued to ask him why he did not take her
life. After 4 a.m., defendant decided to go ahead and "continue
the plan" and fired a shot into his wife's skull through a pillow
while she was lying in bed. Defendant then shot his wife in her
chest because she was quivering and moving around and he thought
she might be in some pain. Thereafter, he fired a shot in the
hall, then shot himself in the shoulder and put the gun in the
video case. Defendant then called 911.

Assistant State's Attorney Tom Kougias testified that he met
Detective Schak at Area Five police headquarters, had a
conversation with him, reviewed the police reports that were
available, and questioned defendant. Detective Schak was present
while Kougias asked defendant questions. Kougias stated that he
gave defendant *Miranda* warnings and interviewed defendant from

6

16-63

1--97--0911

approximately 11:30 a.m. until 2 p.m. on September 28, 1995. Kougias' testimony was identical to Schak's regarding defendant's wife's illnesses and defendant's version of the events that occurred on the night defendant's wife was shot. Kougias further testified that the "story" defendant and his wife decided on was to make the bathroom window look like "a point of entry" for a "six-foot-three-inch African-American male black" to break in the house, shoot defendant's wife and then flee. Kougias also stated that defendant told him that he went about the house throwing pictures on the floor to make it look like a struggle had occurred and pushed the screen door out beyond its limit so that it would break and it would be more believable that the offender escaped through the screen door.

The trial court subsequently found defendant guilty of two counts of first degree murder, and merged count two into count one. At defendant's sentencing hearing, in aggravation the State called Thomas Dye, a police informant, who testified that in November and December 1995 he was in the Cook County jail with defendant. While there, defendant told him that he had killed his wife and "there was insurance money involved." Defendant further told Dye that being with his wife was a good thing to do financially because her family had money; his parents and his wife's family were involved in a custody battle concerning his son; he did not "know how to handle it as far as keeping the insurance money tied into his side of the family"; he had preplanned to kill his wife; and he did not

7

16-84

1--97--0911

like his wife, but stayed with her to "solidify the insurance money" that was coming from her grandparents. Dye also stated that defendant told him "[defendant's] son would inherit the money and [defendant] would control the inheritance based on his son being a minor."

Dye further testified that defendant told him that on the night of the shooting he got drunk at a bar and went back to his house, put a pillow over his wife's head and shot her. Dye also stated that defendant told him that if he was convicted of second degree murder "it would be okay because he would be out of jail before his son turned 18." Defendant further told Dye that he "hoped" to be found guilty of second degree murder because his father was a police officer, his wife was sick and he would tell the court it was a mercy killing, he did not have a record, and he was "clean-cut."

In mitigation, Dr. Larry Heinrich, a licensed clinical psychologist and board certified forensic examiner in psychology, testified in behalf of defendant that he examined defendant in May 1996 to evaluate him for fitness and sanity. According to Dr. Heinrich, defendant suffered from chronic depression and was experiencing a depressive disorder when he was in therapy during his marriage in 1992. Based on defendant's and his wife's therapy records, defendant's depressive disorder was related to family and personal issues such as financial conditions, his wife's health and the raising of his son. Heinrich also stated that defendant's wife

8

16 -65

1--97--0911

talked about passive suicidal ideation and wishes in her therapy session, and wrote in her personal diary notes about despondencies, hopelessness, helplessness and a feeling of a sense of worthlessness and being useless as a woman. Heinrich further stated that at one time defendant and his wife considered separation and divorce.

Gerald Phillips, defendant's adopted brother, testified that as a child, defendant had asked his parents to take Phillips into their home and raise him after Phillips' parents had died and he was having problems with his new family. Phillips was eventually adopted by defendant's parents when he was 14 years old. John Kohn, defendant's brother-in-law testified that defendant came to his rescue after he was involved in a traffic altercation and was attacked and stabbed. Defendant also submitted 30 letters from his friends and family in his behalf that described defendant as a kind and compassionate person.

In closing argument, the State argued that defendant's act merited that defendant be sentenced to 60 years' imprisonment because defendant's murder of his wife was "pure sickness" based on defendant's acts in removing the bathroom window, throwing pictures down from off the wall to make the murder look like a struggle occurred, implicating a black person, and defendant's shooting of himself so that the police would believe he had been assaulted.

Defendant's counsel urged the trial court to impose the minimum sentence of 20 years' imprisonment based upon Dr.

9

16-66

1--97--0911

Heinrich's testimony; Dye's lack of credibility; defendant's participation in 20 sessions of marital counseling; the lack of evidence of any battery by defendant against his wife; defendant's lack of criminal history; and testimony that defendant had been a loving member of his family, helping out those in need and he was a good father.

Defendant testified that he was "very sorry for all the pain and suffering" he had caused everyone.  Defendant further stated that he signed a prenuptial agreement and he would not receive financial gain from his wife's death.  Defendant also asked the trial court to "please make a reasonable sentence [so] that [he] may one day return back to this society and try to make up to [his] son for the loss of his mother."

The trial court subsequently sentenced defendant to 50 years' imprisonment.  Defendant filed a motion for new trial and a motion to reconsider his sentence, which the trial court denied.  This appeal followed.

Defendant first contends that the trial court abused its discretion in sentencing him to 50 years' imprisonment, arguing that the sentence is excessive because he had no prior criminal history, had strong family and community support, the circumstances of his case were unique and unlikely to recur, and he had a "great amount of rehabilitative potential."  Defendant also argues that Dye's testimony was "self-serving" and "completely untrustworthy and should be given no credence by this Court in assessing whether

10

10-67

1--97--0911

[his] sentence was excessive." The State argues that the trial court's sentence was not an abuse of discretion based on the fact that defendant shot and killed his wife because "he no longer wanted to be married to her and wanted to gain control over a large inheritance which she had received."

"The standard of review of a sentence claimed to be excessive is whether *** the trial court exercised discretion and, if so, whether this discretion was abused." People v. Cox, 82 Ill. 2d 268, 275, 412 N.E.2d 541 (1980). A reviewing court is empowered to reduce the punishment that has been imposed by the trial court. 134 Ill. 2d R. 615(b)(4). The trial court's judgment with regard to the appropriate punishment is entitled to great deference. People v. Illgen, 145 Ill. 2d 353, 379, 583 N.E.2d 515 (1991), citing People v. Godinez, 91 Ill. 2d 47, 55, 434 N.E.2d 1121 (1982). "[A] reviewing court will not substitute its judgment for that of a sentencing court merely because it would have weighed the factors differently." People v. Pittman, 93 Ill. 2d 169, 178, 442 N.E.2d 836 (1982), citing People v. Perruquet, 68 Ill. 2d 149, 368 N.E.2d 882 (1977). The trial court is in the best position to determine an appropriate sentence because of its ability to hear evidence and view witnesses. People v. Jones, 236 Ill. App. 3d 244, 251, 603 N.E.2d 619 (1992).

At the time of defendant's murder of his wife, the Unified Code of Corrections (Code) provided a sentence of imprisonment for first degree murder of not less than 20 years and not more than 60

11

16-68

1--97--0911

years.   730 ILCS 5/5--8--1 (a)(1)(a) (West 1996).   Section 5--4--
1(c) of the Code provides that, "[i]n imposing a sentence for a
violent crime *** the trial judge shall specify on the record the
particular evidence, information, factors in mitigation and
aggravation or other reasons that led to his sentencing
determination." 730 ILCS 5/5--4--1(c) (West 1996). "The nature of
the crime, protection of the public, deterrence, and punishment all
have equal status in the determination" in setting an appropriate
sentence. People v. Smith, 246 Ill. App. 3d 647, 653, 616 N.E. 2d
737 (1993).   It is also well settled that a trial court is not
required to make an express finding that a defendant lacks
rehabilitative potential nor accord greater weight to a defendant's
potential for rehabilitation than to the seriousness of the
offense. People v. Boclair, 225 Ill. App. 3d 331, 335-36, 587
N.E.2d 1221 (1992). A sentence within the statutory limitations
will not be disturbed on review unless it is grossly
disproportionate to the nature of the offense. People v. Moore,
178 Ill. App. 3d 531, 542, 533 N.E.2d 463 (1988).

The trial court's statements at defendant's sentencing hearing
here clearly indicate that the court considered all factors in
aggravation and mitigation. In imposing sentence, the trial court
stated that the factors of aggravation "loom high." The court also
stated:

> "[What the facts] reveal is a sad and sorted
> [sic] tale, cold-blooded and rather ruthless

16-69

1--97--0911

> killing of a wife as she laid rather helpless
> in her bed.  No struggle indicated, a plan
> purportedly  devised  by  Lesley,  so  the
> defendant says, and acted upon by himself, and
> thereafter inflicted a not so grievous wound
> upon himself, and engaged in further deception
> to mask his own culpability."

The court also stated,

> "We have a factor of deterrence both for
> *** [defendant] that he must, by his own acts
> and  conduct,  be  removed  from  society  for  a
> number  of  years  to  come,  and  the  factor  of
> deterrence, as in all cases, for others who
> may  be  similarly  situated  or  inclined  to
> emulate *** [defendant's] behavior here."

The court summarized the mitigating factors as follows,

> "It is true in mitigation that *** [defendant]
> has no prior history of criminal convictions,
> which  the  Court  has  and  is  duty  bound  to
> consider.  He has obviously had the benefit of
> a  good  upbringing,  parents  who  have  been
> faithful to him, supportive, even up to this
> day,  and,  no  doubt,  will  continue  to  be,
> numerous  friends  and  family  who  have  made
> submissions on his behalf today, somebody with

13

16-20

1--97--0911

> a fairly enviable background when I look at
> Mr. O'Farrell in contrast to many others who
> walk in and out of this courtroom.  He is a
> high school graduate, three years of college,
> enjoyed fairly regular employment, at least
> for the three years preceding this event, had
> a family, has a young son, who, unfortunately,
> must suffer the loss of, not only his mother,
> but now his father as well."

The court further noted that while it felt defendant was "truly
remorseful for [the] inevitable result," defendant had overlooked
the fact that it was because of the life that was taken by his hand
that his son will lose the benefit of both parents.  The trial
court also stated that a factor it would consider, as defense
counsel pointed out, was that "this is a truth-in-sentencing case."

We conclude that the trial court's remarks reveal that it
carefully considered both mitigating and aggravating factors in
sentencing defendant.  The trial court was in the best position to
determine an appropriate sentence because of its ability to hear
evidence, view witnesses and weigh the factors in aggravation and
mitigation in sentencing defendant.  We will not substitute our
judgment for that of the trial court.  Additionally, defendant's
50-year sentence was within the statutory range of 20 to 60 years
for the offense of first degree murder.    730 ILCS 5/5--8--1
(a)(1)(a)(West 1996).  Accordingly, we find that the trial court

14

1--97--0911

did not abuse its discretion in sentencing defendant to 50 years' imprisonment.

We briefly note that defendant's reliance on <u>People v. Hammerli</u>, 277 Ill. App. 3d 873, 662 N.E.2d 452 (1996), and <u>People v. Crow</u>, 168 Ill. App. 3d 744, 521 N.E.2d 594 (1988), in support of his excessive argument, is misplaced.  Defendant relies on <u>Hammerli</u> and <u>Crowe</u> for the proposition that because the defendants in those cases were convicted of murdering an ex-spouse and spouse, respectively, and received a sentence of 35 years' imprisonment, lower than his 50-year sentence, his sentence is excessive. Defendant's "argument" consists merely of making a comparison between the nature of the acts of the defendants in committing the murders in <u>Hammerli</u> and <u>Crowe</u>, which were found to be methodical and logical (<u>Hammerli</u>, 277 Ill. App. 3d at 882) and deliberate, planned, "coldblooded and brutal" (<u>Crowe</u>, 168 Ill. App. 3d at 756), and his own murder of his wife, which he asserts was "hardly cold and calculated, but was instead the result of stress and depression."  However, like the <u>Crowe</u> court, in responding to the <u>Crowe</u> defendant's argument that she was suffering an "'emotional upheaval' [when she murdered her husband] and that deterrence is of little effect in such a situation," we similarly respond to defendant's argument by pointing out that defendant here "was convicted of murder, not voluntary manslaughter."  <u>Crowe</u>, 168 Ill. App. 3d at 757.  Moreover, the trial court's judgment with regard to the appropriate punishment is entitled to great deference and,

15

16-72

1--97--0911

as discussed above, the trial court fully considered all mitigating and aggravating factors and we find no reason to substitute our judgment for that of the trial court.

Defendant also argues that this court should not give "credence" to Dye's testimony in assessing whether his sentence was excessive. A trial court's determination as to the credibility of witnesses and the weight to be given their testimony is entitled to great deference. <u>People v. Jones</u>, 174 Ill. App. 3d 737, 745, 528 N.E.2d 1363 (1988). The trial court was in the best position to assess Dye's credibility based on his testimony and in viewing him, and we will not reweigh the evidence. We further find that defendant has waived review of his argument that we should compare his sentence to the average sentence imposed for first degree murder according to the "Statistical Presentation of the Illinois Department of Corrections." Defendant has raised this issue for the first time in his reply brief; defendant did not raise it as his sentencing hearing nor did he raise it in his motion to reconsider his sentence. <u>People v. Enoch</u>, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988).

Defendant next argues that "[t]his Court should issue an order stating that *** [he] will not be subject to the truth-in-sentencing law," enacted by Public Act 89-404, because it "violated the single subject rule of the Illinois Constitution, Article IV, Section 8(d)." The State argues that Public Act 89-404 was passed in compliance with the single subject rule because it was limited

16

16 - 23

1--97--0911

to the single subject of governmental relations.  The State also argues that if Public Act 89-404 was originally passed in violation of the single subject rule, any defect has been cured by its subsequent codification.  The State contends that it is irrelevant that defendant was sentenced after the codification because he could have filed a timely action for a declaratory judgment that Public Act 89-404 was passed in violation of the constitution's single subject requirement.

Section 3--6--3(a)(2)(i) was enacted on August 20, 1995, as part of Public Act 89-404, and provides "that a prisoner who is serving a term of imprisonment for first degree murder shall receive no good conduct credit and shall serve the entire sentence imposed by the court."  730 ILCS 5/3--6--3(a)(2)(i) (West 1996).  Defendant was convicted of an offense that occurred on September 28, 1995, and because his offense occurred after August 20, 1995, the truth-in-sentencing provision would be applicable to him.  However, our supreme court has recently held that Public Act 89-404 violated the single subject rule.  People v. Reedy, Nos. 85191, 85297 (Cons.) (January 22, 1999).  The Reedy court also declined to accept the codification argument asserted by the State that a defendant is precluded from challenging the constitutionality of an act on single subject grounds once the act has become codified.  Reedy, slip op. at 8-9.  We therefore hold that defendant is entitled to be sentenced in accordance with the statute in effect prior to Public Act 89-404, and is eligible to receive "one day of

17

16-74

1--97--0911

good conduct credit for each day of service in prison." 730 ILCS
5/3--6--3 (West 1994).

Lastly, defendant contends the mittimus should be amended to
reflect that he was convicted and sentenced for only one count of
first degree murder; defendant argues that the mittimus incorrectly
shows that he was convicted of two counts of murder. The State
argues this is a "non-issue" because the trial court expressly
stated that it was merging count two of the indictment into count
one; i.e., the court clearly wrote upon the mittimus, "Count Two to
Merge."

This court is empowered to "reverse, affirm, or modify the
judgment or order" from which an appeal is taken. 134 Ill. 2d R.
615(b)(1)(1990). A reviewing court has a duty to resolve
contradictions which exist between the common law record and the
report of proceedings by looking at the record as a whole. People
v. Stingley, 277 Ill. App. 3d 239, 242, 660 N.E.2d 67 (1995),
citing People v. Fike, 117 Ill. 2d 49, 56, 509 N.E.2d 1011 (1987).
Where there is only one victim, there can be only one conviction
for murder. People v. Burnett, 267 Ill. App. 3d 11, 17, 640 N.E.2d
1350 (1994). It is the oral pronouncement of the judge which is
the judgment of the court; the written order of commitment is
merely evidence of the judgment of the court. People v. Smith, 242
Ill. App. 3d 399, 402, 609 N.E.2d 1004 (1993), citing People v.
Williams, 97 Ill. 2d 252, 310, 454 N.E.2d 220 (1983). "Where
looking at the record as a whole, if the written order is not

18

16-75

1--97--0911

inconsistent with the intent, sense and meaning of the circuit court's oral pronouncement, the written order will be enforced." Smith, 242 Ill. App. 3d at 402.

In the present case, defendant was indicted on two counts of first degree murder, in violation of "Chapter 720, Act 5, Section 9--1--A(1) of the Illinois Compiled Statutes" (count one) and "Chapter 720, Act 5, Section 9--1--A(2)" (count two). At defendant's bench trial, the court stated:

> "All in all, based upon the totality of the circumstances here, the Court finds that the State has overwhelmingly I would say proved the allegations contained in the indictment and more particularly the allegations in Count 1, which are predicated upon the theory of express malice or intentional murder. The Court will enter a finding of guilty as to Count 1. Count 2, while there is sufficient evidence to sustain it, it will merge into the finding as to Count 1. And that will be the findings entered today."

The mittimus lists both counts from the indictment and clearly states, "Count Two to Merge." Given the fact that the written order is consistent with what the trial court orally pronounced, we find that the mittimus need not be amended.

For the reasons stated, the judgment of the circuit court is

19

16--76

1--97--0911

affirmed, and we modify the mittimus to reflect defendant's entitlement to receive one day of good conduct credit for each day of service in prison.  See e.g., <u>People v. Percy Jones</u>, No. 1--97--3747 (December 31, 1998); <u>People v. Reedy</u>, 295 Ill. App. 3d 34, 44, 692 N.E.2d 376 (1998).

Affirmed, as modified.

BURKE, J., with CERDA and McBRIDE, JJ., concurring.

---

\*J. McBride replaced J. Leavitt as a panel member in the decision of this appeal, and she reviewed the record, briefs, and tape of the oral argument.

20

| NAME (LAST, FIRST, MIDDLE OR MAIDEN) | | | DATE | ARRIVAL | OUTPATIENT NO. | RACE | |
|---|---|---|---|---|---|---|---|
| OFARRELL LESLIE | | | 02/28/91 | 07:39PM | 980 54 | | 321140 |

| ADDRESS (STREET AND NUMBER) | (APT) | CITY | STATE | ZIP | PHONE | SEX | BIRTHDATE | AGE |
|---|---|---|---|---|---|---|---|---|
| 5253 N WINTHROP 1 | | CHICAGO | IL | 60604 | 312-334-5183 | F | 01/25/1966 | 25Y |

| MAR. | FIN STATUS | CLASS | SOCIAL SECURITY NO. | PREV ADM | DATE | PRIVATE PHYSICIAN | PATIENT'S OCCUPATION | |
|---|---|---|---|---|---|---|---|---|
| M | S | | | N | | MICHAEL NAGEL | NONE | |

| EMPLOYER | | ADDRESS | CITY | STATE | ZIP | EMPLOYER'S TELEPHONE | REL |
|---|---|---|---|---|---|---|---|
| NONE | | | | | | | OTH |

| GUARANTOR | ADDRESS | CITY | STATE | ZIP | GUARANTOR SOC. SEC. NO. |
|---|---|---|---|---|---|
| OFARRELL LESLIE 5253 N WINTHROP 1 | | CHICAGO | IL | 60604 | |

| NEAREST RELATIVE | RELATIONSHIP | ADDRESS | CITY | STATE | NEAREST RELATIVE'S PHONE |
|---|---|---|---|---|---|
| FARRELL, THOMAS F. | HUSBAND | 5253 N WINTHROP 1 | CHICAGO | IL | 312-334-5183 |

| PRIMARY PLAN | CODE NO. | POLICY NO. | GROUP | SUBSCRIBER NAME | 3RD CODE NO. | POLICY NO. | GROUP |
|---|---|---|---|---|---|---|---|
| | | No al | | | | | |

| SECONDARY PLAN | CODE NO | POLICY NO. | GROUP | SUBSCRIBER NAME | 4TH CODE NO. | POLICY NO. | GROUP |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| ACCID. | DATE | JOB REL. | PLACE | | PATIENT BROUGHT BY | SPECIFY | NO. OF INS. | INS. VER? |
|---|---|---|---|---|---|---|---|---|
| | | NO | | | OTH | HUS | O | |

| METHOD | NOTIFIED TIME: | | | BEAT | STAR | ARVEY CLINIC PT.? | SMOKER | MED. REC. NO. |
|---|---|---|---|---|---|---|---|---|
| W | | ☐ RELATIVE ☐ SOC. SERVICE ☐ POLICE | | | | NO | ☐ YES ☒ NO | 4051288 |

| CHIEF COMPLAINT | CONDITION CODE | REGISTERED AT |
|---|---|---|
| | | STB |

ER-6 (12/88)   DIABETIC

251.2

16-78

HOSPITAL

| TIME | INIT. | PHYSICIAN ORDERS AND TREATMENT RENDERED | |
|---|---|---|---|
| 7⁴⁶ | LC | ☒ CBC ☐ WITH DIFF | 1 |
| | | ☒ LYTES | 1 |
| | | ☒ GLU ☐ BUN ☐ CR. | 1 |
| | | ☒ UA CX ☐ W/MICRO | |
| | | ☐ CPK ☐ LDH | |
| | | ☒ ABG CX | 1 |
| | | ☐ URINE HCG | |
| | | ☐ AMYLASE | |
| | | ☐ ETOH LEVEL | |
| | | ☐ DIG LEVEL | |
| | | ☐ THEO LEVEL | |
| | | ☐ DILANTIN LEVEL | |
| | | CULTURES ☐ URINE ☐ BLOOD ☐ GC/CHLAMYDIA | |
| | | ☐ PT/PTT | |
| | | ☐ P-CXR | |
| | | ☐ CXR | |
| | | ☐ P-C SPINE | |
| | | ☐ FULL C SPINE | |
| | | ☐ EKG | |
| 7⁵⁰ | W | Acetone levels | 1 |
| 7⁴⁵ | PC | D50 2 amps | |
| 75⁴⁵ | LC | FHT - 160/min | |
| 7⁵⁰ | LC | Accucheck - 29 | |
| 8⁰⁰ | LC | repeat Accucheck | |
| 7⁴⁹ | LC | NG LYTE L 224 | |

RESPONSE TO TREATMENT

ED ATTENDING MD

CPK 460 Nov 29 91
12 84
137 109 28
40 24
Acetone - Neg

| ☐ GYNE ☐ ORTHO ☐ SURG ☐ OTHER |
|---|
| TIME CALLED |
| TIME RESPONDED |

PROVISIONAL DIAGNOSIS: Hypoglycemic Reaction

EMERGENCY PHYSICIAN ___ PRINT NAME R. Hussain

ER 005

---

DATE: 2/28/91

CONDITION ON ARRIVAL: ☒ EMERGENT ☐ URGENT ☐ NON URGENT

VITAL SIGNS
TEMP 96² B/P 114/70
PULSE 92 RESP 20

FARRELL, LESLIE 674-75
9800954 M/R: 4051088
F 25Y 01/25/1966
RAZIUDDIN, AHMED
708-674-9088

CHIEF COMPLAINT: Unresponsiveness. Diabetic. 20 wks pregnant.

LMP - 10/14/91
DATE LAST T.T. NA

ALLERGIES - Keflex

MEDICATIONS: Insulin H 60/kg ___ Al: Keflex

HISTORY & PHYSICAL EXAMINATION

25 y/o WF 20 wks pregnant G₁ P₀ was found confused by her husband at home. Upon arrival by CFD arrived c stable V.S. Accu 29 - responded excellent to D50 ...

PMH: PROM on Reg... NC...
Meds: as above
ABDN: ...
Neck: Supple
Chest: clear to A&B
Cor:
Abd:

Ext: - CCE
Neuro: Intact

M.D. SIGNATURE ___

---

CONDITION ON DISCHARGE
☐ UNCHANGED ☐ IMPROVED ☐ STABLE
☐ INSTRUCTIONS SHEETS GIVEN #

ATTACHMENTS
☐ PROGRESS SHEETS ☐ CONSUL-TATIONS ☐ NURSING ASSESSMENT RECORDS

PHYSICIAN NOTIFIED ___ TIME
☐ ATTENDING DR. Syed Khan
PRINT NAME BK Raziuddin

LOUIS A. WEISS
MEMORIAL HOSPITAL

**NURSING ASSESSMENT RECORD**

4646 North    Chicago, IL
Marine Drive    60640

DATE: 2/28/91    TIME: 740 P

**SERIAL VITAL SIGNS**

Time: P    T ___ B/P 1P    P 88    R 20
Time: ___ T ___ B/P ___ P ___ R ___
Time: ___ T ___ B/P ___ P ___ R ___
Time: ___ T ___ B/P ___ P ___ R ___

**LUNG SOUNDS**

☑ CLEAR    R ___ L ___    ☐ RHONCHI    R ___ L ___
☐ ABSENT    R ___ L ___    ☐ DIMINISHED    R ___ L ___
☐ WHEEZES    R ___ L ___    ☐ CRACKLES    R ___ L ___

RHYTHM ☑ REGULAR ☐ IRREGULAR

**BOWEL SOUNDS**

PRESENT ☐ Y ☐ N

**ALLERGIES:**

WT/KG:

☐ VALUABLES: ☐ WATCH ☐ RINGS
☐ WALLET/PURSE ☐ OTHER ___
DESCRIPTION:

| SKIN COLOR | SKIN MOISTURE | SKIN TEMP. |
|---|---|---|
| ☐ PINK | ☐ DRY | ☐ HOT |
| ☐ CYANOTIC | ☑ MOIST | ☑ WARM |
| ☑ PALE | ☐ DIAPHORETIC | ☐ COOL |
| ☐ ASHEN | **SKIN TURGOR** | ☐ COLD |
| ☐ FLUSHED | ☐ POOR | |
| ☐ RASH | ☐ FAIR | |
| ☐ ICTERIC | ☑ GOOD | |

OFARRELL, LESLIE
9800954    M/R# 4051288
F        25Y    01/25/1966
RAZIUDDIN, AHMED

**MENTAL STATUS**

☐ CONSCIOUS    ☐ ALERT
☐ LOSS OF CONSCIOUSNESS ___ SEC/MIN
☐ ORIENTED ___
☑ DISORIENTED    ☐ UNCOOPERATIVE
☐ RESTLESS    ☑ CRYING
☐ COMBATIVE    ☐
☐ CALM    ☐ POSTICTAL
☐ STUPOR    ☐ SPEECH ___

**INITIAL HISTORY & ASSESSMENT**

Brought in. carried per husband, responding to stimulus, states pt. was unresponsive @ home. Denies n vomiting. Pt. is 20 wks pregnant. Denies any v-discharge. PERLA. Moving all A.

**SUBSEQUENT TREATMENT PER M.D. ORDER**

☐ F/C SIZE ___
☐ SUCTIONING X
☐ PELVIC EXAM
☑ O₂ L/M 5 L/nc
☐ NGT SIZE ___ /☐ WALL SUCTION
☑ PROCEDURES (TREATMENTS EXPLAINED)
☐ IVAC CONTROLLER/PUMP

☐ INTUBATION SIZE ET ___
☑ MONITOR-RHYTHM SR
☑ IV N/S site LA GUAGE 20
☑ SIDE RAILS UP
☐ RESTRAINTS ☐ WRIST ☐ ANKLES
(SEE CHECKLIST FOR LEATHERS)
☑ OTHER Fetal Doppler

☐ WOUND IRRIGATION (0.9% NaCl)
☐ DRESSINGS/OINTMENT
☐ ICE PACK    TIME ___
☐ SPLINT    TYPE ___
☐ ACE WRAP
☐ CRUTCHES/WALKER
☐ VENI PUNCTURE
☐ RELATIVES/FRIENDS

**PROGRESS NOTES / RESPONSE TO TREATMENT**

740 Pt. A/A/O x3 right p̄ I vial D₅₀
820 Voided in BR. Ambulatory s̄ incident
90 Feels a lot better

**DISPOSITION:**

TIME CALLED ___    ☐ ADMISSION: ROOM # ___    ☐ TIME BED RECEIVED ___
TIME ___    ☑ HOME: via ☐ WHEELCHAIR ☑ AMBULATORY ☐ CARRIED
TIME ___    ☐ TRANSFER: WHERE ___

REPORT CALLED TO: ___

L. Cruzat RN
RN - PRINT NAME(S)

RN — SIGNATURE(S)

ER 004

**PHYSICIAN EMERGENCY SERVICES**

THIS FORM IS FOR BILLING PURPOSES ONLY AND MUST COINCIDE WITH DOCUMENTATION IN MEDICAL RECORDS

The following codes must be used when billing for all emergency room services. Hospitals are to use these codes in Box 23, Acc./Inj... of the DPA 1438, Outpatient/Clinic Invoice. Physicians are to use these same codes when billing on the DPA 2360, Health Insurance Claim Form, in Box 10 B, Other.

PT. NAME: OFARRELL, LESLIE
MR# 9800954 M/R: 4051288
DOB F 25Y 01/25/1966
RAZIUDDIN, AHMED

- ☐ A. obstetrical crises and/or labor;
- ☐ B. acute trauma;
- ☐ C. reparative or reconstructive surgical procedures which were necessitated by antecedent trauma;
- ☐ D. hemorrhage or treat of hemorrhage;
- ☐ E. serious infection;
- ☐ F. severe pain;
- ☐ G. shock or impending shock;
- ☐ H./I. decompensated vital functions or threat to vital functions such as sensorium, respiration, circulation, excretion and sensory organs;
- ☐ J. congenital defects or abnormalities in a newborn infant, best managed by prompt intervention;
- ☐ K. any condition the management of which requires prompt diagnosis procedures necessarily performed on an emergency basis;
- ☐ L. any other condition which causes severe pain or might result in disability or death if it is not promptly diagnosed or treated.
- ☐ M. Child/adult abuse;
- ☐ N. sexual assault;
- ☐ P. not an emergency.

33504

BILLING INSTRUCTIONS
☐ PROFESSIONAL COURTESY ☐ 100% DISCOUNT ☐ DISCOUNT ☐ % OTHER

PLEASE INDICATE THE DIAGNOSIS ON THE REVERSE SIDE AFTER COMPLETING THE CPT CODES.
Please indicate if patient was admitted to hospital ☐ Yes ☑ No

PHYSICIAN NO. | SIGNATURE OF ATTENDING PHYSICIAN | DATE 2/28/91 | DIAGNOSIS / ICD-9 CODE

## PROCEDURES

| CPT | DESCRIPTION | CPT | DESCRIPTION | CPT | DESCRIPTION | CPT | DESCRIPTION |
|---|---|---|---|---|---|---|---|
| | **VISITS** | | **Integument (Cont.)** | | **Cardiovascular (Cont.)** | | **Eye/Ear (Cont.)** |
| 90505 | Brief Service | 10100 | Drain Paronychia | 33010 | Pericardiocentesis | 69210 | Rmv Impact Cerumen |
| 90500 | Minimal Service | 11740 | Evac. Subungal Hem. | 36430 | Transfusion, of blood or comp. | | **Suturing Simple** |
| 90510 | Limited Service | 11730 | Excise/Avul Nail | | **Respiratory** | | **Trunk/Ext/Scalp** |
| 90515 | Intermediate Service | 10121 | F B Removal Complex w/Fluoro | 36600 | Arterial Puncture | 12001 | Up to 2.5 cm |
| 90517 | Extended Service | 10120 | F B Removal Simple | 31605 | Circothyrotomy | 12002 | 2.6-7.5 cm |
| 90520 | Comprehensive Service | 10061 | I & D Abcess/Cx | 31500 | E T Intubation | 12004 | 7.6-12.5 cm |
| 99162 | Crit Care Each 30 Min. | 10060 | I & D Abcess/S | 31515 | Laryngoscopy Direct | 12005 | 12.6-20 cm |
| 99150 | Detention Time 30-60 Min. | 56420 | I & D Bartholin Cyst | 31505 | Laryngoscopy Indrt | | **Face/Ear/Eye/M M** |
| 90530 | NonEmer Revisit Min | 46050 | I & D Perianal | 94160 | Peak Flow | 12011 | Up to 2.5 cm |
| 90540 | NonEmer Revisit Brief | 11042 | Wound Irr. & Debridement | 31720 | Suction | 12013 | 2.6-5.0 cm |
| 90590 | EMS/Adv Life Support | | **Burns Drsg & Debrd % & Dgr** | 32110-52 | Thoracotomy | 12014 | 5.1-7.5 cm |
| | **PROCEDURES** | 16000 | Initial 1st Dgr | 32000 | Thoracentesis | 12015 | 7.6-12.5 cm |
| | **Orthopedic** | 16030 | Large Extensive | 31719 | Trach Reinsertion | 12016 | 12.6-20 cm |
| ☐ Fracture ☐ Dislocation | | 16025 | Med 2nd-3rd Dgr | 32020 | Tube Thoro w/Water Seal | | **Suturing/Intermediate** |
| Body Site ___ | | 16020 | Small 2nd-3rd Dgr | | **GI/GU/OB/GYN** | | **Trunk/Ext/Scalp** |
| ☐ Open ☐ Closed | | | **Lab Tests** | 46600 | Anoscopy Diag | 12031 | Up to 2.5 cm |
| ☐ Manipulation ☐ No Manipulation | | 87210 | Wet Mount | 53670 | Cath Foley Insert | 12032 | 2.6-7.5 cm |
| 21800 | Treatment of Rib Fracture | 81015 | Urinalysis, Microscopic | 51010 | Cath Suprapubic | 12034 | 7.6-12.5 cm |
| | **Splints** | 87205 | Gram Stain | 43760 | Gastrostomy Tube Change | 12035 | 12.6-20 cm |
| 29130 | Finger | | **Cardiovascular** | 56420 | I & D Bartholin | | **Neck/Hand/Foot/Genital** |
| 29105 | Long Arm | 36620 | Arterial Line Insertion | 99175 | Ipecac Admin | 12041 | Up to 2.5 cm |
| 29505 | Long Leg | 94700 | Blood Gas Analysis | 62270 | Lumbar Puncture | 12042 | 2.6-7.5 cm |
| 29125 | Short Arm | 92960 | Cardiovert/Defib | 99170 | Nasogas Intub/Lavage | 12044 | 7.6-12.5 cm |
| 29515 | Short Leg | 36489 | Central Venous Cath | 59800 | Spontaneous Abortion | 26418 | Repair Ext. Finger |
| 29799-52 | Spinal Immobilization | 92950 | C P R | 59410 | Vag Delivery in E D | | **Face/Ear/Eye/Nose/Lip** |
| | **Arthrocentesis** | 36625 | Cutdown Arterial | | **Eye/Ear** | 12501 | Up to 2.5 cm |
| 20600 | S Joint (eg. finger, toe) | 36425 | Cutdown Venous 1 yr | 69200 | Ear F B Removal | 12052 | 2.6-5 cm |
| 20605 | I Joint (eg. elbow, wrist) | 36420 | Cutdown Venous 1 yr | 30903 | Epistax Ant Pack | 12053 | 5.1-7.5 |
| 20610 | M Joint (eg. knee, shoulder) | 93950 | Doppler Study Venous | 30904 | Bilateral | 12054 | 7.6-12.5 cm |
| | **Integument** | 93014 | Tele/R Strip Interp. | 30901 | Epistax Cautery | 12055 | 12.6-20 cm |
| 10160 | Aspiration Abcess | 36680 | Intra-Osseous Needle | 30902 | Bilateral | 64450 | Nerve Block |
| 11043 | Complex Wound Irrigation | 36410 | IV > 3 yr difficult | 30905 | Epistax Post Pac | | |
| 11041 | Debridement Full Thickness | 36406 | IV < 3 yr difficult | 65205 | F B Removal Conjuc | | |
| 11040 | Debridement Partial Thickness | 22999 | Mast Suit Placement | 65220 | F B Removal Cornea | | |
| 26010 | Drain Finger Abcess | 33210 | Pacemaker Temp IV Insert | 92230 | Flourescein Stain | | |

16-81

Chicago, Illinois 60640 Phone No. 878-8700

HE DEPARTMENT OF PATHOLOGY AND LABORATORY MEDICINE, KATHERINE SIMONSON, ASST. ADM., VIJAYA MORANKAR, M. CTING DIR., KISHEN MANGLANI, M.D.

| PATIENT NAME | AGE | SEX | DATE OF BIRTH | REFERRING PHYSICIAN |
|---|---|---|---|---|
| OFARRELL, LESLIE | 25Y | F | 01/25/1966 | RAZIUDDIN, AHMED |
| Nrs Stn: ER    Room: | | | | |

EMERGENCY ROOM　　　　300053
Attn: Dr. Malik
Weiss Memorial Hospital
CHICAGO, IL　60640

| MEDICAL RECORD NUMBER | ACCESSION NO. | HMO ID |
|---|---|---|
| 4051288 | 01810851 | |

| BILLING NO | COLLECTION DATE | TIME | REPORT DATE | TIME |
|---|---|---|---|---|
| 9800954 | 02/28/91 | 08:15PM | 02/28/91 | 11:45PM |

| Test | | Result | | Reference Range | Units |
|---|---|---|---|---|---|
| **CBC - Count Only** | | | | | |
| WBC | HI | 12.3 | | 4.5-11.0 | mL |
| RBC | | 3.81 | | 3.50-5.50 | mL |
| HGB | LO | 11.6 | | 12.0-15.0 | Gm/dl |
| HCT | LO | 34.8 | | 36.0-48.0 | % |
| Mean Corpuscular Volume | | 91.4 | | 78.0-98.0 | femtolit |
| Mean Corpuscular Hemoglobin | | 30.4 | | 25.4-34.6 | pg |
| Mean Corpuscular Hgb Content | | 33.3 | | 30.0-37.0 | % |
| Red Cell Distribution Width | | 12.9 | | 8.0-14.5 | % |
| Platelet Count | HI | 460 | | 130-400 | mL |
| MPV | | 8.6 | | 7.4-10.4 | |
| Lymphs percent | | 17.6 | | 15-41 | |
| Mono percent | HI | 8.9 | | 0-4 | |
| Granulocytes percent | HI | 73.5 | | 40-60 | |
| Total Lymphs | | 2.2 | | 1.0-3.0 | |
| Total Monos | | 1.1 | | | |
| Total Granulocytes | | 9.0 | | | |
| Total Eosinophil | | <.7 | | | /cu mm |
| Total Basophil | | <.2 | | | /cu mm |
| | | | | | |
| **CBC - Diff (Manual)** | | | | | |
| | | | | | |
| Manual diff not indicated based on lab criteria | | | | | |
| Refer to 5-Cell Diff | | | | | |
| SENT 20:24 HRS. | | | | | |
| | | | | | |
| **Electrolytes, ser** | | | | | |
| Sodium | | 137 | | 136-146 | meq/L |
| Potassium | | 4.0 | | 3.5-5.3 | meq/L |
| Chloride | HI | 109 | | 99-106 | meq/L |
| CO2 | LO | 24 | | 25-32 | meq/L |
| | | | | | |
| Glucose, serum | LO | 28 | | 70-105 | mg/dl |
| Test repeated and results confirmed | | | | | |
| 　　Normal range is for FASTING specimens only. Interpret results with | | | | | |
| 　　caution. | | | | | |
| | | | | | |
| Acetone | | Negative, undiluted | | | |

FINAL Report　　　　　　　(Copy)　　　　　　　　　　Page　1 of　1

[ ] PRELIMINARY RESULTS

16-83

```
UPANNEL
   9800954   M/R: 405 288
F      25Y   01/25  66
RAZIUDDIN, AHMED
```

## AUTHORIZATION FOR EMERGENCY/OUTPATIENT TREATMENT

I give consent to Louis A. Weiss Memorial Hospital, its nurses, residents, members of its Medical Staff and other Hospital personnel, to treat and care for me as an emergency/outpatient and to undertake any medical procedure they consider necessary on my behalf.

I acknowledge that the medical care provided to me will be limited solely to emergency/outpatient treatment, and I agree to comply with any and all recommendations made to me for follow-up medical and nursing care after my emergency/outpatient treatment is completed. I release Louis A. Weiss Memorial Hospital, any and all of its agents and any physicians involved in my care of all responsibility for any injury or damages I may suffer due to my neglect or delay in carrying out these instructions for follow-up care.

I hereby authorize the release of information necessary to secure payment from insurance companies or third party payors for the charges and claims for my emergency/outpatient treatment.

I certify that I have read and fully understand the above authorization which contains a release of information.

Signature: Patient/Authorized Person                Witness

Relationship, if applicable                          Witness (Print name)

Date: _____ Time: _____    Date: 2-28-9  Time: _____

### Consent to Hospital Care and Medical Inpatient Treatment

I _____ voluntarily consent to hospital care at Louis A. Weiss Memorial Hospital including treatments, and procedures which my physician, his/her assistants (e.g., residents, associates) or designees (e.g., nurses, consultants) are considered necessary or advisable for diagnosis or treatment.

The practice of medicine and surgery is not an exact science. I acknowledge that no guarantee has been made to me as to the result of any treatment or examination in Weiss Hospital.

I authorize Weiss Hospital and any appropriate physicians (i.e. surgeon, anesthesiologist, etc.) to complete the insurance forms which I or others may submit in connection with my hospitalization.

I agree to be responsible for all charges billed for hospital services rendered during my hospitalization that are not covered by insurance.

This form has been explained to me and I understand its contents.

Patient is a minor _____ years of age.

Patient is unable to sign: (reason) _____

Signature: Patient/Authorized person                Witness

Relationship, if applicable                          Witness, (Print Name)

Date: _____ Time: _____    Date: _____ Time _____

### Disclaimer of Responsibility of Hospital

I understand that the hospital cannot be responsible for any items brought into the hospital unless checked into the Hospital Business Office. The hospital has recommended that I send home all items of value or have them checked in the Business Office. Any items that I elect to keep with me, including but not limited to eyeglasses, dentures, hearing aids, jewelry, money and clothing is done at my own risk.

Signature: Patient/Authorized Person                Witness Signature

Date: _____ Time: _____    Date: _____ Time: _____

Rev. 3/90

16-83

# LOUIS A. WEISS MEMORIAL HOSPITAL

## EMERGENCY DEPARTMENT DISCHARGE INSTRUCTIONS

**DISCHARGE INSTRUCTIONS**

1. You have been examined for an emergency condition ONLY. This is not a substitute for complete medical care. Persistent problems or changes in your condition should be reported to your private doctor. For information on the release of your records, call Medical Records (878-8700). Be sure to request X-ray release if appropriate.
   **If you have any questions regarding our follow up care, please call (312) 989-2636 and ask for the Triage Nurse.**

### TREATMENT RENDERED

☑ Exam and Evaluation   M.D. Signature _____   Date _____

☑ Laboratory Test   Print Name _____

☐ EKG   ☐ X-Ray   Provisional Diagnosis _____

### FOLLOW UP CARE

**You should return in _____ days to:**

☐ Board of Health Clinic

☐ Emergency Department _____   Avery Clinic _____
                                            Date

**Please call to schedule an appointment with:**

☐ Your Private Doctor in _____ days.

**Other Information:** _____

☐ Your estimated time off work is _____ days.   ☐ No follow-up needed.   ☐ Other _____

### AFTER CARE INSTRUCTIONS

_____

_____

_____

_____

Please phone the Emergency Department in _____ days for the test results checked below.

NAMES OF TESTS TAKEN (checked below)

☐ Urine C & S

☐ Throat Culture

☐ GC/Chlamydia Culture

☐ VDRL

☐ Other (be specific) _____

I HEREBY ACKNOWLEDGE RECEIPT OF THESE INSTRUCTIONS. THEY HAVE BEEN EXPLAINED TO ME AND I UNDERSTAND THEM. I HAVE ALSO RECEIVED A COPY OF THESE INSTRUCTIONS.

X _____
PATIENT/PARENT/GUARDIAN

_____ Time _____
WITNESS

MEDICAL RECORDS
16-84

STATE OF ILLINOIS )
                  )ss
COUNTY OF COOK    )

### AFFIDAVIT OF JOSEPH WAYDA

I, Joseph Wayda, hereby certify under penalty of perjury and otherwise provided by law that the information and statements below are true and correct to the best of my knowledge, information and belief;

1) I am (55) years of age and reside in the State of Illinois, County of DuPage, at 5N774 Acacia Lane, Medinah.

2) I am subject to rules of admissibility, competent to testify to the matters herein.

3) I am the owner of A.I.P. Trucking, County of Cook, at 9864 LeLand Ave., Shiller Park.

4) Thomas O'Farrell was employed by A.I.P. Trucking from October 1992 up to September 1995.

5) Thomas O'Farrell on numerous occasions would not come into work, because he had to take care of his wife, Lesley, who was very ill.

6) Thomas O'Farrell on numerous occasions was called home by his wife, Lesley, because she was very ill and needed his assistance in caring for her.

7) Thomas O'Farrell was unable to put his wife, Lesley on the company insurance policy, because his wife, Lesley had several severe medical problems that the insurance company

-1-

16-85

would not cover.

Further affiant sayeth nought.

Joseph Wayda

Subscribed and Sworn to before me
on this 2ND day of JUNE , 1999

Notary Public

OFFICIAL SEAL
ANTHONY J ZENOFIO
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 11/30/00

16-86

*EXHIBIT 17*

Larry Heinrich, Ph.D., BCFE
*Licensed & Certified Psychologist   Diplomate, Board Certified Forensic Examiner*

# FORENSIC PSYCHOLOGICAL ASSESSMENT

## IDENTIFYING DATA:

|  |  |
|---|---|
| Name: | Thomas O'Farrell |
| Court Case Number: | 95 CR 30463 |
| Date of Birth: | 8/17/64 |
| Date(s) of Evaluation: | 5/10/96 & 2/14/97 |

## REASON FOR REFERRAL:

Mr. Thomas O'Farrell was referred for a psychological forensic examination by his attorney, APD Joseph Kennelly, relative to issues of fitness and sanity. The attorney informed the examiner that Mr. O'Farrell had made inconsistent statements to the police, some of which finally implicated him in his wife's death. Mr. O'Farrell was subsequently charged with first degree murder. The examiner was also informed that Mr. O'Farrell has a history of previous psychiatric treatment. Following Mr. O'Farrell's trial, the examiner continued the forensic investigation to review the issue of possible mitigation.

## FORENSIC CONCLUSIONS:

1. At the time of the initial interview, Mr. Thomas O'Farrell reported that he was not taking any psychotropic medication. He understood the nature and seriousness of the charges against him; he understood the roles judge, jury, defense counsel and prosecution as well as legal terms such as defense plea, the role of witness and differential sentences; it appeared he was able to cooperate with defense counsel. It is the examiner's opinion that at that time, Mr. O'Farrell was **fit to stand trial.**

2. Mr. Thomas O'Farrell discussed his previous psychiatric treatment and relationship with his wife. He discussed circumstances surrounding the death of his wife as well as his conflicting narratives. In the examiner's opinion, Mr. O'Farrell, although impaired, was **legally sane at the time of the offense.**

3. There is independent documentation that prior to Lesley O'Farrell's death both she and Tom O'Farrell suffered from clinical depression and that they had both been in treatment for that mental / emotional condition. There is corroborative evidence that at the time of Lesley's O'Farrell's death that both she and Tom O'Farrell were experiencing significant stress. Mr. Tom O'Farrell was suffering from **extreme mental and emotional disturbance at the time of the instant offense.**

Re: T. O'Farrell                                    2

## COLLATERAL SOURCES OF INFORMATION:

1. Police investigative reports regarding the death of Lesley Chapman O'Farrell, including the report of postmortem examination and statement to police by Tom O'Farrell..

2. Mr. O'Farrell's medical records from North Shore Medical Center, previous psychological evaluation and treatment through Associated Mental Health services (1992).

3. Therapy progress notes (1/92 through 9/94) and diary notations of Lesley O'Farrell (7/94 - 9/94).

4. Telephone interview with Mr. and Mrs. Tom and Mary O'Farrell (2/15/97).

## BEHAVIORAL OBSERVATIONS AND CLINICAL INTERVIEWS:

Mr. Thomas O'Farrell is a thirty-one year old male who was made aware of the objective and non-confidential nature of the interview and assessment process. Mr. O'Farrell related in a friendly, compliant and cooperative manner. In the first interview, he was oriented in all spheres and his thinking appeared to be logical and coherent. There were no evident breaks in his reality testing. He denied hallucinations and he showed no overt delusions. His affect was generally appropriate to the situation and topics discussed. He became tearful and upset when discussing his son and deceased wife. He talked about his current feelings of depression, his previous psychiatric treatment and the difficult relationship with his wife. He talked about having been in therapy both individually and with his wife because of his depression and family stress because of an unstable marriage and his wife's poor health. He said once early in their marriage, after a disagreement with his wife, he put a gun in his mouth, but she talked him out of killing himself. When asked about his health, Mr. O'Farrell reported that he had several surgeries for bone chips and he learned he had a prolapse valve condition when he was about twenty-one. He also suffered a brain concussion after being jumped by gang members in Division I of Cook County Jail and he spent about six days in hospital. Since that time Mr. O'Farrell has been in a Protective Custody Unit. Mr. O'Farrell admitted that he drank alcohol, but substance or alcohol abuse was not a problem for him at home or work. He discussed his previous contact with the police, but he reported that he does not have a history of any previous criminal convictions.

In the first interview, Mr. O'Farrell was examined on the issues of fitness for trial and sanity at the time of alleged offense. Mr. O'Farrell understood the nature and seriousness of the charge(s) against him, he understood the roles of the judge, jury, prosecution and defense as well as the judicial process and Mr. O'Farrell appeared capable of cooperating with defense counsel. At the time of the initial interview Mr. O'Farrell stated that he was not taking any psychotropic medication. The examiner discussed with Mr. O'Farrell his history of depression and psychological treatment as well the circumstances and details surrounding the death of his wife. The examiner subsequently informed defense counsel that Mr. O'Farrell appeared fit for trial and sane at the time of the alleged offense.

Re: T. O'Farrell                                    3

Mr. O'Farrell stated he was the oldest of three children. However, as a youth he had a friend who was taken in by his family and later adopted. Tom related that when he was in grammar school he received special education services because of a rather severe problem of dyslexia. Tom graduated Sheppared High School and then went to Moraine Valley Community College for advanced training in welding. He held a variety of jobs such as working as welder, store clerk, landscaper, bar tender and in the construction business. He had been employed by a trucking firm for about three years prior to his arrest. Tom's parents currently have care of Tom and Lesley's five year old son, Lee.

Mr. O'Farrell talked about his marriage with Lesley, their counseling, her deteriorating health and Lesley's many discussions about wanting to die and asking him to help her. He described his wife as depressed, suicidal and wanting to die. He said she suffered from several medical problems including diabetes, kidney failure, vision deterioration and possible Bells' palsy, all related to deteriorating general health. He described her as frequently in excruciating pain, irritable and increasingly dependent on others to asset her and care for her. He said she talked about only caring for their son, but towards the end she began to feel she was mentally torturing him (Lee). Tom also said that Lesley felt alienated from Tom rather than supported by him. He reported that he frequently had to take time off work because of Lesley's health problems because she was having more and more trouble looking after their son. He said that she had frequent severe headaches, backaches, fatigue and that she was very depressed by the paralysis that had affected half of her face. He said she almost daily would ask him to help her die. He described three incidents in which in called 911 or family or friends to assist with Lee because she was so distraught that she was on the verge of suicide. On one occasion he seized a razor away from her when she threatened to cut herself and she ran out of the house with her insulin needles. He feared she would harm herself and he called for assistance because he could not leave their son alone. On two other occasions she threatened and came close to mis-using her medications. Tom said others were aware of Lesley's depression, but they infrequently saw her as desperate and despondent as he did on a daily basis.

Mr. O'Farrell described Lesley's increasing depression and sense of desperation for at least two weeks prior to her death. He said although she talked about different ways she could hasten her death, he rejected such plans because he did not want her to die. Although previously Lesley had been motivated to put aside suicidal ideation by focusing on their son, prior to her death she had begun to feel that her life was not worth living and that she was frightening her son with her partially paralyzed face. Tom reported that he also was feeling depressed and frustrated, but he had not planned to accommodate Lesley's wishes to die. Afterwards, he felt guilty, ashamed and confused. He did not immediately admit to the incident but instead fabricated the story of an intruder because he knew he could not explain his actions to his son and other family members.

Re: T. O'Farrell                                     4

## TEST(S) ADMINISTERED AND INTERPRETATIONS:

As part of the assessment process, Thomas O'Farrell was given the following psychological tests: **Peabody Picture Vocabulary Test; Draw-a-Person-in-the-Rain Test; Rorschach Inkblot Test; Thematic Apperception Test; Millon Clinical Multiaxial Inventory - III (MCMI-III)**.

Mr. O'Farrell scored within the bright average of intelligence on the **Peabody** test. He reported that although he continues to be a somewhat slow reader, there does not appear to be any significant impairment in his ability to read or comprehend (as was demonstrated on the **Millon** test). On the projective tests (**D-A-P, Rorschach, TAT**), Mr. O'Farrell demonstrated a conventional approach to (perception of) and response to reality. His thought processes and imagination did not reveal any bizarre or idiosyncratic type content or deviation. On the **Thematic Apperception Test**, a task where he was asked to develop themes around central figures in a picture, he over personalized and became emotionally overwhelmed so that it interfered with effective productivity. His response style as well as his capacity for identifying social needs and conflict resolution in interpersonal relationship suggested capacity for empathy and affective engagement. There was evidence of underlying of depression, guilt and remorse. The **Millon** test was scored with the assistance of a copyrighted program of National Computer Systems. His response style on this test reflected feelings of extreme vulnerability associated with a current episode of acute turmoil. Currently he feels personally inadequate and a strong sense of guilt predominates the clinical picture of a major depression. On this test (interpreted independently through an empirically based normative population) Mr. O'Farrell's complaints and behaviors parallel the following Axis I diagnoses: 296.23 Major Depression (recurrent, severe, without psychotic features); 300.02 generalized anxiety disorder; 309.81 posttraumatic stress disorder. The Axis II diagnosis suggested on this test correspond to the personality configuration of 301.90, that is, a depressive personality disorder with borderline personality features and dependent personality traits.

## INDEPENDENT SOURCES OF INFORMATION:

The treatment records of Mr. Thomas O'Farrell indicate that the problem areas (target symptoms) which were being addressed in therapy with Tom were identified as anger, depression, flashbacks and marital stress. Mr. O'Farrell was in therapy with Dr. Keith Robbins, Ph.D. from March through September, 1992 and Tom attended more than twenty sessions. Throughout his therapy it appeared Tom showed periods of improvement as well as exacerbation of symptoms. Tom had reported to the therapist the time he put a gun to his head (3/17/92). In October, 1992, Tom was given a psychological assessment to provide additional information for treatment purposes. At that time Mr. O'Farrell indicated he was interested in cooperating with the assessment because he "wanted to do whatever was needed to improve his marriage". It was reported Tom had difficulty achieving psychological insight and that he showed a passive-aggressive adjustment style.

Re: T. O'Farrell                                     5

The treatment records of Mrs. Lesley O'Farrell indicate that the problem areas (target symptoms) which were being addressed in therapy with Lesley were identified as depression, stress, sleep disturbance, anxiety, marital problems and sexual dysfunction. Progress notes indicate that although there had been improvement in her symptoms early in therapy, there was a worsening of all problems or symptoms between July and September, 1994. Treatment notes indicate that from the beginning of therapy Lesley talked about problems within her family of origin (including the deaths of the individuals whom she thought were her parents as well as back taxes owed to IRS) and marital stress between herself and Tom. She talked about her health problems in therapy including eye problems, diabetes, kidney problems her displeasure with the fact that she needed to take multiple medications. She expressed self doubt, conflict with her biological mother and stress in caring for her son. She acknowledged low self-esteem, unresolved issues related to be raped as a child and reactions to having the truth about her parents being hidden from her. She reported feeling helpless, angry and "pushed away", yet she also stated to the therapist that her husband helps her when she is ill (4/9/92).

Mrs. Lesley O'Farrell's personal diary notes give an unequivocal description of herself as a woman who was angry, depressed, cynical and feeling hopeless and helpless in her situation. She wrote that she feels "useless as a woman". She blamed herself for inability to have more children and she wrote that she regrets the choices she made. She wrote that she was angry with God and felt abandoned. In addition, she resented her "fucking health problems" (7/29/94). In a later entry she wrote that she feels cheated by everyone in one way or another while she has sacrificed "everything for everyone". She wrote that she felt blamed for everything and she was tired of fighting for her life. She wrote, "he (Tom) doesn't want to lose me". She described her life as "A: my marriage is in a shambles  B: my health is for shit  C: everyone I know "guilts" me"  D: I have no money whatsoever and God only knows what else." (9/12/94).

The telephone interview with Mr. and Mrs. O'Farrell confirmed Tom's self-reported history of special education and dyslexia. They also volunteered that they had witnessed Lesley's suicidal threats and at least one attempt. The parents also reported that Tom had suffered a head injury at birth as a result of the use of birthing forceps as opposed to a Caesarian operation.

Re: T. O'Farrell                                    6

## SUMMARY AND CONCLUSIONS RELATIVE TO FORENSIC OPINIONS:

Mr. Thomas O'Farrell is a thirty-two year old male who has been found guilty in the shooting death of his wife. Although Mr. O'Farrell initially denied being the perpetrator of the crime, he later confessed to the crime stating that he was following the wishes and requests of his wife who had multiple health problems and who herself had been in therapy for depression. There are indications in her diary that Lesley was experiencing a sense of desperation as well as hopelessness and helplessness. Mr. Tom O'Farrell had been in therapy for depression and situational stress and it appears he was both depressed and significantly stressed at the time of the instant offense.

DSM IV   Axis I:    296.33 Major Depressive Disorder, recurrent
         Axis II:   301.60 Dependent Personality Disorder with Borderline features
         Axis III:  Deferred
         Axis IV:   Problems related to interaction with legal system
         Axis V:    Global Assessment of Functioning 40-60


Examined by,

Larry Heinrich, Ph.D. BCFE
Licensed Clinical Psychologist
Board Certified Forensic Examiner (in Psychology)

2/18/97

For Exhibit 18 see Appendix A, Exhibit 18
In support of Habeas Corpus petition

16-93